1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3              SAN JOSE DIVISION

4

5  CORE WIRELESS LICENSING        )  C-15-05008 NC
   S.A.R.L.,                      )
                                  )  SAN JOSE, CALIFORNIA
6              PLAINTIFF,         )
                                  )  DECEMBER 5, 2016
7        VS.                      )
                                  )  VOLUME 1
8  APPLE INC.,                    )
                                  )  PAGES 1-185
9              DEFENDANT.         )
   _____  )

10

11           TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE NATHANAEL COUSINS
12         UNITED STATES MAGISTRATE JUDGE

13  A P P E A R A N C E S:

14  FOR THE PLAINTIFF:    RUSS, AUGUST & KABAT
                          BY:  MARC A. FENSTER
15                             REZA MIRZAIE
                               ADAM S. HOFFMAN
16                             NEIL A. RUBIN
                               JAMES N. PICKENS
17                             BENJAMIN T. WANG
                          12424 WILSHIRE BOULEVARD, 12TH FLOOR
18                        LOS ANGELES, CALIFORNIA  90025

19  ALSO PRESENT:         JON LINDGREN
                          NIKEISHA WILSON
20                        JASON WIETHOLTER

21            APPEARANCES CONTINUED ON NEXT PAGE

22

23  OFFICIAL COURT REPORTER:    LEE-ANNE SHORTRIDGE, CSR, CRR
                                CERTIFICATE NUMBER 9595
24
        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25          TRANSCRIPT PRODUCED WITH COMPUTER

1

2      APPEARANCES (CONTINUED)

3

4      FOR THE DEFENDANT:        WILMER CUTLER PICKERING
                                 HALE AND DORR
5                                BY:  MARK D. SELWYN
                                 950 PAGE MILL ROAD
6                                PALO ALTO, CALIFORNIA  94304

7                                BY:   JOSEPH J. MUELLER
                                      CYNTHIA D. VREELAND
8                                60 STATE STREET
                                 BOSTON, MASSACHUSETTS  02109
9

10     ALSO PRESENT:             FRANK CASANOVA
                                 MATTHEW NOLTE
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                          INDEX OF PROCEEDINGS

3

4      OPENING STATEMENT BY MR. FENSTER          P. 126

5      OPENING STATEMENT BY MR. MUELLER          P. 148

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1     SAN JOSE, CALIFORNIA                    DECEMBER 5, 2016

 2                    P R O C E E D I N G S

 3       (COURT CONVENED AT 9:12 A.M.)

 4            THE COURT:  GOOD MORNING AND WELCOME TO TRIAL.

 5       WE HAVE A FULL COURTROOM ALREADY AND THERE'S NOT EVEN ANY

 6   JURORS HERE.

 7       (LAUGHTER.)

 8            THE COURT:  ALL RIGHT.  EVERYONE BE SEATED.

 9            THE CLERK:  CALLING CIVIL 15-5008, CORE WIRELESS

10   LICENSING S.A.R.L. VERSUS APPLE INCORPORATED.

11       COUNSEL, PLEASE STATE YOUR APPEARANCES FOR THE RECORD.

12            MR. FENSTER:  GOOD MORNING, YOUR HONOR.  MARC FENSTER

13   WITH RUSS, AUGUST & KABAT CABIN ON BEHALF OF THE PLAINTIFF

14   CORE WIRELESS.

15       WITH ME, STARTING TO MY LEFT, IS REZA MIRZAIE.

16            THE COURT:  GOOD MORNING.

17            MR. MIRZAIE:  GOOD MORNING.

18            MR. FENSTER:  TO MY RIGHT IS BEN WANG.

19            MR. WANG:  GOOD MORNING, YOUR HONOR.

20            THE COURT:  GOOD MORNING.

21            MR. FENSTER:  TO HIS RIGHT IS ADAM HOFFMAN.

22            THE COURT:  GOOD MORNING.

23            MR. FENSTER:  AT THE FRONT OF THE TABLE IS

24   JON LINDGREN, OUR CORPORATE REPRESENTATIVE.

25            MR. LINDGREN:  GOOD MORNING, YOUR HONOR.
```

```
 1              THE COURT:  GOOD MORNING.

 2              MR. FENSTER:  YOUR HONOR, WE HAVE MR. JAMES PICKENS

 3         BACK HERE, AND NEIL RUBIN AS WELL.

 4              THE COURT:  GOOD MORNING ALL.

 5              MR. FENSTER:  THANK YOU, YOUR HONOR.

 6              MR. MUELLER:  GOOD MORNING, YOUR HONOR.  JOE MUELLER

 7         ON BEHALF OF APPLE.

 8           WITH ME IS MY PARTNER CINDY VREELAND, MY OTHER PARTNER,

 9         MARK SELWYN.

10           AND FROM APPLE IS FRANK CASANOVA, WHO WILL BE OUR

11         CORPORATE REPRESENTATIVE.

12              THE COURT:  GOOD MORNING.  WELCOME ALL.

13              MR. CASANOVA:  THANK YOU.

14              THE COURT:  ALL RIGHT.  WE HAVE JURORS WHO HAVE

15         ASSEMBLED DOWNSTAIRS.  THAT'S OUR PRINCIPAL MATTER OF BUSINESS

16         THIS MORNING, BUT WE HAVE SOME OTHER LOGISTICS TO TALK ABOUT

17         BEFORE THEY GET HERE.

18           LET ME ASK MY DEPUTY WHAT OUR COUNT IS.

19              THE CLERK:  44, YOUR HONOR.

20              THE COURT:  44.  SO WE'RE GOING TO HAVE TO SQUEEZE 44

21         PEOPLE INTO THIS COURTROOM, AND WE HAVE A LITTLE MORE THAN 20

22         SEATS ASSEMBLED ON OUR LEFT.  WE'RE GOING TO HAVE TO SQUEEZE

23         ABOUT 24 MORE INTO THE REMAINING SEATS OUT THERE, SO SHORTLY

24         THOSE IN THE COURTROOM ARE GOING TO NEED TO SQUEEZE TOGETHER

25         AND MAKE SPACE FOR THE ENTERING JURORS IN A WAY THAT THEY CAN
```

1    SEE AND HEAR THE PROCEEDINGS.

2        WE HAVE QUESTIONNAIRES COMPLETED BY THE JURORS.  WE NEED

3    TO GET THEM COPIED IN SUFFICIENT NUMBERS FOR THE PARTIES AND

4    COUNSEL TO REVIEW THEM IN AN EXPEDITED FASHION, AND FOR THE

5    COURT TO REVIEW THEM ALSO.

6        THERE'S BEEN SOME CONFUSION ABOUT THAT, SO LET'S HAVE SOME

7    CLARITY ON THAT ISSUE.

8        I WOULD LIKE YOU TO COPY THEM IN SUFFICIENT NUMBER SO THAT

9    YOU CAN REVIEW THEM AND SO THAT THE COURT HAS TWO COPIES TO

10   REVIEW AS WELL.  I WISH YOU TO DO THAT NOW SO THAT WE CAN TALK

11   ABOUT OTHER BUSINESS WHILE THE COPYING IS BEING DONE.

12       ONCE YOU HAVE THE COMPLETED QUESTIONNAIRES BACK HERE IN

13   THE COURTROOM, I'LL GIVE YOU SOME TIME TO REVIEW THEM WITH

14   EACH.  I WILL ALSO BE REVIEWING THEM.

15       AND THEN, ONCE WE'VE HAD A COMPLETION OF THAT PROJECT,

16   WE'LL BRING THE JURORS IN TO BEGIN THE VOIR DIRE PROCESS, WITH

17   A REMINDER THAT DURING THAT PHASE, I WILL DO SOME VOIR DIRE

18   MYSELF.  I WILL REQUIRE EACH OF THE POTENTIAL JURORS TO STAND

19   UP AND SPEAK FOR AT LEAST A FEW MOMENTS TO ANSWER SOME

20   QUESTIONS ABOUT THE QUESTIONNAIRES FROM ME, AND I'LL GIVE EACH

21   PARTY AN OPPORTUNITY THEN TO HAVE ABOUT 20 MINUTES EACH OF VOIR

22   DIRE OF THE JURORS IN THE BOX.

23       WE'LL START WITH -- THE FIRST THREE ROWS HERE WILL BE THE

24   ONES SORT OF IN THE BOX, AND IF THAT'S NOT A SUFFICIENT NUMBER

25   OF JURORS, THEN WE'LL GO AND CALL THE NEXT SET TO FILL IN FOR

```
1     ANY JURORS WHO ARE STRICKEN.

2          I WILL BE REVIEWING FOR CAUSE THE QUESTIONNAIRES BEFORE

3     WE, BEFORE WE ASK ANY QUESTIONS, SO IN MY REVIEW AND IN YOUR

4     REVIEW, IF I IDENTIFY ANY JURORS WHO SHOULD NOT EVEN STEP INTO

5     THE BOX, I'M GOING TO POTENTIALLY GET RID OF THEM BEFORE THEY

6     EVEN SIT DOWN.

7          BUT THERE MAY NOT BE ANY THAT QUALIFY IN THAT SITUATION,

8     BUT I'M GOING TO BE CHECKING FOR THAT.  YOU CAN BE CHECKING FOR

9     IT AS WELL.

10         BUT WE WILL TAKE UP THE FOR CAUSE CHALLENGES BEFORE THE

11    PEREMPTORY CHALLENGES AT THE END OF THE PROCESS.

12         ANY QUESTIONS ABOUT THE QUESTIONNAIRES AND THAT PHASE?

13              MR. FENSTER:  YOUR HONOR, ARE THE QUESTIONNAIRES

14    RANDOMIZED AT THIS POINT, OR WILL THEY BE IN THE ORDER THAT

15    THEY'LL BE CALLED 1 THROUGH 44?

16              THE CLERK:  THEY ARE IN ALPHABETICAL ORDER, YOUR

17    HONOR.

18              THE COURT:  THEY'RE IN ALPHABETICAL ORDER.

19         SO YOU'LL COPY THEM IN ALPHABETICAL ORDER, AND WE WILL

20    THEN RANDOMIZE THEM AND PLACE THEM IN THE BOX, SO YOU WILL NOT

21    KNOW THAT INFORMATION YET.

22              MR. FENSTER:  OKAY.

23              THE COURT:  ALL RIGHT.  THANK YOU -- DIFFERENT TOPIC.

24         THANK YOU FOR SETTING UP THE COURTROOM TECHNOLOGY.  WE ARE

25    WIRED AND I APPRECIATE THE EFFORT OF THE STAFF ON FRIDAY AND
```

1    EARLY THIS MORNING IN GETTING IT ALL SET UP.

2         BETWEEN THE ELECTRONICS HERE AND THE ELECTRONICS IN THE

3    CISCO VS. ARISTA TRIAL UPSTAIRS, THERE'S ONLY A 50/50 CHANCE

4    THAT THE POWER TO THE BUILDING WILL BE SHUT DOWN, AND I KNOW

5    THAT THE WI-FI IS ALREADY EXTREMELY SLOW THIS MORNING.  THAT'S

6    BECAUSE OF YOU ALL AND THE ATTORNEYS UPSTAIRS.  BUT BEAR WITH

7    THAT PROCESS.

8         HAVE ALL THE ATTORNEYS PRESENT BEEN ADMITTED TO THE BAR

9    AND TO THIS COURT?

10              MR. FENSTER:  YES, YOUR HONOR, FOR CORE WIRELESS.

11              MR. MUELLER:  YES, YOUR HONOR.

12              THE COURT:  ALL RIGHT.  OUTSTANDING.

13         SOME SCHEDULING ISSUES FOR TODAY AND GOING FORWARD.  I

14    HAVE A CRIMINAL CALENDAR AT 1:30, SO I WILL BE NOT HAVING JURY

15    SELECTION OR OPENING STATEMENTS AT 1:30.

16         I HOPE THAT WE CAN HAVE THE JURY SELECTED BY THAT TIME AND

17    CAN USE THAT AS A BREAK FOR YOU WHILE I DO OTHER BUSINESS, AND

18    WE CAN RETURN AFTER THAT CALENDAR FOR OPENING INSTRUCTIONS ON

19    THE LAW AND OPENING STATEMENTS.  THAT'S MY HOPE.

20         ARE YOU GOING TO BE READY FOR YOUR OPENING STATEMENTS

21    TODAY?

22              MR. MUELLER:  YES, YOUR HONOR.

23              MR. FENSTER:  YES, YOUR HONOR.

24              THE COURT:  AND THERE'S SOME OBJECTIONS TO OPENING

25    DEMONSTRATIVES.  WE'LL TAKE THAT UP HERE IN A FEW MOMENTS.

```
1            HOW LONG DOES EACH PARTY CONTEMPLATE FOR YOUR OPENING

2      STATEMENTS?

3                  MR. FENSTER:  YOUR HONOR, WE ARE ANTICIPATING ABOUT

4       30 TO 35.

5                  MR. MUELLER:  I WOULD SAY ABOUT 45, YOUR HONOR.

6                  THE COURT:  ALL RIGHT.  THANK YOU.

7            IS THE -- AS PART OF THE COURT'S INSTRUCTIONS, OPENING

8       INSTRUCTIONS, THERE IS THE PATENT VIDEO.

9            IS THAT CUED UP AND READY TO GO WHEN WE GET TO THAT PHASE

10      USING THE TECHNOLOGY IN THE COURTROOM?

11                 MR. MUELLER:  I BELIEVE IT IS, YOUR HONOR.

12                 THE COURT:  OKAY.  THANK YOU.

13           WHO WILL THE FIRST WITNESSES BE IN THE CASE, EXPECTING

14      THAT TO BE TOMORROW?

15                 MR. FENSTER:  YOUR HONOR, CORE WIRELESS'S FIRST

16      WITNESS WILL BE JARKO OKSALA, THE INVENTOR OF THE '151 PATENT;

17      FOLLOWED BY JYRI SUVANEN, HE'S THE INVENTOR OF THE '536 PATENT.

18           THEY WILL BE FOLLOWED BY DR. RICK WESEL, TECHNICAL EXPERT

19      ON BOTH.

20           AND THEN AFTER THAT, TIME PERMITTING, THERE WILL BE DEPO

21      PLAYS.

22                 THE COURT:  ALL RIGHT.  THANK YOU.

23           I DIDN'T PAUSE AT THIS MOMENT, BUT FOR THE QUESTIONNAIRES,

24      IF ANYONE NEEDS TO GO AND GET THEM AND TAKE CARE OF THEM,

25      CERTAINLY DON'T WAIT FOR ME TO GIVE ANY FURTHER INSTRUCTION.
```

1          IS THAT PROCESS UNDERWAY?

2              MR. FENSTER:  IT IS, YOUR HONOR.

3              THE COURT:  ALL RIGHT.  I ASSUMED SO, BUT I DIDN'T

4      WANT TO SKIP PAST THAT.

5          WE HAD SOME DISCUSSION ABOUT THE EQUITABLE PART OF THE

6      CASE AND DR. WALKER.  I KNOW THIS IS SUBJECT TO OTHER TIMING,

7      BUT WHAT'S YOUR CURRENT PROGNOSTICATION AS TO WHEN THAT PHASE

8      OF THE CASE MIGHT COME?

9              MR. MUELLER:  YOUR HONOR, I BELIEVE IF -- AT THIS

10     CURRENT SCHEDULE WE'RE LOOKING AT, THAT WOULD BE ON THURSDAY.

11     THURSDAY OR FRIDAY, ONE OF THOSE TWO DAYS.

12             THE COURT:  ALL RIGHT.  BUT NOT --

13             MR. MUELLER:  I THINK THINGS ARE GOING TO MOVE PRETTY

14     QUICKLY.

15             THE COURT:  BUT NOT IN THE FIRST 48 HOURS

16     CHRONOLOGICALLY IN THE CASE?

17             MR. MUELLER:  THAT'S CORRECT, YOUR HONOR.

18             THE COURT:  ALL RIGHT.  THANK YOU FOR THAT UPDATE.

19         STIPULATIONS OF FACT.  THERE WAS REFERENCE TO STIPULATIONS

20     OF FACT MADE IN THE -- OR THAT WILL BE MADE IN THE PRELIMINARY

21     INSTRUCTIONS, THE CLOSING INSTRUCTIONS, BUT I'M NOT SURE THAT

22     I'VE SEEN STIPULATIONS OF FACT FILED.  SO DID I MISS THEM?

23     HAVE THERE BEEN STIPULATIONS OF FACT SUBMITTED BY THE PARTIES?

24             MR. MUELLER:  I'M NOT SURE THERE ARE ANY.

25             THE COURT:  OKAY.

1              MR. MUELLER:  WE CAN DOUBLE-CHECK.

2              THE COURT:  WE'RE ON BOARD.  ANYONE ELSE IN THE

3     COURTROOM KNOW OF STIPULATIONS OF FACT?  SPEAK NOW OR FOREVER

4     HOLD YOUR PEACE.

5              ALL RIGHT.  THEN IF THERE ARE NO STIPULATIONS OF FACT,

6     THEN I WON'T TELL THE JURY THAT THERE ARE STIPULATIONS OF FACT

7     BECAUSE THEY MIGHT BE CONFUSED, AS I AM, TO HEAR ABOUT

8     SOMETHING THAT DOES NOT EXIST.

9              BUT HOPE STRINGS ETERNAL.  IF THERE SHOULD BE SOME

10    STIPULATIONS OF FACT OVER THE COURSE OF THE TRIAL, WE WILL

11    ALERT THE JURY TO THAT, AND ALSO WE CAN GIVE AN INSTRUCTION AT

12    THAT TIME AS TO WHAT A STIPULATION OF FACT MEANS.

13             I THINK IT'S JUST ONE LINE IN THE PRELIMINARY

14    INSTRUCTIONS, SO I'LL PROBABLY STILL TELL THEM THAT

15    STIPULATIONS ARE ADMISSIBLE -- THEY'RE EVIDENCE THAT MIGHT BE

16    CONSIDERED BY THE JURY, JUST IN CASE THAT DOES COME UP.

17             ALL RIGHT.  YOU HAVE MOVED AROUND THE DOCUMENTS.  I KNOW

18    THAT WE'VE GOTTEN THE BINDERS HERE AGAINST THE WALL.

19             DURING THE TRIAL, WE WILL BE KEEPING A RUNNING TALLY OF

20    THOSE DOCUMENTS MARKED AND ADMITTED INTO EVIDENCE.  AND MY

21    DEPUTY WILL, AT THE END OF EACH TRIAL DAY, ISSUE MINUTES

22    INDICATING THAT.

23             GIVEN THAT THE ATTORNEYS ON EACH SIDE OUTNUMBER US, IT'S

24    YOUR RESPONSIBILITY TO CHECK OUR WORK TO MAKE SURE THAT YOU

25    AGREE WITH WHAT'S BEEN ADMITTED AND WHAT HAS NOT BEEN ADMITTED,

1   AND TO RAISE ANY OBJECTIONS TO THAT RECORD KEEPING PROCESS IN A

2   TIMELY WAY.

3        SO YOU ULTIMATELY ARE IN CHARGE OF MAKING SURE THAT THE

4   JURY ONLY CONSIDERS EXHIBITS THAT ARE IN EVIDENCE AND DOES NOT

5   CONSIDER EXHIBITS THAT ARE NOT IN EVIDENCE.

6        AND AT THE END OF THE TRIAL, BEFORE THE DELIBERATIONS,

7   WE'LL DOUBLE-CHECK AND TRIPLE CHECK THAT TO MAKE SURE THERE ARE

8   NO ERRORS.

9        BUT I ALERT YOU NOW THAT THAT IS YOUR RESPONSIBILITY TO

10  MAKE SURE THAT WE ARE KEEPING GOOD RECORDS AND TO HELP US WORK

11  TOGETHER TO GET A CLEAN RECORD IN THIS CASE.

12        ALL RIGHT.  OVER, I THINK ON FRIDAY OR SATURDAY, WE

13  ISSUED -- ATTACHED TO THE OPENING INSTRUCTIONS -- A GLOSSARY OF

14  TERMS, AS WELL AS THE DERIVED CLAIM CONSTRUCTION TERMS.

15        WE DID NOT, AT THE PRETRIAL CONFERENCE, DISCUSS THOSE AS

16  BEING PART OF WHAT WOULD BE PRESENTED TO THE JURY, SO I WANTED

17  TO GET YOUR INPUT NOW AS TO WHETHER YOU HAVE ANY OBJECTION TO

18  THE CLAIM CONSTRUCTION THAT IS ATTACHED TO THE OPENING

19  INSTRUCTION, OR WHETHER YOU HAVE ANY OBJECTION TO THE GLOSSARY

20  ATTACHED; AND THEN, SECONDLY, TO GET YOUR VIEWS AS TO WHETHER

21  WE SHOULD PRESENT THOSE TO THE JURY FROM THE GET-GO, OR SHOULD

22  WE WAIT UNTIL THOSE TERMS ACTUALLY COME UP IN THE CASE SO THEY

23  HAVE A LITTLE MORE CONTEXT FOR WHY THEY'RE HEARING ABOUT THEM.

24        MR. FENSTER, WHAT ARE YOUR THOUGHTS ON EACH OF THOSE

25  ISSUES?

```
 1              MR. FENSTER:  FIRST OF ALL, YOUR HONOR, WITH RESPECT

 2    TO THE CONTENTS, I HAVE NOT PERSONALLY REVIEWED IT.  I AM

 3    INFORMED THAT IT MIGHT BE MISSING THE INSTRUCTION THAT THE

 4    PREAMBLE IS LIMITING, AND THE MEANS-PLUS-FUNCTION CLAIM

 5    CONSTRUCTION.

 6         SUBJECT TO THAT, IT BEING COMPLETE, I DON'T THINK WE HAVE

 7    ANY OBJECTION TO THAT.

 8         OUR SUGGESTION WOULD BE TO GO AHEAD AND INCLUDE IT AT THE

 9    BEGINNING AS WE'LL BE REFERENCING THE CLAIM CONSTRUCTIONS, YOU

10    KNOW, AS EARLY AS OPENING STATEMENT.

11              MR. MUELLER:  AND WE AGREE, YOUR HONOR.  I THINK

12    EVERYTHING THAT MR. FENSTER SAID IS RIGHT.

13         AND WE WOULD ALSO SUGGEST THAT IT BE PART OF THE JURY

14    BINDERS AND THAT THEY HAVE ACCESS TO THOSE TERMS AND THE

15    CONSTRUCTIONS FOR EACH.

16              THE COURT:  ALL RIGHT.  I WILL CHECK ON THE PREAMBLE

17    AND THE MEANS-PLUS-FUNCTION INSTRUCTIONS AND WE'LL POTENTIALLY

18    ADD THOSE TO WHAT'S BEEN CIRCULATED PREVIOUSLY.  I'LL CHECK

19    THAT BEFORE WE GIVE THEM.

20         ALL RIGHT.  ANY OTHER COMMENTS ON THE OPENING INSTRUCTIONS

21    OF LAW NOT PREVIOUSLY RAISED?

22         ALL RIGHT.  HEARING NONE, I'LL MOVE ON.

23         I AM GOING TO INSTRUCT THE JURY THAT THIS TRIAL WILL BE

24    COMPLETED BY DECEMBER THE 16TH, FRIDAY, AND THAT THE 14TH,

25    WEDNESDAY, WE WILL BE DARK.
```

1    FINAL CHANCE TO OBJECT TO THAT AND TELL ME WHY THAT'S AN

2    IMPOSSIBLE ACCOMPLISHMENT.

3    HEARING NONE, WE'RE IN ACCORD ON THAT OBJECTIVE.

4    SEALING PROCEDURES.  I DID NOT AGREE TO YOUR PROPOSAL

5    TO -- ON THE PROCESS OF SEALING BECAUSE IT ALLOWED

6    POST-EXHIBITS AND POST-TRIAL SEALING, BOTH OF THE RECORD, AND

7    TO MY MIND IT WAS NOT SUFFICIENT TO ANTICIPATE THE NEED TO SEAL

8    THE COURTROOM.  THAT'S WHY I ISSUED ONE OF MY OWN.

9    I HOPE THAT WE'RE GOING TO MINIMIZE THE NEED TO SEAL THE

10   COURTROOM DURING THE TRIAL AS MUCH AS POSSIBLE.  AND, OF

11   COURSE, THE RULE IS THAT THIS IS A PUBLIC PROCEEDING AND THE

12   COURTROOM WILL BE OPEN DURING THE TRIAL UNLESS THERE IS A

13   SUFFICIENT REASON TO SEAL THE COURTROOM AND TO SEAL PARTICULAR

14   EVIDENCE.

15   USING THE TECHNOLOGY IN THE COURTROOM, WHICH THE PARTIES

16   HAVE SET UP TO ALLOW THE JURY TO SEE CERTAIN EVIDENCE THAT

17   MIGHT BE CONFIDENTIAL, SHOULD ALLOW US TO MINIMIZE THE CLOSURE

18   OF THE COURTROOM.

19   AND I HOPE THE PARTIES, BOTH IN THEIR QUESTIONS AND THEIR

20   ANSWERS, WILL CHOOSE INSTEAD AN OPTION OF REFERENCING

21   CONFIDENTIAL MATERIAL WITHOUT DISCLOSING IT, THEREBY ALLOWING

22   THE JURY TO SEE IT ON THEIR SCREENS OR ON DOCUMENTS IN FRONT OF

23   THEM WITHOUT SAYING IT OUT LOUD.

24   SO IF IT'S THE SECRET RECIPE FOR KENTUCKY FRIED CHICKEN,

25   WE'RE NOT GOING TO PUT THE RECIPE ON THE SCREEN.  WE WILL JUST

1    GIVE IT TO THE JURY TO LOOK AT AND REFERENCE THAT THERE'S A

2    SECRET RECIPE.  THAT WILL AVOID US HAVING TO CLOSE THE

3    COURTROOM AND DISCUSS IT UNDER SEAL.  SO THAT'S MY PREFERENCE.

4         AND THE SECOND PREFERENCE IS WE TAKE IT UP AHEAD OF TIME

5    AND NOT HAVE A DEBATE ABOUT IT LIVE IN FRONT OF THE JURY WHEN

6    TIME IS VALUABLE AND BEING WASTED.

7         SO THE TWO POINTS OF EMPHASIS THERE ARE, ONE, TO MINIMIZE

8    SEALING AND MINIMIZE COURTROOM CLOSURE; AND, TWO, TO PLAN IT

9    AHEAD OF TIME SO WE DON'T HAVE IN TRIAL DISPUTES.

10            MR. MUELLER:  YOUR HONOR, MAY I JUST MAKE --

11            THE COURT:  YOU MAY.

12            MR. MUELLER:  -- ONE JOINT PROPOSAL ON ONE ASPECT OF

13   THIS SEALING PROCEDURE, NOTHING THAT YOU JUST SAID.

14        BUT IN TERMS OF MOTIONS TO SEAL, YOUR HONOR'S PROCEDURE

15   REQUIRED THOSE TO BE FILED BY 9:00 P.M. THE NIGHT BEFORE.

16            THE COURT:  CORRECT.

17            MR. MUELLER:  IF WE MIGHT HAVE UNTIL, SAY,

18   11:00 P.M., AND THE REASON WHY IS WE'RE GOING TO BE RECEIVING

19   EXHIBITS AT 7:00 O'CLOCK AND THERE'S GOING TO BE A BACK AND

20   FORTH THAT MAY RESULT IN WINNOWING OF THOSE EXHIBITS, AND IF WE

21   HAD A COUPLE MORE HOURS, IT WOULD GIVE US TIME TO COMPLETE THAT

22   PROCESS BEFORE THE SEALING BRIEFING.

23            THE COURT:  THAT REQUEST IS DENIED.  SLEEP IS A

24   WEAPON, I'VE BEEN TAUGHT AT TRIAL, INCLUDING MY STAFF AND MINE.

25   WE WILL NOT HAVE TIME TO REVIEW THINGS FILED AT 11:00 O'CLOCK

```
 1        AT NIGHT, I PROMISE YOU.

 2             SO IN THE INTEREST OF ACTUALLY REVIEWING WHAT YOU SUBMIT,

 3        IT NEEDS TO BE DONE BY 9:00 O'CLOCK.

 4             MR. MUELLER:  THANK YOU, YOUR HONOR.

 5             THE COURT:  AND THAT TURNS TO A DIFFERENT NOTE.

 6             I RECEIVED BY E-MAIL YESTERDAY AT 4:34 OBJECTIONS TO

 7        APPLE'S DEMONSTRATIVES.

 8             PROCEDURALLY, THAT'S NOT THE WAY I WANT THEM.  IF THERE'S

 9        A MOTION, IF THERE'S AN OBJECTION, IT NEEDS TO BE FILED ON THE

10        RECORD.

11             SHOULD THE FEDERAL CIRCUIT SOME DAY REVIEW WHAT'S GOING ON

12        DURING THIS TRIAL, THEY'LL WANT TO KNOW WHAT IT IS I RULED ON

13        AND THE BASIS THEREFORE, AND AN E-MAIL IS NOT GOING TO BE IN

14        THE RECORD FOR THE FEDERAL CIRCUIT TO REVIEW.

15             SO ANY MOTION OR OBJECTION NEEDS TO BE FILED IN ECF SO

16        THAT THERE'S A RECORD MADE, AND THAT ASSURES ME THAT THE OTHER

17        PARTY HAS RECEIVED IT, THERE'S A RECORD OF THE OTHER PARTY

18        RECEIVING IT, AND THAT WE'LL HAVE A GOOD RECORD OF WHAT WAS

19        SUBMITTED TO THE COURT.

20             I WILL NOT BE ABLE TO KEEP TRACK OF ALL THE E-MAILS

21        SUFFICIENTLY.

22             SO THE OBJECTION NEEDS TO BE FILED IN THE RECORD IN ECF,

23        AND THAT WILL BE HOW WE'LL TAKE CARE OF ANY OBJECTIONS AND

24        MOTIONS THAT ARE SUBMITTED DURING AND AFTER THE TRIAL.

25             ALL RIGHT.  SO I'VE GOT TWO MORE PROCEDURAL ISSUES TO TAKE
```

1    UP.  ONE IS THE OBJECTIONS TO DEMONSTRATIVES THAT WAS SUBMITTED

2    BY E-MAIL; AND SECOND IS DOCKET 393, WHICH IS THE DISCOVERY

3    BRIEF, A JOINT DISCOVERY BRIEF, WHICH INCLUDES THE MOTION TO

4    STRIKE EXPERT TESTIMONY.

5         LET'S TAKE UP THE DISCOVERY ISSUE FIRST.

6         MR. MUELLER:  YOUR HONOR, MR. SELWYN WILL ADDRESS

7    THAT FOR US.

8         THE COURT:  SO THERE'S DIFFERENT COMPONENTS TO IT.

9         MR. SELWYN, COME ON UP IF YOU WISH.

10        IT'S APPLE'S MOTION TO STRIKE CORE WIRELESS'S NEW

11   INFRINGEMENT AND DAMAGES THEORIES, THOSE GOING FROM THE

12   SUPPLEMENTAL DELL REPORT ON DAMAGES.

13        AND THEN THE LESSER PARTS ARE THE DISCUSSION OF THE MOTION

14   IN LIMINE NUMBER 1.  THERE THERE SEEMS TO BE AGREEMENT THAT THE

15   MOTION IN LIMINE NUMBER 1 APPLIES TO ALL LITIGATION INVOLVING

16   EITHER PARTY, SO I CLARIFY AND GRANT THAT CLARIFICATION.

17        THEN THE LAST PART IS APPLE'S MOTION AS TO MOTION IN

18   LIMINE NUMBER 14, AND THAT'S CORE WIRELESS'S MOTION IN LIMINE

19   NUMBER 14 WHERE APPLE SEEKS CLARIFICATION THAT THE RULING DOES

20   NOT PRECLUDE EVIDENCE REGARDING CORE WIRELESS'S LICENSING

21   HISTORY FOR PURPOSES OTHER THAN INFRINGEMENT.

22        ALL RIGHT.  LET'S TAKE UP THE APPLE MOTION ON STRIKING THE

23   NEW DELL REPORT FIRST, THE CONCERNS EXPRESSED BEING, ONE, THE

24   TIMING; AND, TWO, THAT THIS IS A SHIFTING SANDS OF LITIGATION

25   AT THE LAST MOMENT BEFORE TRIAL AND SHOULD NOT BE PERMITTED.

1          GO AHEAD AND TELL ME WHY I SHOULD GRANT THE MOTION.

2          MR. SELWYN:  YES, YOUR HONOR.  IF I MAY PROVIDE A

3     LITTLE BIT OF CONTEXT?

4          WHEN CORE WIRELESS WITHDREW ITS INFRINGEMENT ALLEGATIONS A

5     FEW WEEKS AGO AGAINST CERTAIN OLDER IPHONE MODELS, THE

6     IPHONE 4S BECAME THE EARLIEST IN TIME ACCUSED APPLE

7     INSTRUMENTALITY UNDER EITHER PATENT.

8          IN HIS ORIGINAL EXPERT REPORT AT PARAGRAPH 69, MR. DELL

9     WROTE, QUOTE, "APPLE BEGAN INFRINGING THE '151 PATENT IN

10    OCTOBER 2011 WHEN IT INTRODUCED THE IPHONE 4S IN THE

11    UNITED STATES."

12         AND HE LEFT NO DOUBT AS TO THE BASIS FOR THAT ASSUMPTION.

13    HE WROTE IN THE SAME PARAGRAPH THAT HIS ASSUMPTION AS TO THE

14    DATE OF FIRST INFRINGEMENT OF THAT ACCUSED INSTRUMENTALITY WAS,

15    QUOTE, "BASED ON MY DISCUSSIONS WITH DOCTORS WESEL AND MAHON

16    REGARDING THE ACCUSED PRODUCTS ASSERTED TO INFRINGE THE PATENTS

17    IN THIS CASE."

18         IN A SUPPLEMENTAL REPORT SERVED 12 DAYS AGO, MR. DELL NOW

19    WRITES, IN PARAGRAPH 5 IN THE ACCOMPANYING FOOTNOTES, THAT

20    APPLE BEGAN INFRINGING THE '151 PATENT IN APRIL 2011 WHEN

21    CETECOM, A THIRD PARTY, TESTED AN IPHONE 4S PROTOTYPE ON A LAB

22    BENCH.

23         AND HE BASES THAT NEW OPINION ON YET ANOTHER DISCUSSION

24    WITH DR. WESEL AT SOME UNDATED DATE IN WHICH DR. WESEL

25    APPARENTLY TOLD HIM THAT THAT IPHONE 4S PROTOTYPE TEST AT

1    CETECOM, QUOTE, "LIKELY CONTAINED THE FUNCTIONALITY THAT, IN

2    HIS OPINION, RENDERS THE IPHONE 4S INFRINGING."

3         NOW, IT'S UNCLEAR HOW DR. WESEL WOULD HAVE ANY BASIS TO

4    MAKE THE STATEMENT TO MR. DELL SINCE, ACCORDING TO DR. WESEL'S

5    OWN REPORT, HE NEVER EVEN LOOKED AT THE CETECOM DOCUMENTS, EVEN

6    THOUGH THE CETECOM DOCUMENTS WERE AVAILABLE TO HIM LONG BEFORE

7    HE SUBMITTED HIS REPORT.

8         THIS LAB BENCH TESTING PROTOTYPE THEORY FOR INFRINGEMENT

9    IS BOTH A NEW DAMAGES OPINION AND A NEW INFRINGEMENT OPINION

10   WHICH IS CHANNELLED THROUGH MR. DELL.

11        THERE IS NO NEW EVIDENCE THAT HAS EMERGED SINCE THE TIME

12   MR. DELL SUBMITTED HIS ORIGINAL REPORT THAT COULD POSSIBLY

13   JUSTIFY CHANGING THE HYPOTHETICAL NEGOTIATION DATE FOR THE

14   IPHONE 4S.

15        MR. DELL BASED THE HYPOTHETICAL NEGOTIATION DATE IN HIS

16   ORIGINAL REPORT ON THE DATE OF WHAT MR. WESEL IDENTIFIED AS THE

17   EARLIEST ACT OF ALLEGED INFRINGEMENT FOR AN ACCUSED

18   INSTRUMENTALITY, NAMELY, THE SALE OF AN ACCUSED PRODUCT.  AND

19   FOR THE 4S, THAT DATE WAS OCTOBER 2011.

20        SO THERE'S NO EVIDENTIARY OR PROCEDURAL BASIS, OR EVEN A

21   LOGICAL BASIS, FOR THAT DATE TO CHANGE SIMPLY BECAUSE

22   CORE WIRELESS DECIDED FINALLY TO DROP ITS INFRINGEMENT CLAIMS

23   AGAINST ACCUSED INSTRUMENTALITIES FOR WHICH IT HAD NO EVIDENCE.

24        AND THIS, YOUR HONOR, IS ANOTHER EXAMPLE OF TOO LITTLE,

25   TOO LATE.  THIS DISTRICT HAS VERY STRICT RULES FOR THE

1       DISCLOSURE OF INFRINGEMENT CONTENTIONS UNDER THE PATENT LOCAL

2       RULES.

3              IN 3-1(B), IT SAYS, "THE DISCLOSURE OF ACCUSED

4       INSTRUMENTALITIES SHALL BE AS SPECIFIC AS POSSIBLE."

5              SO WHAT WAS DISCLOSED AS THE ACCUSED INSTRUMENTALITIES IN

6       THIS CASE ARE THE PRODUCTS AS SOLD.

7              THEY ARE NOW TRYING TO INTRODUCE A NEW ACCUSED

8       INSTRUMENTALITY IN THE FORM OF A PROTOTYPE TESTED ON A LAB

9       BENCH SIX MONTHS BEFORE.

10             MR. DELL DOESN'T PROVIDE ANY ELEMENT-BY-ELEMENT ANALYSIS

11      FOR THAT TESTING.  HE HAS NO QUALIFICATIONS TO DO SO.

12             IN ADDITION, NEITHER HE NOR CORE WIRELESS, IN ANY

13      DISCLOSURE AT ANY TIME IN THIS CASE, HAS EVER EXPLAINED HOW

14      CETECOM'S TESTING CAN BE IMPUTED TO APPLE, WHICH WOULD BE AN

15      ISSUE ON WHICH CORE WIRELESS HAS THE BURDEN.

16             SO IT REMAINS THAT THE EARLIEST ACT OF ALLEGED

17      INFRINGEMENT IDENTIFIED BY DR. WESEL IS THE SALE OF THE

18      IPHONE 4S.

19                 THE COURT:  LET ME INTERRUPT FOR A MOMENT.  I'LL GIVE

20      THEM A CHANCE TO ARGUE, BUT THEY'RE GOING TO SAY YOU'RE ASKING

21      TO PUNISH THEM FOR REDUCING THEIR CASE BEFORE TRIAL, FOR BEING

22      REASONABLE, FOR DROPPING PRODUCTS THAT DON'T INFRINGE, THEY'RE

23      REACTING TO MY ORDERS AT THE PRETRIAL CONFERENCE AND THE

24      PARTIES' STIPULATIONS AT THE PRETRIAL CONFERENCE LEADING UP TO

25      TRIAL THAT THEY HAVE SUPPLEMENTED THEIR REPORT IN ORDER TO

1    ADJUST THE TRIAL PRESENTATION TO THE CURRENT STATUS OF THE

2    CASE.

3         WHY ISN'T THAT ACCURATE?

4         MR. SELWYN:  WELL, IT'S NOT AT ALL THE CASE.  WE'RE

5    JUST HOLDING THEM TO MR. DELL AND DR. WESEL'S OWN WORDS AND THE

6    DISCLOSURES THAT WERE MADE IN THIS CASE OF WHAT IS THE ALLEGED

7    ACT OF INFRINGEMENT AND WHEN THAT ALLEGED ACT OF INFRINGEMENT

8    OCCURRED.

9         AND FOR THE IPHONE 4S, THE ALLEGED ACT OF INFRINGEMENT,

10   ACCORDING TO DR. WESEL, IS THE SALE.  ACCORDING TO MR. DELL,

11   THAT OCCURRED IN OCTOBER OF 2011.

12        THERE'S NO FACT THAT HAS CHANGED IN THIS CASE BASED UPON

13   THE DROPPING OF THOSE PRODUCTS THAT WOULD CHANGE WHAT MR. DELL

14   AND DR. WESEL ALREADY SAID.

15        IF THERE IS ANY PREJUDICE HERE, YOUR HONOR, IT'S PREJUDICE

16   TO APPLE BECAUSE WHAT THEY'RE TRYING TO DO, BY RETAINING NOKIA

17   AT THE HYPOTHETICAL NEGOTIATION TABLE, IS TO WRAP THEMSELVES

18   AROUND NOKIA EVIDENCE.

19        THERE'S NO BASIS FOR THAT, BECAUSE IN OCTOBER OF 2011,

20   CORE WIRELESS OWNED THE PATENT.  THE PARTIES TO THE

21   HYPOTHETICAL NEGOTIATION WOULD BE APPLE AND CORE WIRELESS.

22        AND THE CHANGE IN THE PARTIES AT THE HYPOTHETICAL

23   NEGOTIATION HAS A REAL CONSEQUENCE IN TERMS OF THE MIX OF

24   EVIDENCE.  FOR EXAMPLE --

25             THE COURT:  LET ME GET TO THAT.  SO IF I GRANT YOUR

1    MOTION AND DELL IS STILL GOING TO TESTIFY, WHAT IS DELL GOING

2    TO BE PERMITTED TO TESTIFY AS TO THE HYPOTHETICAL NEGOTIATION

3    DATE?

4          MR. SELWYN:  HE CAN TESTIFY AS TO THE HYPOTHETICAL

5    NEGOTIATION DATE BEING OCTOBER OF 2011, WHICH IS EXACTLY WHEN

6    HE SAID THE FIRST ALLEGED ACT OF INFRINGEMENT OF THE IPHONE 4S

7    OCCURRED, WHICH IS EXACTLY WHAT DR. WESEL SAYS WAS THE FIRST

8    ALLEGED ACT OF INFRINGEMENT.

9       HE CAN INTRODUCE ALL OF THE DATA THAT'S IN HIS

10   SUPPLEMENTAL REPORT.

11      BUT WHAT HE SHOULDN'T BE ABLE TO DO IS INTRODUCE A

12   COUNTER-FACTUAL THAT NOKIA WOULD STILL BE AT THE TABLE, WHICH

13   IS -- WHICH CONTRADICTS THE VERY OPINION THAT HE GAVE IN HIS

14   ORIGINAL REPORT ABOUT THE DATE OF THE FIRST ALLEGED ACT OF

15   INFRINGEMENT.

16          THE COURT:  ALL RIGHT.  GIVE ME YOUR BEST ARGUMENT ON

17   THE MOTION IN LIMINE NUMBER 14, WHY YOU WANT ME TO RECONSIDER

18   THAT.

19          MR. SELWYN:  AND FOR THAT, LET ME HAVE MR. MUELLER

20   ADDRESS IT, YOUR HONOR.

21          THE COURT:  SURE.  THANK YOU.

22          MR. MUELLER:  VERY BRIEFLY, YOUR HONOR, I'LL MAKE

23   THREE POINTS.

24      THE FIRST IS THE MOTION IN LIMINE ITSELF, AS ORIGINALLY

25   PRESENTED BY CORE WIRELESS, WAS NARROW.  IT SOUGHT TO PRECLUDE

```
 1          US FROM ARGUING THAT CORE WIRELESS'S LICENSING HISTORY IS A

 2     BASIS FOR NON-INFRINGEMENT.  THAT IS TO SAY, WHATEVER LACK OF

 3     SUCCESS THEY'VE HAD IS GROUNDS FOR THE JURY TO CONCLUDE WE

 4     DON'T INFRINGE, AND WE DIDN'T OPPOSE THAT REQUEST.

 5          BUT THEY DIDN'T ASK, AND WE WOULD HAVE OPPOSED, A BROADER

 6     REQUEST TO PRECLUDE THAT LICENSING HISTORY ALTOGETHER.

 7          THERE'S TWO SEPARATE LEGAL GROUNDS ON WHICH IT'S CLEARLY

 8     RELEVANT UNDER FEDERAL CIRCUIT LAW.

 9          THE FIRST IS FOR VALIDITY.  THE COMMERCIAL SUCCESS, OR

10     LACK THEREOF, OF AN ALLEGED INVENTION IS RELEVANT TO THE

11     EVALUATION OF OBVIOUSNESS UNDER THE SECONDARY CONSIDERATIONS OF

12     NON-OBVIOUSNESS.

13          THE SECOND IS IT'S RELEVANT TO DAMAGES.  IT'S AMONG THE

14     GEORGIA-PACIFIC FACTORS.  BOTH SIDES' DAMAGES EXPERTS HAVE

15     LOOKED TO THE LICENSING HISTORY.  THE LICENSING HISTORY HAS

16     ALSO BEEN EVALUATED BY THE EXPERTS FOR INVALIDITY PURPOSES.

17          YOUR HONOR'S JURY INSTRUCTIONS ISSUED OVER THE WEEKEND

18     LIST LICENSING HISTORY WAS ONE OF THE RELEVANT FACTORS FOR

19     VALIDITY AND FOR DAMAGES.

20          SO WE THINK FOR ALL THOSE REASONS, IT'S CLEARLY RELEVANT

21     FOR THOSE PERMISSIBLE PURPOSES UNDER WELL-ESTABLISHED FEDERAL

22     CIRCUIT LAW.

23          THE ORIGINAL MOTION WAS AIMED AT SOMETHING DIFFERENT,

24     NON-INFRINGEMENT, AND WE WILL AGREE, AND WE HAVE AGREED, THAT

25     WE WILL NOT DO THAT.  YOUR HONOR SO ORDERED AND WE'LL FOLLOW
```

1      IT.

2           BUT ON THESE OTHER ISSUES AND OTHER GROUNDS, THIS IS

3      RELEVANT EVIDENCE THAT WE THINK WE SHOULD BE PERMITTED TO

4      INTRODUCE.

5                THE COURT:  ALL RIGHT.  THANK YOU.

6           LET ME HEAR FROM CORE WIRELESS ON EACH OF THOSE ISSUES,

7      PLEASE.

8                MR. HOFFMAN:  GOOD MORNING, YOUR HONOR.

9           SO FIRST AND FOREMOST, THE MOST EGREGIOUS MISSTATEMENT IN

10     THE MOTION BY APPLE IS THIS IDEA THAT DR. WESEL HAD ANY OPINION

11     ABOUT THE DATE OF FIRST INFRINGEMENT OR THAT HIS INFRINGEMENT

12     OPINION RELIED ON SALES DATA.

13          THEY CITE TO A COUPLE PARAGRAPHS IN HIS REPORT WHERE HE

14     SAYS, ESSENTIALLY, BASED ON MY INFRINGEMENT ANALYSIS ELSEWHERE,

15     THESE ARE THE PRODUCTS THAT ARE COVERED BY THAT INFRINGEMENT

16     ANALYSIS.

17          BUT HIS INFRINGEMENT ANALYSIS, AS CITED IN EXHIBIT D TO

18     OUR PART OF THE LETTER BRIEF, IS VERY CLEAR.  HE'S LOOKING AT

19     SOURCE CODE.  HE'S ANALYZING SOURCE CODE.  IN HIS FOOTNOTES TO

20     HIS ANALYSIS, HE POINTS TO THE EVIDENCE HE'S RELYING ON FOR

21     SOURCE CODE.

22          NOTHING ABOUT THAT HAS CHANGED.  DR. WESEL'S REPORT HAS

23     NOT CHANGED IN ANY WAY.  THERE IS NO NEW INFRINGEMENT THEORY.

24          AS FOR MR. DELL, AS IS VERY CLEAR IN HIS INITIAL REPORT,

25     HE POSITED THAT THE DATE OF FIRST -- THE DATE OF THE

1      HYPOTHETICAL NEGOTIATION WAS BASED ON THE ANNOUNCEMENT OF THE

2      3G.

3              MANIFESTLY, LOOKING AT THE DOCUMENT THAT HE RELIES ON,

4      THAT IS NOT A DATE OF FIRST SALE DOCUMENT.  IT VERY CLEARLY

5      SAYS, WE'RE IN JUNE, WE'RE GOING TO COME OUT WITH SOMETHING, IT

6      WILL NOT BE AVAILABLE FOR SALE UNTIL AT LEAST JULY.

7              AND THE SALES INFORMATION PROVIDED BY APPLE CONFIRMS THAT

8      NO 4S WAS -- SORRY -- NO 3G WAS SOLD UNTIL THE NEXT QUARTER.

9              SO -- AND THE IMPORT OF THE ANNOUNCEMENT IS THAT IT IS

10     EVIDENCE THAT APPLE, GIVEN HOW APPLE RELEASES ITS PRODUCTS, HAD

11     THE 4S -- SORRY -- HAD THE 3G.

12             AND SIMILARLY WHEN IT ANNOUNCED THE 4S, IT HAD THE 4S.

13             IT'S NOT THAT THE INFRINGING ACT IS AN ACT OF SALE.  IT'S

14     THAT THE PRODUCT HAD TO EITHER HAVE BEEN IMPORTED INTO THE

15     UNITED STATES OR MADE IN THE UNITED STATES FOR IT TO BE

16     ANNOUNCED AND SHOWN TO THE PUBLIC AT CONFERENCES AND,

17     THEREFORE, THAT IS THE BASIS OF INFRINGEMENT.

18             THE COURT:  LET'S GO BACK TO JUST THE BASES OF THE

19     DELL SUPPLEMENTAL REPORT.  WHAT WAS THE BASIS TO NEED A

20     SUPPLEMENTAL REPORT?  WHAT CHANGED IN THE CASE THAT

21     NECESSITATED HAVING A FURTHER REPORT?

22             MR. HOFFMAN:  SO THE PARTIES -- I THINK MR. SELWYN

23     DESCRIBED IT ACCURATELY.  THE PARTIES NARROWED THE CASE.  IT

24     MEANT THAT THE 3G WAS NO LONGER THE EARLIEST ACCUSED PRODUCT.

25     IT WAS NOW THE 4S.

 1          THERE HAD BEEN NO OPINION ABOUT THE DATE OF HYPOTHETICAL

 2     NEGOTIATION IN MR. DELL'S REPORT BASED ON THE 4S.

 3          THE -- WE WROTE TO -- SHORTLY AFTER THE PARTIES TALKED

 4     ABOUT DROPPING CERTAIN PRODUCTS, WE WROTE TO APPLE AND SAID,

 5     "IT'S GOING TO BE NECESSARY, IN OUR VIEW, BECAUSE THERE'S NO

 6     OPINION ABOUT THIS LATER HYPOTHETICAL NEGOTIATION DATE IN

 7     EITHER PARTY'S OPINIONS, EITHER PARTY'S REPORTS, IT'S GOING TO

 8     BE NECESSARY TO HAVE A SUPPLEMENTAL REPORT TO ADDRESS THIS."

 9          AND THAT SAT OUT THERE WILL UNTIL THE DATE OF THE PRETRIAL

10     CONFERENCE WHERE BASICALLY THEY AGREED TO SUPPLEMENTAL REPORTS.

11          NOW, THERE'S A DISAGREEMENT ABOUT WHAT THE SCOPE IS OF

12     WHAT THEY AGREED.  WE WOULD SUGGEST THAT THE LETTER SAYING --

13     ASKING THE QUESTION IS DEFINING WHAT, WHEN SOMEBODY ANSWERS YES

14     TO A QUESTION, DEFINES WHAT THAT AGREEMENT WAS.

15          BUT IT WAS CERTAINLY CLEAR THAT THERE WAS AGREEMENT THAT

16     SOME SUPPLEMENTATION WOULD BE NECESSARY TO ADDRESS THIS

17     SITUATION BECAUSE THERE SIMPLY WAS NO OPINION IN MR. DELL'S

18     ORIGINAL REPORT ABOUT WHAT THE HYPOTHETICAL NEGOTIATION DATE

19     WOULD BE IF THE 4S WAS THE FIRST ACCUSED PRODUCT.

20          AND THERE WERE OTHER CONSEQUENCES OF A CHANGE OF

21     HYPOTHETICAL NEGOTIATION IN TERMS OF SOME DATA POINTS,

22     OBVIOUSLY THE BASE, ALSO VARIOUS OTHER DATA POINTS THAT AREN'T

23     REALLY DISPUTED IN TERMS OF -- REALLY ALL THAT'S IN DISPUTE IS

24     PARAGRAPH 5 OF MR. DELL'S REPORT.

25          AND PARAGRAPH 5 IS VERY CLEAR THAT HE DOES NOT -- HE'S NOT

1    BASING THIS ON A NEW INFRINGEMENT THEORY, AND CERTAINLY NOT

2    BASING IT ON NEW COMMUNICATIONS WITH MR. WESEL PRIMARILY.

3         HE SAYS, "BASED ON DATA AND DOCUMENTATION PRODUCED IN THIS

4    CASE, I UNDERSTAND THAT APPLE HAD IMPORTED AND BEGAN TESTING

5    THE IPHONE 4S MODEL BY THIRD PARTY LABORATORIES OPERATED BY

6    CETECOM IN SAN DIEGO AND MILPITAS FOR COMPLIANCE WITH 3GPP GSM

7    FEATURES AT LEAST AS EARLY AS APRIL 27, 2011."

8         AND THEN HE CITES TO THE DOCUMENT, THE TESTING DOCUMENT,

9    AND THE DEPOSITION.

10        HE THEN FURTHER TALKS ABOUT, IN THE NEXT PARAGRAPH, IN HIS

11   FOOTNOTE -- FOOTNOTE 6, HE CITES TO DOCUMENTS IN THE

12   DEPOSITION.  FOOTNOTE 7, HE CITES AGAIN TO FURTHER STUFF.

13        THEN THE ONLY THING HE TALKS ABOUT IN TERMS OF DR. WESEL

14   IS THAT THERE WERE CERTAIN TERMS WITHIN THAT REPORT THAT WERE

15   JARGONING AND, THEREFORE, HE CONSULTED WITH DR. WESEL TO

16   CONFIRM THAT THAT JARGON CORRESPONDED TO WHAT DR. WESEL WAS

17   REFERRING TO IN HIS ORIGINAL REPORT.

18        AND THAT'S IMPORTANT.  WHAT HAPPENED HERE IS THIS

19   SIMPLY -- THIS ISN'T -- DATE OF FIRST INFRINGEMENT HERE IS AN

20   ISSUE OF FACT.  DR. WESEL SAYS THE 4S, AND -- THE 4S DEFINED AS

21   A PARTICULAR MODEL NUMBER WITH A PARTICULAR VERSION OF SOFTWARE

22   THAT HE LOOKED AT INFRINGES.

23        SO MR. DELL'S TASK WAS, WHEN WAS THE FIRST TIME THAT THERE

24   WAS AN ACT OF INFRINGEMENT, MAKE, IMPORT, USE, SELL, ALL THINGS

25   COVERED BY 271(A), THAT -- WHAT WAS THE FIRST EVIDENCE THAT

1        THAT HAPPENED?

2              AND SO HE SIMPLY -- THERE'S NO -- THE INFRINGEMENT

3        ANALYSIS IS THE SAME.  THE QUESTION IS, WHAT IS THE EVIDENCE OF

4        WHEN THE 4S WAS EITHER IMPORTED OR MADE?

5              THAT'S NOT A TECHNICAL ANALYSIS.  IT'S A QUESTION OF FACT.

6              THE DOCUMENT HE RELIES UPON SAYS ON ITS FACE THE DATE,

7        THE -- WHAT'S BEING TESTED, AND THE VERSION OF THE SOFTWARE

8        THAT'S BEING TESTED, AND THROUGHOUT REFERS TO THE FUNCTIONALITY

9        THAT IS BEING TESTED, ALL CONFIRMING SIMPLY THAT THIS DOCUMENT

10       REFERS TO THE PRODUCT THAT'S SUBJECT TO MR. WESEL'S

11       INFRINGEMENT ANALYSIS.

12             THE COURT:  ALL RIGHT.  LET'S MOVE ON TO MOTION IN

13       LIMINE NUMBER 14.  WHY SHOULDN'T I GRANT APPLE'S CLARIFICATION

14       REQUESTED, THAT THE RULING ON THAT ONE DOES NOT PRECLUDE

15       EVIDENCE OF CORE WIRELESS'S LICENSING HISTORY FOR PURPOSES

16       OTHER THAN INFRINGEMENT?

17             MR. HOFFMAN:  WELL, YOUR HONOR, SO, I MEAN, WE'LL

18       POINT OUT, THIS WAS AN OPPOSED MOTION AND IT WAS GRANTED.

19             THE -- AS HAS BEEN DISCUSSED, AS IS CLEAR, WE'RE NOT

20       TALKING ABOUT EXCLUDING EVIDENCE OF LICENSES.  WE'RE TALKING

21       ABOUT EVIDENCE OF AN ALLEGED LACK OF LICENSING.

22             AND FOR THE SUBJECTS THAT HAVE BEEN RAISED BY APPLE,

23       THAT'S SIMPLY NOT RELEVANT.

24             FIRST OF ALL, IN TERMS OF GEORGIA-PACIFIC FACTOR 1 AND

25       DAMAGES, THE CASES LIKE RESQNET ARE NOT REFERRING TO A LACK OF

1    LICENSING.  THEY'RE SAYING THAT IF THERE ARE EXISTENT LICENSES

2    TO THE PATENTS-IN-SUIT THAT HAVE NUMBERS IN THEM THAT -- FROM

3    WHICH ONE CAN FIND EVIDENCE OF VALUE, THAT IS RELEVANT.

4         NOT THAT SOME ABSENCE WHICH, OF COURSE, HAS NO NUMBERS IN

5    IT, SOMEHOW INFORMS WHAT THE ROYALTY RATE HAS BEEN.  THERE'S NO

6    CASE LAW SO HOLDING, AND THAT'S NOT WHAT GEORGIA-PACIFIC IS

7    ABOUT.

8         THE -- AS TO SECONDARY CONSIDERATIONS, TWO ISSUES HERE.

9    ONE, IF YOU ACTUALLY LOOK AT THEIR EXPERT REPORTS, THEY HAVE NO

10   ANALYSIS OF SECONDARY CONSIDERATIONS AS AN ABSENCE -- BASED ON

11   AN ABSENCE OF LICENSING.

12        MR. BUEHRER, DR. BUEHRER, MENTIONS THE CONCEPT, BUT HAS NO

13   ANALYSIS.  DR. KNIGHTLY HAS ONE SENTENCE AT THE VERY END OF

14   PARAGRAPH 324.  HE SAYS, "FINALLY, I UNDERSTAND THAT

15   CORE WIRELESS HAS NOT PERSUADED ANY COMPANY TO TAKE A LICENSE

16   TO THE '151 PATENT."

17        HE DOESN'T ACTUALLY HAVE ANY ANALYSIS OF THAT.  DOESN'T

18   CITE ANY EVIDENCE.

19        AND IMPORTANTLY, AS DR. BUEHRER STATES IN PARAGRAPH 30 OF

20   HIS REPORT, ANY ANALYSIS OF LICENSING OF ANY KIND AS AN INDICIA

21   OF SECONDARY -- AS A SECONDARY CONSIDERATION FOR

22   NON-OBVIOUSNESS HAS TO HAVE A NEXUS.  YOU HAVE TO SHOW THAT THE

23   LICENSING HAS A DIRECT RELATIONSHIP TO THE PATENT.

24        AND SO JUST AS ONE -- IF ONE HAD A PORTFOLIO LICENSE WITH

25   A BUNCH OF PATENTS IN IT AND ONE WANTED TO SAY THAT WAS A

1    SECONDARY INDICIA, ONE WOULD HAVE TO SHOW THAT THE

2    PATENTS-IN-SUIT WERE AN IMPORTANT FACTOR IN THE TAKING OF THAT

3    LICENSE.  YOU CAN'T JUST SAY IT WAS ONE OF A THOUSAND,

4    THEREFORE, THAT SHOWS THAT THERE'S ACCEPTANCE AND COMMERCIAL

5    SUCCESS.  YOU HAVE TO SHOW, FOR EXAMPLE, IT WAS A SETTLEMENT

6    THAT WAS ABOUT THAT PATENT WHERE A BUNCH OF OTHER STUFF WAS

7    THROWN IN.

8         THE SAME WOULD BE TRUE OF A LACK OF LICENSING.  THE FACT

9    THAT PEOPLE HAVE NOT TAKEN A LICENSE TO THE LARGE CORE WIRELESS

10   PORTFOLIO, THAT DOESN'T SHOW ANYTHING ABOUT THEIR PARTICULAR

11   VIEWS OF THESE PARTICULAR PATENTS.

12        IT MIGHT.  THERE MIGHT BE EVIDENCE.  BUT NONE OF THAT HAS

13   BEEN INTRODUCED INTO THIS CASE.  NONE OF THAT HAS BEEN PART OF

14   THEIR ANALYSIS.

15        SO THERE'S NO RELEVANCE HERE AND NO NEXUS ESTABLISHED AS

16   TO THAT ELEMENT.

17        AND JUST ONE LAST THING, YOUR HONOR.  I'D POINT OUT THAT

18   WE'RE TALKING ABOUT -- WHEN THEY TALK ABOUT THE IMPORTANCE OF

19   CORE WIRELESS'S HISTORY, CORE WIRELESS ACQUIRED THE PATENTS IN

20   SEPTEMBER 2011.  THEY WOULD ARGUE THE DATE OF FIRST

21   INFRINGEMENT IS IN OCTOBER 2011.  CORE WIRELESS HAD NO

22   LICENSING HISTORY AT THAT POINT IN TIME.

23        THE COURT:  GOT IT.

24        MR. HOFFMAN:  I'M SORRY --

25        THE COURT:  LET ME PAUSE THERE AND LET ME GIVE YOU

1        SOME ORDERS.

2             ON THE -- ON APPLE'S MOTION FOR CLARIFICATION AND

3        RECONSIDERATION OF MOTION IN LIMINE NUMBER 14, I'M GOING TO

4        GRANT IN PART AND DENY IN PART.

5             AND THE GRANT IN PART IS LIMITED TO WHAT CORE WIRELESS HAS

6        AGREED TO IN THEIR PAPERS, AND THAT IS CORE WIRELESS AGREED

7        THAT FEDERAL CIRCUIT LAW PROVIDES THAT LICENSES TO

8        PATENTS-IN-SUIT MAY BE RELEVANT TO GEORGIA-PACIFIC FACTOR 1 AS

9        EVIDENCE OF A COMPARABLE ROYALTY RATE OR COMMERCIAL SUCCESS AS

10       A SECONDARY INDICIA OF NON-OBVIOUSNESS.

11            SO TO CLARIFY, I'LL PERMIT THAT.

12            BUT APPLE'S FURTHER REQUEST FOR A RECONSIDERATION OF THE

13       RULING ON MOTION IN LIMINE NUMBER 14 IS DENIED WITHOUT

14       PREJUDICE TO HEARING THE CONTEXT OF WHAT EVIDENCE IS ACTUALLY

15       COMING IN AT TRIAL AND TO HEAR WHAT THE ARGUMENTS AND EVIDENCE

16       IS OF A NEXUS.

17            BUT AT THIS STAGE OF THE PROCEEDINGS, I'M NOT GOING TO

18       FURTHER RECONSIDER MORE THAN I HAVE RIGHT NOW ON MOTION IN

19       LIMINE NUMBER 14.  HOPEFULLY YOU'LL FOLLOW THAT.

20            ON THE MOTION TO STRIKE PARAGRAPH 5 AND THE ACCOMPANYING

21       FOOTNOTES IN THE NEW DELL REPORT, APPLE'S MOTION IN GRANTED.

22            I FIND THAT THE TIMING OF THE SUPPLEMENTAL DELL REPORT IS

23       DRIVEN BY LITIGATION STRATEGY RATHER THAN BY A CHANGE IN FACTS,

24       THAT TO PERMIT THE NEW DELL REPORT WOULD BE PREJUDICIAL,

25       UNFAIRLY PREJUDICIAL TO APPLE AT THIS STAGE OF THE PROCEEDINGS.

1          THERE IS NOT GOOD CAUSE, AFTER THE PRETRIAL CONFERENCE,

2     FOR A SUPPLEMENTAL REPORT FROM DELL, AND THE BETTER APPROACH

3     WOULD HAVE BEEN TO ASK FOR PERMISSION AND TO CLARIFY AT THE

4     TIME, BEFORE THE PRETRIAL CONFERENCE AND AT THE CONFERENCE,

5     WHAT SUPPLEMENTAL REPORTS WERE BEING SOUGHT AND ON WHAT BASES.

6          NOW I'M PRESENTED WITH HINDSIGHT TO DECIDE WHETHER I

7     SHOULD PERMIT THE EVE-OF-TRIAL REPORT OR NOT, AND HAVING

8     REVIEWED THE PAPERS PRESENTED AND THE INFORMATION HERE IN

9     COURT, I'M NOT GOING TO ALLOW A NEWLY DISCLOSED REPORT WITH

10    UNCLEAR INFORMATION THAT IT RELIES UPON TO BE USED AT TRIAL.

11         IF THERE WERE MORE TIME AND THERE WAS DISCOVERY AS TO THE

12    NEW REPORT, IT MIGHT BE A DIFFERENT SITUATION.

13         BUT WE'RE HERE ON THE FIRST DAY OF TRIAL AND I DON'T

14    THINK, UNDER THE CIRCUMSTANCES, IT'S FAIR TO REQUIRE APPLE TO

15    RESPOND TO THIS LATE SUBMITTED REPORT.

16         SO ON THAT BASIS, I'M GRANTING THE MOTION TO STRIKE AND

17    PRECLUDE PARAGRAPH 5 AND THE ACCOMPANYING FOOTNOTES IN THE

18    SUPPLEMENTAL DELL REPORT.

19         THAT'S THE ORDERS ON THOSE ISSUES.

20         MR. HOFFMAN:  THANK YOU, YOUR HONOR.

21         JUST SO -- ONE, JUST FOR THE RECORD, I'LL SAY -- I WANT TO

22    INFORM THE COURT THAT APPLE HAS SUBMITTED A REBUTTAL REPORT ON

23    LAST FRIDAY ADDRESSING THESE ISSUES.

24         THE OTHER -- AND IN TERMS OF YOUR CLARIFICATION OF THE

25    MIL, AM I TO UNDERSTAND THAT THE ORDER IS THAT THEY CAN TALK

```
 1          ABOUT LICENSES IN RELATION TO DAMAGES, BUT NOT --

 2                  THE COURT:  SO FAR -- SO FAR, YES, THAT'S CORRECT.

 3                  MR. HOFFMAN:  THANK YOU, YOUR HONOR.

 4                  THE COURT:  ALL RIGHT.  LET'S TURN TO THE OBJECTIONS

 5           TO APPLE'S DEMONSTRATIVES.

 6              NOW, I DON'T HAVE MUCH CONTEXT FOR THESE.  I'VE BEEN GIVEN

 7           TEN PAGES OF DEMONSTRATIVES, BUT I DON'T KNOW IF THIS IS ALL OF

 8           APPLE'S DEMONSTRATIVES, 10 PERCENT OF THEM, 1 PERCENT OF THEM,

 9           WHETHER THEY'RE USING THEM.  SO GIVE ME CONTEXT.

10                  MR. WANG:  YOUR HONOR, IT IS A SUBSET OF THE

11           DEMONSTRATIVES THAT WE RECEIVED FROM APPLE, JUST THE ONES THAT

12           WE HAVE OBJECTIONS TO, AND THERE WERE SOME CHANGES THERE.

13              JUST BRIEFLY, BEFORE I GET INTO THAT, YOUR HONOR, ABOUT

14           THE PRELIMINARY JURY INSTRUCTIONS --

15                  THE COURT:  I DON'T WANT TO HEAR ABOUT THE

16           PRELIMINARY JURY INSTRUCTIONS.  I WANT TO TALK ABOUT THIS.

17                  MR. WANG:  OKAY.  THERE WERE TWO CORRECTIONS I WANTED

18           TO MAKE, SO I'LL BRING THAT UP LATER.

19                  THE COURT:  COME BACK AT THE END.

20                  MR. WANG:  AT 10:00 A.M. IN THE MORNING, WE ARE

21           SUPPOSED TO IDENTIFY ANY DEMONSTRATIVES, AND ALSO PHYSICAL

22           DEMONSTRATIVES THAT WILL BE SHOWN TO THE JURY.

23              WE DID NOT GET A COPY OF THIS PURPORTED GSM STANDARD WHICH

24           FILLED FOUR BOXES AND WAS SOMETHING LIKE 20,000 PAGES, THAT WAS

25           NOT MADE AVAILABLE TO US TO INSPECT UNTIL LAST NIGHT AT 8:30.
```

1          SO LAST NIGHT AT 8:30, I WENT TO THEIR HOTEL AT THE

2     FAIRMONT AND I WAS IN THE LOBBY ON THE FLOOR GOING THROUGH

3     THESE FOUR BOXES, NEVER BEEN PRODUCED IN THE CASE --

4               THE COURT:  ALL RIGHT.  BACK UP.

5          ARE YOU REFERRING TO THE PRINTED COPY OF THE GSM STANDARD?

6               MR. WANG:  YES, YOUR HONOR.

7               THE COURT:  ALL RIGHT.  IS THAT ATTACHED HERE?  I

8     DON'T KNOW -- I WASN'T AT THE FAIRMONT, SO I DON'T KNOW WHAT

9     YOU'RE TALKING ABOUT.

10              MR. WANG:  IT IS LITERALLY FOUR BANKER'S BOXES OF

11    20,000-PLUS PAGES WHICH THEY SAY IS THE GSM STANDARD.  I DON'T

12    HAVE A PHYSICAL COPY OF IT.

13              THE COURT:  LET'S PAUSE HERE.

14         IS APPLE GOING TO BE SHOWING THE JURY FOUR BANKER'S BOXES

15    OF STUFF IN THEIR OPENING STATEMENT?

16              MR. MUELLER:  YOUR HONOR, I DON'T THINK WE ARE.

17         JUST TO BE CLEAR, THE REASON FOR THE GSM STANDARD, OR TO

18    REFER TO ANY OF THE STANDARDS, IS TO PUT IN CONTEXT WHAT'S AT

19    ISSUE IN THIS CASE.  WE WERE SIMPLY TRYING TO ILLUSTRATE THE

20    VOLUME OF THE STANDARD.

21         TO MINIMIZE THE ISSUES BEFORE YOUR HONOR THIS MORNING, I'M

22    HAPPY TO SAY WE WON'T DO IT.

23         I DO THINK, THOUGH, THAT IS A FAIR DEMONSTRATIVE OVER THE

24    COURSE OF THE TRIAL AT SOME POINT.  IT'S SIMPLY INTENDED TO

25    SHOW THE VOLUME OF THE STANDARD AND TO PUT IN CONTEXT THE

1    ALLEGATIONS OF THE CASE.

2         THE COURT:  ALL RIGHT.  THE OBJECTION IS SUSTAINED.

3    NEXT?

4         MR. WANG:  THANK YOU, YOUR HONOR.

5    THEY ALSO HAD A PHYSICAL DEMONSTRATIVE OF AN AT&T ZTE Z223

6    GO PHONE WHICH THEY PURPORTEDLY BOUGHT SOME TIME RECENTLY AT A

7    WAL-MART.

8    AGAIN, NEVER PRODUCED IN LITIGATION.  IT'S NOT MENTIONED

9    IN ANY EXPERT REPORT, CONTENTION, OR INTERROGATORIES.

10   IT'S PREJUDICIAL AND IT'S MISLEADING, YOUR HONOR.  I

11   LOOKED IT UP ON THE INTERNET.  IT HAS A DIFFERENT BASEBAND CHIP

12   THAT IS NOT EVEN IN THIS CASE.

13        THE COURT:  LET'S PAUSE THERE.

14        MR. MUELLER:  IT'S A DEMONSTRATIVE, YOUR HONOR, AND

15   IT'S JUST INTENDED TO SHOW THAT ALL PHONES USE STANDARDS.  I

16   WAS GOING TO REFER TO IT AND SAY ALL PHONES USE STANDARDS, EVEN

17   A PHONE THAT WE BOUGHT FROM WALGREENS.

18        THE COURT:  HOW ABOUT USING ONE THAT'S IN THE CASE?

19        MR. MUELLER:  THAT'S FINE, YOUR HONOR.  THAT'S FINE.

20        THE COURT:  ALL RIGHT.  GRANTED.  THE OBJECTION IS

21   SUSTAINED.

22        MR. WANG:  YOUR HONOR, THERE WAS AN OBJECTION TO

23   DDX SLIDE 1-16 -- THE WAY THEY NUMBERED THE SLIDES IS INSTEAD

24   OF 1, 2, 3, IT'S 1, DASH, THE SUBNUMBER, AND THE SECOND NUMBER

25   IS ACTUALLY THE SLIDE NUMBER.

1           SO DDX 1-16, -23, -27, -32, -37, -39, AND -45, YOU HAVE

2      COPIES OF THOSE, YOUR HONOR.

3               THE COURT:  I DO, YES.

4               MR. WANG:  THE OBJECTION THERE IS THE SAME THING

5      ABOUT THE STANDARDS BOXES.

6           WHEN ME MET AND CONFERRED WITH OPPOSING COUNSEL, THEY SAID

7      THAT THE IMAGE IN THE BOTTOM LEFT-HAND CORNER OF THAT SLIDE

8      REFERS TO THIS PURPORTED COMPLETE GSM STANDARD, AND THAT IS OUR

9      OBJECTION THERE.  SO IT'S THE SAME THING ABOUT THE FIRST ISSUE,

10     YOUR HONOR.

11              THE COURT:  ALL RIGHT.  I THINK THE PREJUDICE OF THAT

12     IS MINIMAL BECAUSE IT'S JUST AN IMAGE OF A STACK OF PAPERS.

13     THAT'S OVERRULED.

14              MR. WANG:  FINAL -- THE FINAL OBJECTION, YOUR HONOR,

15     IS TO DDX 1-53 AND -52.  THAT'S THE SLIDE THAT HAS THESE BASE

16     STATIONS AND SOME PHONES AND SOME THINGS GOING IN BETWEEN.

17          WE DON'T REALLY KNOW WHAT IS BEING DEPICTED THERE.  BUT TO

18     THE EXTENT THEY'RE ARGUING THAT PHONES NOT IN THE CASE ARE

19     SOMEHOW COMMUNICATING DIFFERENTLY OR THE SAME, THEY SHOULD BE

20     PRECLUDED.  IT'S NOT ANYTHING THAT'S IN THE CASE, AND IT COULD

21     POTENTIALLY BE INCONSISTENT WITH THE COURT'S CLAIM CONSTRUCTION

22     RULINGS, AND THAT'S THE BASIS FOR OUR OBJECTIONS TO THOSE

23     SLIDES.

24              THE COURT:  ELABORATE FOR ME WHAT IT IS ABOUT THAT

25     SLIDE THAT SUGGESTS PHONES NOT IN THE CASE.  WHY ARE YOU

```
 1        WORRIED ABOUT THAT?

 2                MR. WANG:  SURE, YOUR HONOR.  SO IF YOU --

 3                MR. MUELLER:  I CAN PERHAPS EXPLAIN WHAT I'M GOING TO

 4        DO.

 5                THE COURT:  GO AHEAD.

 6                MR. MUELLER:  THESE TWO SLIDES ARE DEMONSTRATIVES

 7        THAT WE WANTED TO GIVE THEM FAIR NOTICE OF.  WE INTEND TO PUT

 8        THESE BEFORE THE JURY ON AN EASEL AND I'M GOING TO USE THEM TO

 9        ILLUSTRATE THE BACKGROUND TECHNOLOGY, THE PATENT, AND THE

10        PRODUCTS IN THIS CASE.

11            THOSE PHONES IN THE TOP ARE JUST CLIP ART DESIGNED TO HELP

12        ME ILLUSTRATE THE TECHNOLOGY FROM A BACKGROUND PERSPECTIVE.

13            THERE'S BACKGROUND TECHNOLOGY SLIDES ALL OVER

14        CORE WIRELESS'S OPENING.  WE DIDN'T OBJECT TO ANY OF THEM.

15                THE COURT:  ALL RIGHT.  HERE'S WHAT WE'LL DO.  WHEN

16        YOU GET TO THAT POINT IN THE PROCEEDINGS, IDENTIFY THOSE AS

17        CLIP ART THAT IS NOT THE PHONES AT ISSUE IN THE CASE.

18                MR. MUELLER:  FAIR ENOUGH, YOUR HONOR.

19                THE COURT:  NEXT?

20                MR. WANG:  YOUR HONOR, THE SLIDE THAT HE SHOWED IS

21        DIFFERENT FROM THIS DDX 1-53.  AND HERE I WANT TO MAKE SURE

22        THAT THAT'S CLIP ART AS WELL.  BECAUSE YOU HAVE PHONES THAT

23        AREN'T IN THE CASE AND YOU HAVE TWO EXAMPLES --

24                MR. MUELLER:  IT'S CLIP ART, YOUR HONOR.  IT'S CLIP

25        ART.
```

```
 1              THE COURT:  SAME RULING.

 2         NEXT?

 3              MR. WANG:  THE LAST ISSUE, YOUR HONOR, IS ABOUT A

 4    MOTION IN LIMINE THAT WE HAD FILED WITH THE COURT, MOTION IN

 5    LIMINE NUMBER 17, TRYING TO REACH AGREEMENT WITH THE PARTIES

 6    THAT NO PEJORATIVE TERMS WOULD BE USED IN REFERENCE TO EITHER

 7    CORE WIRELESS OR TO APPLE.

 8         WE THOUGHT WE WOULD REACH A STIPULATION, BUT FOR WHATEVER

 9    REASON, THEY WEREN'T WILLING TO GO ALONG WITH THAT.  AND I JUST

10    WANT TO MAKE SURE THAT NONE OF THOSE SORT OF TERMS COME UP IN

11    OPENING, YOUR HONOR.

12              THE COURT:  WHAT ARE YOU ASKING FOR?

13              MR. WANG:  JUST AN INSTRUCTION THAT THE PARTIES CAN'T

14    NEGATIVELY REFERENCE THE PARTIES AND CALL THEM CHEATS OR

15    STEALERS OR ANYTHING NEGATIVE LIKE THAT.

16              THE COURT:  WE'RE GOING TO HAVE A NON-DISPARAGEMENT

17    ORDER?

18         (LAUGHTER.)

19              THE COURT:  DENIED.

20         OKAY.  NEXT?

21              MR. WANG:  YOUR HONOR, MY CONCERN WAS THE PATENT

22    TROLL ISSUE.

23              THE COURT:  THEN SAY "PATENT TROLL ISSUE," DON'T SAY

24    "NOTHING NEGATIVE ABOUT THE OTHER PARTY," BECAUSE THAT'S --

25              MR. WANG:  THOSE ARE THE TERMS, YOUR HONOR:  TROLL,
```

```
 1        PATENT TROLL, PATENT PIRATE, LITIGATION SHOP, LAWSUIT FACTORY,

 2        SUBMARINE PATENTS, SHAKEDOWN EXTORTIONISTS.  THOSE ARE THE

 3        TERMS THAT WE WERE TRYING TO GET THEM TO AGREE NOT TO SAY.

 4             MR. MUELLER:  I'M NOT GOING TO SAY ANY OF THOSE

 5        TERMS, YOUR HONOR.

 6             THE REASON WHY THERE'S A DISPUTE IS BECAUSE WE SAID TO THE

 7        PLAINTIFF, IT'S FAIR GAME TO EXPLAIN THEIR BUSINESS, THE NATURE

 8        OF THE BUSINESS, WITHOUT USING PEJORATIVE TERMS, WHICH NEITHER

 9        I NOR MS. VREELAND NOR MR. SELWYN WOULD EVER DO.

10             THE COURT:  ALL RIGHT.  VERY GOOD.  WE'RE IN ACCORD.

11             MAYBE I COVERED IT, DDX 1-22 ABOUT THE -- MR. STURT'S

12        OPINION.

13             MR. WANG:  YOUR HONOR, WE SPOKE TO COUNSEL THIS

14        MORNING.  HE'S JUST GOING TO USE THAT SLIDE TO INTRODUCE THE

15        WITNESS AND HE WON'T GET INTO THE TESTIMONY OF THAT WITNESS, SO

16        WE'LL WITHDRAW THAT.

17             THE COURT:  SO THAT'S RESOLVED?

18             MR. WANG:  YES, YOUR HONOR.

19             THE COURT:  THANK YOU.

20             YOU COVERED IT AT THE BEGINNING, BUT LET'S COME BACK TO

21        THE PRELIMINARY INSTRUCTION ISSUES.

22             MR. WANG:  THANK YOU, YOUR HONOR.

23             YOU ASKED ABOUT THE AGREED STIPULATED FACTS.  THERE ARE

24        SOME, AND IT'S IN DI 372 AT PAGE 4.  YOU'LL SEE A LISTING OF

25        ABOUT 12 FACTS, SO I THINK THAT'S OKAY TO MENTION THAT TO THE
```

1    JURY.

2         ALSO IN THE PRELIMINARY JURY INSTRUCTIONS --

3              THE COURT:  ALL RIGHT.  ONE MOMENT.  WHEN YOU SAY

4    "DI 372" --

5              MR. WANG:  DOCKET NUMBER 372, YOUR HONOR, AT PAGE 4.

6    THAT IS OUR FIRST AMENDED JOINT PRETRIAL CONFERENCE STATEMENT

7    AND PROPOSED ORDER.  YOU'LL SEE A LISTING OF 12 AGREED FACTS.

8              THE COURT:  VERY GOOD.  THANK YOU.  SOMEBODY IN THE

9    COURTROOM KNEW WHERE IT WAS.

10             MR. WANG:  THEN, YOUR HONOR, IN THE PRELIMINARY

11   INSTRUCTIONS THAT WERE MADE AVAILABLE, DOCKET NUMBER 398, THERE

12   IS ONE CORRECTION THAT WE NEED TO MAKE TO THE SUMMARY OF

13   CONTENTIONS AT PAGE 10.  THAT IS THE LISTING OF THE ACCUSED

14   PRODUCTS IN THIS CASE.  THE 3G, 3GS, AND 4 SHOULD BE REMOVED.

15   THOSE HAVE TO DO WITH A DIFFERENT CHIP THAT'S NO LONGER IN THE

16   CASE.

17             THE COURT:  ALL RIGHT.  SO 3G, 3GS, AND 4 ARE OUT;

18   CORRECT?

19             MR. WANG:  THAT'S RIGHT, YOUR HONOR.

20        THANK YOU.

21             THE COURT:  ALL RIGHT.  AND THAT, THE DESCRIPTION OF

22   THE 3G, 3GS, AND 4, THAT IS NOT IN MY -- THE STATEMENT OF THE

23   CASE THAT I WAS GOING TO GIVE THE JURY, POTENTIAL JURORS HERE

24   THIS MORNING, SO I WILL MAKE SURE NOT TO MENTION THOSE

25   PRODUCTS.

```
1              THANK YOU.

2              ALL RIGHT.  IT APPEARS WE HAVE --

3                  THE CLERK:  WERE COPIES MADE FOR THE COURT?

4                  MR. MUELLER:  THEY'RE BEING COPIED.

5                  THE COURT:  ALL RIGHT.  WE'LL LOOK FOR THOSE SHORTLY.

6              ANY OTHER LOGISTICAL MATTERS THAT WE SHOULD TAKE UP NOW

7      BEFORE WE TAKE A BREAK?

8                  MR. MUELLER:  JUST ONE, YOUR HONOR.  MAY WE HAVE A

9      NON-LAWYER MEMBER OF OUR LEGAL TEAM AT THE TABLE FOR THE JURY

10     SELECTION?

11                 THE COURT:  YOU MAY.

12                 MR. MUELLER:  THANK YOU, YOUR HONOR.

13                 THE COURT:  AS WELL AS THE OTHER PARTY MAY AS WELL IF

14     YOU WISH TO.

15                 MR. FENSTER:  THANK YOU, YOUR HONOR.

16             JUST IN TERMS OF LOGISTICS REGARDING ADMISSION OF

17     EXHIBITS, SO MY UNDERSTANDING IS THAT ALL EXHIBITS THAT ARE NOT

18     OBJECTED TO ARE TO BE ADMISSIBLE, BUT YET THEY HAVE TO BE

19     FORMALLY MOVED IN.

20             MY QUESTION IS, CAN WE DO THAT AT THE END OF THE WITNESS,

21     AS OPPOSED TO HAVING TO SHOW THE WITNESS IN THE BINDER, BEFORE

22     PUBLISHING TO THE JURY, WHAT -- THE PROCEDURE I'D LIKE TO

23     FOLLOW IS THAT, FOR UNOBJECTED TO EXHIBITS, MENTION IT WITH THE

24     WITNESS, SHOW THE JURY, AND THEN AT THE END, OUTSIDE THE

25     PRESENCE OF THE JURY, MOVE THEM IN WITHOUT OBJECTION.
```

1      THE COURT:  IF IT'S AN UNOBJECTED EXHIBIT, I MIGHT

2    SUGGEST YOU MOVE BEFORE THE WITNESS TAKES THE STAND, MOVE THEM

3    ALL IN, THEY'LL BE ADMITTED, THEN THERE WILL BE NO DISPUTE AS

4    TO WHETHER IT'S IN OR OUT AND WE CAN HANDLE IT THAT WAY.

5      MR. FENSTER:  EVEN BETTER.  THANK YOU.

6      MR. MUELLER:  THAT SOUNDS GREAT, YOUR HONOR.

7      THE COURT:  IF WE FAIL THAT THEN, YES, I ENCOURAGE

8    EFFICIENCY.  SO IF WE CAN DO IT ALL AT ONE TIME FOR UNDISPUTED

9    ISSUES, WE CAN DO IT THAT WAY.

10      MR. MUELLER:  WE AGREE FOR UNDISPUTED ISSUES, BUT TO

11    THE EXTENT THERE'S AMBIGUITY, WE WOULD PREFER THINGS NOT BE

12    SHOWN ON THE SCREEN.

13      THE COURT:  I WOULD AS WELL, IT HELPS ME TO KNOW, AND

14    IT WILL HELP THE WITNESS TO KNOW, TOO, WHERE WE'RE GOING AHEAD

15    OF TIME IF WE HAVE A COMPLETE SET OF THOSE EXHIBITS THAT WILL

16    BE USED AND WILL BE ADMITTED.

17      MR. MUELLER:  THANK YOU, YOUR HONOR.

18      THE COURT:  ALL RIGHT.  I'M GOING TO GO BACK AND

19    CHECK ON THE FACT STIPULATIONS, THE SUMMARY OF THE CASE, AND OF

20    THE TWO CLAIM CONSTRUCTION AND GLOSSARY ISSUES TO SEE IF WE

21    NEED TO MAKE ANY MODIFICATIONS THERE.

22      AS SOON AS WE GET THE QUESTIONNAIRES, WE WILL BEGIN

23    REVIEWING THEM, AS WILL YOU, AND THE NEXT PHASE WILL THEN BE

24    JURY SELECTION.

25      THANK YOU VERY MUCH.

1          MR. MUELLER:  THANK YOU, YOUR HONOR.

2          THE COURT:  WE'LL BE IN RECESS.

3          (RECESS FROM 10:04 A.M. UNTIL 11:28 A.M.)

4          THE COURT:  THANK YOU.  JUST CHECKING IN WITH THE

5    PARTIES TO SEE IF YOU'VE HAD ENOUGH TIME IT EVALUATE OUR

6    QUESTIONNAIRES?

7          MR. MUELLER:  WE HAVE, YOUR HONOR.

8          MR. FENSTER:  WE HAVE.

9          THE COURT:  YOU MAY BE SEATED.  AND JUST FOR THE

10   RECORD, OUR JURORS ARE NOT PRESENT.  AND THOSE IN THE AUDIENCE

11   HAVE MOVED OVER.  THANK YOU FOR DOING THAT.

12        WE ARE WAITING FOR ONE QUESTIONNAIRE TO BE COMPLETED THAT

13   WAS ONLY HALF COMPLETED.  THERE'S A SECOND QUESTIONNAIRE IN MY

14   HAND THAT ALSO IS IN THE SAME CATEGORY THAT I'LL WAIT UNTIL

15   THAT JUROR IS IN THE COURTROOM TO HAVE HIM FILL IT OUT WHILE

16   WAITING.  HE'S NOT IN THE FIRST SET.

17        WE'RE GOING TO HAVE 20 JURORS IN OUR FIRST SET IN THE BOX.

18        THESE ARE THE JURORS WHO I PROPOSE TO STRIKE FOR CAUSE FOR

19   HARDSHIP REASONS AS SET FORTH IN THEIR JURY QUESTIONNAIRES.

20        THEY ARE JURORS CACERES, C-A-C-E-R-E-S; CONTRERAS; PASTOR,

21   P-A-S-T-O-R; LAREDO; THOENI, T-H-O-E-N-I; WOOD; KING;

22   SALCICCIA, THAT IS S-A-L-C-I-C-C-I-A; BERNAL, B-E-R-N-A-L;

23   JULIE LEE, L-E-E; DU KENDRICK, D-U; PHUONG -- MAYBE I SAID THIS

24   ONE -- PHUONG VO, V-O; AND MICHAEL GARDNER, G-A-R-D-N-E-R.

25        BY MY COUNT THAT IS 13 POTENTIAL JURORS TO EXCUSE FOR

```
 1    CAUSE.
 2           CAN I REVIEW THE NUMBERING THERE, JUST TO MAKE SURE --
 3                  THE CLERK:  YES.
 4                  THE COURT:  AND, BREEA, MAY I PASS ONE BACK TO YOU
 5    FOR THE SAME PURPOSE?
 6                  MS. ROSELLINI:  OF COURSE, YES.
 7                  MR. FENSTER:  YOUR HONOR, I'M SORRY.  MAY I HAVE THE
 8    FIRST THREE?
 9                  THE COURT:  OKAY.
10                  MR. FENSTER:  CACERES.
11                  THE COURT:  I'LL JUST GIVE IT TO EACH PARTY.
12    CACERES; CONTRERAS, C-O-N-T-E-R-A-S; AND KIM PASTOR,
13    P-A-S-T-O-R.
14                  MR. FENSTER:  THANK YOU.
15                  THE COURT:  I JUST RECEIVED BACK THE UPDATED
16    QUESTIONNAIRE FROM JUROR BESIC, B-E-S-I-C.
17           DOES CORE WIRELESS HAVE ANY OBJECTION TO THE FOR CAUSE
18    EXCUSES?
19                  MR. FENSTER:  MAY I HAVE JUST ONE MOMENT, YOUR HONOR?
20                  THE COURT:  YOU MAY.
21           I'LL HAVE THE SAME QUESTION FOR APPLE.
22                  MR. MUELLER:  WE HAVE NO OBJECTION, YOUR HONOR.  WE
23    DO HAVE ONE ADDITIONAL CANDIDATE TO PROPOSE.
24                  THE COURT:  I'LL TAKE THAT IN A MOMENT.
25           (PAUSE IN PROCEEDINGS.)
```

```
 1              THE COURT:  ALL RIGHT.  BACK TO CORE WIRELESS.  ANY

 2   OBJECTION TO MY FOR CAUSE CHALLENGES?

 3              MR. FENSTER:  NO OBJECTION TO THE COURT'S PROPOSALS.

 4              THE COURT:  ALL RIGHT.  AND WHAT IS THE ADDITIONAL

 5   JUROR THAT APPLE SEEKS TO LIST?

 6              MR. MUELLER:  YOUR HONOR, WE PROPOSE STRIKING

 7   DI ZHANG, ZHANG, Z-H-A-N-G.  DI, D I, BASED ON THE RESPONSE TO

 8   QUESTION 25 IN YOUR HONOR'S QUESTIONNAIRE.  I THINK IT'S A

 9   PRETTY CLEAR BIAS ISSUE.

10              THE COURT:  CAN YOU SPELL THE LAST NAME OF THE

11   JUROR'S NAME.

12              MR. MUELLER:  SURE.  I BELIEVE IT'S Z-H-A-N-G.

13              THE COURT:  I'M GOING TO OVERRULE THAT OBJECTION FOR

14   THE MOMENT.  WE'LL ALLOW SOME VOIR DIRE OF THAT JUROR'S ANSWER

15   IF YOU WISH.

16              MR. MUELLER:  THANK YOU, YOUR HONOR.

17              THE COURT:  UNLESS THERE'S A JOINT REQUEST ON THAT.

18              MR. FENSTER:  THERE IS NOT, YOUR HONOR.

19          WE HAVE THREE TO ADD TO THE PROPOSE FOR CAUSE LIST.

20              THE COURT:  OKAY.  LET'S TAKE THEM ONE AT A TIME.

21              MR. FENSTER:  YES.  YOUR HONOR, THE FIRST IS

22   BLANCHARD, B-L-A-N-C-H-A-R-D.

23              THE COURT:  ONE MOMENT.

24          OKAY.  YES.  ON WHAT BASIS?

25              MR. FENSTER:  AGAIN, IT IS MR. BLANCHARD'S RESPONSE
```

1    TO NUMBER 25 INDICATING THAT HE HAS RECEIVED DISCOUNTS ON THE

2    PRODUCT IN ASSOCIATION WITH APPLE CO-FOUNDER STEVE WOZNIAK.

3         THE COURT:  AT THIS STAGE, I'LL ALLOW VOIR DIRE TO

4    SEE IF THAT IS GOING TO BE BIAS.  I'LL OVERRULE THAT FOR THE

5    MOMENT.

6       NEXT?

7         MR. FENSTER:  I'LL ALSO JUST NOTE THAT MR. WOZNIAK'S

8    PICTURE IS IN THE OPENING SLIDE.

9       YOUR HONOR, THE NEXT ONE IS MR. --

10        THE COURT:  HOWEVER, THERE'S NO GUITAR PATENTS IN THE

11   CASE, SO GO AHEAD.

12      NEXT?

13        MR. FENSTER:  THE NEXT ONE IS, I THINK IT'S

14   MS. CHEONG, C-H-E-O-N-G.

15        THE COURT:  YES.

16        MR. FENSTER:  AND MS. CHEONG INDICATES, IN RESPONSE

17   TO NUMBER 25, THAT SHE IS WORKING ON GETTING APPLE AS A CLIENT,

18   OR AS A CUSTOMER FOR HER BUSINESS THROUGH WORK.

19      (PAUSE IN PROCEEDINGS.)

20        THE COURT:  WHICH ANSWER?

21        MR. FENSTER:  NUMBER 25, YOUR HONOR.  IT'S THE SECOND

22   SENTENCE.  SHE INDICATES THAT SHE IS A MANAGER AT DELOITTE IN

23   ANSWER TO NUMBER 8, AND SHE SAID IN THE SECOND SENTENCE, IN

24   RESPONSE TO QUESTION 25 --

25        THE COURT:  ALL RIGHT.  I'M GOING TO ALLOW YOU TO

```
1      VOIR DIRE ON THAT.  THAT'S KIND OF AN OPEN-ENDED STATEMENT, SO

2      OVERRULED FOR THE MOMENT.

3          NEXT?

4              MR. FENSTER:  ACTUALLY, I'LL WITHDRAW THE LAST ONE,

5      SO JUST THOSE TWO.

6              THE COURT:  ALL RIGHT.  THANK YOU.

7          LILI, CAN YOU COMMUNICATE THE FOR CAUSES TO OUR JURY, OR

8      SHOULD WE DO IT IN PERSON?

9              THE CLERK:  IN PERSON, YOUR HONOR.

10             THE COURT:  OKAY.  THEN LET'S BRING THEM IN.

11         ALL RIGHT.  BEAR WITH US WHILE WE BRING IN OUR JURORS.

12     WE'LL FIRST EXCUSE THOSE THAT HAVE BEEN EXCUSED AND THEN SEAT

13     THE FIRST 20.

14             THE COURT:  COME ON IN.

15             PROSPECTIVE JUROR:  SHALL BE SIT, OR --

16             THE COURT:  YES.  YES.  WE'RE GOING TO BE IN TIGHT

17      SPACE, SO COME ALL THE WAY ACROSS.  WE'RE GOING TO BE IN ALL

18      THE OPEN SEATS.

19         WE'RE GOING TO NEED TO TAKE EVERY AVAILABLE SEAT.  WE'RE

20     GOING TO BE REAL FRIENDLY WITH EACH OTHER, SO PLEASE DON'T

21     LEAVE ANY SEATS UNTAKEN, OTHERWISE ONE OF YOUR NEIGHBORS WILL

22     BE STANDING.

23         (PAUSE IN PROCEEDINGS.)

24             THE COURT:  ALL RIGHT.  AS MORE PEOPLE COME IN,

25      PLEASE COME ON IN.  I SEE THERE'S SOME EMPTY SEATS.  PLEASE,
```

```
 1    EVERYONE, SLIDE ACROSS.  TAKE ALL THE EMPTY SEATS.

 2         WE MAY HAVE A FEW PEOPLE STANDING IN THE BACK FOR JUST A

 3    FEW MINUTES, BUT WE'LL HAVE SEATS FOR YOU ALL SHORTLY.  THANK

 4    YOU FOR YOUR PATIENCE.

 5         ONCE YOU'RE IN, EVERYONE MAY BE SEATED.  BUT TO HELP YOUR

 6    NEIGHBORS GET IN, PLEASE SLIDE ACROSS.

 7         (PAUSE IN PROCEEDINGS.)

 8         THE COURT:  ALL RIGHT.  FOR THOSE COMING IN WHO DON'T

 9    HAVE SEATS.  I'LL HAVE YOU COME UP IN THESE FIRST SIX SEATS IN

10    THE FRONT.  COME IN THROUGH THE SIDE HERE.  I THINK IT'S YOUR

11    BEST POINT OF ENTRY.  YOU'LL HAVE TO MANEUVER AROUND THE

12    ATTORNEYS.  WE'VE GOT SIX SEATS VERY COMFORTABLE UP HERE RIGHT

13    IN FRONT.

14         PROSPECTIVE JUROR:  CAN I GO UP FRONT?

15         THE COURT:  YES, PLEASE COME THROUGH.  WATCH YOUR

16    STEP.  THERE'S CABLES.  IT'S A VERY FULL COURTROOM.

17         PROSPECTIVE JUROR:  IS THIS WHERE YOU WANT US?

18         THE COURT:  YES, RIGHT IN THOSE FIRST SIX SEATS

19    THERE.  WE NEED THREE MORE VOLUNTEERS AS YOU COME IN.  NO

20    OBLIGATION IF YOU COME ACROSS.  THANK YOU FOR -- WE'VE GOT A

21    FEW MORE SEATS UP HERE NEXT TO.  COME ON UP.  THERE'S ONE MORE

22    SEAT UP HERE.  THE ATTORNEYS MIGHT EVEN MOMENTARILY STAND UP.

23    WE'RE GOING TO HAVE MORE SPACE IN A MOMENT.  I'M GOING TO

24    EXCUSE SOME PEOPLE.

25         ALL RIGHT.  HAVE WE GOT EVERYONE HERE?
```

1            MS. ROSELLINI:  YES.

2            THE COURT:  THANK YOU VERY MUCH.  EVERYONE MAY BE

3    SEATED WHERE YOU HAVE.  IF YOU DON'T HAVE A SEAT, YOU'LL HAVE

4    ONE IN A MOMENT.  I'M GOING TO BE EXCUSING SOME JURORS, AND

5    WE'LL HAVE MORE SPACE IN THE COURTROOM.

6            I'M JUDGE COUSINS.  WE ARE HERE TODAY FOR JURY SELECTION

7    IN THE CASE OF CORE WIRELESS LICENSING S.A.R.L. AGAINST APPLE,

8    INCORPORATED.

9            AND TODAY'S PROCESS IS PART OF OUR PARTICIPATORY

10   DEMOCRACY.  OUR DEMOCRACY IS A CONTACT SPORT, AND TODAY YOU'RE

11   COMING DIRECTLY INTO CONTACT WITH OUR DEMOCRATIC PROCESS.  WE

12   THANK YOU FOR YOUR PATIENCE AND ATTENTION THROUGH THIS

13   MORNING'S PROCEEDINGS.  THIS NEXT PHASE WILL TAKE ABOUT AN HOUR

14   AS WE PICK OUR EIGHT JURORS FOR THIS CIVIL PATENT INFRINGEMENT

15   TRIAL.

16           THE SEVENTH AMENDMENT TO THE U.S. CONSTITUTION IS WHAT

17   GUARANTEES THE RIGHT TO A JURY TRIAL IN EVERY CIVIL CASE.  IT'S

18   THAT FOUNDING PRINCIPAL OF OUR DEMOCRACY THAT CAUSES YOU TO BE

19   HERE TODAY.

20           IT IS CERTAINLY A HARDSHIP FOR EVERYONE TO BE HERE.  YOU

21   ALL HAVE FAMILIES AND SCHOOLS AND JOBS THAT YOU'D RATHER BE AT,

22   BUT WE DEPEND UPON YOU BEING HERE TO HELP US RESOLVE THIS

23   COMMUNITY DISPUTE.

24           IT'S A DIFFERENT PART OF THE CONSTITUTION THAT CREATES THE

25   PATENT LAW SYSTEM IN OUR COUNTRY, PARTICULARLY, IT'S ARTICLE I,

1    SECTION 8, CLAUSE 8 OF THE U.S. CONSTITUTION THAT SAYS,

2    "CONGRESS SHALL HAVE POWER TO PROMOTE THE PROGRESS OF SCIENCE

3    AND USEFUL ARTS BY SECURING FOR A LIMITED TIME TO AUTHORS AND

4    INVENTORS THE EXCLUSIVE RIGHT TO THEIR RESPECTIVE WRITINGS AND

5    DISCOVERS."

6         THE FIRST PATENT WAS ISSUED BACK IN 1790.  IT WAS SIGNED

7    BY PRESIDENT GEORGE WASHINGTON.  THAT WAS FOR IMPROVEMENTS IN

8    MAKING OF POTASH.

9         TODAY THERE'S MORE THAN NINE MILLION PATENTS THAT HAVE

10   BEEN ISSUED IN THIS COUNTRY, AND THOSE PATENTS ARE ADMINISTERED

11   BY THE U.S. PATENT AND TRADEMARK OFFICE, WHICH IS PART OF THE

12   U.S. DEPARTMENT OF COMMERCE.

13        LET ME TELL YOU MORE ABOUT THE CASE AND THE PATENTS YOU'LL

14   BE HEARING ABOUT.

15        THIS IS A CASE INVOLVING CELLULAR PHONE TECHNOLOGY AND TWO

16   U.S. PATENTS.  YOU'LL HEAR THEM REFERRED TO AS THE '536 PATENT

17   AND THE '151 PATENT.

18        THOSE NUMBERS MIGHT SEEM DENSE TO YOU.  THEY'RE JUST THE

19   LAST THREE NUMBERS OF THE PATENT NUMBERS.  SO THOSE ARE THE TWO

20   PATENTS YOU'LL HEAR ABOUT, THE '536 AND THE '151 PATENT.

21        THE TWO PARTIES TO THE CASE ARE CORE WIRELESS S.A.R.L.,

22   I'LL REFER TO THEM AS CORE WIRELESS; AND APPLE, INC., WHO I'LL

23   REFER TO AS APPLE.

24        CORE WIRELESS ALLEGES THAT APPLE INFRINGED CERTAIN CLAIMS

25   OF TWO U.S. PATENTS:  THE '536 PATENT AND THE '151 PATENT.

1        CORE WIRELESS ALLEGES THAT IT IS ENTITLED TO DAMAGES FOR

2   APPLE'S ALLEGED INFRINGEMENT OF THOSE PATENTS.

3        APPLE DENIES THAT IT INFRINGES ANY OF THE ASSERTED PATENTS

4   AND DENIES THAT CORE WIRELESS IS ENTITLED TO DAMAGES.

5        APPLE ALSO ASSERTS THAT BOTH OF THE ASSERTED PATENTS ARE

6   INVALID.

7        CORE WIRELESS DENIES THAT THE ASSERTED PATENTS ARE

8   INVALID.

9        THE PRODUCTS YOU'LL HEAR ABOUT IN THIS CASE ARE CERTAIN OF

10   APPLE'S IPHONES AND IPADS.

11        LATER, FOR THOSE JURORS SELECTED, I WILL TELL YOU MORE

12   ABOUT THE DETAILS OF THE LAW THAT YOU WILL APPLY, AND THAT WILL

13   BE BOTH BEFORE AND AFTER THE PARTIES PRESENT THEIR EVIDENCE.

14        NOW, BEFORE I GO ANY FURTHER, WE HAVE REVIEWED THE

15   QUESTIONNAIRES THAT THE POTENTIAL JURORS HAVE SUBMITTED, AND

16   I'M GOING TO IDENTIFY CERTAIN JURORS BY NAME WHO ARE GOING TO

17   BE EXCUSED FROM THE JURY SELECTION PROCESS.

18        SO I'M GOING TO GO THROUGH EACH OF THESE NAMES, AND ONCE I

19   FINISH THAT LIST, THOSE JURORS ARE EXCUSED TO RETURN TO THE

20   JURY ASSEMBLY ROOM AND YOUR SERVICE IS COMPLETED.  PLEASE TAKE

21   NO OFFENSE THAT YOU'VE NOT BEEN SELECTED.  I HOPE YOU GET

22   PICKED FOR A FUTURE JURY IN ANOTHER CASE.

23        SO THESE JURORS WILL BE EXCUSED:  JUROR STEPHANIE

24   CASANOVA; JUAN CONTRERAS; KIM NGUYEN PASTOR; MICHAEL LAREDO;

25   MARIA THOENI, T-H-O-E-N-I; ISAAC WOOD; STACY KING; TOBY

```
 1       SALCICCIA -- SORRY FOR THE PRONUNCIATION -- S-A-L-C-I-C-C-I-A;

 2       PHUONG VO; SUSAN BERNAL; JULIE LEE; TOAN DU KENDRICK; AND

 3       MICHAEL GARDNER.

 4            SO IF YOU JUST HEARD YOUR NAME, YOU'RE EXCUSED.  THANK YOU

 5       AGAIN VERY MUCH.  AND EVERYONE ELSE, YOU ARE WELCOME TO STAY.

 6                 PROSPECTIVE JUROR:  WOULD YOU LIKE US TO --

 7                 THE COURT:  YOU DON'T HAVE TO -- IF YOUR NAME WAS

 8       CALLED, YOU MAY LEAVE.  OTHERWISE STAY WHERE YOU HAVE, AND

 9       WE'LL DO SOME FURTHER MOVING AROUND.

10            ALL RIGHT.  NOW I'M GOING TO CALL THE NEXT 20 NAMES WHO

11       ARE GOING TO FILL IN THE MOST COMFORTABLE LEATHER SEATS UP HERE

12       IN THE BACK BECAUSE THOSE WILL BE THE FIRST JURORS WHO ARE

13       ASKED QUESTIONS TO.  SO THIS WILL REQUIRE SOME MOVING AROUND

14       THE COURTROOM.

15            SO JUROR ASHLEY WALLACE, IF YOU CAN PLEASE TAKE THE TOP

16       SEAT IN THE BACK LEFT.  AND THEN WE'LL CALL THE NEXT JURORS,

17       AND WE'LL FILL THE ROW ACROSS THE BACK AND THEN MOVING FORWARD.

18            AND EVERYONE PLEASE WATCH YOUR STEP AS YOU COME IN.  WE DO

19       HAVE A VERY CROWDED COURTROOM.

20            ALL RIGHT.  THE NEXT JUROR WILL BE YUEFENG XIE, X-I-E.

21            AND PAMELA ROBB WILL BE JUROR NUMBER 3.

22            EMILIO GARCIA, JUROR NUMBER 4.

23            AND LORRAINE KREFT, K-R-E-F-T, WILL BE JUROR NUMBER 5.

24            RAMONA COLUNGA WILL BE JUROR NUMBER 6.

25            AND DAVID BOZOVICH WILL BE JUROR NUMBER 7.
```

```
 1          SO THAT WILL BE THE SEVEN JURORS ACROSS THE TOP ROW.

 2          SO PAMELA ROBB, THIRD; EMILIO GARCIA, FOURTH; LORRAINE

 3     KREFT, FIFTH; RAMONA COLUNGA, SIXTH; DAVID BOZOVICH, SEVENTH.

 4          MR. BOZOVICH, IF IT WOULD --

 5              PROSPECTIVE JUROR:  I WOULD LOVE TO TAKE A FRONT

 6     SEAT.

 7              THE COURT:  IF IT WOULD AID YOU TO TAKE A SEAT IN THE

 8     FRONT, YOU CAN DO THAT.  YOU PICK THE ONE THAT'S CONVENIENT FOR

 9     YOU.

10          ALL RIGHT.  SO WE'RE GOING TO MODIFY IT TO MR. BOZOVICH IS

11     IN THE FRONT ROW.

12          JUROR FRANCIS DEGRANGE WILL MOVE UP AND BE IN SEAT NUMBER

13     7 IN THE BACK ROW.

14          ALL RIGHT.  AND NEXT TO MR. BOZOVICH.

15          CONTINUING, WILL BE DEBORAH RIFFIN WILL BE NUMBER 9.

16          CHRISTOPHER JACKSON, JUROR NUMBER 10.

17          DENNIS QUANG NGUYEN, JUROR NUMBER 11.

18          AND THERE'S ANOTHER DOOR BACK THERE.

19              PROSPECTIVE JUROR:  DO YOU WANT ME HERE OR BACK THERE

20     (INDICATING)?

21              THE COURT:  KEEP GOING -- NO, RIGHT AS YOU WERE.

22     YES, WE'RE GOING TO KEEP GOING THAT WAY.  I'M JUST SAYING

23     THERE'S ANOTHER DOOR.

24          DI ZHANG WILL BE JUROR NUMBER 12.

25          KIARA TORRES WILL BE JUROR NUMBER 13.
```

1           AND MARGARET SUSOEV, S-U-S-O-E-V, WILL BE JUROR NUMBER 14.

2     THAT WILL COMPLETE THE SECOND ROW.

3           SO ACROSS THE SECOND ROW THERE, IT'S MR. BOZOVICH;

4     MS. RIFFIN; MR. JACKSON; MR. NGUYEN; DI ZHANG; KIARA TORRES.

5           AND DO WE HAVE MS. SUSOEV?  YOU'RE THERE.  ALL RIGHT.  IS

6     THERE A SEAT NEXT TO YOU?

7                 PROSPECTIVE JUROR:  YES, THERE'S ONE.

8                 THE COURT:  ALL RIGHT.  IS DI ZHANG HERE?  ALL RIGHT.

9      DENNIS NGUYEN?  DENNIS NGUYEN IS WHO'S MISSING.  IS DENNIS

10      QUANG NGUYEN HERE?  ALL RIGHT.  SO WE'RE GOING TO HAVE YOU GO

11       IN BETWEEN MR. JACKSON AND DI ZHANG.

12          SO IF WE CAN HAVE THE THREE, THE LAST THREE MOVE OVER ONE

13     SEAT.  AND YOU'RE GOING TO GO RIGHT INTO THAT MIDDLE SEAT, THE

14     SPECIAL SEAT IN THE AIRPLANE, RIGHT IN THE MIDDLE.

15          ALL RIGHT.  NOW, COMING ACROSS THE FIRST SIX SEATS WILL BE

16     OUR NEXT SIX JURORS, STARTING ON THIS END, IT WILL BE REBECCA

17     SMITH.  REBECCA SMITH WILL BE DOWN HERE ON THIS END, JUROR 15.

18          THOMAS KEVIN GRIFFIN WILL BE JUROR 16.

19          CHARLES MAIDMENT, M-A-I-D-M-E-N-T, WILL BE JUROR 17.

20          MARK BLANCHARD WILL BE JUROR 18.

21          FOOKWENG CHEONG WILL BE JUROR 19.

22          AND JOSEPH FLORESCA WILL BE JUROR NUMBER 20.

23          AND THOSE JURORS THERE, I APOLOGIZE FOR HAVING TO MAKE YOU

24     MOVE AROUND.  YOU WILL BE BACK OUT IN THE AUDIENCE.

25          ALL RIGHT.  SO WE'VE GOT MR. FLORESCA THERE TAKING THE

1        LUCKY 20TH JUROR SEAT.

2              ALL RIGHT.  SO FOR THOSE JURORS WHOSE NAMES I'VE NOT

3        CALLED YET, DURING THIS PHASE I'D LIKE YOU TO LISTEN.  WE WILL

4        NOT BE ASKING YOU ANY QUESTIONS.  IT MAY BE THAT IN A FEW

5        MOMENTS WE WILL ASK YOU THE SAME QUESTIONS, SO THIS IS A CHANCE

6        FOR YOU TO LEARN ABOUT YOUR FELLOW JURORS AND TO THINK ABOUT

7        WHAT YOUR ANSWERS MIGHT BE.

8              DURING THIS PHASE, YOU CAN BE IN A MORE PASSIVE ROLE OF

9        BEING IN THIS AUDIENCE.

10             MY QUESTIONS DURING THIS PHASE WE FOCUSSED ON OUR FIRST 20

11       JURORS WHO ARE SEATED IN THE BOX.  I'LL HAVE MY DEPUTY SWEAR

12       YOU ALL IN SO WE CAN START ASKING YOU SOME QUESTIONS.

13             THE CLERK:  WILL ALL THE PROSPECTIVE JURORS PLEASE

14        STAND AND RAISE YOUR RIGHT HAND.

15          (PROSPECTIVE JURORS SWORN.)

16             PROSPECTIVE JUROR:  I DO.

17             THE CLERK:  PLEASE BE SEATED.

18             THE COURT:  ALL RIGHT.  SO LET ME TELL OUR FIRST 20

19        POTENTIAL JURORS A LITTLE BIT MORE ABOUT THE CASE.

20             I'M GOING TO ASK THE ATTORNEYS FOR EACH PARTY TO INTRODUCE

21       THEIR TEAMS BECAUSE THERE ARE MANY OF THEM.

22             LET'S START WITH CORE WIRELESS.

23             MR. FENSTER:  THANK YOU, YOUR HONOR.

24             GOOD MORNING, LADIES AND GENTLEMEN.  MY NAME IS MARC

25        FENSTER, AND I REPRESENT CORE WIRELESS.

1          JON LINDGREN IS THE MANAGER OF CORE WIRELESS, AND HE IS

2     THE CORPORATE REPRESENTATIVE WHO WILL BE WITH US THROUGH TRIAL.

3          TO MY RIGHT IS BEN WANG, HE'LL BE HELPING ME TRY THE CASE

4     FOR CORE WIRELESS.

5          REZA MIRZAIE IS RIGHT HERE (INDICATING).

6          AND LET ME INTRODUCE THE INVENTORS, MR. JYRI SUVANEN STAND

7     UP.  HE'S THE INVENTOR ON THE '536 PATENT.

8          MR. JAR YO OKSALA IS HERE.  HE'S THE INVENTOR ON THE '151

9     PATENT.

10         DR. RICK WESEL IS THE TECHNICAL EXPERT WHO HAS ANALYZED

11    THE INFRINGEMENT AND VALIDITY ISSUES FOR CORE WIRELESS.

12         AND STEVEN DELL IS IN THE BACK.  HE IS THE DAMAGES EXPERT

13    AND WILL BE PRESENTING DAMAGES TESTIMONY FOR CORE WIRELESS.

14         THANK YOU, YOUR HONOR.

15            THE COURT:  THANK YOU.  NOW FOR APPLE.

16            MR. MUELLER:  THANK YOU, YOUR HONOR.

17         GOOD MORNING.  MY NAME IS JOE MUELLER.  I REPRESENT APPLE.

18    ALONG WITH ME ARE TWO OF MY PARTNERS, CINDY VREELAND AND MARK

19    SELWYN.  AND ALSO FRANK CASANOVA, WHO'S GOING TO BE HERE THE

20    ENTIRE TRIAL.  HE'S FROM APPLE, AND HE'LL BE HERE, AND HE'LL

21    TESTIFY TO THE JURY.

22         YOU'LL HAVE SOME OTHER WITNESSES AS WELL, BUT WE'LL BE AT

23    THIS TABLE EACH AND EVERY DAY.

24         THANK YOU.

25            THE COURT:  THANK YOU.  NOW LET ME INTRODUCE SOME OF

1      THE COURT PLAYERS IN THIS PROCESS.

2           MY COURTROOM DEPUTY, LILI HARRELL, WILL BE YOUR

3      COORDINATOR FOR ALL JURY ACTIVITIES DURING THE TRIAL AND WILL

4      KEEP US RUNNING ON TIME.

5           MY LAW CLERK, CASSIE KERKHOFF-JOHNSON PROVIDES ASSISTANCE

6      TO ME.  SHE'S AN ATTORNEY AND PROVIDES ME WITH ALL SORTS OF

7      LEGAL RESEARCH AND ASSISTANCE.

8           OUR TWO COURT REPORTERS HERE ARE IRENE RODRIGUEZ AND

9      LEE-ANNE SHORTRIDGE.  THEY'LL BE TAKING A TRANSCRIPT AND

10     WRITING DOWN WHAT'S SAID DURING THE TRIAL, INCLUDING THIS

11     PHASE.

12          AND I'M JUDGE COUSINS.  I'M A MAGISTRATE JUDGE HERE IN THE

13     NORTHERN DISTRICT OF CALIFORNIA.

14          OUR SCHEDULE TODAY IS WE'LL BE PICKING THE JURY, AND THEN

15     FOR THOSE SELECTED JURORS, WE'LL HAVE THE OPENING STATEMENTS.

16          THE TRIAL DAYS WILL BE FROM APPROXIMATELY 9:00 A.M. TO

17     4:00 P.M. EACH DAY, WITH A LUNCH BREAK, AND ALSO BREAKS IN

18     BETWEEN IN THE MORNING AND AFTERNOON.

19          THE TRIAL WILL TAKE UP TO TWO WEEKS LONG, THIS WEEK AND

20     NEXT WEEK, ENDING BY DECEMBER THE 16TH.

21          THERE WILL BE A BREAK ON WEDNESDAY, DECEMBER THE 14TH.

22     THERE WILL BE NO TRIAL ON DECEMBER THE 14TH.

23          AND THE TRIAL WILL BE HERE IN THIS COURTROOM.

24          THE QUALITIES WE ARE LOOKING FOR IN JURORS, WE NEED JURORS

25     WHO CAN ATTEND THE ENTIRE TRIAL EVERY DAY, WHO CAN LISTEN AND

1     LOOK AT ALL THE EVIDENCE PRESENTED.

2          WE NEED JURORS WHO WILL KEEP AN OPEN MIND UNTIL ALL THE

3     EVIDENCE HAS BEEN PRESENTED.

4          WE NEED JURORS WHO CAN BE FAIR AND IMPARTIAL TO BOTH

5     PARTIES IN THE CASE, WHO CAN FOLLOW THE INSTRUCTIONS OF THE LAW

6     AS I GIVE IT TO YOU.

7          WE NEED JURORS WHO CAN USE COMMON SENSE AND WHO WILL BE

8     ABLE TO COMMUNICATE WITH EACH OTHER DURING THE DELIBERATIONS TO

9     REACH A UNANIMOUS VERDICT.

10         SO THAT'S WHAT WE'RE GOING TO BE DOING TODAY IS TRYING TO

11    FIND EIGHT OF YOU WHO CAN FIT THOSE QUALIFICATIONS.

12         NOW, A FEW OF YOU IN YOUR QUESTIONNAIRES EXPRESSED

13    CONCERNS ABOUT WHETHER THIS MIGHT BE A DEATH PENALTY CASE, AND

14    I CAN ASSURE YOU IT IS NOT A DEATH PENALTY CASE.  IT IS NOT A

15    CRIMINAL CASE AT ALL.

16         THIS IS A CIVIL DISPUTE BETWEEN PARTIES WHO DISAGREE ABOUT

17    TWO PATENTS, AND YOU'LL BE HEARING MUCH MORE ABOUT THAT.  BUT

18    TO ALLAY ANY CONCERNS, THIS CASE HAS NO CRIMINAL COMPONENT TO

19    IT, AND AT THE END, NO ONE WILL BE GOING TO JAIL.

20         WE HAVE ALREADY LEARNED QUITE A BIT ABOUT YOU THROUGH YOUR

21    QUESTIONNAIRES, BUT DURING THIS PHASE OF THE JURY SELECTION, WE

22    WANT TO SPEAK WITH EACH OF YOU A LITTLE BIT MORE AND TO HEAR

23    YOU SPEAK RATHER THAN JUST HEAR ABOUT YOU IN WRITING.

24         THERE'S A FEW PIECES OF PAPER THERE, AND I'M GOING TO

25    START IN THE BACK CORNER WITH MS. WALLACE, AS OUR LUCKY JUROR

```
 1       NUMBER 1, AND I'LL ASK YOU TO STAND UP AND SPEAK LOUD ENOUGH SO

 2       THAT OUR ATTORNEYS CAN HEAR US.  AND YOU'RE REALLY JUST

 3       INTRODUCING YOURSELF TO THEM, AND I'VE GIVEN YOU SOME IDEAS

 4       THAT YOU MIGHT SHARE.  THIS IS, OF COURSE, SOME REPETITIVE

 5       INFORMATION FROM THE JURY QUESTIONNAIRE, BUT IT'S AN IDEA JUST

 6       TO LET THEM HEAR FROM YOU DIRECTLY.  AND THEN I MAY ASK SOME

 7       FOLLOW-UP QUESTIONS.

 8                   PROSPECTIVE JUROR:  OKAY.  MY NAME IS ASHLEY WALLACE.

 9        I HAVE A BACHELOR'S OF SCIENCE IN BIOLOGY FROM U.C. SANTA CRUZ.

10           I WORK FOR KAISER PERMANENTE IN THE HOSPITAL LABORATORY.

11       I HAVE A LICENSE TO DO THAT.

12           I LIVE IN SAN JOSE.

13           AND MY HOBBIES ARE REALLY ANYTHING THAT MY THREE-YEAR-OLD

14       DAUGHTER WANTS TO DO RIGHT NOW, SO ANYTHING THAT SHE WANTS TO

15       DO, AND READING.

16           THAT'S PRETTY MUCH IT.

17                   THE COURT:  AND DOES YOUR THREE-YEAR-OLD DAUGHTER

18        HAVE ANY INTEREST IN PATENTS?

19                   PROSPECTIVE JUROR:  NO.

20                   THE COURT:  WHAT SORTS OF ACTIVITIES IS SHE

21        INTERESTED?

22                   PROSPECTIVE JUROR:  THE PARK AND PLAYING.  THAT'S

23        PRETTY MUCH IT.

24                   THE COURT:  AND ARE THERE ANY PARTICULAR SKILLS OR

25        EXPERIENCES YOU'VE HAD IN YOUR LIFE THAT YOU THINK WOULD MAKE
```

```
1        YOU AN EXCELLENT JUROR IN THIS CASE?

2              PROSPECTIVE JUROR:  I THINK I'M WELL EDUCATED AND MY

3        MIND IS OPEN TO ANYTHING, AND I WILL LISTEN TO THE EVIDENCE AND

4        HAVE AN OPEN MIND.

5              THE COURT:  IF YOU WERE IN THE POSITION OF THE

6        PARTIES HERE, IS THERE ANYTHING MORE ABOUT YOUR BACKGROUND THAT

7        YOU WOULD WANT THEM TO KNOW IN EVALUATING WHETHER YOU CAN BE A

8        FAIR AND IMPARTIAL JUROR?

9              PROSPECTIVE JUROR:  NO.

10             THE COURT:  ALL RIGHT.  THANK YOU FOR GOING FIRST AND

11       FOR BEING HERE.

12             PROSPECTIVE JUROR:  ALL RIGHT.

13             THE COURT:  PLEASE PASS TO THE NEXT JUROR.

14             PROSPECTIVE JUROR:  GOOD MORNING.  MY NAME IS

15       YUEFENG, LAST NAME XIE, I HAVE -- I HAVE.

16             THE COURT:  SAY YOUR DEGREES AGAIN, PLEASE.

17             PROSPECTIVE JUROR:  YEAH.  SO I HAVE BACHELOR'S

18       DEGREE, I HAVE A MASTER'S DEGREE, AND PH.D. DEGREE IN BIOLOGY.

19            SO I LIVE IN SUNNYVALE, AND I HAVE MY OWN LITTLE COMPANY

20       IN SANTA CLARA.  IT'S A BIOTECH COMPANY.

21           AND HOBBY, I -- I HAVE A LOT OF HOBBIES IN SPORTS.

22             THE COURT:  WHICH SPORTS DO YOU LIKE?

23             PROSPECTIVE JUROR:  SOCCER AND, LIKE, PING PONG,

24       SOMETHING LIKE THAT, BRIDGE.

25             THE COURT:  YOU MENTIONED THAT YOU OWN FOUR PATENTS
```

1     OF YOUR OWN.  WHAT KIND OF PATENTS ARE THEY?

2              PROSPECTIVE JUROR:  THOSE ARE -- WHEN I WORK FOR

3     NOVALIS AND THEN I WORK FOR ATLAS & COMPANY, WE INVENTED NEW

4     DRUGS, AND WE HAVE TO APPLY FOR PATENTS TO PROTECT THOSE NEW

5     DRUGS.

6              THE COURT:  I JUST DIDN'T HEAR, WHAT -- CAN YOU SAY

7     MORE ABOUT WHAT THE PATENTS DID.

8              PROSPECTIVE JUROR:  THOSE PATENTS ARE RELATED TO NEW

9     MEDICINE.

10             THE COURT:  NEW MEDICINE.  THANK YOU.

11          AND DO YOU HAVE ANY SPECIAL SKILLS OR EXPERIENCES THAT YOU

12     THINK WOULD MAKE YOU AN EXCELLENT JUROR IN THIS CASE?

13             PROSPECTIVE JUROR:  I'D LOVE TO BE A JUROR IN THIS

14     CASE, BUT MY TIME IS A PROBLEM.  BECAUSE I HAVE SIX FULL-TIME

15     EMPLOYEE, AND WHENEVER I'M NOT THERE FOR A FIELD DAY, THEN IT'S

16     ALMOST -- THAT'S MY BIG CONCERN.

17             THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH FOR BEING

18     HERE.

19             PROSPECTIVE JUROR:  THANK YOU.

20             THE COURT:  HI.  MY NAME IS PAM ROBB.  MY EDUCATION

21     IS BACHELOR OF SCIENCE IN EDUCATION.

22          I LIVE IN GILROY.

23          MY HOBBIES -- I'M CURRENTLY A HOUSE WIFE AND HAVE BEEN

24     MOST OF MY MARRIED LIFE RAISING MY CHILDREN.

25             MY HOBBIES ARE QUILTING, STAINED GLASS, AND READING,

1    MOSTLY HISTORY.

2         SPECIAL SKILLS AND TRAINING.  I THINK THAT I HAVE GREAT

3    COMMON SENSE AND I LOVE CRITICAL ANALYSIS, IF THAT --

4         THE COURT:  WHAT TYPES OF HISTORY ARE YOU -- ARE

5    THERE ANY PARTICULAR HISTORY PERIODS THAT YOU'RE INTERESTED IN?

6         PROSPECTIVE JUROR:  WORLD WAR II.  I LOVE READING

7    ABOUT THAT.  ASIAN HISTORY A LITTLE BIT.  MY TWO CHILDREN ARE

8    ADOPTED KOREANS.

9         JUST ANY KIND OF HISTORY AND BIOGRAPHY.  I'M INTERESTED IN

10   PEOPLE.

11        THE COURT:  THANK YOU VERY MUCH FOR BEING HERE AND

12   FOR SHARING.

13        PROSPECTIVE JUROR:  THANK YOU.

14        THE COURT:  PLEASE PASS ON THE MICROPHONE.

15        PROSPECTIVE JUROR:  HI, GOOD MORNING.  MY NAME IS

16   EMILIO GARCIA.  I HAVE A BACHELOR OF SCIENCE IN MANUFACTURING

17   SYSTEMS FROM SAN JOSE STATE WITH A MINOR IN BUSINESS.

18        I LIVE IN MORGAN HILL, CALIFORNIA.

19        MY HOBBIES, I ENJOY FISHING, SOCCER, PLAYING SOCCER,

20   CYCLING, AND HOME PROJECTS.  I LIKE TO DO A LOT OF HANDS-ON

21   REMODELING, THINGS OF THAT NATURE.

22        AS FAR AS MY EMPLOYMENT, I WORK FOR ABBOTT VASCULAR, IN

23   THE FDA INDUSTRY ASSOCIATED PRODUCT VESSEL CLOSURE AND MITRAL

24   CLIP, WHICH IS NEW TECHNOLOGY FOR VASCULAR TECHNOLOGIES.

25        AS FAR AS MY SPECIAL SKILLS, FROM -- FROM A PROFESSIONAL

```
 1      PERSPECTIVE, PROCESS VALIDATIONS, GREEN BELTS AND SIX SIGMA,

 2      MANUFACTURING SYSTEMS AS FAR AS GNP, THOSE KIND OF THINGS.

 3              AS FAR AS MY HOBBIES, I HAVE A -- I'M A LICENSED OFFICIAL

 4      FOR COLLEGE AND MEN'S -- BASICALLY ALL AGE GROUPS FROM COLLEGE

 5      TO MEN'S TO YOUTH, AND ALSO I'M A LICENSED SOCCER COACH AS

 6      WELL.

 7                  THE COURT:  SO THOSE ARE ALL IN SOCCER?

 8                  PROSPECTIVE JUROR:  IN SOCCER, THAT IS CORRECT.

 9                  THE COURT:  THANK YOU VERY MUCH FOR BEING HERE.

10                  PROSPECTIVE JUROR:  SURE.

11                  PROSPECTIVE JUROR:  HI.  MY NAME IS LORRAINE KREFT.

12      I HAVE AN ASSOCIATE OF ARTS DEGREE.

13          I LIVE IN LOS ALTOS.

14          HOBBIES.  I DON'T HAVE TIME FOR HOBBIES RIGHT NOW, BUT I'M

15      LOOKING FORWARD TO THEM.

16          I'M AN APPLE AVID USER AND FAN, SO I DON'T KNOW HOW FAIR

17      MAYBE THAT I COULD BE.

18                  THE COURT:  ALL RIGHT.  AND DO YOU HAVE ANY SPECIAL

19      SKILLS OR EXPERIENCES THAT YOU THINK MIGHT MAKE YOU AN

20      OUTSTANDING JUROR IN THIS CASE?

21                  PROSPECTIVE JUROR:  WELL, I WORK FOR AN OB-GYN, SO I

22      DON'T KNOW HOW THAT PLAYS INTO EFFECT HERE.

23                  THE COURT:  OKAY.  THANK YOU VERY MUCH FOR BEING

24      HERE.

25                  PROSPECTIVE JUROR:  THANK YOU.
```

1    PROSPECTIVE JUROR:  HI.  MY NAME IS RAMONA COLUNGA.

2  MY EDUCATION IS HIGH SCHOOL EDUCATION WITH SOME COLLEGE CLASSES

3  IN ACCOUNTING.

4    I LIVE IN SALINAS.

5    AND MY HOBBIES ARE -- WHEN I HAVE TIME FOR HOBBIES, BUT I

6  DO SPEND A LOT OF TIME WITH MY -- I'M ACTIVE IN MY CHURCH, SO I

7  HELP WITH EVENTS FOR THE WOMEN.  SO I'M VERY ACTIVE THERE.

8    AS FAR AS SPECIAL SKILLS AND TRAINING, I KNOW I'M VERY

9  FAIR AND I -- YOU KNOW, I COULD LOOK AT THINGS IN MORE -- IN

10  DEPTH IF I NEEDED TO.

11    AND I BELIEVE I CAN -- I HAVE GOOD JUDGMENT IN THAT AREA.

12    THANK YOU.

13    THE COURT:  THANK YOU VERY MUCH.

14    PROSPECTIVE JUROR:  HI.  MY NAME IS FRANCIS DEGRANGE.

15    I HAVE SOFTWARE ENGINEERING DEGREE, AND I ALSO HAVE A

16  PH.D. IN VIDEO IMAGE PROCESSING.

17    I LIVE IN SAN JOSE.

18    I WORK FOR A COMPANY MANY PEOPLE KNOW IS NAMED ROKU, ROKU

19  INCORPORATED.

20    MY HOBBIES ARE BIKING, PLAYING MUSIC.

21    SPECIAL SKILLS OR SPECIAL TRAINING, I'M NOT SURE.  MAYBE

22  SWIMMING.

23    THE COURT:  YOU DESCRIBED THAT YOU FILED A PATENT

24  YOURSELF.  WHAT TYPE OF PATENT WAS THAT?

25    PROSPECTIVE JUROR:  ONE WAS ON A SYSTEM, A GENERAL

1     SYSTEM FOR VIDEO STREAMING OVER THE INTERNET.  THAT WAS OVER

2     TEN YEARS AGO.

3          AND I HAVE A PENDING LICENSE, A PENDING PATENT RIGHT NOW

4     WITH ROKU.  IT'S FOR VIDEO PROCESSING FOR SEAMLESS BIT RATE

5     SWITCHING, BIT RATE FOR SEAMLESS BIT RATE SWITCHING.

6          THE COURT:  DOES THE FACT THAT YOU HAVE YOUR OWN

7     PATENT APPLICATIONS, WOULD THAT PREVENT YOU FROM BEING A FAIR

8     JUROR IN A CASE WHERE THERE'S ALLEGED INFRINGEMENT OF OTHER

9     PATENTS?

10         PROSPECTIVE JUROR:  I'M NOT SURE.

11         THE COURT:  ALL RIGHT.  THANK YOU VERY MUCH FOR BEING

12    HERE.

13         IF WE COULD PASS IT UP TO MR. BOZOVICH.

14         PROSPECTIVE JUROR:  MY NAME IS DAVID BOZOVICH,

15    JUNIOR.

16         I HAVE A BACHELOR'S OF SCIENCE IN INDUSTRIAL TECHNOLOGY,

17    CONCENTRATING IN GRAPHIC INFORMATION TECHNOLOGY, WHICH IS A

18    FANCY WAY OF SAYING WEB DESIGN.

19         I CURRENTLY LIVE IN SAN JOSE WHERE I'VE LIVED FOR ALMOST

20    TWO YEARS NOW.

21         HOBBIES INCLUDE VIDEO GAMES, BIKE RIDING, AND ANYTHING MY

22    KID DOES WANT TO DO.

23         ANY SPECIAL SKILLS, I'M -- I'VE RECENTLY BECOME A MANAGER

24    AT WORK, SO I'M TRYING TO BEEF UP THAT SKILL SET IN TERMS OF

25    LEADING PEOPLE AND MANAGING OTHERS.

1          THE COURT:  CAN YOU TELL US ABOUT THE PATENTS THAT

2     YOU HAVE BEEN INVOLVED IN?

3          PROSPECTIVE JUROR:  I WAS SCARED YOU WOULD ASK THAT.

4       SO AT WORK WE DO BRAINSTORMING SESSIONS WHERE WE DON'T

5     REALLY GO IN WITH ONE IDEA.  SO DEPENDING ON WHAT I SAID IN THE

6     ROOM, I MAY BE THE SOLE INVENTOR OR A CO-INVENTOR ON ANY NUMBER

7     OF PATENTS THAT HAVE BEEN SUBMITTED BY PAYPAL.  I CANNOT TELL

8     YOU SPECIFICS ON ANYTHING THAT'S PROGRESSED.

9          THE COURT:  ALL RIGHT.  THANKS VERY MUCH FOR BEING

10     HERE.

11          PROSPECTIVE JUROR:  GOOD MORNING.  MY NAME IS DEBORAH

12     RIFFIN, DEB.

13       I HAVE A B.A. IN INDUSTRIAL ARTS FROM SAN FRANCISCO STATE,

14     AND I SPENT FOUR YEARS AT CAL POLY IN EARLY CHILDHOOD

15     EDUCATION.  I HAVE A MULTIPLE SUBJECT TEACHING CREDENTIALS, AND

16     I ACTUALLY TAUGHT FOR A COUPLE OF YEARS AFTER 9/11.

17       I'M ACTUALLY A PROFESSIONAL INSTRUCTIONAL DESIGNER,

18     TRAINER, AND TECHNICAL WRITER, SO I'VE BEEN WORKING WITH

19     ENGINEERS IN VARIOUS CONTRACTS FOR COMPANIES IN SILICON VALLEY

20     FOR ABOUT 25 TO 30 YEARS.

21          AND MY SPECIAL SKILLS ARE IN THE AREAS OF LANGUAGE AND

22     ART -- I'M VERY ARTICULATE, AND I CAN SPEAK IN FRONT OF PEOPLE,

23     AND I'M VERY USED TO WORKING WITH DIFFERENT FOLKS, LIKE

24     ENGINEERS AND THINGS LIKE THAT, AND MAKING SENSE OUT OF

25     TECHNICAL INFORMATION.

 1          MY HOBBIES ARE PETS.  I LOVE DOGS.  AND I LOVE TO TRAVEL,

 2     ESPECIALLY TO BEACHES.  AND I LOVE TO READ.

 3          THE COURT:  VERY GOOD.  THANKS FOR BEING HERE.

 4          PROSPECTIVE JUROR:  GOOD MORNING.  MY NAME IS

 5     CHRISTOPHER JACKSON.

 6          EDUCATION.  SOME COLLEGE AT DSU UNIVERSITY.

 7          I LIVE IN SAN JOSE.

 8          HOBBIES ARE GAMING WITH MY SON, WORKING OUT, DOG A POD

 9     CAST WITH MY WIFE.

10          SPECIAL SKILLS.  I'M A TECHNICIAN AT TESLA MOTORS, SO I'M

11     GOOD WITH MY HANDS.

12          AND I'M JUST WORKING WITH YOUTH.

13          THE COURT:  WHAT IS YOUR POD CAST ABOUT?

14          PROSPECTIVE JUROR:  IT'S COMEDY.  I DO TWO DIFFERENT

15     ONES.  THE ONE WITH MY WIFE IS JUST, I GUESS, ABOUT MARRIAGE

16     AND THINGS YOU GO THROUGH.  BUT IT'S JUST -- IT'S COMEDY-BASED.

17          THE COURT:  WHAT KINDS OF GAMING TO YOU DO WITH YOUR

18     SON?

19          PROSPECTIVE JUROR:  RIGHT NOW WE'RE ON CALL OF DUTY,

20     MINECRAFT, I STILL DON'T KNOW HOW TO DO THAT, BUT --

21          (LAUGHTER.)

22          PROSPECTIVE JUROR:  JUST ANYTHING, ALL THE BASICS,

23     ALL THE BASIC GAMES.

24          THE COURT:  THANK YOU VERY MUCH FOR BEING HERE.

25          PROSPECTIVE JUROR:  MY NAME IS DENNIS NGUYEN.  I

```
 1        FINISHED A DEGREE IN GENERAL STUDY AT EVERGREEN COLLEGE.
 2            MY HOBBIES ARE I ENJOY LISTENING TO MUSIC AND I AM
 3    CURRENTLY A TECHNICIAN AT WESTERN DIGITAL.
 4            I HAVE NO SPECIAL SKILL.
 5                THE COURT:  ALL RIGHT.  DO YOU HAVE ANY PRIOR
 6    EXPERIENCE WITH PATENTS?
 7                PROSPECTIVE JUROR:  NO.
 8                THE COURT:  NO?  ALL RIGHT.  THANKS VERY MUCH FOR
 9    BEING HERE.
10
11                PROSPECTIVE JUROR:  ALL RIGHT.  MY NAME IS DI ZHANG.
12    I HAVE A DARK LETTER OF SCIENCE IN BUSINESS ADMINISTRATION.
13            I WORK AT VISA.
14            I KIND OF DO A LOT OF THINGS, SO I KNOW A LOT OF STUFF --
15    I KNOW A LOT OF THINGS ABOUT A LOT OF THINGS, I GUESS.
16            I MAINLY WORK IN PROJECT MANAGEMENT.  I ALSO DO TECHNICAL
17    WRITING.  I ALSO WORK WITH A LOT OF OTHER TEAMS, SO I PRETTY
18    MUCH PICK UP A LOT OF NEW TECHNOLOGY REAL QUICKLY AND ADAPT TO
19    THEM.
20            I LIVE IN SAN JOSE.
21            SOME OF MY HOBBIES ARE VERY SPECIFIC.  SO YOU COULD SAY I
22    LIKE SPORTS, BUT ACTUALLY NOT REALLY.  I ONLY LIKE SPECIFIC
23    PORT SPORTS.  I ONLY LIKE PROFESSIONAL FOOTBALL, AND I ONLY
24    LIKE BASKETBALL.  I DON'T LIKE ANY OF THOSE OTHER SPORTS.  I
25    FIND THEM REALLY BORING.
```

1          SO IN THE TIME OF TODAY, I DON'T HAVE TO WATCH ESPN AND

2     KNOW WHAT'S GOING ON WITH BASEBALL AND THINGS LIKE THAT.  I CAN

3     WATCH SPECIFIC CHANNELS WITH STUFF THAT I LIKE.  AND THAT'S

4     BASICALLY HOW I FRAME MY LIFE.

5          I DID WRITE SOMETHING ON THE QUESTIONNAIRE YOU PROBABLY

6     READ.  I DO NOT LIKE APPLE.  I'M A VERY TECH SAVVY PERSON.

7     I'VE ALWAYS BUILT MY OWN COMPUTERS.  I DON'T LIKE APPLE

8     PRODUCTS BECAUSE THEY'RE CLOSED SYSTEMS.  I FEEL LIKE -- I DID

9     WRITE I FEEL LIKE THEY'RE MADE NOR IDIOTS, PEOPLE THAT DON'T

10    UNDERSTAND TECHNOLOGY VERY WELL AND JUST WANT TO PUSH ONE

11    BUTTON AND THINGS ARE REAL EASY.

12         SO -- BUT SAYING THAT, STILL I CAN BE IMPARTIAL.  I

13    UNDERSTAND THE, YOU KNOW, THE MAGNITUDE OF PATENT INFRINGEMENT

14    VERY WELL.

15         SO --

16              THE COURT:  AND THAT WAS ONE OF MY QUESTIONS FOR YOU.

17              PROSPECTIVE JUROR:  I KNEW THAT WOULD COME UP.

18              THE COURT:  HAVING A STRONG FEELING WITH THEIR

19    PRODUCTS, WOULD YOU BE ABLE TO PUT THAT ASIDE AND BE A FAIR

20    EVALUATOR OF THE PATENTS THAT ARE ALLEGED TO BE INFRINGED IN

21    THIS CASE?

22              PROSPECTIVE JUROR:  NO PROBLEM.

23              THE COURT:  THANK YOU VERY MUCH FOR BEING HERE.

24              PROSPECTIVE JUROR:  HI.  MY NAME IS KIARA TORRES.

25    AND I WENT TO COLLEGE FOR, LIKE, TWO YEARS, AND I'M TAKING A

```
 1        YEAR OFF.

 2             AND FOR -- I LIVE IN WATSONVILLE.  AND I DON'T HAVE ANY

 3        HOBBIES.  I JUST HANG OUT WITH MY FAMILY AND FRIENDS AND READ

 4        AND DRAW.

 5             AND FOR SPECIAL SKILLS OR SPECIAL TRAINING, I DON'T REALLY

 6        HAVE ANYTHING, BUT I'LL KEEP AN OPEN MIND, AND I HAVE THE TIME

 7        TO BE HERE.

 8             THE COURT:  VERY GOOD.  THANK YOU FOR BEING HERE.

 9             PROSPECTIVE JUROR:  GOOD MORNING.  OR GOOD AFTERNOON.

10        MY NAME IS MARGARET SUSOEV.

11        I'M -- I FINISHED HIGH SCHOOL.  I DON'T HAVE ANY COLLEGE

12        EDUCATION.

13        BUT I LIVE IN SAN JOSE FOR ABOUT 25 YEARS.

14        I DO -- MY HOBBIES -- WELL, I WORK AT OAK HILL FUNERAL

15        HOME, SO I RUN THE FRONT OFFICE, THE RECEPTION THERE.  I WORK

16        WITH A LOT OF PEOPLE.

17             I'M HONEST, CARING, I FOLLOW DIRECTIONS REALLY WELL.  I'VE

18        GOT A LOT OF COMMON SENSE.  I LISTEN WELL AND I'M IMPARTIAL,

19        AND I WOULD LOVE TO BE ON THE JURY.

20             THE COURT:  OUTSTANDING.

21             PROSPECTIVE JUROR:  MY HOBBIES, I WORK FOR HOSPICE

22        VOLUNTEERS, SO I MAKE THE COMFORT BEARS FOR A LOT OF FAMILIES

23        THAT NEED A LITTLE COMFORT.

24             AND MY SPECIAL TRAINING IS I RUN A LOT OF SERVICES FOR

25        FAMILIES THAT LOST A CHILD BECAUSE I LOST MY SON.  SO I DO RUN
```

1      A LOT OF SPECIAL SERVICES FOR FAMILIES.

2              THE COURT:  THANK YOU VERY MUCH FOR BEING HERE.

3          LET'S PASS IT UP TO MS. SMITH HERE IN THE FRONT ROW.

4              PROSPECTIVE JUROR:  CAN I HAVE THAT -- OKAY.

5          I'M REBECCA SMITH.  I HAVE EDUCATION IN SOCIAL WORK.  I

6      GOT AN UNDERGRAD DEGREE AT U.C SANTA CRUZ AND THEN A MASTER'S

7      DEGREE HERE AT SAN JOSE STATE FOR SOCIAL WORK.

8              I CURRENTLY LIVE IN SANTA CRUZ.

9          I WORK OUT OF SAN JOSE AND MENLO PARK AT THE V.A.  I'M IN

10     COMMUNITY MENTAL HEALTH AS A SOCIAL WORKER.

11             MY HOBBIES INCLUDE -- IT USED TO BE A LOT OF SOCCER, BUT I

12     TORE MY ACL, SO NOW IT'S PT ALL THE TIME.

13             SPECIAL SKILLS OR SPECIAL TRAINING WOULD INCLUDE MENTAL

14     HEALTH TRAINING, HUMAN BEHAVIOR.  I BELIEVE THAT I UNDERSTAND

15     PEOPLE PRETTY WELL AND THEIR MOTIVES, MOTIVATIONS, AND I HAVE

16     PRETTY GOOD COMMUNICATION SKILLS.

17             THE COURT:  DO YOU WORK OUT OF THE PALO ALTO V.A.

18     FACILITY?

19             PROSPECTIVE JUROR:  IT'S THAT HOSPITAL SYSTEM, YEAH.

20     AND SOMETIMES I GO TO PALO ALTO HOSPITAL FOR IN-PATIENT

21     PSYCHIATRY.

22             THE COURT:  ALL RIGHT.  AND IS THERE ANYTHING MORE

23     YOU WOULD LIKE THE PARTIES TO KNOW THAT WOULD IMPACT YOUR

24     ABILITY TO BE A FAIR AND IMPARTIAL JUROR?

25             PROSPECTIVE JUROR:  I DON'T THINK SO.  I DON'T KNOW

1      TOO MUCH ABOUT, ABOUT COMPUTER SOFTWARE AND APPLE VERSUS ANY

2      OTHER COMPANY OTHER THAN THE FACT THAT I USE APPLE.

3            BUT, YEAH, TECHNICALLY I'M NOT SO INCLINED.

4            SOCIALLY I'M MORE INCLINED.

5                  THE COURT:  VERY GOOD.  THANK YOU FOR BEING HERE.

6                  PROSPECTIVE JUROR:  MY NAME IS TOM GRIFFIN.  I HAVE A

7      HIGH SCHOOL DEGREE.  I HAVE SOME COLLEGE.

8            I LIVE IN SUNNYVALE.

9            I WORK FOR A BROKERAGE FIRM IN MENLO PARK, BEEN THERE FOR

10     20 YEARS.

11           HOBBIES WISE, I LOVE PLAYING GOLF.  PRETTY MUCH ANY TYPE

12     OF SPORT.

13           AS FAR AS SPECIAL SKILLS OR TRAINING, I CONSIDER MYSELF A

14     VERY GOOD LISTENER, AND I CAN MULTI TASK PRETTY WELL.

15                 THE COURT:  VERY GOOD.  THANK YOU VERY MUCH.

16                 PROSPECTIVE JUROR:  GOOD AFTERNOON.  MY NAME IS

17     CHARLES MAIDMENT.  I'M THE EXECUTIVE DIRECTOR AT THE SALINAS

18     YMCA.

19           I LIVE IN SALINAS.

20           I HAVE A LITTLE BIT OF COLLEGE, BUT NO FORMAL DEGREE.

21           MY HOBBIES ARE RUNNING AND GOLF.

22           AND I GUESS MY ONLY SPECIAL SKILLS ARE LOTS OF YEARS OF

23     BUSINESS MANAGEMENT.

24                 THE COURT:  VERY GOOD.  THANK YOU FOR BEING HERE.

25                 PROSPECTIVE JUROR:  MY NAME IS MARK BLANCHARD.

1       MY EDUCATION, EDUCATIONAL BACKGROUND IS IN MATH, PHYSICS,

2   ENVIRONMENTAL STUDIES FROM U.C. SANTA CRUZ.

3       I LIVE IN LOS GATOS.  I'M A SELF-EMPLOYED GUITAR MAKER AND

4   INVENTOR.  I HAVE TWO PATENTS.

5       HOBBIES ARE MOUNTAINEERING, ROCK CLIMBING.

6       AND SPECIAL SKILLS WOULD BE MY UNDERSTANDING OF PATENTS.

7   I DID BOTH MY PATENTS MYSELF, DID ALL THE PAPERWORK.  SO I HAVE

8   A LITTLE BIT DEEPER UNDERSTANDING OF ALL OF THAT THAN MOST

9   PEOPLE DO.

10          THE COURT:  CAN YOU TELL US MORE ABOUT THE PATENTS

11   THAT YOU POSSESS?

12          PROSPECTIVE JUROR:  ONE IS A ROCK CLIMBING DEVICE.

13   IT'S A FALL ARRESTING DEVICE.  AND THE OTHER IS GUITAR RELATED.

14   IT'S A TRUSS ROD FOR ADJUSTING THE NECK ON A GUITAR.  THAT ONE

15   I CURRENTLY MANUFACTURE AND SELL.

16          THE COURT:  AND DO YOU ENGAGE IN LICENSING ACTIVITY

17   FOR THAT PATENT?

18          PROSPECTIVE JUROR:  I LICENSED MY FIRST ONE.  IT'S

19   LONG SINCE EXPIRED.

20       THE CURRENT ONE, I AM NOT LICENSING.  I'M MANUFACTURING

21   AND SELLING IT MYSELF.

22          THE COURT:  YOU MENTIONED IN YOUR QUESTIONNAIRE THAT

23   YOU KNOW ONE OF THE FOUNDERS OF APPLE, MR. WOZNIAK.

24          PROSPECTIVE JUROR:  INDIRECTLY.  I'M FRIENDS WITH HIS

25   PERSONAL ASSISTANT AND HAVE SOME INDIRECT DEALINGS WITH

```
1        STEVE WOZNIAK THROUGH --

2                THE COURT:  ARE THOSE RECENT CONNECTIONS OR IN THE

3        PAST?

4                PROSPECTIVE JUROR:  FIVE TO TEN YEARS AGO.

5                THE COURT:  WOULD YOU BE ABLE TO PUT ASIDE THAT

6        PERSONAL CONNECTION AND BE A FAIR JUROR IN THIS CASE?

7                PROSPECTIVE JUROR:  I CAN CERTAINLY TRY.

8                THE COURT:  WELL, IF YOU WERE IN THE POSITION OF

9        CORE WIRELESS, WOULD YOU THINK THAT YOU WOULD BE A FAIR JUROR,

10       OR NOT?

11               PROSPECTIVE JUROR:  I'M NOT SURE.

12           I'M ALSO A REAL STRONG BELIEVER IN APPLE PRODUCTS AND

13       I'VE BEEN AN APPLE USER SINCE 1977.

14               THE COURT:  THANK YOU VERY MUCH FOR BEING HERE.

15               PROSPECTIVE JUROR:  THANK YOU.

16               PROSPECTIVE JUROR:  HI.  FIRST NAME FOOKWENG, LAST

17        NAME CHEONG.  PEOPLE CALL ME KEVIN AS WELL.

18           STUDIED IN RMIT AUSTRALIA FOR FOUR YEARS.  MOVED HERE

19       ABOUT 12 YEARS AGO.  RECENTLY GOT MY CITIZENSHIP.

20           I LIVE IN CUPERTINO.

21           HOBBIES ARE I LIKE COLLECTIBLE CARD GAMES.  I'M INVOLVED

22       PRETTY MUCH IN CONSULTING AS WELL.  I'VE BEEN CONSULTING FOR A

23       LONG TIME.

24           SPECIAL SKILLS IS PROBABLY LISTENING AND THEN HELPING

25       PEOPLE SOLVE THEIR ISSUES, BASICALLY.  THAT'S WHAT I DO A LOT.
```

1      AND ALSO PROJECT MANAGEMENT.

2              THE COURT:  THANK YOU VERY MUCH FOR BEING HERE.

3              PROSPECTIVE JUROR:  HI.  MY NAME IS JOSEPH FLORESCA.

4      I HAVE A -- I FINISHED HIGH SCHOOL AND SOME COLLEGE YEARS.

5          I LIVE IN SAN JOSE, AND I'M A MAINTENANCE WORKER AT

6      BELMORE CORPORATION, THE WELDING COMPANY.

7              THE COURT:  WHICH BELMORE LOCATION DO YOU WORK AT?

8              PROSPECTIVE JUROR:  MILPITAS.

9              THE COURT:  THANK YOU VERY MUCH FOR BEING HERE.

10         ALL RIGHT.  SO THAT CONCLUDES OUR FIRST 20 JURORS.  I KNOW

11     IT'S THE LUNCH HOUR AND PEOPLE ARE PROBABLY GETTING HUNGRY.

12     I'M ALSO MINDFUL OF WANTING TO GET THE JURORS HOME WHO ARE NOT

13     GOING TO BE ON THE JURY AND TO GET THIS PROCESS COMPLETED AS

14     QUICKLY AS POSSIBLE, AND THAT'S WHY I'M GOING TO GO A LITTLE

15     BIT FARTHER.

16         WE WILL HAVE A LUNCH BREAK FOR THOSE JURORS SELECTED, BUT

17     I WOULD CONCLUDE THIS PROCESS AND ASK YOU TO STICK AROUND A

18     LITTLE BIT LONGER SO THAT WE CAN POTENTIALLY GET EVERYONE ELSE

19     EXCUSED TO GO HOME.  SO THANK YOU FOR YOUR CONTINUED ATTENTION.

20         WHAT I'M GOING TO DO NOW IS ASK FOR THOSE FIRST 20 JURORS

21     SOME FOLLOW-UP QUESTIONS FOR ALL OF YOU.  AGAIN, IN THE

22     AUDIENCE, YOU CAN KEEP LISTENING, BUT THESE QUESTIONS ARE NOT

23     TARGETED TO YOU YET.

24         SO IF YOUR ANSWER TO ONE OF THESE QUESTIONS IS -- YOU HAVE

25     SOMETHING TO SAY ABOUT IT, PLEASE RAISE YOUR HAND AND I'LL COME

```
1       TO YOU INDIVIDUALLY TO FOLLOW UP.

2           SO FOR THOSE FIRST 20 JURORS, DO ANY OF YOU KNOW ANY OF

3       THE COURT STAFF?  DO YOU KNOW ME FROM BEFORE OR DO YOU KNOW ANY

4       OF MY COURT STAFF FROM BEFORE TODAY?

5           NO HANDS.

6           DO ANY OF THE FIRST 20 JURORS KNOW ANY OF THE ATTORNEYS

7       WHO INTRODUCED THEMSELVES TO YOU BRIEFLY THIS MORNING?

8           NO HANDS.

9           AND A FEW OF YOU -- EXCUSE ME.

10          A FEW OF THE WITNESSES WERE INTRODUCED BY CORE WIRELESS'S

11      COUNSEL, AND THOSE AREN'T ALL THE WITNESSES YOU'LL HEAR IN THE

12      CASE, BUT THEY ARE SOME OF THE WITNESSES YOU'LL HEAR IN THE

13      CASE.

14          DID ANY OF THE JURORS RECOGNIZE AND KNOW ANY OF THOSE

15      WITNESSES IN THE CASE?

16          NO HANDS.

17          DO ANY OF THE FIRST 20 JURORS HAVE A FINANCIAL STAKE IN

18      EITHER OF THE PARTIES, CORE WIRELESS OR APPLE?  MEANING DO YOU

19      OWN ANY STOCK IN ONE OF THOSE COMPANIES?

20          ALL RIGHT.  LET'S GO TO THE FRONT ROW THERE.  I THINK THAT

21      WAS MR. BLANCHARD; RIGHT?

22              PROSPECTIVE JUROR:  YES.

23              THE COURT:  CAN YOU TELL US -- STAND UP AND MAYBE

24      SPEAK INTO THE MICROPHONE.  YOU DON'T NEED TO TELL ME EXACTLY

25      HOW MUCH, BUT CAN YOU TELL ME MORE ABOUT WHAT THE FINANCIAL
```

1    STAKE YOU HAVE IS?

2              PROSPECTIVE JUROR:  I JUST OWN COMMON STOCK IN APPLE

3    COMPUTER.

4              THE COURT:  ALL RIGHT.  THANK YOU.

5         AND THERE WAS -- I THINK NEXT TO YOU.

6              PROSPECTIVE JUROR:  YEAH.  I OWN TWO SHARES OF APPLE.

7              THE COURT:  TWO SHARES.

8         (LAUGHTER.)

9              THE COURT:  AND WOULD YOU BE ABLE TO PUT THAT

10   OWNERSHIP ASIDE AND BE A FAIR JUDGE IN THIS CASE?

11             PROSPECTIVE JUROR:  YEAH.

12             THE COURT:  ALL RIGHT.  THANK YOU.

13        WERE THERE ANY OTHER JURORS WHO HAVE A FINANCIAL STAKE IN

14   EITHER OF THE COMPANIES?

15        ALL RIGHT.  I'M SEEING NONE.

16        HAVE ANY OF THE POTENTIAL JURORS EVER BEEN RETAINED AS AN

17   EXPERT WITNESS IN A LAWSUIT?

18        THERE ARE CERTAIN WITNESSES WHO, BECAUSE OF THEIR SKILLS

19   AND EXPERIENCES, CAN BE QUALIFIED AS EXPERTS TO TESTIFY.  I'M

20   JUST WONDERING IF ANY JURORS HAVE EVER TESTIFIED OR BEEN

21   RETAINED TO TESTIFY AS AN EXPERT WITNESS?

22        NO.

23        PLEASE RAISE YOUR HAND IF YOU BROUGHT AN IPHONE OR AN IPAD

24   TO COURT WITH YOU TODAY.

25        ALL RIGHT.  THAT'S 10 OUT OF THE FIRST 20 WITNESSES -- 20

1    JURORS.

2         PLEASE RAISE YOUR HAND IF YOU'VE REACHED A CONCLUSION

3    ABOUT WHICH PARTY SHOULD WIN THIS CASE?

4         GOOD.  THAT WAS A TEST.

5         (LAUGHTER.)

6           THE COURT:  YOU SHOULD KEEP -- YOU'VE NOT HEARD ANY

7    EVIDENCE YET, AND I DON'T WANT YOU TO REACH A CONCLUSION UNTIL

8    YOU'VE HEARD ALL THE EVIDENCE, NOT JUST FROM ONE PARTY, BUT

9    UNTIL YOU'VE HEARD ALL THE EVIDENCE IN THE CASE, PLEASE DON'T

10   REACH A CONCLUSION ABOUT THAT.

11        HAS ANY JUROR HEARD ANY INFORMATION ABOUT THIS CASE BEFORE

12   TODAY?

13        NO HANDS.

14        ALL RIGHT.  AND DOES ANY JUROR OF THE FIRST 20 HAVE ANY

15   OTHER INFORMATION THAT YOU WOULD LIKE THESE PARTIES TO KNOW

16   THAT WOULD IMPACT YOUR ABILITY TO BE A FAIR AND IMPARTIAL JUROR

17   IF YOU HAVE NOT ALREADY SHARED THAT INFORMATION IN YOUR

18   QUESTIONNAIRE OR HERE IN COURT?

19        NO.  ALL RIGHT.

20        SO AT THIS POINT I'M GOING TO GIVE EACH PARTY AN

21   OPPORTUNITY TO ASK SOME QUESTIONS OF THEIR OWN, AND THEY MIGHT

22   BE QUESTIONS TO THE ENTIRE GROUP, OR THEY CAN IDENTIFY

23   PARTICULAR JURORS.

24        THEIR OBJECTIVE, LIKE MINE, IS TO FIND A FAIR AND

25   IMPARTIAL JURY, AND THEY ARE ALLOWED TO ASK QUESTIONS TO HELP

1    THEM DO THAT PROCESS.

2         WE'LL START WITH CORE WIRELESS.

3            MR. FENSTER:  THANK YOU, YOUR HONOR.

4         HELLO, EVERYONE.  I INTRODUCED MYSELF EARLIER.  I'M

5    MARC FENSTER.

6         AND I APOLOGIZE IN ADVANCE IF THAT THIS IS A QUESTION

7    WHERE YOU HAVE TOTAL STRANGERS ASKING YOU QUESTIONS.  I'LL

8    ANSWER SOME OF THE QUESTIONS, I THINK IT'S FAIR.

9         I'M -- I'VE BEEN MARRIED FOR 18 YEARS.  I'VE GOT TWO

10   DAUGHTERS.  MADDIE AND DANI ARE 14 AND 18.  I'VE GOT A BIO

11   ENGINEER BACKGROUND, WENT TO SCHOOL IN UCLA, AND LIVE IN LOS

12   ANGELES.

13        AND CYCLING AND THOSE ARE KIND OF MY HOBBIES.

14        SO WE'RE HERE TO TRY TO FIND A GROUP OF JURORS WHO CAN

15   HEAR OUR CASE.  CORE WIRELESS OWNS TWO PATENTS, SO SOME OF THE

16   QUESTIONS THAT I'M GOING TO BE ASKING ARE REALLY AIMED AT

17   IDENTIFYING WHETHER OR NOT YOU CAN BE PARTIAL AND -- IMPARTIAL

18   IN DECIDING THAT CASE AND LISTENING TO THE EVIDENCE FOR US.

19        DOES ANYONE HAVE ANY STRONG FEELINGS ABOUT LITIGATION?

20   THERE'S A LOT OF LAWSUITS, YOU SEE A LOT OF LAWSUITS IN THE

21   PRESS THESE DAYS.  ANYONE HAVE STRONG FEELINGS THAT THE

22   LITIGATION SYSTEM IS JUST BROKEN, WE HAVE TOO MANY LAWSUITS?

23   ANYONE HAVE A FEELING LIKE THAT, THAT THE LITIGATION SYSTEM

24   NEEDS TO BE FIXED?

25        DOES ANYONE HAVE A PROBLEM WITH -- DOES ANYONE THINK THAT

```
 1        IT'S WRONG TO COME TO COURT TO TRY TO PROTECT A PATENT IF THEY

 2        THINK THAT IT'S BEEN VIOLATED?  OR SHOULD THEY JUST DEAL WITH

 3        IT ON THEIR OWN?

 4            DOES ANYONE FEEL UNCOMFORTABLE ABOUT SOMEONE COMING TO

 5        COURT AND ASKING YOU TO DECIDE TO PROTECT THEIR PATENT RIGHTS?

 6        DOES ANYONE FEEL THAT WAY?

 7            MS. KREFT, I'M GOING TO PICK ON YOU FIRST.

 8            (LAUGHTER.)

 9                PROSPECTIVE JUROR:  OKAY.

10                MR. FENSTER:  YOU MENTIONED THAT YOU HAVE SOME APPLE

11        PRODUCTS.  I HAVE AN APPLE PRODUCT.

12                PROSPECTIVE JUROR:  I'M AN APPLE FAN.

13                MR. FENSTER:  YOU'RE AN APPLE FAN.  THAT'S RIGHT.

14                PROSPECTIVE JUROR:  I HAVE THE WATCH AND THE WHOLE

15        THING.

16                MR. FENSTER:  OKAY.  WE ALSO HEARD FROM MR. ZHANG

17        RIGHT IN FRONT OF YOU, WHO --

18                PROSPECTIVE JUROR:  I HATE THEM.

19                MR. FENSTER:  WHO IS NOT AN APPLE FAN.

20            HE MENTIONED THAT HE THOUGHT THAT EVEN THOUGH HE WASN'T AN

21        APPLE FAN, HE COULD BE FAIR AND IMPARTIAL IN DECIDING THE CASE.

22            TELL ME ABOUT SORT OF HOW BIG A DEVOTEE -- HOW MUCH DO YOU

23        LOVE APPLE?  HOW BIG --

24                THE COURT:  FOR ANYONE ANSWERING THE QUESTIONS, IF WE

25        CAN PASS THAT JUROR THE MICROPHONE.  AND OUR COURT REPORTERS DO
```

```
 1        NEED TO GET DOWN EVERY WORD.

 2                PROSPECTIVE JUROR:  I JUST DON'T KNOW IF I CAN BE

 3        FAIR.  THAT'S WHERE I'M COMING FROM.

 4                MR. FENSTER:  OKAY.  TELL ME A LITTLE BIT ABOUT THAT.

 5        IT'S TOTALLY FAIR.  WE ALL COME IN WITH OUR OWN IDEAS, AND SO

 6        TELL ME A LITTLE BIT ABOUT THAT.

 7                PROSPECTIVE JUROR:  I DON'T HAVE ANSWERS FOR THAT.

 8                MR. FENSTER:  OKAY.  YOU HAVE -- OKAY.  SO YOU HAVE A

 9        BUNCH OF APPLE PRODUCTS?

10                PROSPECTIVE JUROR:  UM-HUM.

11                MR. FENSTER:  DO YOU BUY NEW PRODUCTS WHEN THEY COME

12        OUT?

13                PROSPECTIVE JUROR:  UM-HUM.  I JUST GOT THE NEW

14        PHONE.

15                MR. FENSTER:  AND BECAUSE OF THAT, DO YOU THINK THAT

16        IT WOULD BE HARD FOR YOU TO EVALUATE --

17                PROSPECTIVE JUROR:  TO STAY FOCUSSED MAYBE AND TRY TO

18        MAKE AN IMPARTIAL DECISION.

19                MR. FENSTER:  OKAY.  IF WE -- EVEN THOUGH -- SO

20        APPLE'S NOT ON TRIAL FOR BEING GOOD OR BAD.

21                PROSPECTIVE JUROR:  RIGHT.

22                MR. FENSTER:  OR MAKING GOOD PRODUCTS OR NOT.

23          THE ONLY QUESTION IS WHETHER THEY USE THE TECHNOLOGY

24        PROTECTED BY THE TWO PATENTS.

25                SO IF WE PRESENT EVIDENCE THAT APPLE'S PHONES, AS GOOD AS
```

1    THEY ARE, DO USE THIS TECHNOLOGY, DO YOU THINK YOU COULD PUT

2    YOUR FEELINGS ABOUT APPLE ASIDE AND FIND FOR INFRINGEMENT?

3              PROSPECTIVE JUROR:  I'M NOT SURE.  I --

4              MR. FENSTER:  OKAY.

5              PROSPECTIVE JUROR:  YEAH.

6              MR. FENSTER:  THANK YOU.

7         DOES ANYONE ELSE FEEL THAT THEY SHARE MS. KREFT'S FEELING

8    THAT IT MIGHT BE HARD, BECAUSE WE LIKE APPLE SO MUCH, WE'VE

9    GOT -- YOU KNOW, I USE ALL THEIR PRODUCTS, THE KIDS USE THEIR

10   PRODUCTS, WHATEVER IT IS, THAT IT MIGHT BE HARD TO EVALUATE?

11   DOES ANYONE ELSE FEEL THAT WAY?

12        MR. -- SO I WANTED TO ASK A LITTLE BIT ABOUT EXPERIENCE

13   WITH PATENTS.

14        SO SEVERAL OF YOU HAVE WORKED AT A TECHNOLOGY COMPANY.

15   HAS ANYONE WORKED AT A COMPANY THAT HAS BEEN SUED FOR PATENT

16   INFRINGEMENT?  HAS ANYONE WORKED --

17             PROSPECTIVE JUROR:  WE DON'T HAVE -- IT'S POSSIBLE,

18    BUT WE HAVE NO IDEA.

19             MR. FENSTER:  OKAY.  BUT IT'S NOT SOMETHING THAT'S

20   REGISTERED WITH YOU AND HAS BEEN PART OF YOUR EXPERIENCE THAT

21   WOULD AFFECT YOUR UNDERSTANDING COMING INTO THIS CASE?

22             PROSPECTIVE JUROR:  CORRECT.

23             MR. FENSTER:  HAS ANYONE WORKED AT A COMPANY THAT

24   ASSERTED PATENTS FOR INFRINGEMENT?  THEY HAD -- THEIR COMPANY

25    HAD PATENTS AND THOUGHT THAT SOMEONE ELSE MIGHT BE INFRINGING

1      THEM AND ASSERTED PATENTS?

2          MR. DEGRANGE.

3              PROSPECTIVE JUROR:  YEAH.  I THINK SO, BUT I DON'T

4      KNOW.

5          I DON'T HAVE A CLEAR EXAMPLE OF WHAT PATENTS WERE

6      INVOLVED.

7              MR. FENSTER:  OKAY.

8              PROSPECTIVE JUROR:  I WORK FOR BIG COMPANY, MOST OF

9      THEM BIG COMPANIES.

10              MR. FENSTER:  YOU MENTIONED THAT YOU HAD ONE PATENT

11      AND YOU FILED ANOTHER APPLICATION?

12              PROSPECTIVE JUROR:  YES.

13              MR. FENSTER:  DO YOU HAVE ANY FEELINGS ABOUT THE

14      PATENT SYSTEM AND THE PURPOSE OF PATENTS?

15              PROSPECTIVE JUROR:  YES.  I THINK THE PATENTS ARE

16      REQUIRED AND NECESSARY FOR PROTECTING COMPANIES -- PROTECTING

17      SMALL COMPANIES FOR WHAT THEY INVENT AND WHAT THEY TRY TO

18      ACHIEVE, FROM A FINANCIAL POINT OF VIEW, AS WELL AS A TECHNICAL

19      POINT OF VIEW.

20              MR. FENSTER:  OKAY.  THANK YOU.

21          YOU'LL HEAR IN THIS CASE, THE JUDGE WILL TELL YOU THAT

22      PATENTS ARE LIKE ANY OTHER PROPERTY THAT CAN BE BOUGHT AND

23      SOLD.  SO THE PATENTS THAT WE'RE GOING TO BE TALKING ABOUT WERE

24      ACTUALLY INVENTED BY NOKIA ENGINEERS, AND THEN CORE WIRELESS

25      ACQUIRED THOSE PATENTS.

1          AND YOU'LL HEAR MORE ABOUT THAT IN THE TRIAL.

2          DOES ANYONE HAVE ANY QUALMS OR UNEASY FEELINGS ABOUT THE

3     IDEA THAT PATENTS CAN BE SOLD OR ACQUIRED AND STILL ENFORCED?

4     ANYONE HAVE ANY QUESTIONS ABOUT WHY THAT IS?

5          SO ONE OF THE THEMES THAT YOU MIGHT HEAR IN THIS CASE IS

6     THAT CORE WIRELESS DOESN'T MAKE ANY PRODUCTS ITSELF.  SO

7     CORE WIRELESS OWNS THE PATENT RIGHTS AND IS HERE TO ENFORCE THE

8     PATENT RIGHTS.

9          BUT CORE WIRELESS IS NOT A CELL PHONE COMPANY.

10         WHO FEELS THAT IT'S OKAY FOR A CELL PHONE -- FOR A COMPANY

11    TO ASSERT PATENTS EVEN IF THEY DON'T MAKE THE PRODUCT?

12         OKAY.  A NUMBER OF YOU.

13         DOES ANYONE FEEL DIFFERENTLY, THAT IT'S NOT OKAY?  OR HAVE

14    QUESTIONS ABOUT WHETHER OR NOT THAT'S -- THAT'S RIGHT THAT

15    SOMEONE WHO DOESN'T MAKE THE PRODUCT THAT'S PROTECTED BY THEIR

16    PATENT CAN NONETHELESS ENFORCE IT AGAINST THOSE WHO DO?

17             PROSPECTIVE JUROR:  I WOULD HAVE A QUESTION.

18             MR. FENSTER:  SURE.

19             PROSPECTIVE JUROR:  THIS IS THE FIRST TIME THAT I'VE

20     HEARD THAT.

21         SO I WOULD ASK WHAT THE LAW IS REGARDING A PATENT THAT'S

22    BEEN SOLD OR PURCHASED --

23             MR. FENSTER:  UM-HUM.

24             PROSPECTIVE JUROR:  -- BY ANOTHER COMPANY.

25             THE COURT:  AND I'LL INTERRUPT HERE TO SAY THAT I

1    WILL BE INSTRUCTING THOSE JURORS ON THE LAW OF PATENTS AND THE

2    LAW THAT'S APPLIED IN THIS CASE.  SO QUESTIONS LIKE THAT WILL

3    BE ANSWERED IN DUE TIME.

4        GOOD QUESTION.

5             MR. FENSTER:  IF, MS. RIFFIN, IS THAT RIGHT, IF THE

6    JUDGE TELLS YOU THAT THE OWNER OF A PATENT HAS THE RIGHT TO

7    ENFORCE THAT PATENT, EVEN IF THEY DON'T MAKE IT, WOULD YOU FEEL

8    COMFORTABLE ENFORCING -- APPLYING THE JUDGE'S INSTRUCTIONS IN

9    THAT REGARD?

10            PROSPECTIVE JUROR:  I THINK WE HAVE TO -- SORRY.  I

11   PROBABLY DON'T NEED IT.

12       I THINK WE HAVE TO GO BY WHAT THE LAW SAYS, AND IF THE

13   JUDGE GIVES US THAT INFORMATION FROM THE LAWS, THEN I THINK WE

14   HAVE TO GO WITH THAT.

15            MR. FENSTER:  MR. CHEONG.

16            PROSPECTIVE JUROR:  YES.

17            MR. FENSTER:  DID I PRONOUNCE THAT RIGHT?

18            PROSPECTIVE JUROR:  YEAH, CHEONG.

19            MR. FENSTER:  YOU MENTIONED IN YOUR -- IN YOUR JURY

20   QUESTIONNAIRE THAT I THINK YOU WORKED AT A COMPANY THAT WAS

21   TRYING TO GET APPLE AS A CUSTOMER?

22            PROSPECTIVE JUROR:  YEAH.

23            MR. FENSTER:  IS THAT RIGHT?

24            PROSPECTIVE JUROR:  YES.

25            MR. FENSTER:  CAN YOU TELL ME A LITTLE BIT ABOUT

1    THAT?  IS THAT SOMETHING THAT YOU THINK MIGHT AFFECT YOUR

2    ABILITY TO SERVE AS A JUROR IN THIS CASE?

3            PROSPECTIVE JUROR:  I DON'T THINK IT'S GOING TO

4    AFFECT ME.  WHAT WE'RE TRYING TO DO BASICALLY IS MAKE SURE THAT

5    WE'RE IN THE TAX AND ACCOUNTING PURPOSE.

6        SO WE SELL TO A LOT OF CUSTOMERS, 90 PERCENT OF BIG SIZE

7    AUDITING FIRMS USE US, AND A LOT OF, THE TOP HUNDRED COMPANIES

8    ARE USING US AS WELL.

9        SO WE -- APPLE IS NOT USING US.  WE'RE TRYING TO GET THEM

10   TO USE US.

11           MR. FENSTER:  OKAY.

12           PROSPECTIVE JUROR:  SO GOOGLE USES US, MICROSOFT USES

13   US.

14           MR. FENSTER:  APPLE SHOULD, TOO.

15       SO DO YOU HAVE ANY -- BECAUSE YOU'RE TRYING TO -- ARE YOU

16   ACTIVELY INVOLVED IN SOLICITING THEIR BUSINESS RIGHT NOW?

17           PROSPECTIVE JUROR:  NO.  RIGHT NOW I'VE BEEN -- YEAH,

18   BECAUSE OF -- I DON'T KNOW -- I WAS LATE BECAUSE I JUST JOINED

19   THE COMPANY, SO PRETTY MUCH MY COLLEAGUES ARE AND I'M NOT.

20           MR. FENSTER:  OKAY.  DOES THE FACT THAT YOUR COMPANY

21   IS TRYING TO GET APPLE AS A CUSTOMER, WOULD THAT AFFECT YOUR

22   ABILITY TO FAIRLY WEIGH THE EVIDENCE IN THIS CASE?

23           PROSPECTIVE JUROR:  NO.

24           MR. FENSTER:  THANK YOU, MR. CHEONG.

25           MR. XIE, X-I-E?  IS IT MR. XIE?

1          PROSPECTIVE JUROR:  XIE.

2          MR. FENSTER:  DR. XIE.  SO YOU HAVE A PH.D. IN BIO

3     SCIENCES AND A NUMBER OF PATENTS YOURSELF; IS THAT RIGHT?

4          PROSPECTIVE JUROR:  YES.

5          MR. FENSTER:  SO YOU MENTIONED THAT YOU HAD A HARD --

6     THAT IT WOULD BE HARD FOR YOU TO SERVE ON THE JURY BECAUSE OF

7     YOUR COMPANY?

8          PROSPECTIVE JUROR:  YEAH.

9          MR. FENSTER:  CAN YOU TELL US A LITTLE BIT ABOUT

10    THAT, PLEASE?

11         PROSPECTIVE JUROR:  I FOUNDED A SMALL BIOTECH COMPANY

12    AND WE PROVIDE SERVICES FOR CRO, CONTRACT RESEARCH, CONTRACT

13    RESEARCH (ORGANIZATION.  SO OUR COMPANY HAVE ABOUT 50 CLIENTS

14    IN THIS AREA ALONE.  SO WE HAVE A LOT OF PROJECT FROM THOSE

15    BIOTECH COMPANIES, AND WE HAVE TO RUN TESTING FOR THEM ALMOST

16    ON A DAILY BASIS.

17         MR. FENSTER:  OKAY.  DO YOU THINK THAT IF YOU ARE

18    SELECTED AS A JUROR, DO YOU THINK YOU'LL BE ABLE TO PAY

19    ATTENTION AND WEIGH THE EVIDENCE FAIRLY AND EXAMINE THE ISSUES

20    OF INFRINGEMENT AND VALIDITY?

21         PROSPECTIVE JUROR:  IT WOULD BE TOUGH FOR ME TO

22    CONCENTRATE.  SO -- BUT THAT'S THE REAL --

23         MR. FENSTER:  AND -- AND IT WOULD BE TOUGH TO

24    CONCENTRATE BECAUSE OF YOUR WORK RELATED THINGS?

25         PROSPECTIVE JUROR:  RIGHT.

```
 1                  MR. FENSTER:  ALL RIGHT.  THANK YOU, MR. XIE,
 2        DR. XIE.
 3             MR. GARCIA.
 4                  PROSPECTIVE JUROR:  YES.
 5                  MR. FENSTER:  SO, MR. GARCIA, YOU MENTIONED THAT YOU
 6        WORK AT ABBOTT VASCULAR?
 7                  PROSPECTIVE JUROR:  CORRECT, YES.
 8                  MR. FENSTER:  CAN YOU TELL ME ABOUT WHAT EXPERIENCE
 9        YOU HAD WITH THE PATENT SYSTEM, OR THE IMPORTANCE OR
10        UNIMPORTANCE OF PATENTS, GOOD OR BAD, IN CONNECTION WITH ABBOTT
11        VASCULAR.
12                  PROSPECTIVE JUROR:  AT THAT LEVEL, I HAVEN'T VERY
13        CLOSELY BEEN INVOLVED.  I'VE MORE SO BEEN INVOLVED IN WHAT WE
14        HAVE -- WE HAVE COMMERCIAL PRODUCT FOR DEVELOPMENT, R&D
15        PRODUCTS.
16             BUT AS FAR AS ACTUALLY WORKING WITH THE PH.D.'S IN
17        DEVELOPMENT, I HAVEN'T HAD THAT INTERFACE.
18             DOES THAT ANSWER YOUR QUESTION.
19                  MR. FENSTER:  YES, IT DOES.  THANK YOU.
20             DO YOU HAVE ANY FEELINGS ABOUT PATENTS ONE WAY OR THE
21        OTHER THAT WILL --
22                  PROSPECTIVE JUROR:  I MEAN, AS FAR AS A PATENT, YOU
23        NEED TO RESPECT A COMPANY THAT DEVELOPED IT AND NOT BE TAKING
24        TECHNOLOGY FROM ONE TO ANOTHER.  THAT'S ALWAYS AN ISSUE AS FAR
25        AS RESPECTING AND ETHICS, THOSE TYPE OF THINGS.
```

1          AND MY PERSONAL BACKGROUND, BEING IN THE FDA INDUSTRY,

2     ETHICS IS MOST IMPORTANT TO ME.  IF I DIDN'T FEEL THAT WAY --

3     WHAT I'M SAYING IS ETHICS IS OF ULTIMATE IMPORTANCE TO ME.  I'M

4     EMPLOYED WITH A COMPANY IN THE FDA INDUSTRY, SO THAT'S TOP OF

5     THE LEVEL.

6          MR. FENSTER:  JUDGE COUSINS MENTIONED THAT THE PATENT

7      SYSTEM WAS ACTUALLY PUT IN THE CONSTITUTION 200 YEARS AGO AND

8      PART OF THE REASON THAT THE FOUNDING FATHERS PUT IT IN WAS TO

9      ENCOURAGE INNOVATION.

10          DOES ANYONE FEEL THAT THE PATENT SYSTEM, WHILE IT MAY HAVE

11     HAD ITS PURPOSE BACK THEN, NOW IT GETS IN THE WAY OF

12     INNOVATION?  NOW IT'S JUST A TAX ON BUSINESS, NOW IT'S JUST

13     MAKING -- GETTING IN THE WAY OF COMPANIES THAT ARE TRYING TO

14     MAKE GOOD PRODUCTS?

15          ANYONE -- HAS ANYONE FELT THAT WAY OR SEEN ARTICLES ABOUT

16     THAT IN THE PAPER OR HAVE CONCERNS ABOUT THAT?

17          DR. -- MR. ZHANG.

18          PROSPECTIVE JUROR:  NOT VERY STRONGLY, BUT A LITTLE

19      BIT.  I FEEL LIKE A LOT OF THINGS SHOULD BE OPEN SOURCE.  I

20      DON'T LIKE CLOSED SYSTEMS.

21          I FEEL LIKE SOMETIMES IT CAN GET IN THE WAY OF

22      COMPETITION.

23          MR. FENSTER:  OKAY.

24          PROSPECTIVE JUROR:  KIND OF FREE MARKET TYPE

25      COMPETITION WHEN A CERTAIN COMPANY WILL OWN A PATENT FOR AN

```
 1        ITEM AND THE COMPANY WILL BE ABLE TO SELL THIS TYPE OF THING

 2        FOR HOWEVER MANY YEARS, BE IT 30 YEARS OR WHATNOT.

 3            BUT I THINK SOMETIMES IT'S REALLY ANNOYING.  YEAH.

 4                MR. FENSTER:  OKAY.  DOES ANYONE ELSE --

 5                THE COURT:  MR. FENSTER, YOU'VE GOT ONE MINUTE LEFT.

 6                MR. FENSTER:  THANK YOU, YOUR HONOR.

 7            DOES ANYONE ELSE SHARE THOSE FEELINGS ABOUT -- WITH

 8        MR. ZHANG THAT PATENTS -- YOU KNOW, WE KIND OF JUST WISH

 9        EVERYTHING WOULD BE OPEN SOURCE, AVAILABLE TO ANYBODY, AND

10        MAYBE THAT WOULD BE A BETTER WAY TO GO?

11            DR. -- OR DEGRANGE, DO YOU HAVE ANY FEELINGS LIKE THAT?

12                PROSPECTIVE JUROR:  NO.  OPEN SOURCE IS A GOOD THING,

13        BUT SOMETIMES IT'S NOT A GOOD THING.  SO I THINK MOST OF

14        THEM -- MOST OPEN SOURCE, AND NONE OPEN SOURCE -- I'M AN APPLE

15        USER MYSELF.  I USE OPEN SOURCE FOR THE COMPANY I WORK WITH,

16        AND I -- I OWN A PC AS WELL.  SO I HAVE NO PREFERENCE.

17                MR. FENSTER:  LAST QUESTION.  IS THERE ANYTHING THAT

18        I SHOULD KNOW AS CORE WIRELESS, SOMETHING THAT I HAVEN'T ASKED

19        YOU ABOUT, SOMETHING THAT YOU MIGHT BE -- YOU KNOW, YOU -- THAT

20        YOU THINK I SHOULD KNOW REPRESENTING CORE WIRELESS AS A PATENT

21        HOLDER THAT YOU THINK MIGHT AFFECT YOUR ABILITY, MAYBE THIS

22        ISN'T THE BEST CASE FOR YOU TO BE A FAIR AND IMPARTIAL JUROR,

23        MAYBE ANOTHER CASE WOULD BE BETTER?

24            LADIES AND GENTLEMEN, THANK YOU VERY MUCH FOR YOUR TIME

25        AND YOUR ATTENTION TODAY.
```

```
 1              THE COURT:  THANK YOU, MR. FENSTER.

 2         MR. MUELLER.

 3              MR. MUELLER:  THANK YOU, YOUR HONOR.

 4         GOOD MORNING.  MY NAME IS JOE MUELLER, AND I REPRESENT

 5    APPLE.

 6         I'LL TELL YOU A LITTLE BIT ABOUT MYSELF AS WELL.  I'M FROM

 7    MASSACHUSETTS.  I LIVE IN A SMALL TOWN ABOUT AN HOUR NORTH OF

 8    BOSTON.  I'VE BEEN IN MARRIED FOR 16 YEARS, AND I HAVE THREE

 9    LITTLE KIDS, 13, 11, AND 9, TWO BOYS AND A GIRL.

10         AND FOR HOBBIES, MOSTLY MY KIDS.  BASKETBALL AND READING

11    WHEN I CAN FIND THE TIME.

12         SO THANK YOU FOR BEING HERE, AND THANK YOU FOR YOUR

13    ATTENTION AND YOUR WILLINGNESS TO ANSWER A FEW QUESTIONS.

14         THE FIRST QUESTION I HAVE IS I KNOW SEVERAL FOLKS HERE

15    EITHER HAVE PATENTS OR HAVE SOME EXPERIENCE WITH PATENTS.

16         AND MY FIRST QUESTION IS ARE THOSE OF YOU WHO DO HAVE SOME

17    UNDERSTANDING OF THE PATENT SYSTEM WILLING TO TAKE A CLOSE LOOK

18    AT THE PATENTS IN THIS CASE AND REALLY LOOK AT THE DETAILS?

19    APPLE BELIEVES IN THIS CASE THAT -- OR REALLY IS LOOKING FOR

20    JURORS WHO WILL DIG INTO THE EVIDENCE.

21         ARE ALL OF YOU READY TO DO THAT?  IS THERE ANYONE HERE WHO

22    HAS EXPERIENCED THE PATENT SYSTEM AND WHO HAS ANY HESITATION IN

23    LOOKING AT THE DETAILS OF THE PATENTS AND MAKING SURE THE

24    PATENTS ARE HELD TO THEIR PROPER SCOPE AS HIS HONOR IS GOING TO

25    CONSTRUE THEM?  ANY CONCERNS ABOUT THAT?
```

1          OKAY.  AND MORE GENERALLY, YOU'RE GOING TO SEE A LOT OF

2     DOCUMENTS AND A LOT OF WITNESSES.  ARE ALL OF YOU READY TO

3     LISTEN CAREFULLY, TO DIG INTO THE DOCUMENTS, AND TO REALLY

4     STUDY THEM CAREFULLY?  DOES ANYONE HAVE ANY CONCERNS ABOUT

5     THAT?

6              PROSPECTIVE JUROR:  HOW MUCH TIME WOULD WE HAVE TO GO

7      THROUGH THE PATENT?

8              MR. MUELLER:  I'M SORRY?

9              PROSPECTIVE JUROR:  HOW MUCH TIME WOULD WE HAVE AND

10     HOW BIG ARE THE PATENTS?

11             MR. MUELLER:  YOUR HONOR, I'M NOT SURE --

12             PROSPECTIVE JUROR:  HOW MANY DOCUMENTS?

13             MR. MUELLER:  I'M SORRY.  I CAN'T QUITE --

14             THE COURT:  HOW MANY DOCUMENTS WAS HIS QUESTION.

15             MR. MUELLER:  HOW MANY DOCUMENTS?  OKAY.

16         IT'S A LITTLE HARD TO SAY EXACTLY, BUT THERE'S PROBABLY

17     GOING TO BE SEVERAL DOZEN DOCUMENTS.  SOME OF THEM WILL BE

18     TECHNICAL, AND WE'RE GOING TO DO OUR BEST TO EXPLAIN THEM.

19         BUT IS EVERYONE READY TO GIVE IT THEIR BEST SHOT AT TRYING

20     TO DIG INTO THE EVIDENCE?

21         NOW, PRODUCTS.  IT SOUNDS LIKE TEN FOLKS IN THE JURY

22     EITHER ARE CURRENT APPLE PRODUCT OWNERS OR HAVE OWNED THEM IN

23     THE PAST.

24         HAS ANYONE HAD A PARTICULARLY BAD EXPERIENCE THAT MIGHT

25     CAUSE YOU TO BE BIASED IN THIS CASE?

```
1          AND, MR. ZHANG, I KNOW YOU DON'T HAVE A GREAT OPINION OF

2     THE APPLE PRODUCTS.  I THINK YOU SAID YOU'RE AN APPLE HATER.

3          WOULD THAT BE A VIEW THAT YOU PRETTY STRONGLY HOLD?

4          PROSPECTIVE JUROR:  YEAH.  I'M ACTUALLY -- I'M A

5     PRETTY OPINIONATED PERSON, IF YOU CAN'T TELL.

6          SO, YEAH.  I -- I'VE INFLUENCED -- SO AFTER I MET MY WIFE,

7     SHE WAS SAYING SHE WANTED AN IPHONE.  SO I TALKED A WHOLE BUNCH

8     OF MESS, AND NOW SHE'S ALL INTO HATING IPHONES JUST LIKE ME.

9          SO, YOU KNOW, I JUST -- I NEVER LIKED THEM SINCE I WAS A

10    KID REALLY.  I ALWAYS LIKED PC'S BECAUSE I CAN CUSTOMIZE, I CAN

11    BUILD IT, I CAN HAVE IT THE WAY I WANT IT.  RIGHT?

12         AND THAT'S EXACTLY WHAT APPLE DOESN'T LET YOU DO.  AND

13    WHAT IF I WANT TO SWAP OUT ONE PIECE OF MY MAC BOOK?  WELL, YOU

14    CAN'T.

15         WELL, THAT'S JUST -- I DON'T LIKE BEING TOLD I CAN'T.

16         MR. MUELLER:  AND I'M NOT GOING TO TRY TO CHANGE YOUR

17    MIND, BUT IT SOUNDS LIKE THAT'S A STRONGLY HELD OPINION.

18         PROSPECTIVE JUROR:  AGREED.

19         MR. MUELLER:  OKAY.  MS. SUVANEN, IS IT?  DO I HAVE

20    THAT RIGHT?  YOUR SON-IN-LAW IS AN ATTORNEY?  DO I HAVE THAT

21    CORRECT?

22         PROSPECTIVE JUROR:  YES, HE IS AN ATTORNEY.  HE'S --

23    MY DAUGHTER JUST RECENTLY GOT MARRIED FOUR MONTHS AGO.

24         MR. MUELLER:  COULD YOU TELL ME A LITTLE BIT ABOUT

25    WHAT TYPE OF LAWYER HE IS.
```

```
 1            PROSPECTIVE JUROR:  HE'S A CORPORATE LAWYER IN

 2     PALO ALTO.  WE DON'T REALLY TALK ABOUT -- YOU KNOW, I DON'T

 3     REALLY KNOW TOO MUCH ABOUT HIS, YOU KNOW, WORK.

 4          SO WE DON'T DISCUSS, YOU KNOW, ANY KIND OF WHAT HE DOES AT

 5     WORK.

 6          I GOT -- YOU KNOW, MY DAUGHTER IS ALSO A PROFESSIONAL, BUT

 7     SHE'S NOT A LAWYER.

 8            MR. MUELLER:  FAIR ENOUGH.  AND HE'S A CORPORATE

 9      LAWYER?

10            PROSPECTIVE JUROR:  YES, HE IS.

11            MR. MUELLER:  GREAT.  THANK YOU VERY MUCH, MA'AM.

12          MS. RIFFIN, I HAVE A QUESTION FOR YOU.  I'M JUST CURIOUS

13     ABOUT YOUR JOB.  CAN YOU TELL ME A LITTLE BIT MORE ABOUT WHAT

14     YOU DO DAY-TO-DAY AND WHAT TYPES OF -- IF YOU COULD, JUST GIVE

15     ME A LITTLE BIT MORE?

16            PROSPECTIVE JUROR:  RIGHT NOW I AM BETWEEN CONTRACTS.

17          BUT I'VE WORKED AS A CONSULTANT FOR VARIOUS COMPANIES, AND

18     I WORK IN -- WE WRITE TRAINING COURSES ON VARIOUS SOFTWARE

19     PRODUCTS OR CELL PHONE APPLICATIONS, WHATEVER THE COMPANY IS

20     DOING.  SO I'M KIND OF A GENERALIST.  I JUST KNOW HOW TO WRITE

21     AND WRITE COURSES THAT PEOPLE UNDERSTAND OF TECHNICAL

22     DOCUMENTATION.

23            MR. MUELLER:  SO YOU WOULD TALK TO FOLKS WHO WORK ON

24      TECHNICAL ISSUES AND HELP THEM COMMUNICATE WITH FOLKS WHO MIGHT

25      NOT WORK ON TECHNICAL ISSUES?
```

```
1              PROSPECTIVE JUROR:  ABSOLUTELY.  THAT WOULD BE THE

2      ENGINEERS.

3              MR. MUELLER:  WHAT ARE SOME EXAMPLES OF TYPES OF

4      THINGS YOU'VE WORKED ON OVER THE YEARS?

5              PROSPECTIVE JUROR:  I'VE WORKED ON SECURITY; I HAVE

6      WORKED ON MOST RECENTLY WORKDAY, WHICH IS AN APPLICATION THAT

7      LETS THEM DO A LOT OF DIFFERENT THINGS, SIX OR SEVEN

8      IMPLEMENTATIONS OF THAT; I WORKED ON SAP WRITING TRAINING

9      COURSES FOR THAT.

10             MR. MUELLER:  GREAT.  THANK YOU VERY MUCH.

11             PROSPECTIVE JUROR:  AND I STARTED IT IN TELECOM BACK

12     AT ROLM YEARS AGO AS AN INSTRUCTIONAL DESIGNER.

13             MR. MUELLER:  THANK YOU VERY MUCH.

14         MS. WALLACE, IF YOU COULD TELL ME A LITTLE BIT MORE ABOUT

15     YOUR WORK AS A SCIENTIST?

16             PROSPECTIVE JUROR:  OKAY.  SO I WORK IN THE HOSPITAL

17     LAB, AND I DO ALL THE TESTING ON THE BLOOD AND THE BODY FLUIDS

18     THAT COME IN.

19             MR. MUELLER:  AND HAVE YOU EVER HAD OCCASION TO DEAL

20     WITH PATENTS AT ALL?

21             PROSPECTIVE JUROR:  NO.  I JUST RUN TESTING.  I DON'T

22     DO ANYTHING LIKE THAT.

23             MR. MUELLER:  OKAY.  WHAT TYPES OF MACHINES DO YOU

24     USE FOR THOSE TESTS.

25             PROSPECTIVE JUROR:  LIKE THE NAMES?
```

1          MR. MUELLER:  NOT THE NAMES, JUST THE NATURE OF THEM.

2          PROSPECTIVE JUROR:  THEY'RE HEMATOLOGY ANALYZERS AND

3    CHEMISTRY ANALYZERS AND MICROSCOPES.  AND I WORK IN THE BLOOD

4    BANK, TOO.  I GIVE OUT BLOOD TO PEOPLE.

5          MR. MUELLER:  THANK YOU VERY MUCH.

6       MR. BOZOVICH, DO I HAVE THAT RIGHT?

7          PROSPECTIVE JUROR:  BOZOVICH.

8          MR. MUELLER:  MR. BOZOVICH, SORRY.  I KNOW YOU'VE

9    DONE SOME WORK ON BRAINSTORMING SESSIONS THAT MAY HAVE LED TO

10   PATENTS OR PATENT APPLICATIONS.

11      DO I HAVE THAT RIGHT?

12         PROSPECTIVE JUROR:  PATENT APPLICATIONS.  THEY'RE ALL

13   IN THE PROCESS, NOTHING FINALIZED.

14         MR. MUELLER:  OKAY.  I DON'T WANT TO ASK YOU FOR ANY

15   DETAILS ABOUT ANY OF THE CONFIDENTIAL INFORMATION, BUT IF YOU'D

16   JUST GIVE ME THE GENERAL BALLPARK OF THE TYPES OF TECHNOLOGIES

17   THAT YOU WORK ON.

18         PROSPECTIVE JUROR:  SO I WORK AT PAYPAL AND WE'RE

19   VERY INTERESTED IN PAYMENTS AND THE FUTURE OF PAYMENTS USING

20   TECHNOLOGY.

21      SO GENERALLY SPEAKING, HOW MIGHT PAYMENTS LOOK IN THE

22   FUTURE?  AND MANAGING PAYMENTS AS A CONSUMER AND A MERCHANT.  I

23   WORK SPECIFICALLY ON THE MERCHANT SIDE OF THINGS.  SO I MIGHT

24   OFFER THESE PAYMENT PROCESSES TO MY CUSTOMERS.

25         MR. MUELLER:  AND DO YOU WORK ON THE DESIGN OF THE

```
1        BUSINESS OPERATIONS?  OR IS IT MORE ON THE BACK END?

2              PROSPECTIVE JUROR:  I'M STRICTLY THE INTERFACE, THE

3        UI, AND I LOOK AT THE APPLICATIONS THAT ARE SUBMITTED BASED ON

4        MY IDEAS, AND WHAT THEY'RE ACTUALLY SUBMITTING, I DIDN'T

5        UNDERSTAND.

6           BUT IT WOULD POWER WHATEVER FRONT END THAT I WAS

7        DESIGNING.

8              MR. MUELLER:  GREAT.  THANK YOU VERY MUCH.

9           HIS HONOR IS, OF COURSE, GOING TO GIVE YOU INSTRUCTIONS ON

10       THE LAW, INCLUDING THE BURDEN OF PROOF.  IS EVERYONE HERE

11       PREPARED TO HOLD THE PARTIES TO THEIR BURDEN AS TO WHAT THEY

12       HAVE TO PROVE AS HIS HONOR WILL INSTRUCT YOU AND TO CAREFULLY

13       CONSIDER WHO HOLDS THE BURDEN OF PROVING WHAT?

14          JUST AS MR. FENSTER SAID AT THE END, IS THERE ANYONE ELSE

15       THAT ANYONE HAS THAT MIGHT NOT MAKE YOU A GREAT CANDIDATE FOR

16       THIS CASE?

17          AND NOW I'M ASKING AS THE ATTORNEY FOR APPLE.  ANYTHING

18       THAT MIGHT GIVE YOU A BIAS OR MAKE YOU A LITTLE BIT WORRIED

19       ABOUT BEING A FAIR AND IMPARTIAL JUROR IN THIS CASE?

20          OKAY.  THANK YOU VERY MUCH.  I APPRECIATE YOUR TIME.

21             THE COURT:  THANK YOU, MR. MUELLER.

22          ALL RIGHT.  LADIES AND GENTLEMEN, WE'VE REACHED A BREAKING

23       POINT HERE IN THE PROCEEDINGS.  I WILL TURN MY ATTENTION BACK

24       TO THOSE JURORS OUT IN THE AUDIENCE.

25          I'M SORRY TO SAY YOU'VE NOT BEEN PICKED FOR THE JURY TODAY
```

1    AND YOU'RE EXCUSED FROM FURTHER SERVICE.  YOU MAY RETURN TO THE

2    JURY ASSEMBLY ROOM AND YOUR TIME HERE IS COMPLETE.

3         YOU ARE WELCOME TO STICK AROUND AND HEAR MORE ABOUT THE

4    CASE.  I HOPE YOU GET PICKED FOR ANOTHER JURY ANOTHER DAY, BUT

5    YOUR TIME HERE IS COMPLETE.

6         THANK YOU VERY MUCH.

7         AND FOR THOSE 20 POTENTIAL JURORS REMAINING, WE ARE CLOSE

8    TO COMPLETING THIS PROCESS.  I'VE KEPT YOU HERE FOR A LONG TIME

9    WITHOUT A BREAK, SO WHAT I'D LIKE TO DO IS TAKE A TEN MINUTE

10   BREAK, COME BACK AT -- MAYBE LET'S MAKE IT 15.

11        COME BACK AT 1:10, A 15 MINUTE BREAK.  NOT ENOUGH TIME FOR

12   A LUNCH, BUT AT THAT TIME WE'LL BE EXCUSING MOST OF YOU AND

13   KEEPING OUR EIGHT FINAL JURORS.  SO THAT'S WHAT WE'LL DO NOW.

14        WE'LL TAKE A 15 MINUTE RECESS AND COME BACK AT 1:10,

15   PLEASE.  AND WE'LL COME BACK TO THE SAME SEATS YOU'RE IN NOW.

16   SO REMEMBER WHERE YOU'RE SEATED.  AND IT'S A TOUGH -- I KNOW

17   IT'S A TOUGH WAY TO GET OUT.

18        (PROSPECTIVE JURORS NOT PRESENT.)

19            THE COURT:  YOU CAN LEAVE YOUR STUFF HERE, AS LONG AS

20   YOU COME BACK.

21        (PROSPECTIVE JURORS NOT PRESENT.)

22            THE COURT:  AND THE AUDIENCE IS WELCOME TO SPREAD

23   BACK OUT.  THANK YOU FOR HAVING SQUEEZED IN.

24        AND BY MY CALCULATION, THE 20 JURORS HAVE EXITED THE

25   COURTROOM.

```
 1              COUNSEL AGREE WITH THAT?  THAT'S YOUR ASSESSMENT?

 2              MR. MUELLER:  YES, YOUR HONOR.

 3              THE COURT:  ALL RIGHT.  EVERYONE MAY BE SEATED OUT

 4       THERE.

 5          ALL RIGHT.  NOW LET'S TALK ABOUT THE INFORMATION THAT

 6    WE'VE RECEIVED SO FAR.  I HAVE THREE JURORS THAT I WOULD

 7    PROPOSE THAT WE STRIKE FOR CAUSE.  THEY ARE JURORS, AND THEIR

 8    NUMBERS NOW ARE JUROR 5, KREFT; JUROR 18, BLANCHARD; AND JUROR

 9    2, DR. XIE.

10          IN SUMMARY, KREFT DESCRIBED SOME BIAS, ALSO IN HER

11    QUESTIONNAIRE DESCRIBED ANXIETY, AND I WOULD PROPOSE TO EXCUSE

12    HER FOR CAUSE.

13          BLANCHARD OWNS STOCK IN APPLE AND HIS ANSWERS DESCRIBE

14    BIAS IN FAVOR OF APPLE.

15          DR. XIE DESCRIBED BEING DISTRACTED AND BURDENED OF AN

16    EXTREME HARDSHIP IN HIS QUESTIONNAIRE.  SO I WOULD PROPOSE TO

17    EXCUSE EACH OF THOSE THREE.

18          DOES APPLE HAVE ANY OBJECTION?

19              MR. MUELLER:  YOUR HONOR, WE HAVE NO OBJECTION.  BUT

20    I WOULD STATE, I THINK UNDER THOSE SAME STANDARDS, NUMBER 12,

21    MR. ZHANG, SHOULD BE STRUCK.  I UNDERSTAND THAT HE SAID THAT HE

22    THOUGHT HE COULD BE FAIR, BUT HE ALSO MADE MULTIPLE COMMENTS

23    ABOUT IMPLACABLE OF APPLE.

24              THE COURT:  I THINK IMPLACABLE WAS YOUR WORD, NOT

25       HIS.
```

1          MR. MUELLER:  I THINK IT WAS PRETTY STRONGLY STATED.

2          MR. FENSTER:  NO OBJECTION TO THE THREE PROPOSED.  WE

3     DO OBJECT TO DISMISSAL OF ZHANG.  HE SAID HE COULD BE FAIR AND

4     IMPARTIAL.

5          THE COURT:  THANK YOU.  SO I WILL EXCUSE KREFT,

6     BLANCHARD, AND XIE AS SUGGESTED.

7          AS TO JUROR NUMBER 12, ZHANG, I THINK HE REHABILITATED

8     HIMSELF, STATING THAT HE COULD BE FAIR TO THE PARTIES.  DID

9     EXPRESS DISPLEASURE TOWARDS THE APPLE PRODUCTS.

10         ON THE OTHER HAND, THERE WERE TEN JURORS WHO CAME TO THE

11    COURTROOM TODAY WITH APPLE PRODUCTS.  THAT DOESN'T EVEN BALANCE

12    OUT THAT EQUATION EVEN CLOSE TO IT.  SO I DON'T -- I'M NOT

13    GOING TO STRIKE ZHANG FOR CAUSE.

14         LET'S BEGIN THE -- ARE THERE ANY OTHER ARGUMENTS FOR CAUSE

15    CHALLENGES?

16         MR. MUELLER:  NO, YOUR HONOR.  THANK YOU.

17         THE COURT:  CORE WIRELESS?

18         MR. FENSTER:  NO, YOUR HONOR.

19         THE COURT:  ALL RIGHT.  LET'S BEGIN THE PEREMPTORY

20    CHALLENGE.  EACH SIDE GETS UP TO THREE.  I'LL REMIND YOU THAT

21    IF EACH PARTY PASSES IN SEQUENCE, THAT CONCLUDES THE SELECTION

22    PROCESS.  AND A PASS COUNTS AS A STRIKE.

23         WE'RE OFF THE RECORD.

24         (PAUSE IN PROCEEDINGS.)

25         THE COURT:  ALL RIGHT.  BACK ON THE RECORD.

1           BY MY CALCULATION, THE FIRST EIGHT JURORS WHO WILL BE

2     SEATED WILL BE JUROR 1, WALLACE; 2, ROBB; 3, GARCIA; 4,

3     JACKSON; 5, NGUYEN; 6, TORRES; 7, SUSOEV; 8, THOMAS GRIFFIN.

4           I'LL ASK MY DEPUTY IF SHE AGREES WITH MY CALCULATION.

5               THE CLERK:  YES, YOUR HONOR.

6               THE COURT:  ANY OBJECTION TO THAT SEATING?

7               MR. MUELLER:  NO, YOUR HONOR.

8               MR. FENSTER:  NO, YOUR HONOR.

9               THE COURT:  ALL RIGHT.  LET'S SIGNAL IN OUR JURORS.

10              MR. FENSTER:  YOUR HONOR, IN TERMS OF THE SEATING,

11    JUST TO SEE THE WITNESS, WE MIGHT -- THE WAY THE COURTROOM IS

12    SET UP, IF WE SIT TO THIS SIDE, IT'LL BE HELPFUL.

13              THE COURT:  ALL RIGHT.  WE'LL ADDRESS THAT ISSUE ONCE

14    THEY ARE SEATED LATER.

15          BRING THEM IN.

16          (PROSPECTIVE JURORS PRESENT.)

17              THE COURT:  ALL RIGHT.  WELCOME BACK.  THANK YOU FOR

18    YOUR PATIENCE.

19          IF YOU CAN FIND YOUR WAY BACK TO YOUR PREVIOUS SEAT NEXT

20    TO YOUR PREVIOUS NEIGHBOR.

21          WATCH YOUR STEP.

22          MR. BOZOVICH, IF YOU WANT TO TAKE THAT SEAT RIGHT THERE,

23    IF THAT'S EASIER FOR YOU, YOU CAN.

24              PROSPECTIVE JUROR:  MY STUFF IS OVER THERE.

25              THE COURT:  YOUR STUFF IS OVER THERE.  OKAY.

```
1              (PAUSE IN PROCEEDINGS.)

2                  THE COURT:  ALL RIGHT.  EVERYONE MAY BE SEATED.

3          OUR 20 POTENTIAL JURORS HAVE RETURNED TO THE COURTROOM.

4          WE'RE ON THE RECORD WITH THE PARTIES PRESENT.

5              I'M GOING TO READ THE NAMES OF OUR EIGHT JURORS WHO HAVE

6          BEEN SELECTED TO SERVE IN THIS JURY.  THE REMAINING JURORS WILL

7          BE EXCUSED.  THANK YOU FOR YOUR SERVICE.  PLEASE DON'T TAKE IT

8          AS ANY CRITICISM OF YOUR ANSWERS THAT YOU'VE NOT BEEN PICKED

9          FOR THIS JURY.  YOU MIGHT BE PICKED FOR ANOTHER JURY ON ANOTHER

10         DAY.  I WANT TO THANK EVERYONE FOR YOUR ATTENTION.

11             SO THESE ARE THE EIGHT JURORS.  I'LL READ ALL THE NAMES

12         AND MAKE SURE WE'VE GOT THE EIGHT PRESENT.

13             ASHLEY WALLACE; PAMELA ROBB; EMILIO GARCIA;

14         CHRISTOPHER JACKSON; DENNIS NGUYEN; KIARA TORRES;

15         MARGARET SUSOEV; AND THOMAS GRIFFIN.  YOU'RE OUR EIGHT JURORS.

16             I'LL READ THE NAMES VERY QUICKLY AGAIN.  I KNOW I'VE BEEN

17         GOING VERY FAST ALL ALONG.  ASHLEY WALLACE; PAMELA ROBB;

18         EMILIO GARCIA; CHRISTOPHER JACKSON; DENNIS NGUYEN;

19         KIARA TORRES; MARGARET SUSOEV; AND THOMAS GRIFFIN ARE OUR

20         JURORS.

21             THE REST OF YOU ARE EXCUSED.  THANK YOU VERY MUCH FOR YOUR

22         SERVICE TODAY.

23             (PROSPECTIVE JURY PANEL OUT, JURY PANEL PRESENT.)

24                 THE COURT:  ALL RIGHT.  EVERYONE MAY BE SEATED,

25          PLEASE.
```

1        I'M GOING TO ASK MY DEPUTY TO SWEAR IN OUR EIGHT SELECTED

2   JURORS, AND THEN WE'LL HAVE FURTHER INSTRUCTION AS TO OUR LUNCH

3   BREAK AND NEXT STEPS.

4            THE CLERK:  PLEASE STAND AND RAISE YOUR RIGHT HAND.

5        (JURY PANEL SWORN.)

6            JURORS:  I DO.

7            THE CLERK:  THANK YOU.  PLEASE BE SEATED.

8            THE COURT:  ALL RIGHT.  THANK YOU, LADIES AND

9   GENTLEMEN.

10       WE'RE GOING TO TAKE A LUNCH BREAK, AND I'LL ASK THE JURY

11  TO RETURN AT 2:15 P.M.  MY DEPUTY WILL SHOW YOU WHERE THE JURY

12  ROOM IS.  WE HAVE A ROOM JUST RIGHT THROUGH THIS DOOR THAT WILL

13  BE YOUR HOME BASE DURING THE TRIAL WHEN YOU ARE NOT IN SESSION

14  HERE, AND SHE WILL ORIENT YOU TO THAT, GIVE YOU YOUR JUROR

15  BADGES, AND SHOW YOU SOME OF THE LOGISTICS BEHIND THE SCENES.

16       I'LL ASK YOU TO COME BACK AT 2:15.

17       DURING THE BREAK, AND AT ALL POINTS, PLEASE DO NOT DO YOUR

18  OWN INVESTIGATION INTO THE CASE; DO NOT HAVE ANY COMMUNICATION

19  WITH THE ATTORNEYS OR WITH THE COURT ABOUT THE CASE; AND DON'T

20  DO ANYTHING TO INVESTIGATE THE FACTS OR LAW THAT YOU'LL BE

21  HEARING IN THE CASE.

22       YOU'LL BE GETTING AN INSTRUCTION ON THE LAW WHEN YOU

23  RETURN AT 2:15, AND THE ATTORNEYS WILL GIVE THEIR OPENING

24  STATEMENTS, AND THEN THE CASE WILL PROCEED ON TO THE EVIDENCE.

25       SO PLEASE DON'T DO ANYTHING BEFORE THE CASE EVEN BEGINS

1      THAT MIGHT IMPAIR THE ABILITY OF THE PARTIES TO PRESENT A FAIR

2      AND EVEN CASE TO YOU.

3              THANK YOU VERY MUCH FOR YOUR ATTENTION.  WE'LL SEE YOU AT

4      2:15 BACK HERE IN THE COURTROOM.

5              AND ONCE YOU BACK COME, YOU CAN SIT ANYWHERE IN THE JURY

6      BOX YOU WISH TO.  YOU DON'T HAVE TO KEEP YOUR CURRENT ORDER OF

7      THINGS.

8              THANK YOU.

9              GO RIGHT ON THERE INTO THE JURY ROOM.

10             (JURY OUT AT 1:19 P.M.)

11               THE COURT:  ALL RIGHT.  EVERYONE MAY BE SEATED.

12             THE JURY IS NOT PRESENT.

13             JUST A FEW LOGISTICS.

14             WE WILL DO THE PRELIMINARY INSTRUCTIONS OF LAW AT 2:15,

15     FOLLOWING BY THE OPENING STATEMENTS.

16             WE HAVE RECEIVED THE, FROM THE RECORD, THE FACTUAL

17     STIPULATIONS.  WE'LL ATTACH THOSE TO THE PRELIMINARY

18     INSTRUCTIONS.

19             WE ALSO HAVE REMOVED THE PRODUCTS THAT ARE NO LONGER IN

20     THE CASE FROM THE PRELIMINARY INSTRUCTIONS, AND WE'VE ADDED IN

21     THE ONE PREAMBLE LANGUAGE FROM THE CLAIM CONSTRUCTION TO THE

22     CLAIM CONSTRUCTION SECTION.

23             THE ONE INSTRUCTION ON MEANS-PLUS-FUNCTION FUNCTIONALITY,

24     WE'RE GOING TO WAIT UNTIL LATER TO GIVE THAT WHEN IT HAS A

25     LITTLE BIT MORE CONTEXT.  WE'VE PREPARED A ONE-PAGE SHEET THAT

```
 1    GOES WITH THAT, BUT I'M GOING TO DEFER THAT UNTIL LATER IN THE

 2    CASE.

 3            SO I THINK THOSE ARE THE NEXT STEPS.

 4         HAVE A NICE BREAK.  WE'LL SEE YOU AT 2:15.

 5              MR. MUELLER:  THANK YOU, YOUR HONOR.

 6              THE COURT:  AND YOU CAN LEAVE YOUR STUFF.  MY

 7    CRIMINAL CALENDAR IS IN A DIFFERENT COURTROOM, SO YOU CAN LEAVE

 8    YOUR THINGS HERE.

 9              MR. FENSTER:  YOUR HONOR, WHEN ARE THEY GOING TO SEE

10    THE VIDEO?

11              THE COURT:  DURING THE PRELIMINARY INSTRUCTION ON THE

12    LAW.

13              MR. FENSTER:  THANK YOU, YOUR HONOR.

14        (THE LUNCH RECESS WAS TAKEN FROM 1:21 P.M. UNTIL

15    2:25 P.M.)

16

17

18

19

20

21

22

23

24

25                        AFTERNOON SESSION
```

```
1              (JURY OUT AT 2:25 P.M.)

2                  THE COURT:  ALL RIGHT.  GOOD AFTERNOON.  EVERYONE MAY

3         BE SEATED.

4              OUR JURORS, NEWLY SWORN IN, ARE ASSEMBLING, SO BEAR WITH

5         US ONE MOMENT.

6              WE'LL HAVE OUR PRELIMINARY INSTRUCTIONS AND THEN OPENING

7         STATEMENTS.

8                  MR. MUELLER:  MAY I ASK ONE LOGISTICAL QUESTION, YOUR

9         HONOR?

10            THIS -- MAY I APPROACH?

11                 THE COURT:  YES.

12                 MR. MUELLER:  THIS EASEL, DURING THE OPENING

13        STATEMENT, MAY I PUT IT RIGHT HERE JUST SO THE JURY CAN SORT OF

14        SEE IT (INDICATING)?

15                 THE COURT:  YES, ESPECIALLY IF IT AIDS THEM IN NOT

16        TRIPPING OVER IT AS THEY COME INTO THE WELL.

17                 MR. MUELLER:  THANK YOU, YOUR HONOR.

18                 THE COURT:  WHATEVER MAKES IT READABLE FOR THEM AND

19        FOR OPPOSING COUNSEL.

20            AND THE PARTIES DID RECEIVE A COPY OF THE UPDATED

21        PRELIMINARY INSTRUCTIONS?  YOU HAVE NOT?

22            THOSE ARE COMING.

23            (PAUSE IN PROCEEDINGS.)

24            (JURY IN AT 2:27 P.M.)

25                 THE COURT:  ALL RIGHT.  AS THE JURORS GET ASSEMBLED,
```

1    IT'LL PROBABLY BE EASIER TO SIT ON THAT END OF THE JURY SEATS

2    TO SEE SOME OF THE THINGS THAT WE'LL HAVE UP HERE DURING THE

3    OPENING STATEMENTS.

4        I'D SAY MOVE DOWN TO THAT END, TO THE EXTENT THAT YOU CAN.

5        GREAT.  THANK YOU.

6        ALL RIGHT.  EVERYONE MAY BE SEATED.

7        OUR JURORS ARE NOW ASSEMBLED.

8        LADIES AND GENTLEMEN, YOU'RE NOW THE JURY IN THE CASE.

9    IT'S MY DUTY TO INSTRUCT YOU ON THE LAW.

10       THESE INSTRUCTIONS ARE PRELIMINARY INSTRUCTIONS TO HELP

11   YOU UNDERSTAND THE PRINCIPLES THAT APPLY TO CIVIL TRIALS, AND

12   TO HELP YOU UNDERSTAND THE EVIDENCE AS YOU LISTEN TO IT.

13       EACH OF YOU HAS BEEN GIVEN A COPY OF THESE INSTRUCTIONS

14   AND YOU'LL BE ALLOWED TO KEEP A SET THROUGHOUT THE TRIAL TO

15   WHICH TO REFER.  THIS SET OF INSTRUCTIONS IS NOT TO BE TAKEN

16   HOME AND MUST REMAIN IN THE JURY ROOM WHEN YOU LEAVE IN THE

17   EVENINGS.

18       AT THE END OF THE TRIAL, I WILL GIVE YOU A FINAL SET OF

19   INSTRUCTIONS.  IT IS THE FINAL SET OF INSTRUCTIONS THAT WILL

20   GOVERN YOUR DELIBERATIONS.

21       YOU MUST NOT INFER FROM THESE INSTRUCTIONS OR FROM

22   ANYTHING I MAY SAY OR DO AS INDICATING THAT I HAVE AN OPINION

23   REGARDING THE EVIDENCE OR WHAT YOUR VERDICT SHOULD BE.

24       IT IS YOUR DUTY AS THE JURY TO FIND THE FACTS FROM ALL THE

25   EVIDENCE PRESENTED IN THE CASE.  TO THOSE FACTS YOU WILL APPLY

1    THE LAW AS I GIVE IT TO YOU.  YOU MUST FOLLOW THE LAW AS I GIVE

2    IT TO YOU, WHETHER YOU AGREE WITH THE LAW OR NOT.

3        YOU MUST NOT BE INFLUENCED BY ANY PERSONAL LIKES OR

4    DISLIKES, OPINIONS, PREJUDICES, OR SYMPATHY.  THAT MEANS YOU

5    MUST DECIDE THE CASE SOLELY BASED ON THE EVIDENCE BEFORE YOU.

6    YOU WILL RECALL THAT YOU TOOK AN OATH TO DO SO.

7        IN FOLLOWING MY INSTRUCTIONS, YOU MUST FOLLOW ALL OF THEM

8    AND NOT SINGLE OUT SOME AND IGNORE OTHERS; THEY ARE ALL

9    IMPORTANT.

10       SUMMARY OF THE CLAIMS IN THIS CASE.

11       I WILL NOW GIVE YOU A SUMMARY OF WHO THE PARTIES ARE IN

12   THE CASE AND WHAT THIS CASE IS ABOUT.

13       THE PARTIES ARE CORE WIRELESS LICENSING S.A.R.L., WHO MAY

14   BE REFERRED TO AS CORE WIRELESS, AND APPLE, INC., WHO MAY BE

15   REFERRED TO AS APPLE.

16       CORE WIRELESS ALLEGES THAT APPLE HAS INFRINGED CERTAIN

17   CLAIMS OF TWO PATENTS:  U.S. PATENT NUMBERS 6,633,536, WHICH IS

18   THE '536 PATENT, AND 6,477,151, WHICH IS REFERRED TO AS THE

19   '151 PATENT.

20       CORE WIRELESS ALLEGES THAT IT IS ENTITLED TO DAMAGES FOR

21   APPLE'S ALLEGED INFRINGEMENT OF EACH PATENT.

22       APPLE DENIES THAT IT INFRINGES ANY OF THE ASSERTED PATENTS

23   AND DENIES THAT CORE WIRELESS IS ENTITLED TO DAMAGES.

24       APPLE ALSO ALLEGES THAT THE ASSERTED PATENT CLAIMS ARE

25   INVALID.

1    CORE WIRELESS DENIES THAT THE ASSERTED PATENT CLAIMS ARE

2    INVALID.

3    THIS CASE INVOLVES CELLULAR PHONE TECHNOLOGY.  THE

4    PRODUCTS AT ISSUE ARE CERTAIN OF APPLE'S IPHONES AND IPADS.

5    I WILL TELL YOU MORE ABOUT THE DETAILS OF THE LAW YOU MUST

6    APPLY, BOTH BEFORE AND AFTER THE PARTIES PRESENT THEIR EVIDENCE

7    IN SUPPORT OF THEIR CLAIMS AND DEFENSES.

8    THE BURDEN OF PROOF.

9    THERE ARE TWO STANDARDS OF PROOF THAT YOU WILL APPLY TO

10   THE EVIDENCE, DEPENDING ON THE ISSUE YOU ARE DECIDING.  WHEN A

11   PARTY HAS THE BURDEN OF PROVING ANY CLAIM BY A PREPONDERANCE OF

12   THE EVIDENCE, IT MEANS YOU MUST BE PERSUADED BY THE EVIDENCE

13   THAT THE CLAIM IS MORE PROBABLY TRUE THAN NOT.

14   WHEN A PARTY HAS THE BURDEN OF PROVING ANY CLAIM OR

15   DEFENSE BY CLEAR AND CONVINCING EVIDENCE, IT MEANS THAT YOU

16   MUST BE PERSUADED BY THE EVIDENCE THAT IT IS HIGHLY PROBABLE

17   THAT THE CLAIM OR DEFENSE IS TRUE.  THIS IS A HIGHER STANDARD

18   OF PROOF THAN PROOF BY A PREPONDERANCE OF THE EVIDENCE, BUT IT

19   DOES NOT REQUIRE PROOF BEYOND A REASONABLE DOUBT.

20   YOU SHOULD BASE YOUR DECISION ON ALL OF THE EVIDENCE,

21   REGARDLESS OF WHICH PARTY PRESENTED IT.

22   EVIDENCE YOU MIGHT -- EXCUSE ME.  EVIDENCE YOU MAY

23   CONSIDER.

24   THE EVIDENCE YOU ARE TO CONSIDER IN DECIDING WHAT THE

25   FACTS ARE CONSISTS OF:

1         1.   THE SWORN TESTIMONY OF ANY WITNESS;

2         2.   THE EXHIBITS WHICH ARE RECEIVED INTO EVIDENCE; AND,

3         3.   ANY FACTS TO WHICH THE LAWYERS HAVE AGREED, SOMETIMES

4    REFERRED TO AS STIPULATIONS OF FACT.

5         IN REACHING YOUR VERDICT, YOU MAY CONSIDER ONLY THE

6    TESTIMONY, EXHIBITS, AND STIPULATIONS OF FACT RECEIVED INTO

7    EVIDENCE.

8         THINGS YOU MAY NOT CONSIDER.

9         CERTAIN THINGS ARE NOT EVIDENCE AND YOU MAY NOT CONSIDER

10   THEM IN DECIDING WHAT THE FACTS ARE.

11        I WILL LIST THEM FOR YOU:

12        1.   THE ARGUMENTS AND STATEMENTS BY THE LAWYERS ARE NOT

13   EVIDENCE.  THE LAWYERS ARE NOT WITNESSES.  WHAT THEY SAY IN

14   THEIR OPENING STATEMENTS, THEIR CLOSING ARGUMENTS, AND AT OTHER

15   TIMES IS INTENDED TO HELP YOU INTERPRET THE EVIDENCE, BUT IT IS

16   NOT EVIDENCE.  IF THE FACTS AS YOU REMEMBER THEM DIFFER FROM

17   THE WAY THE LAWYERS HAVE STATED THEM, YOUR MEMORY OF THE

18   EVIDENCE CONTROLS.

19        THE QUESTIONS AND THE OBJECTIONS BY THE LAWYERS ARE NOT

20   EVIDENCE.  THE ATTORNEYS HAVE A DUTY TO THEIR CLIENTS TO OBJECT

21   WHEN THEY BELIEVE A QUESTION IS IMPROPER UNDER THE RULES OF

22   EVIDENCE.  YOU SHOULD NOT BE INFLUENCED BY THE OBJECTION OR BY

23   THE COURT'S RULING ON AN OBJECTION.

24        THIRD, TESTIMONY THAT HAS BEEN EXCLUDED, OR STRICKEN, OR

25   THAT YOU HAVE BEEN INSTRUCTED TO DISREGARD, IS NOT EVIDENCE AND

1      MUST NOT BE CONSIDERED BY THE JURY.

2              IN ADDITION, SOMETIMES TESTIMONY AND EXHIBITS ARE RECEIVED

3      FOR A LIMITED PURPOSE.  WHEN I GIVE A LIMITING INSTRUCTION, YOU

4      MUST FOLLOW IT.

5              4.  ANYTHING YOU MIGHT SEE OR HEAR WHEN COURT IS NOT IN

6      SESSION IS NOT EVIDENCE.

7              YOU ARE TO DECIDE THE CASE SOLELY ON THE EVIDENCE RECEIVED

8      DURING THE TRIAL.

9              CHARTS AND SUMMARIES NOT RECEIVED IN EVIDENCE.

10             CERTAIN CHARTS AND SUMMARIES NOT RECEIVED IN EVIDENCE MAY

11     BE SHOWN TO YOU IN ORDER TO HELP EXPLAIN THE CONTENTS OF BOOKS,

12     RECORDS, DOCUMENTS, OR OTHER EVIDENCE IN THE CASE.  YOU MAY

13     HEAR THESE CHARTS AND SUMMARIES REFERRED TO AS DEMONSTRATIVES

14     OR DEMONSTRATIVE EVIDENCE.  THEY ARE NOT THEMSELVES EVIDENCE OR

15     PROOF OF ANY FACTS.  IF THEY DO NOT CORRECTLY REFLECT THE FACTS

16     OR FIGURES SHOWN BY THE EVIDENCE IN THE CASE, YOU SHOULD

17     DISREGARD THESE CHARTS AND SUMMARIES AND DETERMINE THE FACTS

18     FROM THE UNDERLYING EVIDENCE.

19             CHARTS AND SUMMARIES IN EVIDENCE.

20             CERTAIN CHARTS AND SUMMARIES MAY BE RECEIVED INTO EVIDENCE

21     TO ILLUSTRATE INFORMATION BROUGHT OUT DURING THE TRIAL.  CHARTS

22     AND SUMMARIES ARE ONLY AS GOOD AS THE UNDERLYING EVIDENCE THAT

23     SUPPORTS THEM.  YOU SHOULD, THEREFORE, GIVE THEM ONLY SUCH

24     WEIGHT AS YOU THINK THE UNDERLYING EVIDENCE DESERVES.

25             TYPES OF EVIDENCE.

1    EVIDENCE MAY BE DIRECT OR CIRCUMSTANTIAL.  DIRECT EVIDENCE

2    IS DIRECT PROOF OF A FACT, SUCH AS TESTIMONY BY A WITNESS ABOUT

3    WHAT THAT WITNESS PERSONALLY SAW OR HEARD OR DID.  FOR EXAMPLE,

4    DIRECT EVIDENCE THAT IT WAS RAINING WOULD BE A PHOTO SHOWING

5    THAT IT WAS RAINING ON A GIVEN DAY.

6    CIRCUMSTANTIAL EVIDENCE IS PROOF OF ONE OR MORE FACTS FROM

7    WHICH YOU COULD FIND ANOTHER FACT.  FOR EXAMPLE, CIRCUMSTANTIAL

8    EVIDENCE THAT IT WAS RAINING WOULD BE TESTIMONY OF A WITNESS

9    WHO SAID THEY BELIEVED IT WAS RAINING, NOT BECAUSE THEY SAW THE

10   RAIN, BUT BECAUSE THEY SAW A PERSON ENTERING A BUILDING WITH A

11   WET UMBRELLA.

12   YOU SHOULD CONSIDER BOTH KINDS OF EVIDENCE, DIRECT AND

13   CIRCUMSTANTIAL.  THE LAW MAKES NO DISTINCTION BETWEEN THE

14   WEIGHT TO BE GIVEN TO EITHER DIRECT OR CIRCUMSTANTIAL EVIDENCE.

15   IT IS FOR YOU, THE JURY, TO DECIDE HOW MUCH WEIGHT TO

16   GIVE, IF ANY, TO ANY EVIDENCE.

17   USE OF INTERROGATORIES OF A PARTY.

18   EVIDENCE MAY BE PRESENTED TO YOU IN THE FORM OF ANSWERS OF

19   ONE OF THE PARTIES TO WRITTEN INTERROGATORIES, WHICH ARE

20   QUESTIONS SUBMITTED BY THE OTHER SIDE.  THE ANSWERS WERE GIVEN

21   IN WRITING AND UNDER OATH, BEFORE THE ACTUAL TRIAL, AND THEY

22   WERE GIVEN IN RESPONSE TO QUESTIONS THAT WERE SUBMITTED IN

23   WRITING UNDER ESTABLISHED COURT PROCEDURES.  YOU SHOULD

24   CONSIDER THE ANSWERS, INSOFAR AS POSSIBLE, IN THE SAME WAY AS

25   IF THEY WERE MADE FROM THE WITNESS STAND.

1          USE OF REQUEST FOR ADMISSION OF A PARTY.

2          BEFORE TRIAL, EACH PARTY HAS THE RIGHT TO ASK ANOTHER

3     PARTY TO ADMIT IN WRITING THAT CERTAIN FACTS ARE TRUE.  IF THE

4     OTHER PARTY ADMITS THOSE FACTS, YOU MUST ACCEPT THEM AS TRUE

5     AND CONCLUSIVELY PROVED IN THIS CASE.

6          EVIDENCE FOR A LIMITED PURPOSE.

7          SOME EVIDENCE MAY BE ADMITTED FOR A LIMITED PURPOSE ONLY.

8          WHEN I INSTRUCT YOU THAT AN ITEM OF EVIDENCE HAS BEEN

9     ADMITTED FOR A LIMITED PURPOSE, YOU MUST CONSIDER IT ONLY FOR

10    THAT LIMITED PURPOSE AND FOR NO OTHER.

11         STIPULATIONS OF FACT.

12         THE PARTIES HAVE AGREED TO CERTAIN FACTS TO BE PLACED IN

13    EVIDENCE.  YOU MUST THEREFORE TREAT THESE FACTS AS HAVING BEEN

14    PROVED.

15         AND ON A SEPARATE PIECE OF PAPER, THOSE STIPULATIONS OF

16    FACT ARE APPENDIX A TO THE INSTRUCTIONS.

17         THE COURT'S RULING ON OBJECTIONS.

18         THERE ARE RULES OF EVIDENCE THAT CONTROL WHAT CAN BE

19    RECEIVED INTO EVIDENCE.  WHEN A LAWYER ASKS A QUESTION OR

20    OFFERS AN EXHIBIT INTO EVIDENCE AND A LAWYER ON THE OTHER SIDE

21    THINKS THAT IT IS NOT PERMITTED BY THE RULES OF EVIDENCE, THAT

22    LAWYER MAY OBJECT.

23         IF I OVERRULE THE OBJECTION, THE QUESTION MAY BE ANSWERED

24    OR THE EXHIBIT RECEIVED.

25         IF I SUSTAIN THE OBJECTION, THE QUESTION CANNOT BE

1    ANSWERED, AND THE EXHIBIT CANNOT BE RECEIVED.

2         WHENEVER I SUSTAIN AN OBJECTION TO A QUESTION, YOU MUST

3    IGNORE THE QUESTION AND MUST NOT GUESS WHAT THE ANSWER MIGHT

4    HAVE BEEN OR WHAT THE DOCUMENT MIGHT HAVE SAID.

5         MY RULINGS ARE NOT INTENDED TO INFLUENCE YOUR DECISION.

6    YOUR DECISIONS MUST BE BASED ENTIRELY ON THE TESTIMONY AND

7    DOCUMENTS RECEIVED INTO EVIDENCE.

8         SOMETIMES I MAY ORDER THAT EVIDENCE BE STRICKEN FROM THE

9    RECORD AND THAT YOU DISREGARD OR IGNORE THE EVIDENCE.  THAT

10   MEANS THAT WHEN YOU ARE DECIDING THE CASE, YOU MUST NOT

11   CONSIDER THE EVIDENCE THAT I TOLD YOU TO DISREGARD.

12        WITNESSES.

13        EVALUATION OF WITNESS TESTIMONY.

14        IN DECIDING THE FACTS IN THIS CASE, YOU MAY HAVE TO DECIDE

15   WHICH TESTIMONY TO BELIEVE AND WHICH TESTIMONY NOT TO BELIEVE.

16   YOU MAY BELIEVE EVERYTHING A WITNESS SAYS, OR PART OF IT, OR

17   NONE OF IT.

18        IN CONSIDERING THE TESTIMONY OF ANY WITNESS, YOU MAY TAKE

19   INTO ACCOUNT:

20        1.  THE OPPORTUNITY AND ABILITY OF THE WITNESS TO SEE OR

21   HEAR OR KNOW THE THINGS TESTIFIED TO;

22        2.  THE WITNESS'S MEMORY;

23        3.  THE WITNESS'S MANNER WHILE TESTIFYING;

24        4.  THE WITNESS'S INTEREST IN THE OUTCOME OF THE CASE AND

25   ANY BIAS OR PREJUDICE;

1          5.   WHETHER OTHER EVIDENCE CONTRADICTED THE WITNESS'S

2     TESTIMONY;

3          6.   THE REASONABLENESS OF THE WITNESS'S TESTIMONY IN LIGHT

4     OF ALL THE EVIDENCE; AND,

5          7.   ANY OTHER FACTORS THAT BEAR ON BELIEVABILITY.

6          THE WEIGHT OF THE EVIDENCE AS TO A FACT DOES NOT

7     NECESSARILY DEPEND ON THE NUMBER OF WITNESSES WHO TESTIFY ABOUT

8     IT.

9          IMPEACHMENT EVIDENCE.

10          THE EVIDENCE THAT A WITNESS LIED UNDER OATH OR GAVE

11     DIFFERENT OR INCONSISTENT TESTIMONY ON A PRIOR OCCASION MAY BE

12     CONSIDERED, ALONG WITH ALL THE OTHER EVIDENCE, IN DECIDING

13     WHETHER OR NOT TO BELIEVE THE WITNESS AND HOW MUCH, IF ANY,

14     WEIGHT TO GIVE TO THAT WITNESS'S TESTIMONY.

15          EXPERT WITNESSES.

16          SOME WITNESSES, BECAUSE OF THEIR EDUCATION OR EXPERIENCE,

17     ARE PERMITTED TO STATE OPINIONS AND THE REASONS FOR THOSE

18     OPINIONS.

19          OPINION TESTIMONY SHOULD BE JUDGED JUST LIKE ANY OTHER

20     TESTIMONY.  YOU MAY ACCEPT IT OR REJECT IT, AND GIVE IT AS MUCH

21     WEIGHT AS YOU THINK IT DESERVES, CONSIDERING THE WITNESS'S

22     EDUCATION AND EXPERIENCE, THE REASONS GIVEN FOR THE OPINION,

23     AND ALL THE OTHER EVIDENCE IN THE CASE.

24          DEPOSITION TESTIMONY.

25          A DEPOSITION IS THE SWORN TESTIMONY OF A WITNESS TAKEN

1    BEFORE TRIAL.  THE WITNESS IS PLACED UNDER OATH TO TELL THE

2    TRUTH AND THE LAWYERS FOR EACH PARTY MAY ASK QUESTIONS.  THE

3    QUESTIONS AND ANSWERS ARE RECORDED BY WRITTEN TRANSCRIPT, AND

4    SOMETIMES BY VIDEO RECORDING.

5         WHEN A PERSON IS UNAVAILABLE TO TESTIFY AT TRIAL, THE

6    DEPOSITION OF THAT PERSON MAY BE USED AT THE TRIAL.  YOU SHOULD

7    CONSIDER DEPOSITION TESTIMONY, PRESENTED TO YOU IN COURT IN

8    LIEU OF LIVE TESTIMONY, IN THE SAME WAY AS IF THE WITNESS HAD

9    BEEN PRESENT TO EVIDENCE.

10        IF TESTIMONY IS READ, RATHER THAN PLAYED BACK FROM A

11   RECORDING, DO NOT PLACE ANY SIGNIFICANCE ON THE BEHAVIOR OR

12   TONE OF THE VOICE OF THE PERSON READING THE QUESTIONS OR

13   ANSWERS.

14        YOU WILL BE HEARING OR VIEWING ONLY A PORTION, OR SERIES

15   OF PORTIONS, OF THE DEPOSITIONS TAKEN BY THE PARTIES IN THIS

16   CASE.  DO NOT MAKE ANY INFERENCES ABOUT THE FACT THAT YOU ARE

17   NOT HEARING OR SEEING THE DEPOSITION IN ITS ENTIRETY OR THAT

18   WHAT YOU ARE HEARING OR VIEWING HAS BEEN EDITED.

19        CONDUCT OF THE JURY.

20        PROHIBITIONS ON YOUR ACTIVITIES.

21        I WILL NOW SAY A FEW WORDS ABOUT YOUR CONDUCT AS JURORS.

22        FIRST, KEEP AN OPEN MIND THROUGHOUT THE TRIAL, AND DO NOT

23   DECIDE WHAT THE VERDICT SHOULD BE UNTIL YOU AND YOUR FELLOW

24   JURORS HAVE COMPLETED YOUR DELIBERATIONS AT THE END OF THE

25   CASE.

1          SECOND, BECAUSE YOU MUST DECIDE THIS CASE BASED ONLY ON

2     THE EVIDENCE RECEIVED IN THE CASE AND ON MY INSTRUCTIONS AS TO

3     THE LAW THAT APPLIES, YOU MUST NOT BE EXPOSED TO ANY OTHER

4     INFORMATION ABOUT THE CASE OR THE ISSUES IT INVOLVES DURING THE

5     COURSE OF YOUR JURY DUTY.

6          THUS, UNTIL THE END OF THE CASE OR UNLESS I TELL YOU

7     OTHERWISE:

8          DO NOT COMMUNICATE WITH ANYONE IN ANY WAY AND DO NOT LET

9     ANYONE ELSE COMMUNICATE WITH YOU IN ANY WAY ABOUT THE MERITS OF

10    THE CASE OR ANYTHING TO DO WITH IT.

11         THIS INCLUDES DO NOT DISCUSS THE CASE IN PERSON, IN

12    WRITING, BY PHONE OR ELECTRONIC MEANS, VIA E-MAIL, TEXT,

13    INTERNET CHAT ROOM, BLOG, WEBSITE OR OTHER COMMUNICATION

14    FEATURE.

15         THIS APPLIES TO NOT COMMUNICATING WITH YOUR FELLOW JURORS

16    UNTIL I GIVE YOU THE CASE FOR DELIBERATION, AND IT APPLIES TO

17    COMMUNICATING WITH EVERYONE ELSE, INCLUDING YOUR FAMILY

18    MEMBERS, YOUR EMPLOYER, THE MEDIA, THE PEOPLE INVOLVED IN THE

19    TRIAL.  YOU MAY NOTIFY YOUR FAMILY AND YOUR EMPLOYER THAT YOU

20    HAVE BEEN SEATED AS A JUROR IN A CASE.

21         BUT IF YOU ARE ASKED OR APPROACHED ABOUT YOUR JURY SERVICE

22    OR ANYTHING ABOUT THE CASE, YOU MUST RESPOND THAT YOU HAVE BEEN

23    ORDERED NOT TO DISCUSS THE MATTER, AND YOU SHOULD REPORT THE

24    CONTACT TO THE COURT.

25         BECAUSE YOU WILL RECEIVE ALL THE EVIDENCE AND LEGAL

1    INSTRUCTION YOU NEED TO CONSIDER AND RETURN A VERDICT:  PLEASE

2    DO NOT READ, WATCH, OR LISTEN TO ANY NEWS OR MEDIA ACCOUNTS OR

3    COMMENTARY ABOUT THIS CASE OR ANYTHING TO DO WITH IT.

4         DO NOT DO YOUR OWN RESEARCH, SUCH AS CONSULTING A

5    DICTIONARY, THE INTERNET, OR OTHER REFERENCE MATERIALS; DON'T

6    MAKE ANY INVESTIGATION TO TRY TO LEARN ABOUT THE CASE ON YOUR

7    OWN.

8         THE LAW REQUIRES THESE RESTRICTIONS TO ENSURE THE PARTIES

9    HAVE A FAIR TRIAL WITH THE SAME EVIDENCE THAT EACH PARTY HAS AN

10   OPPORTUNITY TO ADDRESS.  A JUROR WHO VIOLATES THESE

11   RESTRICTIONS JEOPARDIZES THE FAIRNESS OF THE PROCEEDINGS, AND A

12   MISTRIAL COULD RESULT THAT WOULD REQUIRE US TO START THE ENTIRE

13   PROCESS ALL OVER.  IF ANY JUROR IS EXPOSED TO ANY OUTSIDE

14   INFORMATION, PLEASE NOTIFY THE COURT, THROUGH MY DEPUTY,

15   IMMEDIATELY.

16        TAKING NOTES.

17        DURING DELIBERATIONS, YOU WILL HAVE TO MAKE YOUR DECISION

18   BASED ON WHAT YOU RECALL OF THE EVIDENCE.  YOU WILL NOT HAVE A

19   TRANSCRIPT OF THE TRIAL.  THEREFORE, I URGE YOU TO PAY CLOSE

20   ATTENTION TO THE TESTIMONY AS IT IS GIVEN.

21        IF AT ANY TIME YOU CANNOT HEAR OR SEE THE TESTIMONY,

22   EVIDENCE, QUESTIONS OR ARGUMENTS, LET ME KNOW SO THAT I CAN

23   CORRECT THE PROBLEM.

24        IF YOU WISH, YOU MAY TAKE NOTES TO HELP YOU REMEMBER THE

25   EVIDENCE.  IF YOU DO TAKE NOTES, PLEASE KEEP THEM TO YOURSELF

1    UNTIL YOU AND YOUR FELLOW JURORS GO TO THE JURY ROOM TO DECIDE

2    THE CASE.  DO NOT LET NOTE-TAKING DISTRACT YOU.

3          WHEN YOU LEAVE, YOUR NOTES SHOULD BE LEFT IN THE JURY

4    ROOM.  NO ONE ELSE WILL READ YOUR NOTES.  THE NOTES WILL BE

5    DESTROYED AT THE CONCLUSION OF THE CASE.

6          WHETHER OR NOT YOU TAKE NOTES, YOU SHOULD RELY ON YOUR OWN

7    MEMORY OF THE EVIDENCE.  NOTES ARE ONLY TO ASSIST YOUR MEMORY.

8          YOU SHOULD NOT BE OVERLY INFLUENCED BY YOUR NOTES OR THOSE

9    OF YOUR FELLOW JURORS.

10          QUESTIONS TO WITNESSES.

11          THE JURY WILL BE ALLOWED TO PROPOSE WRITTEN QUESTIONS TO

12    WITNESSES AFTER THE LAWYERS HAVE COMPLETED THEIR QUESTIONING OF

13    EACH WITNESS.  YOU MAY PROPOSE QUESTIONS IN ORDER TO CLARIFY

14    THE TESTIMONY, BUT YOU ARE NOT TO EXPRESS ANY OPINION ABOUT THE

15    TESTIMONY OR TO ARGUE WITH THE WITNESS.  IF YOU PROPOSE A

16    QUESTION, REMEMBER THAT YOUR ROLE IS THAT OF A NEUTRAL FACT

17    FINDER, NOT AN ADVOCATE.

18          BEFORE I EXCUSE EACH WITNESS, I WILL OFFER THE JURY THE

19    OPPORTUNITY TO WRITE OUT A QUESTION, OR QUESTIONS, ON A FORM

20    PROVIDED BY THE COURT.  DO NOT SIGN THE QUESTION.  I WILL

21    REVIEW THE QUESTION WITH THE ATTORNEYS TO DETERMINE IF THE

22    QUESTION IS LEGALLY PROPER.

23          THERE ARE SOME PROPOSED QUESTIONS THAT I WILL NOT PERMIT,

24    OR I WILL NOT ASK IN THE WORDING SUBMITTED BY A JUROR.  THIS

25    MIGHT HAPPEN EITHER DUE TO THE RULES OF EVIDENCE OR OTHER LEGAL

1       REASONS, OR BECAUSE THE QUESTION IS EXPECTED TO BE ANSWERED

2       LATER IN THE CASE.

3               IF I DO NOT ASK A PROPOSED QUESTION, OR IF I REPHRASE IT,

4       DO NOT SPECULATE AS TO THE REASONS WHY.

5               DO NOT GIVE UNDUE WEIGHT TO QUESTIONS YOU OR OTHER JURORS

6       PROPOSE.

7               YOU SHOULD EVALUATE THE ANSWERS TO THOSE QUESTIONS IN THE

8       SAME MANNER AS YOU EVALUATE ALL THE OTHER EVIDENCE.

9               BY GIVING YOU THE OPPORTUNITY TO PROPOSE QUESTIONS, I'M

10      NOT REQUESTING OR SUGGESTING THAT YOU MUST DO SO.  IT WILL

11      OFTEN BE THE CASE THAT A LAWYER HAS NOT ASKED A QUESTION

12      BECAUSE IT IS LEGALLY OBJECTIONABLE OR BECAUSE A LATER WITNESS

13      MAY BE ADDRESSING THAT SUBJECT.

14              BENCH CONFERENCES AND RECESSES.

15              FROM TIME TO TIME IT MIGHT BECOME NECESSARY FOR ME TO TALK

16      WITH THE ATTORNEYS OUTSIDE OF THE HEARING OF THE JURY, EITHER

17      BY HAVING A CONFERENCE AT THE BENCH WHEN YOU'RE PRESENT IN THE

18      ROOM, OR BY CALLING A RECESS, WHICH IS A TIME OUT.  PLEASE

19      UNDERSTAND THAT WHILE YOU ARE WAITING, WE ARE WORKING.  THE

20      PURPOSE OF THESE CONFERENCES IS NOT TO KEEP RELEVANT

21      INFORMATION FROM YOU, BUT TO DECIDE HOW CERTAIN EVIDENCE IS TO

22      BE TREATED UNDER THE RULES OF EVIDENCE AND TO AVOID CONFUSION

23      AND ERROR.  WE WILL DO WHAT WE CAN TO KEEP THE NUMBER AND

24      LENGTH OF THESE CONFERENCES TO A MINIMUM.

25              I MIGHT NOT ALWAYS GRANT AN ATTORNEY'S REQUEST FOR A

1    CONFERENCE.  DO NOT CONSIDER MY GRANTING OR DENYING A REQUEST

2    AS ANY INDICATION OF MY OPINION OF THE CASE OR WHAT THE JURY'S

3    VERDICT SHOULD BE.

4         PATENT BACKGROUND.

5         WE WILL NOW SHOW THE JURY A VIDEO ABOUT WHAT A PATENT IS

6    AND HOW A PATENT IS OBTAINED.  YOU WILL ALSO BE RECEIVING A

7    PAPER EXHIBIT OF A MODEL PATENT TO ASSIST YOU WITH THIS

8    PRESENTATION.

9         WITH THAT, I'LL ASK THE PARTIES TO SHOW THE VIDEO, WHICH I

10   UNDERSTAND IS ABOUT 17 MINUTES LONG.

11        (A VIDEOTAPE WAS PLAYED IN OPEN COURT OFF THE RECORD.)

12            THE COURT:  ALL RIGHT.  THANK YOU TO JUDGE FOGEL.

13        WE'LL NOW CONTINUE WITH THE INSTRUCTIONS.  WE'RE ALMOST

14   DONE.

15        TO HELP YOU FOLLOW THE EVIDENCE, I WILL NOW GIVE YOU A

16   SUMMARY OF THE POSITIONS OF THE PARTIES.

17        AS YOU'VE HEARD, THE PARTIES ARE CORE WIRELESS AND APPLE,

18   AND THE PATENTS ARE PATENTS '536 AND '151.  THESE TWO

19   PATENTS-IN-SUIT WERE ORIGINALLY ASSIGNED TO NOKIA AND WERE

20   SUBSEQUENTLY TRANSFERRED TO CORE WIRELESS.

21        FOR CONVENIENCE, WE'LL BE REFERRING TO THESE PATENTS AS

22   THE '536 AND '151 PATENTS, WITH THOSE BEING THE LAST THREE

23   NUMBER OF EACH PATENT.

24        CORE WIRELESS FILED SUIT IN THIS COURT SEEKING MONEY

25   DAMAGES FROM APPLE FOR ALLEGEDLY INFRINGING THE '536 AND '151

1    PATENTS BY MAKING, USING, SELLING, AND OFFERING FOR SALE

2    PRODUCTS THAT CORE WIRELESS ARGUES ARE COVERED BY THE FOLLOWING

3    CLAIMS, WHICH I WILL REFER TO AS "THE ASSERTED CLAIMS."

4         THE ASSERTED CLAIMS ARE CLAIM 19 OF THE '536 PATENT AND

5    CLAIM 14 OF THE '151 PATENT.

6         THE PRODUCTS THAT ARE ALLEGED TO INFRINGE ARE THE 4S, 5,

7    5S, 5C, 6, 6 PLUS, 6S, 6S PLUS, AND SE MODELS OF APPLE'S IPHONE

8    AND THE IPAD, IPAD 3, IPAD 4, IPAD MINI, IPAD AIR, IPAD AIR2,

9    AND IPAD PRO MODELS OF APPLE'S IPAD PRODUCTS.

10        APPLE DENIES THAT IT HAS INFRINGED THE ASSERTED CLAIMS AND

11   ARGUE THAT, IN ADDITION, THE CLAIMS ARE INVALID.  INVALIDITY IS

12   A DEFENSE TO INFRINGEMENT.

13        THE JURY'S JOB WILL BE TO DECIDE WHETHER THE ASSERTED

14   CLAIMS HAVE BEEN INFRINGED AND WHETHER THOSE CLAIMS ARE

15   INVALID.

16        IF YOU DECIDE THAT ANY ASSERTED CLAIM OF THE '536 AND '151

17   PATENTS HAS BEEN INFRINGED AND IS NOT INVALID, YOU WILL THEN

18   NEED TO DECIDE ANY MONEY DAMAGES TO BE AWARDED TO CORE WIRELESS

19   TO COMPENSATE IT FOR THE INFRINGEMENT.

20        BEFORE YOU DECIDE WHETHER APPLE HAS INFRINGED THE ASSERTED

21   CLAIMS, OR WHETHER THE ASSERTED CLAIMS ARE INVALID, YOU WILL

22   NEED TO UNDERSTAND THE PATENT CLAIMS.

23        AS I MENTIONED, THE PATENT CLAIMS ARE NUMBERED SENTENCES

24   AT THE END OF THE PATENT THAT DESCRIBE THE BOUNDARIES OF THE

25   PATENT'S PROTECTION.  IT IS MY JOB AS JUDGE TO EXPLAIN TO YOU

1    THE MEANING OF ANY LANGUAGE IN THE CLAIMS THAT NEEDS

2    INTERPRETATION.

3         I HAVE ALREADY DETERMINED THE MEANING OF CERTAIN TERMS OF

4    THE ASSERTED CLAIMS.  YOU'VE BEEN GIVEN A DOCUMENT, THAT'S IN

5    THE APPENDIX TO PRELIMINARY JURY INSTRUCTIONS, THAT REFLECTS

6    THOSE MEANINGS.  YOU ARE TO APPLY MY DEFINITIONS OF THOSE TERMS

7    THROUGHOUT THE CASE.

8         HOWEVER, MY INTERPRETATION OF THE LANGUAGE OF THE CLAIMS

9    SHOULD NOT BE TAKEN AS AN INDICATION THAT I HAVE A VIEW

10   REGARDING THE ISSUES, SUCH AS INFRINGEMENT AND INVALIDITY.

11   THOSE ISSUES ARE YOURS TO DECIDE.

12        I WILL PROVIDE YOU WITH MORE DETAILED INSTRUCTIONS ON THE

13   MEANING OF THE CLAIMS BEFORE YOU RETIRE TO DELIBERATE YOUR

14   VERDICT.

15        IN THE INTEREST OF TIME, AT THIS MOMENT I'M NOT GOING TO

16   READ YOU ALL THE CLAIM CONSTRUCTION TERMS OR THE GLOSSARY

17   THAT'S ATTACHED TO THE BACK, BUT THEY ARE THERE FOR YOU TO KEEP

18   AND REVIEW DURING THE TRIAL AS THEY COME UP.

19        TRIAL.

20        THE TRIAL WILL NOW BEGIN WITH ITS NEXT PHASE.  FIRST, EACH

21   SIDE MAY MAKE AN OPENING STATEMENT.  AN OPENING STATEMENT IS

22   NOT EVIDENCE.  IT IS AN OUTLINE TO HELP YOU UNDERSTAND WHAT

23   THAT PARTY EXPECTS THE EVIDENCE WILL SHOW DURING THE TRIAL.

24        THEN THE PRESENTATION OF EVIDENCE WILL BEGIN.  WITNESSES

25   WILL TAKE THE WITNESS STAND OVER HERE AND DOCUMENTS WILL BE

1    OFFERED AND ADMITTED INTO EVIDENCE FOR YOUR CONSIDERATION.

2         CORE WIRELESS WILL PRESENT ITS EVIDENCE ON ITS CONTENTION

3    THAT THE ASSERTED CLAIMS HAVE BEEN AND CONTINUE TO BE INFRINGED

4    BY APPLE.  THOSE WITNESSES WILL BE QUESTIONED BY

5    CORE WIRELESS'S COUNSEL IN WHAT IS CALLED DIRECT EXAMINATION.

6         AFTER THE DIRECT EXAMINATION OF A WITNESS IS COMPLETE, THE

7    OPPOSING SIDE HAS AN OPPORTUNITY TO CROSS-EXAMINE A WITNESS.

8         TO PROVE INFRINGEMENT OF ANY CLAIM, CORE WIRELESS MUST

9    PERSUADE YOU BY A PREPONDERANCE OF THE EVIDENCE THAT APPLE HAS

10   INFRINGED THAT CLAIM.

11        AFTER CORE WIRELESS HAS PRESENTED ITS WITNESSES, APPLE

12   WILL CALL ITS WITNESSES, WHO WILL ALSO BE EXAMINED AND THEN

13   CROSS-EXAMINED.

14        APPLE WILL PRESENT ITS EVIDENCE THAT THE ASSERTED CLAIMS

15   ARE INVALID.  TO PROVE INVALIDITY OF ANY CLAIM, APPLE MUST

16   PERSUADE YOU BY CLEAR AND CONVINCING EVIDENCE THAT THE CLAIM IS

17   INVALID.

18        IN ADDITION TO PRESENTING ITS EVIDENCE OF INVALIDITY,

19   APPLE WILL PUT ON EVIDENCE RESPONDING TO CORE WIRELESS'S

20   INFRINGEMENT CONTENTIONS.

21        CORE WIRELESS WILL THEN RETURN AND WILL PUT ON EVIDENCE

22   RESPONDING TO APPLE'S CONTENTION THAT THE ASSERTED CLAIMS ARE

23   INVALID.  CORE WIRELESS WILL ALSO HAVE THE OPTION TO PUT ON

24   WHAT IS REFERRED TO AS "REBUTTAL" EVIDENCE TO ANY EVIDENCE

25   OFFERED BY APPLE OF NON-INFRINGEMENT.

1     FINALLY, APPLE WILL HAVE THE OPTION TO PUT ON "REBUTTAL"

2   EVIDENCE TO ANY EVIDENCE OFFERED BY CORE WIRELESS ON THE

3   VALIDITY OF THE ASSERTED CLAIMS.

4     BECAUSE THE EVIDENCE IS INTRODUCED PIECEMEAL, YOU NEED TO

5   KEEP AN OPEN MIND AS THE EVIDENCE COMES IN AND WAIT FOR ALL THE

6   EVIDENCE BEFORE YOU MAKE ANY DECISIONS IN THE CASE.  IN OTHER

7   WORDS, KEEP AN OPEN MIND THROUGHOUT THE ENTIRE TRIAL.

8     AFTER THE EVIDENCE HAS BEEN PRESENTED, I WILL GIVE YOU

9   FINAL INSTRUCTIONS ON THE LAW THAT APPLIES TO THE CASE AND THEN

10  THE ATTORNEYS WILL MAKE THEIR CLOSING ARGUMENTS.  THE CLOSING

11  ARGUMENTS ARE NOT EVIDENCE.

12    AFTER THE INSTRUCTIONS AND CLOSING ARGUMENTS, THEN YOU,

13  THE JURY, WILL RETURN TO THE JURY ROOM TO DELIBERATE AND TO

14  RETURN YOUR VERDICT.

15    THAT CONCLUDES THE PRELIMINARY JURY INSTRUCTIONS.

16    LET'S TAKE A SHORT BREAK.  IF ANY JURORS NEED TO GO TO THE

17  JURY ROOM, YOU'RE WELCOME TO.  IF YOU'D LIKE TO STAY HERE AND

18  TAKE A STRETCH BREAK, YOU CAN DO THAT, TOO.

19    WE'LL PLAN FOR CORE WIRELESS'S OPENING STATEMENT IN ABOUT

20  FIVE MINUTES.

21    WE'RE IN RECESS.

22    (RECESS FROM 3:09 P.M. UNTIL 3:12 P.M.)

23      THE COURT:  ALL RIGHT.  IF EVERYONE WOULD LIKE TO BE

24   SEATED.

25    IT WILL NOW BE CORE WIRELESS'S OPPORTUNITY TO MAKE AN

1    OPENING STATEMENT.

2         **(MR. FENSTER GAVE HIS OPENING STATEMENT ON BEHALF OF**

3    **CORE WIRELESS.)**

4              THE COURT:  YOU MAY PROCEED.

5              MR. FENSTER:  GOOD AFTERNOON, LADIES AND GENTLEMEN.

6    MAY IT PLEASE THE COURT.

7         MY COLLEAGUES AND I HAVE THE PRIVILEGE OF REPRESENTING

8    CORE WIRELESS IN THIS CASE.  IT IS A PATENT CASE, AND WE'RE

9    HERE BECAUSE CORE WIRELESS OWNS TWO PATENTS THAT WE BELIEVE

10   APPLE IS INFRINGING AND HAS BEEN INFRINGING SINCE 2011.

11        AS YOU'VE SEEN AND HEARD FROM JUDGE COUSINS AND FROM THE

12   PATENT VIDEO, PATENTS ARE FUNDAMENTAL, CONSTITUTIONALLY

13   PROTECTED PROPERTY RIGHTS.  THEY'RE PROPERTY RIGHTS THAT GIVE

14   THE INVENTOR, THE OWNER, THE EXCLUSIVE RIGHTS TO THEIR

15   INVENTION.

16        AND JUST LIKE SOMEONE CAN'T TRESPASS ON YOUR PROPERTY

17   WITHOUT YOUR PERMISSION, NOBODY CAN TRESPASS ON A PATENT, AN

18   INVENTION, CAN USE A PATENTED INVENTION WITHOUT PERMISSION,

19   WITHOUT A LICENSE, AND THAT'S WHAT APPLE HAS DONE HERE.

20        NOW, YEARS INTO CELLULAR TECHNOLOGY WE ALL KIND OF TAKE

21   FOR GRANTED THIS IDEA THAT WE CAN TALK INTO THIS BATTERY

22   POWERED BOX AND HAVE OUR VOICE HEARD AROUND THE BLOCK, MILES

23   AWAY, AROUND THE WORLD.

24        BUT WE'RE GOING TO LEARN A LOT IN THIS TECHNOLOGY -- IN

25   THIS CASE ABOUT SOME OF THE TECHNOLOGY THAT ACTUALLY MAKES THAT

1    HAPPEN.

2         YEARS BEFORE APPLE EVEN THOUGHT ABOUT MAKING CELL PHONES,

3    IT WAS ENGINEERS AT NOKIA THAT PIONEERED CELLULAR TECHNOLOGY.

4         APPLE DOESN'T COME INTO THE IPHONE SPACE UNTIL 2007.

5         BUT NOKIA ENGINEERS WERE WORKING ON CELLULAR TECHNOLOGY

6    BACK IN THE 1980'S.  THE INVENTIONS THAT WE'RE TALKING ABOUT

7    TODAY BY MR. OKSALA AND MR. SUVANEN WERE IN 1996 AND 1997,

8    YEARS BEFORE APPLE THOUGHT ABOUT MAKING A BOX THAT LOOKS LIKE

9    THIS (INDICATING).

10        I HAVE TO BE HONEST.  THE PATENTS IN THIS CASE, THE

11   INVENTIONS IN THIS CASE, ARE NOT SEXY.  IT'S NOT ABOUT -- IT'S

12   NOT ABOUT THE NICE USER INTERFACE.  IT'S ABOUT THE GUTS OF THE

13   PHONE AND CELLULAR TECHNOLOGY THAT MAKES THE PHONES WORK

14   BETTER.

15        SO IT'S GOING TO BE TECHNICAL, BUT MY PURPOSE IN THIS

16   OPENING STATEMENT IS TO PREVIEW FOR YOU WHAT THE EVIDENCE WILL

17   SHOW AND TO GIVE YOU THE TOOLS THAT YOU WILL NEED TO ANSWER THE

18   ULTIMATE QUESTION IN THIS CASE, WHICH IS INFRINGEMENT.  ARE

19   APPLE'S PRODUCTS INFRINGING THE '151 AND '536 PATENTS?

20        SO FIRST LET ME TELL YOU ABOUT THE '151 PATENT.

21        THE '151 PATENT WAS INVENTED BY JARKO OKSALA.  HE WAS AN

22   ENGINEER AT NOKIA FOR 14 YEARS.  HE WORKED ON THE VERY FIRST

23   PHONE THAT DID VIDEO CONFERENCING.  AND IN 1997, HE WAS WORKING

24   ON ONE OF THE FIRST PHONES TO DO GPRS, AND IT WAS IN THAT

25   CONTEXT THAT HE CAME UP WITH THE INVENTION FOR THE '151 PATENT.

1        MR. OKSALA CAME FROM FINLAND TO TESTIFY FOR YOU TODAY --

2    TOMORROW, HE'LL BE HERE TOMORROW, AND HE'LL TELL YOU ABOUT HIS

3    INVENTION.

4        FIRST LET ME GIVE YOU SOME OF THE BACKGROUND SO THAT WE

5    CAN UNDERSTAND THE '151 INVENTION.

6        MR. OKSALA WILL EXPLAIN THAT CELL PHONES TALK TO BASE

7    STATIONS.  SO A PLURALITY -- A BUNCH OF MOBILE STATIONS, THESE

8    THINGS ARE CALLED MOBILE STATIONS IN THE PATENTS AND IN THE

9    PATENT SPECIFICATIONS, THEY'RE CELL PHONES, AND ALL OF THE CELL

10   PHONES TALK TO BASE STATIONS.

11       BASE STATIONS ARE DISTRIBUTED THROUGHOUT THE COUNTRY.  ALL

12   OF THE CELL PHONES TALK TO BASE STATIONS AND THEN THE BASE

13   STATIONS RELAY THE MESSAGES TO OTHER BASE STATIONS AND

14   ULTIMATELY TO THE CELL PHONES.

15       NOW, MULTIPLE CELL PHONES ARE TALKING TO EACH BASE

16   STATION.  THEY'RE ALL SENDING SIGNALS AT THE SAME TIME.  AND

17   THE BASE STATION HAS TO KEEP TRACK OF ALL OF THE CELL PHONES.

18       TO DO THAT, IT HAS TIME SLOTS THAT IT ALLOCATES TO EACH OF

19   THE CELL PHONES.  TO MAKE SURE THAT THERE'S NOT INTERFERENCE,

20   THE BASE STATION SAYS, TO EACH ONE, YOU SEND ME DATA SO THAT IT

21   ARRIVES IN THIS TIME SLOT AND THEN IT WON'T INTERFERE WITH YOUR

22   CELL PHONE THAT'S COMING IN THE NEXT TIME SLOT, ET CETERA.

23       SO THE DATA HERE, WHAT'S REPRESENTED IS THE TIME SLOTS AND

24   THE ORANGE PHONE IS SENDING DATA, THE ORANGE RECTANGLE APPEARS

25   IN ITS SLOT.  EVERYTHING IS FINE RIGHT NOW.

1       BUT THERE'S SOMETHING CALLED PROPAGATION DELAY.  IT TAKES

2    TIME FOR THE CELL -- FOR THE MESSAGE TO GET FROM THE CELL PHONE

3    TO THE BASE STATION.  AND THE FARTHER AWAY YOU ARE FROM THE

4    BASE STATION, THE LONGER IT TAKES THE MESSAGE TO GET THERE.

5       NOW, IF YOU DON'T ACCOUNT FOR THE DIFFERENT TIMING FROM

6    EVERYONE SENDING SIGNALS IN DIFFERENT PLACES, THEY WON'T ARRIVE

7    IN THE PROPER TIME SLOTS, AND YOU'LL END UP WITH INTERFERENCE.

8       SO YOU HAVE TO FIGURE OUT, HOW LONG IS IT GOING TO TAKE

9    THE SIGNAL TO GET TO THE BASE STATION SO I KNOW HOW FAR IN

10   ADVANCE TO SEND IT SO IT'LL ARRIVE IN THE RIGHT SPOT?

11      SO THE WAY THE SYSTEM DOES THIS IS IT USES WHAT'S CALLED A

12   TIMING ADVANCE VALUE, A TAV, AND THE BASE STATION WILL SEND

13   TIMING ADVANCE VALUES TO TELL THE CELL PHONES WHEN TO SEND THE

14   SIGNALS SO THAT THEY ARRIVE IN THE RIGHT SPOT.

15      AND ONCE THEY USE THE TIMING ADVANCE VALUE, THEN THEY SEND

16   IT AT THE PROPER TIME, THE SIGNAL ARRIVES IN THE RIGHT SLOTS,

17   NO INTERFERENCE, EVERYONE IS HAPPY.

18      SO THIS IS THE PROBLEM THAT MR. OKSALA WAS WORKING ON BACK

19   IN 1997.

20      NOW, THIS IS HOW YOU CALCULATE A TIMING ADVANCE VALUE.

21   YOU START OFF WITH THE BASE STATION SENDING A SPECIAL SIGNAL

22   CALLED A TIMING ACCESS BURST.  SO THE CELL PHONE, THE MOBILE

23   STATION, SENDS AN ACCESS BURST TO THE BASE STATION, AND THAT'S

24   WHAT THE BASE STATION USES TO CALCULATE A TIMING ADVANCE VALUE.

25      THAT TIMING ADVANCE VALUE THEN GETS ENCODED AND SENT

OPENING STATEMENT BY MR. FENSTER

1    ACROSS BACK TO THE BASE STATION IN TIMING ADVANCE MESSAGES.

2    IT'S SENT FOUR TIMES TO GIVE THEM FOUR OPPORTUNITIES TO RECOVER

3    IT.

4         THE MOBILE STATION HAS FOUR OPPORTUNITIES TO RECEIVE IT,

5    AND IT RECEIVES IT ONE TIME.  IF IT'S PROPERLY DECODED, IT WILL

6    RECEIVE THE TIMING ADVANCE VALUE AND USE IT.

7         ONCE IT RECEIVES THE FIRST ONE FROM THE FIRST MESSAGE, IT

8    IGNORES THE REST OF THE MESSAGES.  IT'S JUST FOUR OPPORTUNITIES

9    TO RECEIVE THE TIMING ADVANCE VALUE ONE TIME.

10        SO THAT'S THE WAY THE TESTIMONY WORKED.

11        NOW, THERE ARE -- SO IN SUMMARY, FOR EVERY ACCESS BURST,

12   ONE TIMING ADVANCE VALUE IS CALCULATED, SENT, AND RECEIVED.

13   ONE ACCESS BURST, ONE TIMING ADVANCE VALUE.

14        NOW, THERE ARE TWO CHANNELS.  SO THIS WAS THE PROBLEM THAT

15   MR. OKSALA WAS WORKING ON.  THERE ARE ACTUALLY TWO CHANNELS

16   THAT THE MOBILE STATION USES TO COMMUNICATE.  ONE IS CALLED AN

17   UPLINK CHANNEL, AND THAT'S FROM THE -- THERE WE GO.

18        SO AN UPLINK CHANNEL IS COMMUNICATIONS FROM THE MOBILE

19   STATION TO THE BASE STATION, AND THEN THERE'S A SEPARATE

20   CHANNEL CALLED THE DOWNLINK THAT'S COMMUNICATION FROM THE BASE

21   STATION TO THE MOBILE STATION.

22        NOW, THE OLD SYSTEM REQUIRED SEPARATE TIMING ADVANCE

23   VALUES FOR EACH CHANNEL.

24        AND THIS IS A QUOTE IN THE PATENT, AND IT SAYS "ONE ACCESS

25   BURST IS TRANSMITTED FOR EACH CHANNEL ALLOCATED TO THE MOBILE

1    INDICATION," THAT'S THE CELL PHONE, "(UPLINK AND DOWNLINK)."

2         SO THEY HAD TO SEND ONE ACCESS FIRST FOR THE UPLINK, GET

3    THE TIMING ADVANCE VALUE FOR THE UPLINK, AND A SEPARATE ONE FOR

4    THE DOWNLINK.

5         MR. OKSALA REALIZED THAT THAT'S WASTEFUL, AND HE FIGURED

6    OUT A WAY TO ONLY USE ONE OF THOSE.

7         NOW, WHY DOES THIS MATTER?  IT MATTERS BECAUSE THE CELL

8    PHONES CAN BE MOVING QUICKLY, LIKE IN A CAR.  YOU'RE DRIVING

9    DOWN THE STREET, YOU MAY BE DRIVING 60 MILES AN HOUR AWAY FROM

10   THE BASE STATION OR TOWARDS A BASE STATION.

11        SO THESE THINGS GET UPDATED EVERY ONE AND A HALF SECONDS

12   OR SO.  EVERY ONE AND A HALF SECONDS YOUR CELL PHONE IS HAVING

13   TO SEND THESE TWO SIGNALS, CALCULATE THE TIMING ADVANCE VALUE,

14   AND DO THAT TWO TIMES.

15        MR. OKSALA'S INVENTION WAS TO RECOGNIZE THAT YOU CAN USE

16   THE SAME TIMING ADVANCE VALUE FOR THE UPLINK AND THE DOWNLINK

17   COMMUNICATION.  AND HE DESCRIBES THAT IN THE PATENT HERE, "A

18   SINGLE TIMING ADVANCE INDEX IS ASSIGNED TO THE UPLINK AND

19   DOWNLINK CHANNELS, THUS BOTH THE UPLINK AND DOWNLINK CHANNELS

20   WILL SHARE THE SAME TIMING ADVANCE VALUE."

21        OKAY.  THAT WAS THE -- THAT WAS THE INNOVATION THAT'S

22   CLAIMED IN THE '151 PATENT.

23        SO INSTEAD OF SENDING ONE FOR THE UPLINK, ONE FOR THE

24   DOWNLINK, YOU SEND ONE AND USE THE SAME TIMING ADVANCE VALUE

25   FOR BOTH UPLINK AND DOWNLINK.

OPENING STATEMENT BY MR. FENSTER

```
 1              THIS IS A REPRESENTATION OF THE STREAM OF DATA GOING FROM

 2    THE MOBILE STATION TO THE BASE STATION, AND EACH ONE OF THESE

 3    LITTLE WHITE SQUARES ARE CALLED MULTIFRAMES.  YOU'LL HEAR ABOUT

 4    MULTIFRAMES.  DATA IS BROKEN UP INTO MULTIFRAMES, AND A

 5    MULTIFRAME STRUCTURE IS EIGHT OF THESE THINGS.

 6              WHAT'S IMPORTANT FOR THE PATENT IS THAT THE PATENT

 7    REQUIRES SENDING ONE ACCESS BURST PER EIGHT MULTIFRAMES AND

 8    RECEIVING ONE TIMING ADVANCE VALUE PER EIGHT MULTIFRAMES.

 9              BEFORE, BEFORE THE INVENTION, YOU SEND TWO ACCESS BURSTS,

10    AND NOW YOU'RE JUST SENDING ONE AND USING ONE TIMING ADVANCE

11    VALUE.

12              THE EVIDENCE WILL SHOW THAT THAT'S WHAT'S CLAIMED, AND

13    THAT'S WHAT APPLE IS DOING.

14              MR. OKSALA PRESENTED HIS INVENTION TO NOKIA.  NOKIA AGREED

15    IT WAS A GOOD IDEA, AND THEY FILED FOR A PATENT APPLICATION AND

16    THE U.S. PATENT OFFICE REVIEWED IT AND ALSO AGREED AND GRANTED

17    THE '151 PATENT.

18              THE '151 PATENT WAS GRANTED AND THE INVENTION THAT WE'RE

19    TALKING ABOUT NOW IS CLAIMED IN CLAIM 14 OF THAT PATENT.

20              THE BENEFITS OF THE '151 PATENT WERE IMPRESSIVE.  BECAUSE

21    YOU'RE ONLY SENDING ONE SIGNAL AND CALCULATING ONE TAV AND

22    SENDING AND RECEIVING ONE TAV EVERY ONE AND A HALF SECONDS

23    INSTEAD OF TWO, IT IMPROVES BATTERY LIFE.  WE ALL KNOW HOW

24    IMPORTANT BATTERY LIFE IS.  THIS IMPROVES BATTERY LIFE IN THE

25    PHONES.
```

1          IT ALSO INCREASES THE NUMBER OF PHONES THAT CAN TALK TO A

2     BASE STATION AT A GIVEN TIME.  THAT MEANS THAT YOUR, YOUR CALL,

3     YOUR DATA IS MORE LIKELY TO GO THROUGH BECAUSE THE BASE

4     STATIONS HAVE MORE CAPACITY, AND IT REDUCES INTERFERENCE.

5          THESE ARE THE BENEFITS THAT APPLE IS ENJOYING BY USING

6     MR. OKSALA'S INVENTION THAT CORE WIRELESS OWNS THE PATENT FOR.

7          NOW, IT'S PROTECTED, AS I SAID, BY CLAIM 14.

8          CLAIM 14, LET ME WALK YOU THROUGH IT.  WE'RE GOING TO

9     SPEND A LOT OF TIME ON CLAIM 14 OVER THE COURSE OF THE PATENT,

10    BUT I WANT TO GIVE YOU THE TOOLS TO START GETTING ACCLIMATED TO

11    THE TECHNOLOGY.

12         SO CLAIM 14 IS A MOBILE STATION, THAT'S THE CELL -- SO

13    WHAT IS CLAIMED IS THE CELL PHONE.  IT'S FOR USE IN A RADIO

14    TELEPHONE NETWORK, THAT'S THE CELLULAR NETWORK.

15         THE NETWORK HAS A BASE STATION AND A PLURALITY OF MOBILE

16    PHONES FOR COMMUNICATING, IN WHICH THE RADIO SIGNAL

17    TRANSMISSION SLOTS AT THE MOBILE STATION ARE SYNCHRONIZED TO

18    THE RECEPTION SLOTS AT THE BASE STATION.  THAT'S MAKING SURE

19    THAT THE DATA LANDS IN THE RIGHT SPOT SO THAT THERE'S NOT

20    INTERFERENCE.

21         THE RECEPTION SLOTS CORRESPONDING TO UPLINK AND DOWNLINK

22    CHANNELS.  THAT'S WHAT WE'RE TALKING ABOUT, THERE ARE TWO

23    CHANNELS, UPLINK AND DOWNLINK.

24         THE MOBILE STATION IS CONFIGURED TO DO THE FOLLOWING:  IT

25    RECEIVES A TIMING ADVANCE VALUE ONCE, AND YOU'LL HEAR THAT

1    THAT'S ONE PER EIGHT MULTIFRAMES.  SO IT RECEIVES ONE TIMING

2    ADVANCE VALUE INSTEAD OF SENDING TWO ACCESS BURSTS AND GETTING

3    TWO, YOU'RE SENDING IT ONCE PER EIGHT MULTIFRAMES, AND YOU

4    ADVANCE THE TRANSMISSION SLOTS FOR BOTH THE UPLINK AND DOWNLINK

5    CHANNELS USING THE RECEIVED TIMING ADVANCE VALUE.

6         SO 14D IS WHERE IT'S CLAIMING USING THE SAME TIMING

7    ADVANCE VALUE FOR BOTH THE UPLINK AND DOWNLINK CHANNEL.

8         AND THEN 14E IS SO THAT TRANSMITTED DATA IS RECEIVED IN

9    THE PROPER RECEPTION SLOTS.

10         SO THAT'S BASICALLY WHAT CLAIM 14 IS.  IT'S THIS INVENTION

11    OF USING ONE TIMING ADVANCE VALUE FOR EIGHT MULTIFRAMES FOR

12    BOTH THE UPLINK AND DOWNLINK CHANNEL.

13         SO THE EVIDENCE THAT WE'RE GOING TO PRESENT TO SHOW YOU

14    THAT APPLE IS USING THIS, IN EACH OF THE ACCUSED PRODUCTS, IS

15    GOING TO BE PRESENTED BY DR. RICK WESEL.  I INTRODUCED HIM

16    EARLIER.

17         DR. RICK WESEL IS A PROFESSOR OF ELECTRICAL ENGINEERING AT

18    UCLA.  HE'LL TELL YOU ABOUT HIS BACKGROUND.

19         BUT HE ANALYZED THE SOURCE CODE FOR APPLE'S PRODUCTS.  THE

20    SOURCE CODE IS HERE (INDICATING).  IT'S EXHIBITS -- IT'S

21    PLAINTIFF'S EXHIBITS 52 AND, I THINK, 536 -- 52 AND 316.

22         THESE ARE THE TWO EXHIBITS THAT HAVE THE SOURCE CODE FOR

23    APPLE'S PRODUCTS THAT DR. WESEL REVIEWED.  HE REVIEWED THE

24    SOURCE CODE, THE TECHNICAL SPECIFICATION, APPLE'S OWN

25    DOCUMENTS, APPLE'S OWN WITNESS TESTIMONY TO CONFIRM THAT EVERY

1    SINGLE ONE OF THE ELEMENTS OF CLAIM 14 IS PRACTICED BY APPLE'S

2    PRODUCTS.

3         SO THE COURT'S CLAIM CONSTRUCTION -- REMEMBER, YOU'LL SEE

4    THIS IN YOUR APPENDIX AND IN THE BACK OF YOUR NOTEBOOK THAT

5    YOU'LL GET TOMORROW -- THAT CLAIM REQUIRES RECEIVING A TIMING

6    ADVANCE VALUE, AND I MENTIONED THE COURT CONSTRUED THAT AS

7    "RECEIVING A TIMING ADVANCE VALUE ONE TIME FOR A MULTIFRAME

8    STRUCTURE."

9         SO THAT'S WHAT WE HAVE TO SHOW TO YOU TO SHOW THAT APPLE

10   INFRINGES, THAT THEY SEND ONE ACCESS BURST AND GET ONE TIMING

11   ADVANCE VALUE PER EIGHT MULTIFRAMES.

12        AND DR. WESEL WILL SHOW YOU THAT THE SOURCE CODE SHOWS YOU

13   THAT THAT'S EXACTLY WHAT APPLE'S PRODUCTS DO.  YOU WILL HEAR

14   THAT THEY SEND ONE TIMING ACCESS BURST EVERY EIGHT MULTIFRAMES.

15   ONE ACCESS BURST, ONE TIMING ADVANCE VALUE.  IT GETS SENT BACK

16   SO THAT THE CELL PHONE HAS FOUR OPPORTUNITIES TO RECOVER IT ONE

17   TIME.  THOSE FOUR TIMING ADVANCE MESSAGES ARE IN EIGHT

18   MULTIFRAMES EVERY TIME, EIGHT ON CONSECUTIVE MULTIFRAMES.  AND

19   ONE TIMING ADVANCE VALUE IS RECOVERED, ONLY ONE, FROM THOSE

20   FOUR MESSAGES AND THOSE EIGHT MULTIFRAMES.

21        SO JUST TO SUMMARIZE, THE OLD SYSTEM HAD THIS PROCESS OF

22   SENDING THE ACCESS BURST AND GETTING THE TAV, RECOVERING IT ONE

23   TIME FROM THE FOUR TIMING ADVANCE MESSAGES TWO TIMES.

24        AND THE NEW SYSTEM REQUIRES IT ONCE.

25        APPLE'S PRODUCT UNEQUIVOCALLY DOES IT THIS WAY

1    (INDICATING).  YOU WILL HEAR THEIR EXPERT ADMIT THAT THEY SEND

2    ONE ACCESS BURST IN EIGHT MULTIFRAMES.  THEY SEND THAT

3    ACCESS -- THEY CALCULATE ONE TIMING ADVANCE VALUE AND THEY USE

4    ONE TIMING ADVANCE VALUE EACH EIGHT MULTIFRAMES.

5        SO WHAT DID THEY SAY -- WHAT DO THEY SAY WHEN THEIR SOURCE

6    CODE SHOWS THAT THEY'RE DOING EXACTLY THAT?  THEY TRY TO

7    CONFUSE THE ISSUE, AND HERE'S HOW.

8        THEY LOOK AT THESE FOUR TIMING ADVANCE MESSAGES -- AND

9    REMEMBER I SHOWED YOU, AND YOU'LL HEAR MORE, THAT THOSE TIMING

10   ADVANCE MESSAGES ARE ONLY INTERPRETED ONE TIME TO GIVE ONE

11   TIMING ADVANCE VALUE.

12       THEY SAY, WELL, BECAUSE THERE ARE FOUR TIMING ADVANCE

13   MESSAGES, WE'RE OFF THE HOOK.

14       THAT'S NOT WHAT THIS PATENT IS ABOUT.  THIS PATENT IS

15   ABOUT DOING IT, INSTEAD OF TWO TIMES, THIS WHOLE PROCESS, DOING

16   IT ONCE.  THE PATENT TELLS YOU THIS.  IT'S ALWAYS BEEN THE CASE

17   THAT THERE ARE -- THAT ONE ACCESS BURST GIVES ONE TIMING

18   ADVANCE VALUE, AND THERE ARE -- IT'S ALWAYS BEEN THE CASE THAT

19   THERE ARE FOUR TIMING ADVANCE MESSAGES AND FOUR OPPORTUNITIES

20   TO RECOVER IT.

21       THE PATENT SAYS SO.  THIS IS AT COLUMN 3, LINES 30 THROUGH

22   35.  IT SAYS, GIVEN THAT A TIMING ADVANCE VALUE FOR A GIVEN

23   CHANNEL IS UPDATED ONCE EVERY EIGHT MULTIFRAMES, A MULTI

24   STATE -- MOBILE STATION HAS FOUR OPPORTUNITIES TO RECOVER ITS

25   TIMING ADVANCE VALUE.

1         THOSE ARE THE FOUR TIMING ADVANCE MESSAGES.

2         HOWEVER, IF IT RECEIVES -- IF IT RECEIVES ITS TIMING

3    ADVANCE VALUE CORRECTLY IN THE FIRST TRANSMISSION, IT NEED NOT

4    LISTEN TO ANY OF THE TIMING ADVANCE IDLE FRAMES IN THE NEXT

5    ONES.

6         ONCE IT RECEIVES IT ONE TIME, IT IGNORES THE REST.  IT

7    ONLY USES ONE TIMING ADVANCE VALUE FOR EIGHT MULTIFRAMES.

8    APPLE IS TRYING TO CONFUSE THE ISSUE TO GET OUT OF INFRINGEMENT

9    WHEN THEY LOOK AT THE FOUR.

10         THIS PATENT IS ABOUT RECEIVING IT ONE TIME, THIS WHOLE

11    PROCESS HAPPENING ONE TIME FOR BOTH THE UPLINK AND DOWNLINK

12    INSTEAD OF HAPPENING TWO TIMES FOR THE UPLINK AND DOWNLINK.

13         ALL RIGHT.  LET ME TELL YOU NOW ABOUT THE SECOND PATENT.

14         THE SECOND PATENT IS CALLED -- IT'S THE '536 PATENT, AND

15    THIS WAS INVENTED BY JYRI SUVANEN.  JYRI SUVANEN HAS BEEN A

16    NOKIA ENGINEER.  HE STILL IS FOR OVER 23 YEARS, I THINK.  HE'S

17    DEDICATED HIS LIFE TO IMPROVING CELL PHONE TECHNOLOGY.  HE'S

18    THE INVENTOR ON OVER A DOZEN PATENTS.  HE'S COME FROM HELSINKI,

19    FINLAND TO TESTIFY FOR YOU, AND HE'LL BE OUR SECOND WITNESS TO

20    TELL YOU ABOUT THE '536 INVENTION.

21         SO LET ME GIVE YOU SOME OF THE BACKGROUND FOR THE '536

22    INVENTION.

23         SO THERE ARE TWO KINDS OF INFORMATION THAT'S SENT.

24    THERE'S USER INFORMATION AND MESSAGES.  USER INFORMATION IS

25    SPEECH, IT'S DATA THAT YOU SEND FROM -- THAT YOU'RE SENDING TO

```
1     SOMEONE ELSE, ONE USER TO ANOTHER, LIKE TEXTS, ANY USER

2     INFORMATION, BUT IT'S GENERALLY TO GENERATE SOUNDS.

3          THAT'S DIFFERENT THAN CONTROL MESSAGED.  SO THERE'S USER

4     INFORMATION ON THE ONE HAND AND CONTROL MESSAGES.

5          USER INFORMATION GOES FROM USER TO USER, AND CONTROL

6     MESSAGES GO BETWEEN THE CELL PHONE AND THE BASE STATION TO

7     CONTROL THE CONNECTION AND MAKE SURE THAT THE SOUND -- THAT THE

8     CONNECTION STAYS IN TACT AND OKAY.

9          WITHOUT THE MESSAGES KEEPING THE CONNECTION IN TACT, THE

10    CELLULAR CONNECTION WILL DROP.  IT WILL GET INTERRUPTED.  YOU

11    CAN'T HEAR ME NOW.

12         THE NEXT PIECE OF INFORMATION.  BOTH USER INFORMATION AND

13    MESSAGES ARE SENT IN THINGS CALLED FRAMES.  THEY'RE CHUNKS OF

14    DATA BROKEN UP.  THIS IS DIGITAL DATA AND IT'S BROKEN UP INTO

15    FRAMES.  SO WE'LL HEAR A LOT ABOUT FRAMES BECAUSE THAT'S

16    IMPORTANT TO THE '536 INVENTION.

17         NOW, MR. SUVANEN FIGURED OUT THAT BY USING CONTROL

18    MESSAGES, HE COULD IMPROVE THE CONNECTION.  HE COULD MAKE CELL

19    PHONE CALLS, CELL PHONE CONNECTIONS MORE RELIABLE BY SENDING

20    SHORT MESSAGES TO UPDATE SETTINGS FOR THE CONTROL CONNECTION.

21         SO HE WANTED TO SEND MESSAGES ON THE SPEECH FRAME.  BUT --

22    ON THE SPEECH CHANNEL.  HE DIDN'T WANT TO TAKE UP A SEPARATE

23    CHANNEL.  HE WANTED TO SEND THE MESSAGES ON THE SPEECH CHANNEL

24    WITHOUT INTERRUPTING THE SPEECH.

25         SO HE LOOKED AT SOME OF THE WAYS THAT OTHERS HAD DONE
```

1    THAT.  OTHER PEOPLE HAD TRIED TO SEND TWO TYPES OF DATA ON ONE

2    CHANNEL.

3         SO YOU'LL HEAR ABOUT THE DAVIS PATENT.  THIS WAS A PIECE

4    OF PRIOR ART THAT ALLOWED YOU TO SEND A FAX -- USE THE SAME

5    LINE TO SEND A FAX OVER A PHONE LINE.  SO YOU MIGHT BE TALKING

6    AND SOMETIMES YOU GET THAT AWFUL SOUND FOR THE FAX LINE.  WELL,

7    THIS WAS HOW DAVIS, HE HAD A SOLUTION FOR SENDING FAX DATA ON

8    THE SAME LINE THAT CARRIES SPEECH DATA ON TELEPHONES.

9         AND WHAT HE DID IS HE USED A CODE WORD CALLED V27 START TO

10   TELL THE SYSTEM WHEN THE MESSAGE -- WHEN THE DATA -- WHEN THE

11   FAX DATA STARTED AND WHEN IT ENDED.  SO HE USED CODE WORDS TO

12   DELINEATE THE START AND END OF THE FAX DATA.  SO THE WAY THIS

13   WORKED IS THE SPEECH DATA WOULD BE COMING INTO THE PHONE LINE

14   AND THEN A CODE WORD WOULD APPEAR SAYING, HEY, I'M STARTING FAX

15   DATA NOW, SWITCH ME TO FAX.

16        ONCE THE CODE WORD DELINEATING THE START OF THE MESSAGE

17   APPEARS, IT WOULD DIVERT TO THE FAX LINE.  AND THEN THE FAX

18   DATA WOULD GO TO THE FAX LINE AND THE FAX WOULD BE RECEIVED.

19        AND THEN THERE WOULD BE A CODE WORD TELLING YOU WHEN THE

20   FAX DATA ENDED, SO GO BACK TO THE TELEPHONE.

21        NOW, THE PROBLEM WITH THAT IS IT TOTALLY INTERRUPTS

22   SPEECH.  WHEN YOU'RE ACCEPTING A FAX, YOU CAN'T SEND SPEECH.

23        SO MR. SUVANEN WANTED A WAY TO SEND A MESSAGE ON THE

24   SPEECH CHANNEL WITHOUT INTERFERING WITH THE SPEECH.

25        AND THEN HE REMEMBERED SOMETHING.  CELL PHONES HAVE A WAY

1    TO DEAL WITH BAD FRAMES.  SO CELLULAR DATA IS SENT OVER THE

2    AIRWAVES, AND WE ALL KNOW SOMETIMES IT GETS GARBLED.  SO

3    THERE'S A WAY THAT THE CELL PHONE HAS TO DEAL WITH THAT.  IT

4    WOULD CHECK EACH FRAME AND SAY, DID I RECEIVE THIS PROPERLY?

5    IF SO, IT'S GOOD USER INFORMATION.  IT'S A GOOD FRAME.  LET'S

6    SEND IT TO THE SPEAKER AS SOUND.

7         BUT SOMETIMES YOU WOULD GET A GARBLED FRAME, AND IF YOU

8    GET A GARBLED OR CORRUPTED FRAME, WE DON'T WANT TO MAKE THAT

9    SOUND, SO IT HAD A WAY TO DEAL WITH THAT.  IT WOULD RECOGNIZE

10   IT AS A BAD FRAME, IT WOULD DISCARD IT, AND THEN, TO FILL IN

11   THAT GAP RIGHT THERE SO THAT YOU DON'T HEAR THE GAP, IT WOULD

12   MAKE A COPY OF THE PRECEDING GOOD FRAME.

13        AND BECAUSE THESE FRAMES ARE SO SHORT, WHEN YOU'RE

14   LISTENING TO IT, YOU DON'T EVEN HEAR THE DIFFERENCE.  IT JUST

15   GOES RIGHT PAST IT.

16        MR. SUVANEN SAID, THAT IS PRETTY COOL.  I HAVE A WAY THAT

17   I CAN -- IF I CAN DEAL WITH A BAD FRAME, THEN I CAN STEAL A

18   FRAME AND STICK A MESSAGE IN IT, USE THIS SAME MECHANISM TO

19   SUBSTITUTE AND REPLACE IT SO THAT IT WON'T INTERFERE WITH MY

20   SPEECH, AND THEN I CAN SEND A MESSAGE TO IMPROVE MY -- THE CALL

21   QUALITY.

22        SO THAT'S WHAT HE DID.  HE CAME UP -- THAT WAS PART OF HIS

23   INVENTION.  SO NOW HE NEEDED A WAY TO DETECT THE MESSAGE.  SO

24   HOW DO I KNOW WHEN THE SPEECH FRAME THAT I STOLE AS A STOLEN

25   FRAME THAT MIGHT CONTAIN A MESSAGE AS OPPOSED TO JUST A BAD,

1    GARBLED FRAME?

2         HERE'S WHAT HE CAME UP WITH.  FIRST, DEFINE A UNIQUE BIT

3    PATTERN FOR EACH MESSAGE.  SO I'M GOING TO DEFINE UNIQUE

4    PATTERNS FOR EACH OF MY MESSAGES SO I KNOW IN ADVANCE WHAT THEY

5    LOOK LIKE.

6         THEN I'M GOING TO STEAL A FRAME FOR THE MESSAGE, I'LL

7    IDENTIFY IT AS A BAD FRAME SO THE TESTIMONY KNOWS TO REPLACE IT

8    WITH THE PRECEDING GOOD ONE, AND THEN, BECAUSE IT WAS A BAD

9    FRAME, I'M GOING TO LOOK INSIDE AND SEE, DID IT CONTAIN A BIT

10   PATTERN THAT MATCHES ONE OF MY MESSAGES?

11        AND IF IT DID, THEN I CAN FIGURE OUT, I GOT A MESSAGE.

12        SO HE DEFINED A UNIQUE BIT PATTERN FOR EACH MESSAGE.  HE

13   STEALS A FRAME FOR THE MESSAGE, STICKS A MESSAGE IN IT, TELLS

14   THE SYSTEM THIS IS A BAD FRAME, THAT IT DOES NOT CONTAIN

15   ERROR-FREE USER INFORMATION, AND BECAUSE OF THAT, I NEED TO

16   REPLACE IT WITH THE PRECEDING GOOD FRAME SO I DON'T INTERRUPT

17   MY SPEECH, AND THEN LOOK INSIDE TO SEE, DID IT HAVE A BIT

18   PATTERN THAT MATCHES ONE OF MY UNIQUE MESSAGES?

19        AND IF SO, I GOT A MESSAGE.

20        AND IN THIS WAY, MR. SUVANEN FIGURED OUT A WAY TO SEND

21   MESSAGES USING THE EXISTING EQUIPMENT.  PEOPLE DIDN'T HAVE TO

22   BUY NEW PHONES, THEY DIDN'T HAVE TO CHANGE THE EQUIPMENT.  THEY

23   DIDN'T HAVE TO UPDATE ANYTHING.  IT JUST MADE THE SYSTEM WORK

24   BETTER.

25        SO HERE HE SUBMITTED HIS INVENTION TO NOKIA, NOKIA APPLIED

1    TO THE PATENT OFFICE, THE PATENT OFFICE AGREED THIS IS A GOOD

2    INVENTION, AND THEY AWARDED THE '536 PATENT AND CLAIM 19 IS

3    WHAT WE HAVE FOR THIS ONE.

4         CLAIM 19 HAS -- IT'S LONG, BUT LET ME WALK YOU THROUGH IT

5    QUICKLY.

6         IT'S A RECEIVER.  IN THIS CASE THE RECEIVER IS THE MOBILE

7    STATION.  IT HAS RECEIVING MEANS FOR RECEIVING THE SIGNAL IN

8    FRAMES.  WE TALKED ABOUT THAT.  APPLE DOES THAT.

9         EACH FRAME HAS ONE OF TWO STATES, BEING A GOOD STATE AND A

10   BAD STATE.  IT'S EITHER GOOD USER INFORMATION OR NOT GOOD USER

11   INFORMATION.  AND WE'LL TALK ABOUT THAT BECAUSE THAT'S ONE OF

12   THE KEY ISSUES IN THIS CASE.

13        USER INFORMATION GETS DECODED AND MADE INTO SPEECH.

14        IF IT'S A BAD FRAME, THERE'S A REPLACING MEANS TO REPLACE

15   THE BAD FRAME WITH THE PRECEDING GOOD ONE.

16        THERE'S A MESSAGE DECODER WHEREIN FOR EACH DIFFERENT

17   MESSAGE, A UNIQUE BIT PATTERN WAS DEFINED.  THAT WAS THE KEY

18   PART, ONE OF THE KEY PARTS OF MR. SUVANEN'S DETECTION METHOD,

19   TO FIND A UNIQUE PATTERN FOR EACH ONE.

20        AND THEN, WHEREIN THE RECEIVER DETECTS A FRAME BY SEEING

21   THAT IT'S A BAD FRAME, AND, TWO, THAT IT HAS THE MATCHING BIT

22   PATTERN.  IT CONTAINS A BIT PATTERN THAT DEVIATES FROM A BIT

23   PATTERN CORRESPONDING TO THE MESSAGE BY THE MOST PREDETERMINED

24   THRESHOLD VALUE.

25        SO TWO STEPS:  IDENTIFY IT AS NOT CONTAINING GOOD USER

1    INFORMATION SO YOU CAN REPLACE IT; AND, TWO, LOOK FOR MATCHING

2    BIT PATTERN.  AND IF YOU'VE GOT THE MATCHING BIT PATTERN, THEN

3    YOU KNOW YOU'VE GOT A MESSAGE.

4        DR. WESEL ANALYZED APPLE'S SOURCE CODE, HE ANALYZED THEIR

5    TECHNICAL DOCUMENTS, THE TECHNICAL SPECIFICATION, AND HE'LL

6    SHOW YOU THAT APPLE'S ACCUSED PRODUCTS MEET EVERY SINGLE

7    ELEMENT OF CLAIM 19.

8        IN SUMMARY, YOU'LL HEAR MUCH MORE ABOUT THIS, BUT THERE

9    ARE THINGS CALLED RATSCCH MESSAGES.  IT'S AN ACRONYM,

10   R-A-T-S-C-C-H.  RATSCCH.  YOU DON'T HAVE TO WORRY ABOUT WHAT IT

11   IS RIGHT NOW, BUT RATSCCH MESSAGES ARE THE ONES THAT APPLE IS

12   USING IN THIS INFRINGING WAY.

13       YOU'LL HEAR EVIDENCE THAT'S UNDISPUTED THAT THERE IS A

14   UNIQUE 35 BIT SEQUENCE ASSIGNED TO EACH RATSCCH MESSAGE.

15   THAT'S THE FIRST PART OF MR. SUVANEN'S INVENTION.

16       THE -- THERE WE GO.

17       THE FRAME -- THE MESSAGE IS STOLEN FOR THE RATSCCH FRAME,

18   IT'S IDENTIFIED BY A RATSCCH I.D. TELLING THE SYSTEM THIS IS

19   NOT GOOD USER INFORMATION, LOOK INSIDE FOR A MESSAGE.  IT

20   KNOWS, BECAUSE OF THE RATSCCH I.D., TO SUBSTITUTE AND REPLACE

21   IT WITH THE PRECEDING GOOD FRAME, JUST LIKE THE CLAIM REQUIRES,

22   AND THEN IT KNOWS TO LOOK INSIDE TO SEE DOES IT CONTAIN A BIT

23   PATTERN THAT MATCHES ONE OF THE 35 BIT RATSCCH MESSAGES, JUST

24   LIKE THE CLAIM REQUIRES.

25       IF IT DOES, YOU KNOW YOU HAVE A MESSAGE.

1      ONE OF APPLE'S -- SO I TOLD YOU ABOUT GOOD STATE AND BAD

2  STATE.  SO THIS IS ONE OF APPLE'S DEFENSES.

3      SO THE CLAIM REQUIRES THAT EACH FRAME HAVE ONE OF TWO

4  STATES, A GOOD STATE, WHICH IS DEFINED AS IT CONTAINS

5  ERROR-FREE USER INFORMATION; OR A BAD STATE.  THE COURT HAS

6  DEFINED THAT TO BE IF IT DOESN'T CONTAIN ERROR-FREE USER

7  INFORMATION.  THERE'S ONLY TWO POSSIBILITIES BY DEFINITION.

8  EITHER IT HAS ERROR-FREE USER INFORMATION, OR NOT.

9      IF IT'S -- IF IT'S ERRORED, IF IT HAS ERRORED, IT'S BAD

10  STATE OR IF IT'S NOT USER INFORMATION, IT'S BAD STATE.  IT'S

11  EITHER ERROR-FREE USER INFORMATION, OR NOT.  EVERYTHING IS

12  EITHER A GOOD STATE OR A BAD STATE.

13      APPLE WILL TRY TO TELL YOU THAT THE RATSCCH I.D. HAS EIGHT

14  DATA TYPES.  THESE ARE NOT STATES.  YOU'LL HEAR DR. WESEL

15  EXPLAIN THAT EACH ONE OF THOSE DATA TYPES EITHER HAS GOOD

16  ERROR-FREE USER INFORMATION, OR IT'S A BAD STATE THAT GETS

17  SUBSTITUTED AND REPLACED JUST LIKE THE CLAIM REQUIRES.

18      APPLE'S DEFENSE IS THAT THERE ARE EIGHT DATA TYPES INSTEAD

19  OF TWO, BUT DR. WESEL WILL SHOW YOU THAT EACH ONE IS TREATED AS

20  EITHER A GOOD STATE OR A BAD STATE.

21      LET ME STOP TALKING ABOUT TECHNOLOGY FOR A MINUTE AND TELL

22  YOU ABOUT HOW CORE WIRELESS CAME TO OWN THESE PATENTS FROM

23  NOKIA.

24      SO NOKIA, IN 19 -- IN 2011 WAS WORKING ON A BIG DEAL WITH

25  MICROSOFT, THE TECH GIANT MICROSOFT, AND NOKIA IS A CELL GIANT,

1    AND MICROSOFT, A TECH GIANT, WERE COMING TOGETHER TO WORK ON A

2    BIG MULTI STRUCTURE PLAN.  DR. -- MR. LINDGREN WILL TELL YOU

3    ABOUT HOW THIS CAME TO BE.

4         THERE WAS A LOT OF MONEY INVOLVED, AND PART OF THE PROCESS

5    WAS NOKIA AND MICROSOFT SELECTED A PORTFOLIO OF PATENTS THAT

6    THEY THOUGHT WAS PARTICULARLY VALUABLE THAT THEY WOULD LICENSE

7    TOGETHER TO GENERATE MONEY AS PART OF THIS PROCEEDING, AS PART

8    OF THIS PARTNERSHIP.

9         TO DO THAT, THEY WENT OUT AND HAD A BEAUTY CONTEST TO

10   IDENTIFY THE BEST LICENSING PARTNER THAT THEY COULD FIND.

11   THERE WAS A BEAUTY CONTEST, OTHERS TRIED TO BECOME THE

12   LICENSING PARTNER FOR MICROSOFT AND NOKIA, AND MR. LINDGREN WAS

13   SELECTED FOR CONVERSANT, WHICH IS THE PARENT COMPANY FOR

14   CORE WIRELESS, AND THAT IS HOW THE PARTNERSHIP WAS FORMED.

15        AS PART OF THAT, NOKIA TRANSFERRED THE PATENTS TO

16   CORE WIRELESS AND CORE WIRELESS -- AND THAT'S HOW CORE WIRELESS

17   CAME TO OWN THEM TODAY.

18        I THINK YOU WILL AGREE THAT WE HAVE SHOWN YOU BY A

19   PREPONDERANCE OF THE EVIDENCE THAT APPLE HAS INFRINGED

20   CLAIMS -- THE '151 AND BOTH '536 PATENTS, THEN YOU'LL BE

21   ASKED -- AND IF YOU AGREE THAT THE PATENTS ARE NOT INVALID BY

22   CLEAR AND CONVINCING EVIDENCE, THE HIGHER STANDARD, YOU'LL BE

23   ASKED TO DECIDE DAMAGES.

24        YOU'LL HEAR FROM DR. DELL, WHO IS -- STEPHEN DELL IS AN

25   EXPERT AND MR. DELL IS AN EXPERT IN I.P. VALUATION.  HE'S

1    ANALYZED THE DATA AND HE CAME UP WITH WHAT IS A REASONABLE

2    ROYALTY FOR THESE PATENTS.

3         AND WHAT YOU'LL HEAR IS THAT THE WAY A REASONABLE ROYALTY

4    IS DECIDED IS YOU IMAGINE WHAT THE PARTIES WOULD HAVE AGREED TO

5    AT THE START OF A NEGOTIATION, AND BASED ON THE NEGOTIATING

6    HISTORY BETWEEN APPLE AND NOKIA, HE CAME UP WITH A VALUATION OF

7    4 CENTS PER UNIT ON THE '151 PATENT, AND 5 CENTS A UNIT ON THE

8    '536 PATENT.

9         YOU'LL HEAR EVIDENCE THAT APPLE HAS SOLD 280 OR 260

10   MILLION INFRINGING UNITS.  AND SO BASED ON THAT, A REASONABLE

11   ROYALTY WILL BE $24 MILLION.

12        APPLE, AS I MENTIONED AT THE OUTSET, CAME TO THE CELL

13   PHONE GAME LATE.  IN 2007, CELLULAR TECHNOLOGY WAS ALREADY

14   ADVANCED AT THAT TIME.

15        SO HOW DID THEY COME UP WITH THEIR CELL PHONE?  THEY HAD

16   TO STAND ON THE SHOULDERS OF EVERYONE WHO CAME BEFORE THEM.

17   THEY HAD TO USE THE INVENTIONS OF EVERYONE ELSE WHO HAD

18   PIONEERED THE WAY TO MAKE CELL PHONES WORK SO THAT THEY COULD

19   MAKE THE NICE, SLEEK IPHONE THAT THEY DID.  IT USES THE

20   CELLULAR TECHNOLOGY.

21        NOW, THEY MAY SAY THAT THESE INVENTIONS ARE OLD, THAT THIS

22   RELATES TO OUT-DATED TECHNOLOGY, IT'S 2G.  WE'RE UP TO 4G.

23        WATCH WHAT THEY DO AND NOT WHAT THEY SAY.  IN EVERY SINGLE

24   PHONE, INCLUDING THE LATEST ONES, THEY SUPPORT 2G.  WHY?

25   BECAUSE 4G LTE MAY WORK IN THE CITY, BUT WHEN YOU GO FOR A

1    DRIVE OR GO TO A SPOTTY CELL RECEPTION, YOUR CELL RECEPTION,

2    YOU DON'T HAVE LTE, AND THE ONLY WAY YOU CONNECT IS THROUGH 2G.

3         YOU'LL HEAR EVIDENCE THAT UP UNTIL RECENTLY, EVEN

4    RECENTLY, A LARGE NUMBER OF COMMUNICATIONS ARE 2G USING THE

5    TECHNOLOGY THAT APPLE IS USING WITH THESE PATENTS.

6         THIS IS THE TECHNOLOGY THAT MAKES THIS PHONE WORK WHENEVER

7    WHEREVER, WHENEVER.  WITHOUT THIS TECHNOLOGY, WITHOUT 2G

8    TECHNOLOGY, IT WOULD ONLY WORK SOMETIMES.  IT WOULDN'T BE

9    NEARLY AS VALUABLE OR USABLE AS IT IS TODAY.

10        THESE PATENTS EXPIRE SOON.  THE '536 PATENT EXPIRED IN

11   SEPTEMBER, JUST A FEW MONTH AGO.

12        THEY USED THE PATENT FOR -- THEY USED THE INVENTION ALL

13   THE WAY THROUGH THE LIFE OF THAT PATENT.

14        THE '151 PATENT WILL EXPIRE IN ONE YEAR.  SO THE FACT THAT

15   THIS IS BEING PHASED OUT IS NOT A DEFENSE.  THEY USE THIS

16   TECHNOLOGY TO MAKE THIS PHONE USABLE WHEREVER AND WHENEVER, AND

17   THEY SOLD 280 MILLION UNITS OF CELL PHONES AND IPADS USING THE

18   TECHNOLOGY IN THE '151 AND 530(B)(6).

19        WE THANK YOU FOR YOUR ATTENTION AND CORE WIRELESS ASKS FOR

20   YOUR HELP IN ENFORCING THESE PATENTS.

21             THE COURT:  THANK YOU VERY MUCH.

22        DO YOU WANT TO START NOW, OR DO YOU WANT TO DEFER TO

23   MORNING AND FRESH EARS AND EYES FOR THE JURY?

24             MR. MUELLER:  I'M READY TO START, YOUR HONOR.

25             THE COURT:  JURORS READY TO CONTINUE OR DO YOU WANT

1    TO TAKE A BREAK UNTIL TOMORROW MORNING?  GIVE ME SOME

2    NON-VERBAL SIGNALS.

3         ALL RIGHT.  WE'RE GOOD TO KEEP GOING.

4         IF YOU WANT TO GET SET UP, IF YOU WANT TO TAKE A STAND UP

5    AND STRETCH BREAK, PLEASE DO.

6         (PAUSE IN PROCEEDINGS.)

7              THE COURT:  MR. MUELLER, YOUR DEMONSTRATIVES, ARE

8    THEY THERE?

9              MR. MUELLER:  YES, YOUR HONOR, THESE ARE THE LAST

10   TWO.

11             THE COURT:  THANK YOU.

12        ALL RIGHT.  THIS IS OUR FINAL STEP OF TODAY.

13        MR. MUELLER, TAKE IT AWAY.

14             MR. MUELLER:  MAY I PROCEED?

15             THE COURT:  YOU MAY.

16        **(MR. MUELLER GAVE HIS OPENING STATEMENT ON BEHALF OF**

17   **APPLE.)**

18             MR. MUELLER:  GOOD AFTERNOON AGAIN.  AGAIN, MY NAME

19   IS JOE MUELLER, AND I REPRESENT APPLE.

20        WITH ME ARE MY TWO PARTNER, CINDY VREELAND AND

21   MARK SELWYN.  THEY WILL BE EXAMINING SOME WITNESSES THROUGHOUT

22   THE TRIAL.

23        AND WITH US IS MR. FRANK CASANOVA.  HE'S WORKED AT APPLE

24   FOR ABOUT 25 YEARS.  HE'S THE SENIOR DIRECTOR OF WORLDWIDE

25   PRODUCT MARKETING AT APPLE.  HE'S GOING TO TESTIFY FOR YOU, AND

1      HE'LL BE HERE THROUGHOUT THE ENTIRE TRIAL.

2           NOW, LET ME START AT THE BEGINNING BY MAKING CLEAR THAT

3      THERE'S, OF COURSE, A DISPUTE IN THIS CASE.  APPLE HAS EVER

4      INFRINGED THESE TWO PATENTS, EVER, NOT ONCE.

5           FOR THE '151 PATENT, YOU WILL LEARN IT COVERS A VERY

6      PARTICULAR TECHNIQUE FOR MOBILE PHONES BEING CONFIGURED TO

7      RECEIVE A TIMING ADVANCE VALUE ONE TIME.

8           AND THE PHONES ARE CONFIGURED TO RECEIVE TIMING ADVANCE

9      VALUES AS MANY TIMES AS THEY'RE SENT, AND YOU'RE GOING TO LEARN

10     EXACTLY HOW THAT HAPPENS.

11          I'M GOING TO TRY TO BEGIN THAT PROCESS, AS BRIEFLY AS I

12     CAN, THIS AFTERNOON, AND YOU'LL LEARN IT THROUGH OUR WITNESSES

13     AS WELL.

14          THE '536 PATENT COVERS A TECHNIQUE FOR IDENTIFYING

15     SO-CALLED "STOLEN FRAMES."  PART OF THAT TECHNIQUE INVOLVES

16     DIVIDING FRAMES INTO GOOD STATES AND BAD STATES.  THAT'S IT.

17     TWO STATES.

18          THE APPLE PRODUCTS USE EIGHT STATES.  EIGHT IS NOT TWO.

19          AND IT IS A MATTER OF SIMPLE COMMON SENSE AND ALSO AS A

20     MATTER OF TECHNOLOGY.  THERE IS NO INFRINGEMENT.

21          SO WE'RE GOING TO GO INTO THIS IN MUCH MORE DETAIL, AND

22     I'M GOING TO TRY TO SCRATCH THE SURFACE THIS AFTERNOON, BUT

23     THROUGHOUT THE CASE WE'RE GOING TO TRY TO SHOW YOU THAT THE

24     ARGUMENTS BEING MADE BY CORE WIRELESS FAIL AT THE LEVEL OF

25     BASIC COMMON SENSE, BUT THEY ALSO FAIL AT A DEEPER TECHNICAL

1    LEVEL.

2         I ASKED YOU DURING JURY SELECTION IF YOU WERE WILLING TO

3    LISTEN CAREFULLY AND TO CONSIDER ALL THE EVIDENCE AS CAREFULLY

4    AS YOU CAN, AND THAT'S BECAUSE WE BELIEVE THAT WHEN YOU

5    CONSIDER THE EVIDENCE CAREFULLY, THE TECHNICAL DOCUMENTS

6    CAREFULLY, WHAT THE WITNESSES WILL SAY, YOU WILL UNDERSTAND

7    BOTH THE TECHNOLOGY AND WHY THE ALLEGATIONS IN THIS CASE ARE

8    UNFOUNDED.

9         NOW, I WILL DISCUSS SOME OF WHAT MR. FENSTER SAID, AND

10   SOME OF IT I AGREED WITH.

11        BUT THERE'S A HECK OF A LOT THAT WAS LEFT OUT, SO I'M

12   GOING TO TRY TO PROVIDE A BIT OF AN OVERVIEW OF WHAT THE

13   EVIDENCE WILL SHOW, NOT ONLY ON SOME ISSUES, BUT ON ALL THE

14   ISSUES.

15        AND ONE IMPORTANT WORD THAT I DON'T THINK I HEARD ONCE WAS

16   THE WORD "STANDARD."

17        STANDARD.  YOU WILL LEARN IN THIS CASE QUITE A BIT ABOUT

18   WHAT CELLULAR STANDARDS ARE, HOW THEY'RE DEVELOPED AND HOW

19   THEY'RE REFLECTED, OR NOT REFLECTED, IN PARTICULAR PATENTS AND

20   WHETHER PARTICULAR PATENTS COVER STANDARDS AND COVER PRODUCTS,

21   LIKE THE IPHONE, THAT SUPPORT STANDARDS.

22        AGAIN, I'M GOING TO BEGIN THE PROCESS OF TRYING TO EXPLAIN

23   WHAT STANDARDS ARE TODAY, AND WE'LL DO OUR BEST TO SHOW OVER

24   THE COURSE OF THE TRIAL EXACTLY HOW IT WORKS.

25        BUT I THINK WHAT YOU'RE GOING TO FIND IS THAT THE EXPERT

OPENING STATEMENT BY MR. MUELLER

1    IN THIS CASE FOR CORE WIRELESS RELIED ON STANDARDS TO MAKE HIS

2    INFRINGEMENT ALLEGATIONS, AND THEN REALIZED, FOR WHATEVER

3    REASON, DECIDED TO WALK AWAY FROM THAT, OR AT LEAST

4    CORE WIRELESS AS A PARTY IS WALKING AWAY FROM THAT.  AND I

5    THINK YOU'LL UNDERSTAND WHY WHEN YOU SEE THAT THE PATENTS DON'T

6    FIT THE STANDARDS.  THEY JUST DON'T FIT.  NOR DO THEY FIT THE

7    QUALCOMM BASEBAND CHIPS, WHICH I WILL EXPLAIN IN A BIT, IN THE

8    APPLE PRODUCTS THAT SUPPORT THOSE STANDARDS.  THEY DON'T FIT.

9         YOU'RE LIMITED TO WHAT YOU CLAIM IN YOUR PATENT.  YOU'VE

10   HEARD ABOUT THE CLAIMS IN THE PATENT VIDEO.  YOU'VE SEEN THERE

11   ARE BOUNDARIES.

12        YOU'RE HELD TO YOUR BOUNDARIES.  YOU CAN'T MOVE THE FENCE

13   TO TRY TO CAPTURE SOMEONE ELSE'S PRODUCTS.  THAT'S NOT THE WAY

14   IT WORKS.

15        SO LET ME START, IF I COULD, BY EXPLAINING THE CAST OF

16   CHARACTERS THAT WE HAVE IN THIS CASE.  AND LET'S START WITH

17   APPLE.  APPLE WAS FOUNDED IN THE 1970'S BY STEVE JOBS AND

18   STEVE WOZNIAK.  AND FOR THE FIRST 25 YEARS OR SO, IT WAS

19   PRIMARILY A COMPUTER COMPANY, AND THEY FOCUSSED ON TRYING TO

20   TAKE COMPUTING TECHNOLOGIES AND MAKE THEM EASIER AND MORE

21   ENJOYABLE TO USE AT HOME, AT WORK, AND IN SCHOOLS.

22        NOW, OVER TIME, APPLE MOVED INTO CONSUMER ELECTRONICS

23   DEVICES, AND MR. CASANOVA IS GOING TO EXPLAIN TO YOU HOW THAT

24   HAPPENED.  AND APPLE TOOK THE COMPUTING TECHNOLOGIES THAT IT

25   HAD DEVELOPED OVER THE COURSE OF 25 YEARS OF COMPUTER PRODUCTS

1        AND BROUGHT THOSE TO CONSUMER DEVICES LIKE THE IPHONE.

2             THE IPHONE, OF COURSE, IS A PHONE, BUT IT IS MUCH MORE

3        THAN THAT.  IT IS REALLY A COMPUTER IN YOUR POCKET.  AND THERE

4        WERE SEVERAL ASPECTS OF THE IPHONE THAT WERE DISTINCTIVE AS

5        COMPARED TO MOBILE DEVICES AT THE TIME.

6             THE PHYSICAL DESIGN OF IT, THE GLASS SURFACES, THE METAL

7        SHAPES WERE EASY TO HOLD, THEY FIT IN YOUR POCKET EASILY, AND

8        THEY WERE DURABLE, OR AT LEAST PRETTY DURABLE.

9             THE USER INTERFACE, THE ICONS, THE PICTURES, THOSE COULD

10       BE USED WITH SWIPES OF YOUR FINGER.  YOU COULD PRESS A PICTURE

11       AND START A COMPUTER PROGRAM.

12            IT WAS AT THAT TIME AN UNUSUAL WAY TO INTERACT WITH YOUR

13       PHONE.

14            AND IT ALLOWED YOU TO ACCESS ALL SORTS OF COMPUTER

15       PROGRAMS SIMPLY BY USING YOUR FINGERS TO ACTIVATE THE USER

16       INTERFACE.

17            INSIDE THE PHONE, POWERFUL COMPUTER HARDWARE, INCLUDING A

18       CENTRAL PROCESSING UNIT THAT APPLE ITSELF DESIGNED.

19            AND THEN, OF COURSE, THE SOFTWARE.  THE IPHONE AND ALL THE

20       APPLE PRODUCTS USE AN APPLE OPERATING SYSTEM, IT'S CALLED IOS.

21       MR. CASANOVA WILL EXPLAIN IT TO YOU.  IOS RUNS SOFTWARE

22       APPLICATIONS, HUNDREDS OF THOUSANDS OF SOFTWARE APPLICATIONS

23       THAT USERS CAN CHOOSE TO USE AS THEY SEE FIT TO PERSONALIZE THE

24       DEVICES.  THAT WAS UNVEILED IN 2007.  THREE YEARS LATER APPLE

25       RELEASED THE IPAD, WHICH IS A TABLET COMPUTER.  IT IS

1    ESSENTIALLY A LARGER VERSION OF THE IPHONE.  IT HAS THAT SAME

2    TYPE OF USER INTERFACE, SAME APPROACH OF TRYING TO TAKE

3    POWERFUL COMPUTING TECHNOLOGIES AND MAKE THEM EASIER TO USE,

4    AND FUN.

5         NOW, DOES THE IPHONE AND CERTAIN IPAD MODELS USE CELLULAR

6    FUNCTIONALITY TO COMMUNICATE?  OF COURSE, THEY DO.  EVERY

7    SINGLE CELL PHONE IN THE WORLD USES CELLULAR NETWORKS OF SOME

8    FORM, AND YOU'RE GOING TO LEARN HOW THAT HAPPENS.  THEY USE

9    STANDARDS.  THEY USE STANDARDS, AND WE'RE GOING TO TALK ABOUT

10   WHAT STANDARDS ARE.

11        BUT DO CELLULAR STANDARDS MAKE THE IPHONE, THE IPAD OR THE

12   IPHONE, DIFFERENT OR SPECIAL AS COMPARED TO OTHER PRODUCTS?

13        AND THE ANSWER IS, NO.

14        EVERY SINGLE CELL PHONE IN THE WORLD USES STANDARDS.

15   EVERY CELL PHONE IN THE WORLD HAS SOME FORM OF WHAT'S CALLED A

16   BASEBAND CHIP.  AND, AGAIN, YOU WILL LEARN MORE AND THE

17   EVIDENCE WILL SHOW MORE ABOUT WHAT A BASEBAND CHIP IS AND WHAT

18   IT DOES.  THOSE CHIPS SUPPORT STANDARDS AND STANDARDS ARE USED

19   BY CELL PHONES ALL OVER THE WORLD.

20        BUT WHAT MAKES THE IPHONE AND THE IPAD UNIQUE AND SPECIAL

21   AND DIFFERENT ARE THOSE COMPUTING TECHNOLOGIES, THE USER

22   INTERFACE, THE INDUSTRIAL DESIGN, THE INTERNAL HARDWARE, THE

23   COMPUTER SOFTWARE, AND THAT'S WHAT MADE IT DIFFERENT, THOSE

24   PRODUCTS DIFFERENT, AND SPECIAL.

25        THAT'S WHAT MADE THEM A SUCCESS AND, CANDIDLY, THAT'S WHAT

OPENING STATEMENT BY MR. MUELLER

1    CHANGED THE MOBILE DEVICE INDUSTRY.  THINGS CHANGED QUITE A BIT

2    SINCE THE IPHONE AND THE IPAD WERE UNVEILED.

3         NOW, SOME OF THAT CHANGE WAS FOR THE WORSE FOR SOME OLDER

4    COMPANIES THAT DIDN'T KEEP UP, AND ONE WAS NOKIA.

5         NOKIA AT ONE TIME SOLD MORE CELL PHONES THAN ANY COMPANY

6    IN THE WORLD, ANY COMPANY IN THE WORLD.  BUT AFTER THE

7    INTRODUCTION OF THE IPHONE, NOKIA WAS LESS SUCCESSFUL IN

8    BRINGING COMPUTER TECHNOLOGIES TO ITS OWN PRODUCTS, AND

9    EVENTUALLY THEY SOLD OFF THEIR HANDSET DIVISION ENTIRELY, THEIR

10   CELL PHONE DIVISION ENTIRELY, AND THEY SOLD IT OFF TO

11   MICROSOFT, WHICH MANY OF YOU, OF COURSE, KNOW IS A VERY LARGE

12   SOFTWARE COMPANY, THE MAKER OF WINDOWS.

13        AND FOR A TIME, MICROSOFT MADE CELL PHONES ITSELF USING

14   THE FORMER NOKIA HANDSET DIVISION.

15        NOW, THERE'S ONE OTHER PLAYER IN THIS PLAY, SO TO SPEAK,

16   THAT WE NEED TO TALK ABOUT.  THERE'S CERTAIN COMPANIES WHOSE

17   JOB IT IS TO TRY TO LICENSE PATENTS, AND CONVERSANT, WHO'S

18   HEADED UP BY MR. LINDGREN RIGHT HERE, IS ONE OF THOSE

19   COMPANIES.

20        CONVERSANT IS A PATENT LICENSING COMPANY.  AND AS YOU

21   HEARD MR. FENSTER DESCRIBE, CONVERSANT EVENTUALLY ENTERED INTO

22   AN ARRANGEMENT WITH NOKIA AND MICROSOFT, AND I'M GOING TO

23   EXPLAIN THAT IN MORE DETAIL.

24        BUT FIRST LET ME SET THE STAGE A BIT MORE.

25        NOW, YOU HEARD MR. FENSTER TALK ABOUT HOW APPLE, IN HIS

1    WORDS, HAD STOOD ON THE SHOULDERS OF THOSE WHO CAME BEFORE

2    THEM, OR SOMETHING TO THAT EFFECT, AND HE ALSO TALKED ABOUT

3    NOKIA BEING A CELLULAR PIONEER.

4        NOW, YOU MIGHT HAVE HAD THE IMPRESSION THAT APPLE HAD NO

5    RIGHT TO USE ANY NOKIA PATENTS.

6        WELL, THAT'S JUST NOT TRUE.  WHEN APPLE, IN THE -- AFTER

7    APPLE RELEASED THE IPHONE IN 2007, THEY ENTERED INTO A SERIES

8    OF NEGOTIATIONS WITH NOKIA, AND IN 2011, NOKIA AND APPLE

9    REACHED AN AGREEMENT.

10       LET ME REPEAT.  APPLE AND NOKIA HAVE A PATENT

11   CROSS-LICENSE AGREEMENT.

12       PURSUANT TO THAT AGREEMENT, APPLE HAS THE RIGHT TO USE

13   CERTAIN NOKIA PATENTS, AND VICE-VERSA.  NOKIA HAS THE RIGHT TO

14   USE CERTAIN APPLE PATENTS.

15       IT DOESN'T MEAN THEY ARE USING THEM, BUT THEY HAVE THE

16   RIGHT TO PURSUANT TO THIS AGREEMENT, WHICH REMAINS IN PLACE

17   TODAY.

18       AND PURSUANT TO THAT AGREEMENT, APPLE PAID SOME MONEY TO

19   NOKIA.  IT WAS A DEAL THEY AGREED TO AND THEY EXECUTED IN 2011.

20       NOW, AT THAT SAME TIME, BACK IN 2011, NOKIA WAS HAVING

21   ANOTHER NEGOTIATION THAT APPLE DIDN'T KNOW ABOUT.  IT WAS A

22   SECRET NEGOTIATION WITH MICROSOFT AND CONVERSANT.  IT WAS THE

23   NEGOTIATION THAT RESULTED IN THE FORMATION OF CORE WIRELESS.

24       NOW, WHAT THOSE PARTIES AGREED TO, UNBEKNOWNST TO APPLE,

25   WAS A DEAL IN WHICH NOKIA WOULD CONTRIBUTE PATENTS, THOSE

1    PATENTS WOULD END UP IN CORE WIRELESS, CONVERSANT WOULD TAKE

2    RESPONSIBILITY FOR TRYING TO MAKE MONEY OFF THE PATENTS AS THE

3    DIRECT OWNER OF CORE WIRELESS, AND NOKIA AND MICROSOFT WOULD

4    STAND TO BENEFIT IF CORE WIRELESS WERE SUCCESSFUL IN THOSE

5    EFFORTS.

6         NOW, LET ME PAUSE FOR A MOMENT ON CORE WIRELESS.  YOU

7    DIDN'T HEAR A LOT ABOUT CORE WIRELESS ITSELF IN WHAT

8    MR. FENSTER TOLD YOU, AND YOU MIGHT THINK FROM ITS NAME THAT IT

9    MAKES WIRELESS PRODUCTS.

10        IT DOESN'T.  IT DOESN'T HAVE ANY LABS OR RESEARCH

11   FACILITIES.  IT DOESN'T DESIGN PRODUCTS.  IT DOESN'T MAKE

12   PRODUCTS.  IT IS A PATENT LICENSING COMPANY, CORE WIRELESS

13   LICENSING.

14        AND IN THIS DEAL, CONVERSANT ACQUIRED AND TRANSFERRED

15   ABOUT 2,000 FORMER NOKIA PATENTS TO CORE WIRELESS.  THE

16   UP-FRONT PRICE WAS ABOUT $20,000.

17        NOW, MR. LINDGREN I'M SURE WILL EXPLAIN TO YOU WHEN HE

18   TESTIFIES THAT CONVERSANT AGREED TO DO MORE THAN JUST PAY

19   $20,000, AND HE'S RIGHT.  THAT'S A FACT.  THEY AGREED TO TAKE

20   ON THE EXPENSE OF TRYING TO MAKE MONEY OFF THIS PORTFOLIO.

21        BUT IT IS ALSO A FACT THAT THE UP-FRONT PRICE FOR THOSE

22   PATENTS WAS ABOUT $10 A PATENT, INCLUDING THE TWO IN THIS CASE.

23   $10 A PATENT.

24        FOR THOSE $10 A PATENT AS THE UP-FRONT PRICE, THEY'RE

25   SEEKING OVER $24 MILLION FROM YOU AS AN AWARD FROM APPLE WHERE

OPENING STATEMENT BY MR. MUELLER

1    THERE'S NO INFRINGEMENT WHATSOEVER.

2         NOW, AT SOME POINT MICROSOFT, ACTUALLY LAST YEAR,

3    MICROSOFT LEFT.  THEY ARE NO LONGER PART OF THIS ARRANGEMENT.

4    THEY CONCLUDED IT WAS IN THEIR BEST INTEREST NOT TO BE

5    ASSOCIATED WITH IT, AND THEY'RE NO LONGER A PART OF THIS

6    ARRANGEMENT.

7         SO IF CORE WIRELESS WERE SUCCESSFUL IN THEIR ARGUMENTS TO

8    YOU, THE LADIES AND GENTLEMEN OF THE JURY, THE BENEFICIARIES

9    WOULD BE NOKIA AND CONVERSANT.  MICROSOFT HAS LEFT.

10        AND I THINK WHEN YOU REVIEW THE EVIDENCE, YOU WILL

11   UNDERSTAND EXACTLY WHY MICROSOFT NO LONGER WANTED TO BE

12   ASSOCIATED WITH THIS.

13        NOW, I WANT TO ORGANIZE THE EVIDENCE.  THE FIRST IS FOR

14   EACH OF THE TWO PATENTS, I WANT TO CONSIDER THE BACKGROUND

15   TECHNOLOGY, WHAT CAME BEFORE THE PATENT.

16        YOU CAN'T CLAIM IDEAS THAT OTHER FOLKS CAME UP WITH.

17   THAT'S NOT RIGHT.  YOU'RE NOT ALLOWED TO DO THAT.

18        AND SO WE HAVE TO CONSIDER THE BACKGROUND TECHNOLOGY

19   BEFORE WE LOOK AT THE PATENTS THEMSELVES.

20        SECOND THING WE NEED TO DO IS TO LOOK AT THE PATENTS

21   THEMSELVES, OF COURSE, AND WE HAVE TO FOCUS ON THE CLAIMS.

22        NOW, AS HIS HONOR TOLD YOU, THERE ARE TWO CLAIMS AT ISSUE

23   IN THIS CASE.  FOR THE '151 PATENT, IT'S CLAIM 14; AND FOR THE

24   '536 PATENT, IT'S CLAIM 19.

25        THOSE ARE THE ONLY TWO PATENTS AT ISSUE IN THIS CASE, AND

1      IT'S VERY CAREFUL THAT WE LOOK AT THE EXACT WORDS IN THOSE

2      CLAIMS AND APPLY THEM ONE BY ONE.

3           TO INFRINGE A PATENT, EVERY SINGLE WORD IN THAT CLAIM

4      NEEDS TO BE MET BY THE PRODUCT THAT'S ACCUSED.  EVERY SINGLE

5      WORD.

6           NOW, THERE'S MORE.

7           WE ARE ALL BOUND, OF COURSE, BY ALL THE INSTRUCTIONS HIS

8      HONOR GIVES US ON THE LAW, AND THOSE INCLUDE THE COURT'S

9      INTERPRETATIONS OF CERTAIN WORDS IN THE CLAIMS, AND WE CALL

10     THOSE THE COURT'S CLAIM CONSTRUCTIONS.

11          AND YOU HAVE THOSE, OR SOME OF THEM, IN YOUR BINDER AND

12     YOU SHOULD FEEL FREE TO REFER TO THEM THROUGHOUT THE TRIAL.

13     THEY'RE VERY IMPORTANT.  THEY'RE HIS HONOR'S INTERPRETATIONS OF

14     THE WORDS AND WE'RE BOUND TO FOLLOW THOSE INTERPRETATIONS.

15          SO AS WE REVIEW THE PATENTS, WE HAVE TO LOOK AT THE CLAIMS

16     AND WE HAVE TO LOOK AT THE COURT'S CONSTRUCTIONS.

17          AND YOU RECALL IN THE PATENT VIDEO THAT WE SAW IT TALKED

18     ABOUT PATENTS HAVING THIS BOUNDARY, OR THIS FENCE, THAT'S

19     DEFINED BY THE CLAIMS AS INTERPRETED BY HIS HONOR, AND NO ONE

20     CAN CHANGE THAT, NO ONE.

21          WE'RE GOING TO HEAR TOMORROW FROM TWO, TWO OF THE FOLKS

22     WHO ARE NAMED AS INVENTORS ON THESE PATENTS, CORE WIRELESS HAS

23     BROUGHT THEM HERE TO US, AND OF COURSE WE SHOULD LISTEN TO THEM

24     CAREFULLY.

25          BUT THEY MAY BE THE MOST CHARMING FELLOWS ON EARTH -- I'VE

1    NEVER MET THEM -- THEY CAN'T CHANGE THE CLAIMS.  THE CLAIMS ARE

2    WHAT MATTER.  IT'S WHAT THE PATENT OFFICE AGREED TO ISSUE AFTER

3    THAT BACK AND FORTH.

4         SO YOU CAN'T BRING INVENTORS TO COURT MANY YEARS LATER AND

5    TRY TO CHANGE THE CLAIMS.  WE'RE BOUND TO FOLLOW EVERY WORD IN

6    THE CLAIMS AND HIS HONOR'S CONSTRUCTIONS OF THOSE CLAIMS.

7         NOW, WHAT DO WE APPLY THEM TO?

8         WELL, FOR PURPOSES OF EVALUATING THE ALLEGATIONS MADE BY

9    CORE WIRELESS IN THIS CASE, THERE'S TWO THINGS WE NEED TO LOOK

10   AT.  THE FIRST IS YOU WILL LEARN THAT DR. WESEL'S ALLEGATIONS

11   WERE BASED -- WERE BASED PRIMARILY ON STANDARDS, AND WE WILL

12   GET INTO THIS WITH HIM TOMORROW.  REFERENCE AFTER REFERENCE

13   AFTER REFERENCE IN HIS EXPERT REPORT TO STANDARDS, AND I'LL

14   TELL YOU IN A FEW MOMENTS MORE ABOUT WHAT STANDARDS ARE.

15        SO WE HAVE TO LOOK AT THE STANDARDS TO SEE IF HE'S RIGHT.

16        WE HAVE TO LOOK AT THE STANDARDS TO SEE IF THESE PATENTS

17   ACTUALLY COVER CERTAIN SECTIONS OF THE STANDARDS.  AND WE'RE

18   GOING TO LOOK AT HOW THESE STANDARDS WERE CREATED TO SEE WHO

19   ACTUALLY CAME UP WITH THE IDEAS IN THE STANDARDS.

20        THEN WE ALSO NEED TO LOOK AT THE APPLE PRODUCTS THAT

21   SUPPORT THESE STANDARDS, AND YOU WILL LEARN THAT APPLE SUPPORTS

22   THESE STANDARDS THROUGH THE USE OF CERTAIN CHIPS MADE BY A

23   COMPANY BASED IN SAN DIEGO CALLED QUALCOMM.  QUALCOMM SUPPLIES

24   CHIPS TO APPLE THAT SUPPORT THE STANDARDS.

25        SO WE NEED TO LOOK AT THE STANDARDS, WE NEED TO LOOK AT

1    THE CHIPS, AND WE NEED TO SEE IF EVERY WORD IN THE CLAIM, AS

2    INTERPRETED BY HIS HONOR, CAN BE FOUND IN THE APPLE PRODUCTS

3    THAT SUPPORT THE STANDARDS.  THAT'S WHAT WE NEED TO DO.  THAT'S

4    WHAT WE WILL DO.

5         AND I'M GOING TO TRY TO ORGANIZE THE REMAINDER OF MY

6    PRESENTATION AROUND THIS SAME FRAMEWORK.

7         SO LET ME START BY TALKING A BIT ABOUT WHAT STANDARDS ARE.

8         NOW, STANDARDS ARE ALL OVER THE PLACE, AND ONCE YOU START

9    TO THINK ABOUT THEM, YOU'LL SEE THEM EVERYWHERE.  A COMMON

10   EXAMPLE IS ELECTRICAL PLUGS.  EVERY ELECTRICAL PLUG FOR A

11   CONSUMER DEVICE IN THE U.S. HAS PRETTY MUCH THE SAME SIZE AND

12   SHAPE AND VOLTAGE, AND THERE'S A REASON FOR THAT.

13        YOU WANT IT TO BE ABLE TO PLUG INTO OUTLETS WHEREVER YOU

14   GO.  IF YOU HAVE A LAMP, YOU CAN PLUG IT INTO THE OUTLET.  IF

15   YOU HAVE A TV SET, YOU CAN PLUG IT INTO THE OUTLET.  IF YOU

16   HAVE A TOASTER, YOU CAN PLUG IT INTO THE OUTLET.  AND SO ON.

17        IT DOESN'T MATTER WHICH COMPANY MAKES THOSE PRODUCTS.

18   THEY ALL PLUG INTO THE OUTLET.

19        NOW, THE WAY THAT CAME TO BE IS THAT MANY YEARS AGO

20   COMPANIES GOT TOGETHER AND THEY SAID, LET'S COME UP WITH A

21   STANDARD OR A SET OF RULES OR GUIDELINES THAT WILL DICTATE WHAT

22   THESE PLUGS SHOULD LOOK LIKE IN TERMS OF THEIR SIZE AND THEIR

23   SHAPE AND THEIR VOLTAGE, AND THEY AGREED ON IT AND THAT BECAME

24   THE STANDARD.  AND THEN EVERYONE USED IT FROM THAT POINT

25   FORWARD.

1      IF YOU TRAVEL TO DIFFERENT COUNTRIES, YOU'LL SEE DIFFERENT

2   STANDARDS FOR DIFFERENT PLUGS.  DIFFERENT COUNTRIES USE

3   DIFFERENT PLUG DESIGNS.  BUT WHEN YOU'RE IN A PARTICULAR

4   COUNTRY, YOU'RE PRETTY MUCH GOING TO SEE ONE TYPE OF PLUG

5   THROUGHOUT THE ENTIRE COUNTRY, AND THAT'S BECAUSE IT'S BEEN

6   STANDARDIZED.

7      THE SAME IS TRUE FOR MANY AREAS OF LIFE, AND THAT'S

8   CERTAINLY TRUE FOR CELLULAR COMMUNICATIONS.  IF YOU HAVE A

9   MOTOROLA PHONE, YOU'RE GOING TO WANT TO BE ABLE TO CALL SOMEONE

10  WHO OWNS AN LG PHONE, OR WHO OWNS A SAMSUNG PHONE, OR WHO OWNS

11  AN APPLE PHONE.  SO YOU NEED SOME COMMON RULES FOR HOW THOSE

12  PRODUCTS ARE GOING TO COMMUNICATE WITH EACH OTHER.  YOU NEED

13  SOME GUIDELINES.  YOU NEED SOME SPECIFICATIONS FOR HOW THAT'S

14  GOING TO BE DONE.

15      AND IT TURNS OUT THAT YOU USE CELLULAR STANDARDS,

16  INCLUDING SOME THAT HAVE BEEN DEVELOPED AT AN ORGANIZATION IN

17  FRANCE CALLED THE EUROPEAN TELECOMMUNICATIONS STANDARDS

18  INSTITUTE, OR ETSI.

19      EXCUSE ME.

20      IT'S AN IMPORTANT ORGANIZATION THAT'S PLAYED A LEADING

21  ROLE IN DEVELOPING MANY OF THE STANDARDS THAT WE USE TODAY,

22  INCLUDING THE TWO STANDARDS THAT YOU WILL FIND AT ISSUE IN THIS

23  CASE.

24      NOW, HOW DOES IT WORK?

25      IT WORKS LIKE THIS.  DIFFERENT COMPANIES SEND ENGINEERS TO

1    MEETINGS, EITHER AT ETSI OR TELEPHONE CONFERENCES OR THEY TALK

2    BY E-MAIL, AND THEY HAVE A DISCUSSION AND THEY WORK ON CERTAIN

3    ISSUES, CERTAIN PARTS OF THE STANDARD, AND THEY MAKE PROPOSALS.

4    AND ONE COMPANY WILL MAKE A PROPOSAL OR ANOTHER COMPANY WILL

5    MAKE A PROPOSAL OR THEY'LL HAVE A JOINT PROPOSAL.

6        YOU CAN THINK OF IT LIKE A RULE MAKING COMMITTEE IN A

7    SPORT.  ONE TEAM COULD MAKE A PROPOSAL FOR HOW THE RULES MIGHT

8    CHANGE, ANOTHER TEAM MIGHT MAKE A PROPOSAL, AND THEY TAKE A

9    VOTE, AND WHICHEVER PROPOSAL WINS OUT BECOMES PART OF THE

10   STANDARD.  AND THAT HAPPENS OVER AND OVER AND OVER AGAIN AND

11   THESE STANDARDS BECOME BIGGER AND BIGGER.

12       AND THESE ARE DOCUMENTS, OR SETS OF GUIDELINES, THAT ARE

13   TENS OF THOUSANDS OF PAGES LONG.  WHAT'S BEING ACCUSED IN THIS

14   CASE ARE TINY SLIVERS OF THOSE STANDARDS.

15       BUT THEY'RE COLLECTIVELY VOLUMINOUS.  IF I PRINTED THEM

16   THEY WOULD TOUCH THE CEILING PROBABLY SEVERAL TIMES OVER.

17       AND IT'S ALL THROUGH THE WORK OF THESE WORKING GROUPS THAT

18   TAKE VOTES ON PROPOSALS AND FIGURE OUT WHAT THEY'RE GOING TO

19   PUT INTO THE STANDARD.

20       NOW, OVER THE YEARS, THERE'S BEEN SEVERAL GENERATIONS OF

21   CELLULAR STANDARDS.  THIS IS JUST ONE FAMILY.  THERE'S ACTUALLY

22   OTHER FAMILIES AS WELL.  BUT THIS FAMILY IS RELEVANT TO THIS

23   PARTICULAR CASE.

24       ABOUT 25 YEARS AGO, A STANDARD WAS RELEASED CALLED GSM,

25   AND THAT'S ONE OF THE STANDARDS THAT'S ACCUSED IN THIS CASE,

1       THE '536 PATENT.

2            IN THE LATE 1990S, A STANDARD WAS RELEASED CALLED GPRS,

3       AND THAT STANDARD IS ACCUSED FOR THE '151 PATENT.

4            NOW, SINCE THEN, THERE'S BEEN OTHER STANDARDS.  THERE HAVE

5       BEEN STANDARDS AROUND 2000 OR SO, AS WELL AS MORE RECENTLY, THE

6       LTE STANDARD, AND THESE COME IN GENERATIONS, 2G, 2 AND A HALF

7       G, 3G, 4G.  THAT MEANS SECOND GENERATION, SECOND AND A HALF

8       GENERATION, THIRD GENERATION, FOURTH GENERATION.

9            EACH GENERATION IS NEW AND DIFFERENT AS COMPARED -- IN

10      IMPORTANT WAYS AS COMPARED TO WHAT CAME BEFORE IT, AND EACH ONE

11      OFFERS NEW PERFORMANCE BENEFITS.

12           TODAY MOST OF US ARE USING LTE OR 3G TECHNOLOGY.

13           MR. FENSTER SAID IT'S IMPORTANT TO HAVE THE OLDER ONES IF

14      YOU'RE OUT ON A RURAL ROAD OR SOMEWHERE, AND IN SOME

15      CIRCUMSTANCES YOU WILL USE GSM IF YOU'RE OUT ON A RURAL ROAD,

16      BUT THAT'S ABOUT IT.

17           MOST OF THE COUNTRY IS COVERED BY 3G AND LTE THESE DAYS.

18           WHAT IS BEING ACCUSED IN THIS CASE ARE OLDER STANDARDS,

19      ONE FROM ABOUT 25 YEARS AGO, AND ONE FROM 18 YEARS AGO OR SO.

20           NOW, THESE STANDARDS, IN THE APPLE PRODUCTS, ARE

21      SUPPORTED, THAT IS TO SAY, THE COMPUTER PROCESSING THAT'S

22      RELEVANT TO THEM OCCURS IN A CHIP SUPPLIED BY QUALCOMM CALLED A

23      BASEBAND CHIP.  ALL OF THESE STANDARDS ARE IN THIS TINY LITTLE

24      CHIP THAT IS PURCHASED FROM QUALCOMM.

25           NOW, EVERY SINGLE PHONE IN THE WORLD HAS SOME FORM OF

1    BASEBAND CHIP.  THEY'RE NOT ALL MADE BY QUALCOMM, BUT EVERY

2    PHONE HAS SOME FORM OF BASEBAND CHIP, AND EVERY PHONE HAS SOME

3    FORM OF STANDARDS.  YOU CAN BUY A PHONE AT A GROCERY STORE THAT

4    WILL SUPPORT GSM AND GPRS, AND EVEN 3G AND MAYBE EVEN LTE, FOR

5    LESS THAN $20, AND THAT PHONE WILL HAVE A BASEBAND CHIP AS

6    WELL.

7         BUT THE PHONES IN THIS PARTICULAR CASE, THE APPLE PHONES,

8    USE BASEBAND CHIPS SUPPLIED BY QUALCOMM.

9         NOW, WE ARE GOING TO EXPLAIN TO YOU EXACTLY HOW QUALCOMM'S

10   PRODUCTS SUPPORT CELLULAR STANDARDS, AND ONE WITNESS WE'RE

11   GOING TO CALL -- IF I CAN ASK HIM TO STAND -- BERND ADLER,

12   WHO'S RIGHT THERE, HE IS THE HEAD OF WIRELESS ARCHITECTURE AT

13   APPLE.  HE IS THE CHIEF OF WIRELESS ARCHITECTURE AT APPLE.

14        AND BEFORE HE JOINED APPLE, HE WORKED FOR ABOUT 15 TO 20

15   YEARS ON BASEBAND CHIPS, INCLUDING AT INTEL, AND BEFORE THAT AT

16   INFINEON, AND BEFORE THAT AT SIEMENS SEMICONDUCTOR.

17        AND MR. ADLER IS GOING TO TELL YOU HOW APPLE SUPPORTS

18   STANDARDS, WHAT TECHNOLOGIES IT USES, AND HE'S ALSO GOING TO

19   EXPLAIN TO YOU WHY APPLE HAS SELECTED QUALCOMM AS A VENDOR FOR

20   BASEBAND CHIPS.

21        THANK YOU, MR. ADLER.

22        NOW, IN ADDITION, WE WILL CALL, OR PLAY, VIDEOTAPED

23   DEPOSITION TESTIMONY FROM THE FOLKS WHO ACTUALLY WROTE THE CODE

24   AT ISSUE IN THIS CASE, THE QUALCOMM ENGINEERS.  YOU CAN SEE

25   THEIR PICTURES ON THE SCREEN.  THEY WILL APPEAR BY DEPOSITION.

1          AS HIS HONOR INSTRUCTED YOU IN THE PRELIMINARY

2    INSTRUCTIONS, YOU SHOULD GIVE AS MUCH WEIGHT TO THEIR TESTIMONY

3    AS IF THEY WERE ON THE STAND.  THEY GAVE THEIR TESTIMONY UNDER

4    OATH, AND CORE WIRELESS HAD A CHANCE TO ASK THEM QUESTIONS, WE

5    DID AS WELL, AND THAT TESTIMONY WILL BE PLAYED FOR YOU.

6          NOW, IT MAY BE PLAYED FOR YOU AS PART OF CORE WIRELESS'S

7    CASE, AND THE WAY IT WORKS IS THEY HAVE THE RIGHT TO PLAY

8    VIDEOTAPED DEPOSITION CLIPS, AND IF THEY DO, WE CAN PUT IN SOME

9    OF THE CLIPS THAT WE THINK SHOULD BE PLAYED FROM THAT SAME

10   WITNESS AT THE SAME TIME.

11         SO IT MAY BE THAT THE QUALCOMM WITNESSES ARE PLAYED DURING

12   THEIR CASE.

13         BUT I CAN TELL YOU THIS:  IF THEY DO NOT PLAY THE QUALCOMM

14   ENGINEER TESTIMONY, WE WILL, BECAUSE WE THINK YOU'RE ENTITLED

15   TO HEAR FROM THE FOLKS WHO ACTUALLY WROTE THE COMPUTER CODE AT

16   ISSUE IN THIS CASE.  WE WANT YOU TO UNDERSTAND HOW THAT CODE

17   WORKS PRECISELY, BECAUSE WE THINK WHEN YOU DO, YOU'LL

18   UNDERSTAND THESE TWO PATENTS ARE VERY FAR REMOVED FROM THAT

19   CODE.

20         NOW, WITH THAT AS BACKGROUND, LET'S TALK ABOUT THE TWO

21   PATENTS, AND LET'S BEGIN WITH THE '151.

22         AND LET'S START, IF WE COULD, WITH BACKGROUND TECHNOLOGY.

23         SO I'M GOING TO DO MY BEST HERE -- MY HANDWRITING IS NOT

24   THE GREATEST, BUT I'LL TRY.

25         THIS IS HOW TIMING ADVANCE VALUES WORK, AND I WANT TO BE

1    VERY, VERY CLEAR.  MR. FENSTER TOLD YOU SOMETHING ABOUT TIMING

2    ADVANCE VALUES, AND I AGREE WITH A LOT OF WHAT HE SAID.

3         BUT THE '151 PATENT DID NOT INVENT TIMING ADVANCE VALUES.

4    TIMING ADVANCE VALUES WERE KNOWN FOR MANY YEARS BEFORE THE '151

5    PATENT.  DR. WESEL IS NOT GOING TO TELL YOU DIFFERENT.  NO ONE

6    WILL.

7         THE '151 PATENT DOESN'T COVER THE BASIC IDEA OF TIMING

8    ADVANCE VALUES.  IT'S AN OLD IDEA THAT WAS KNOWN IN THE

9    BACKGROUND TECHNOLOGY.

10        HERE'S HOW IT WORKS.

11        THESE ARE JUST GENERIC PHONES.  THERE'S NOTHING SPECIAL

12   ABOUT THEM, THEY'RE JUST IMAGES OF PHONES, AND THEY'RE EACH

13   COMMUNICATING WITH A CELL TOWER USING RADIO WAVES (INDICATING).

14        NOW, THESE RADIO WAVES TRAVEL AT THE SPEED OF LIGHT.  BUT

15   EVEN THOUGH THEY TRAVEL AT THE SPEED OF LIGHT, THE DISTANCE

16   THAT A PHONE IS FROM A CELL TOWER CAN MAKE A DIFFERENCE.  IT

17   TAKES A TINY LITTLE AMOUNT OF TIME TO ARRIVE, BUT THAT CAN BE

18   MEANINGFUL WHEN WE'RE DEALING WITH A SYSTEM THAT'S TRYING TO

19   ALLOW FOR MILLIONS OF COMMUNICATIONS AT THE SAME TIME.

20        THESE CELL TOWERS COULD BE CELL TOWERS THAT YOU SEE ON THE

21   SIDE OF THE HIGHWAY.  SOMETIMES THEY'RE HIDDEN AS TREES.

22   SOMETIMES YOU CAN SEE THEM.  BUT THOSE ARE CELL TOWERS, AND WE

23   SOMETIMES CALL THOSE BASE STATIONS.

24        NOW, IN CERTAIN CELLULAR SYSTEMS, THE SYSTEM IS DESIGNED

25   IN A WAY TO ALLOW MULTIPLE PHONES TO USE THE SAME RADIO

1    FREQUENCY.

2         AND YOU MIGHT ASK YOURSELF, HOW CAN THAT HAPPEN?  WOULDN'T

3    THEY INTERFERE WITH EACH OTHER?

4         AND THE WAY IT WORKS IS THE SAME RADIO FREQUENCY IS

5    DIVIDED INTO SLICES OF TIME.  SO HERE'S TIME.  IMAGINE A

6    STOPWATCH STARTING AND THEN RUNNING AND TIME IS CONTINUING.

7         AND YOU CAN DIVIDE TIME UP INTO SLOTS.  SO HERE WE HAVE A

8    SLOT THAT WE'VE GIVEN TO PHONE A.  HERE WE HAVE A SLOT THAT

9    WE'VE GIVEN TO PHONE B.  HERE WE HAVE A SLOT THAT WE'VE GIVEN

10   TO PHONE C.  HERE WE HAVE A SLOT THAT WE'VE GIVEN TO PHONE D.

11        AND THEN WE START ALL OVER AGAIN.

12        AND BY DOING THAT, BY DIVIDING TIME INTO SLOTS, WE CAN

13   ALLOW THE SAME FREQUENCY TO BE USED BY DIFFERENT PHONES.  THEY

14   JUST HAVE TO USE IT AT THEIR SLOT.

15        IF THEY EACH KEEP IT IN THEIR OWN SLOT, THEY CAN USE THE

16   SAME FREQUENCY.  THEY'RE DIVIDING IT UP AND WE CAN SHARE THE

17   ACCESS, AND WE CALL THIS TIME DIVISION MULTIPLE ACCESS.  TIME

18   DIVISION MULTIPLE ACCESS, OR TDMA.

19        ONE EXAMPLE OF A SYSTEM THAT USED THIS IS THAT STANDARD,

20   THE 2 AND A HALF G STANDARD CALLED GPRS.  THAT'S AN EXAMPLE OF

21   A TIME DIVISION MULTIPLE ACCESS STANDARD.

22        AND THIS ALL SOUNDS GREAT, AND IT IS.

23        BUT THERE'S AN ISSUE, AND THE ISSUE IS IF YOU ARE PHONE B,

24   FOR EXAMPLE, YOUR COMMUNICATIONS -- AND YOU'RE SENDING A

25   COMMUNICATION TO A CELL TOWER, IT'S SUPPOSED TO ARRIVE RIGHT

1    HERE IN THIS TIME SLOT (INDICATING).

2        SO IN A PERFECT WORLD, THE COMMUNICATION WOULD BE RECEIVED

3    IN THAT TIME SLOT (INDICATING).

4        BUT BECAUSE OF THE DISTANCE THAT PHONE B HAS TO TRAVEL, OR

5    THE SIGNAL HAS TO TRAVEL TO THE TOWER, IT MIGHT NOT GET THERE

6    IN TIME, AND SO IT MIGHT BE A LITTLE BIT JETTING INTO THE SLOT

7    OF PHONE C (INDICATING).

8        THERE'S TWO PROBLEMS WITH THIS.  THE FIRST PROBLEM IS THE

9    CELL TOWER IS EXPECTING TO RECEIVE A FULL MESSAGE FROM PHONE B

10   IN THIS TIME SLOT AND IT'S ONLY RECEIVING A PART OF A MESSAGE

11   IN THAT TIME SLOT.

12       THE SECOND PROBLEM IS THIS TIME SLOT HAS BEEN RESERVED FOR

13   PHONE C, BUT NOW WE HAVE B INTERFERING WITH SLOT C, AND THAT'S

14   A PROBLEM (INDICATING).

15       AND THIS HAS BEEN LONG KNOWN SINCE WELL BEFORE THE '151

16   PATENT.

17       THE WAY TO DEAL WITH THIS IS FOR THE CELL TOWER TO TELL

18   PHONE B, SEND A LITTLE EARLIER.  IT'S LIKE YOU -- IF YOU HAVE A

19   DOCTOR'S APPOINTMENT AT NOON AND YOU LIVE 15 MINUTES AWAY, YOU

20   DON'T LEAVE AT NOON.  YOU LEAVE 15 MINUTES BEFORE NOON TO

21   ARRIVE AT NOON.

22       AND SO THE CELL TOWER WILL TELL PHONE B TO USE A TIMING

23   ADVANCE VALUE, OR TAV, AND THAT MEANS MOVE IT UP.  SO ONCE YOU

24   MOVE IT UP, YOU SEND IT EARLIER, IT ARRIVES IN THE RIGHT SLOT,

25   AND LIFE IS GOOD.

1        SO THAT'S THE IDEA.  IT'S LONG KNOWN.  YOU MOVE UP THE

2    TRANSMISSION.  YOU DO SO BASED ON A DIRECTION FROM THE BASE

3    STATION.  THIS IS CALLED TIMING ADVANCE VALUES AND IT'S KNOWN

4    WELL BEFORE THE '151 PATENT.

5        THERE'S ONE MORE BACKGROUND CONCEPT THAT I WANT TO SHOW

6    YOU, AND THAT IS IN THIS GPRS NETWORK, WHICH USES TIME DIVISION

7    MULTIPLE ACCESS, THERE'S SOMETHING CALLED FRAMES, AND FRAMES

8    HAVE EIGHT TIME SLOTS.  SO YOU SEE I HAVE EIGHT TIME SLOTS

9    HERE.

10       SO, TOO, IN GPRS.  IT USES FRAMES THAT HAVE EIGHT TIME

11   SLOTS.

12       THOSE FRAMES CAN BE PUT INTO A LONGER STRING OF FRAMES

13   CALLED A MULTIFRAME, AND IT CONSISTS OF 52 FRAMES CONNECTED ONE

14   TO THE OTHER.

15       AND THOSE MULTIFRAMES CAN BE PUT INTO AN EVEN BIGGER

16   STRUCTURE CALLED A MULTIFRAME STRUCTURE.

17       SO IF YOU TAKE 52 FRAMES, YOU HAVE A MULTIFRAME.  IF YOU

18   TAKE EIGHT MULTIFRAMES, YOU HAVE A MULTIFRAME STRUCTURE.

19       AND, REMEMBER, THIS IS ALL TIME.  WE'RE TALKING ABOUT

20   TIME.  SO A MULTIFRAME, JUST TO GIVE YOU A SENSE OF HOW LONG IT

21   IS, IS ABOUT A QUARTER OF A SECOND.  A MULTIFRAME STRUCTURE IS

22   ABOUT TWO SECONDS.

23       THESE ARE APPROXIMATIONS, BUT IT GIVES YOU A SENSE OF HOW

24   LONG WE'RE TALKING ABOUT.

25       NOW, WHAT WAS THE '151 PATENT?  LET'S LOOK AT THE CLAIMS

1     AGAINST THIS BACKDROP.

2          THERE WE GO.

3          SO CLAIM 14 IS THE ONE CLAIM AT ISSUE, AND I'M NOT GOING

4     TO GO THROUGH ALL THE LANGUAGE NOW.  YOU'LL HAVE PLENTY OF

5     OPPORTUNITY TO DO THAT.  EVERY WORD DOES MATTER AND WE'RE GOING

6     TO TRY TO GO THROUGH THEM VERY CAREFULLY OVER THE COURSE OF THE

7     CASE.

8          BUT LET ME FOCUS YOU IN ON A FEW IMPORTANT WORDS RIGHT

9     NOW.

10         CLAIM 14 SAYS THE MOBILE STATION, AND IN THIS CONTEXT THAT

11    COULD BE A CELL PHONE, FOR EXAMPLE, THE MOBILE STATION BEING

12    CONFIGURED TO RECEIVE A TIMING ADVANCE VALUE ONCE.

13         NOW, YOU HAVE TO LISTEN VERY CAREFULLY TO THE EVIDENCE,

14    AND I ASKED YOU EARLIER IF YOU'RE PREPARED TO DO THAT, AND THIS

15    IS ONE OF THE REASONS WHY.

16         MR. FENSTER SAID OVER AND OVER AGAIN, RECEIVE ONE TIMING

17    ADVANCE VALUE.

18         THAT'S NOT WHAT THE CLAIM SAYS.  THE CLAIM SAYS RECEIVE A

19    TIMING ADVANCE VALUE ONCE.  NOT RECEIVE ONE TIMING ADVANCE

20    VALUE.  RECEIVE IT ONCE.

21         AND HIS HONOR HAS TOLD US EXACTLY WHAT THAT MEANS.

22    RECEIVE A TIMING ADVANCE VALUE ONCE MEANS RECEIVE A TIMING

23    ADVANCE VALUE ONE TIME, ONE TIME.  THAT'S AN IMPORTANT PIECE OF

24    GUIDANCE THAT WE HAVE FROM HIS HONOR.  RECEIVE A TIMING ADVANCE

25    VALUE ONE TIME FOR A MULTIFRAME STRUCTURE.

1          SO FOR THAT MULTIFRAME STRUCTURE THAT WE'VE SEEN -- AND I

2     JUST SHOWED IT TO YOU A MOMENT AGO -- IT'S THAT COLLECTION OF

3     FRAMES.

4          THIS IS FROM THE PATENT.  IT'S THE SAME THING.  THEY

5     DIDN'T COME UP WITH IT.  THIS IS THE GPRS MULTIFRAME STRUCTURE.

6          YOU SEND A TIMING ADVANCE VALUE ONE TIME.

7          AND THE MOBILE STATION HAS TO BE CONFIGURED TO RECEIVE IT

8     ONE TIME.  THAT MEANS A CELL PHONE HAS TO BE CONFIGURED TO

9     RECEIVE A TIMING ADVANCE VALUE ONE TIME FOR A MULTIFRAME

10    STRUCTURE.

11         IF THE MOBILE STATION, IF THE CELL PHONE OR IF THE

12    CELLULAR TABLET COMPUTER IS ABLE TO RECEIVE MORE THAN ONE

13    TIMING ADVANCE VALUE IN A MULTIFRAME STRUCTURE, THEN IT DOESN'T

14    USE THIS.  THE WHOLE POINT OF THIS IS TO BE CONFIGURED TO

15    RECEIVE A TIMING ADVANCE VALUE ONE TIME.  THAT'S WHAT THE CLAIM

16    SAYS, AND THAT'S WHAT THE CONSTRUCTION SAYS.

17         AND SO IF WE LOOK AT THIS, IT MEANS THE MOBILE STATION,

18    THE CELL PHONE, IS CONFIGURED TO RECEIVE ONE TIMING ADVANCE

19    VALUE.

20         NOW, HOW DOES IT WORK IN THE STANDARD?  HOW DOES IT WORK

21    IN THE QUALCOMM CHIPS?

22         IT DOESN'T WORK LIKE THAT.

23         AND IF WE COULD PULL UP SLIDE 17 FROM CORE WIRELESS'S

24    OPENING.

25         THEY HAVE A PROBLEM, AND THEY'RE DOING THEIR BEST TO DEAL

1    WITH IT, BUT HERE YOU CAN SEE THE TIMING ADVANCE VALUE IS BEING

2    SENT TO AN ENCODER, AND THEN THEY HAVE RENAMED IT TAM AND SAID

3    THIS TAM GOES TO THE PHONE.

4         BUT THE PHONE ONLY, I THINK THEY SAID, RECEIVES CORRECTLY

5    ONE.

6         WELL, EACH ONE OF THOSE TAM'S, YOU WILL FIND OUT, CONTAINS

7    A TIMING ADVANCE VALUE.  SO, IN FACT, THE PHONE, EVEN IN THE

8    PART THAT THEY'RE ACCUSING, RECEIVES A TIMING ADVANCE VALUE

9    FOUR TIMES, AND THE PHONE IS CONFIGURED TO RECEIVE IT FOUR

10   TIMES.

11        SO THE APPLE IPHONES, THE APPLE IPADS ARE CONFIGURED TO

12   RECEIVE FOUR TIMING ADVANCE VALUES PER MULTIFRAME STRUCTURE IN

13   THIS PARTICULAR PROCEDURE.

14        NOW, THERE'S MORE.  THERE'S OTHER PROCEDURES, INCLUDING A

15   PROCEDURE CALLED ON DEMAND, WHICH ALLOWS THE CELL TOWER TO SEND

16   TIMING ADVANCE VALUES AS OFTEN AS THEY'RE NECESSARY.

17        SOMETIMES THEY'RE NOT NECESSARY.  YOU COULD BE STANDING

18   RIGHT NEXT TO A CELL TOWER AND YOU'RE SO CLOSE THAT THERE'S NO

19   DELAY.  YOU DON'T NEED A TIMING ADVANCE VALUE.

20        OR YOU'RE ON A HIGHWAY, YOU KNOW, SPEEDING.  YOU NEED MANY

21   TIMING ADVANCE VALUES.  THE CELL TOWER CAN REACT TO THE

22   CONDITIONS.

23        AND SO IN THE ON DEMAND MODE, AGAIN, THE CELL STATION IS

24   EQUIPPED TO SEND MORE THAN ONE TIMING ADVANCE VALUE PER

25   MULTIFRAME STRUCTURE, AND CRUCIALLY, THE APPLE IPHONES,

1   CELLULAR IPADS, AND THE OTHER PRODUCTS THAT PRACTICE THE

2   STANDARD ARE CONFIGURED TO RECEIVE AS MANY TIMING ADVANCE

3   VALUES AS ARE SENT.

4       SO THE ACTUAL GPRS STANDARD, WHICH WE'LL GET INTO, THE

5   ACTUAL QUALCOMM CHIPS ARE CONFIGURED TO RECEIVE AS MANY TIMING

6   ADVANCE VALUES AS NEEDED, INCLUDING, IN ONE PROCEDURE, FOUR

7   TIMING ADVANCE VALUES PER MULTIFRAME STRUCTURE.

8       NOW, THE PURPORTED BENEFIT, OR ONE OF THE BENEFITS THAT

9   MR. FENSTER MENTIONED WAS INCREASING CAPACITY IN THE NETWORK,

10  AND THE IDEA THERE IS THAT IF YOU'RE ONLY SENDING AND RECEIVING

11  THE TIMING ADVANCE VALUE ONE TIME, YOU'RE FREEING UP OTHER TIME

12  SLOTS TO BE USED FOR OTHER OPERATIONS.

13      BUT THERE'S A BIG PROBLEM WITH THAT, TOO, AND THE PROBLEM

14  IS -- THERE'S A COUPLE PROBLEMS.  ONE IS IF YOU'RE SET --

15  CONFIGURED TO RECEIVE A TIMING ADVANCE VALUE ONE TIME, YOU

16  MIGHT MISS IT.  IF THERE'S INTERFERENCE BECAUSE OF THE SIGNAL

17  HITTING BUILDINGS OR VARIOUS OTHER REASONS, YOU MIGHT MISS IT

18  AND YOU -- THERE CAN BE BENEFITS TO HAVING IT SENT MULTIPLE

19  TIMES.  YOU'RE LIKELY TO GET AT LEAST ONE OF THEM.  THAT'S ONE

20  BENEFIT.

21      THE OTHER BENEFIT TO BEING ABLE TO RECEIVE MORE THAN ONE

22  TIMING ADVANCE VALUE FOR A MULTIFRAME IS YOU MIGHT NEED MORE

23  THAN ONE.  IF YOU'RE IN THAT FAST CAR ON THE HIGHWAY, YOUR

24  DISTANCE FROM THE CELL TOWER IS CHANGING CONSTANTLY, SO THE

25  TIMING ADVANCE VALUE THAT'S NEEDED TO CALIBRATE THE SYSTEM ALSO

1      NEEDS TO ADJUST TO CONDITIONS.

2          NOW, YOU WILL LEARN THAT THE GPRS STANDARD WAS CREATED AT

3      A TIME WHEN NOKIA ACTUALLY PROPOSED ITS APPROACH TO ETSI AND

4      THEY REJECTED IT.  THEY REJECTED IT.  THEY REJECTED IT IN FAVOR

5      OF A DIFFERENT APPROACH.

6          AND NOW HERE TODAY, CORE WIRELESS IS TRYING TO SAY THAT

7      THE PATENT STILL COVERS THE REJECTED IDEA, AND IT DOESN'T MAKE

8      ANY SENSE.

9          NOR DOES IT MAKE ANY SENSE WHEN YOU LOOK AT THE QUALCOMM

10     CHIPS WHICH PRACTICE THE STANDARD.  THE CLAIM LANGUAGE SIMPLY

11     DOESN'T FIT THE ACTUAL PRODUCTS, THE ACTUAL QUALCOMM CHIPS.

12         WE'RE GOING TO ASK YOU TO LOOK AT THAT CLAIM LANGUAGE AS

13     CAREFULLY AS YOU CAN, TO APPLY IT TO THE APPLE PRODUCTS AS

14     CAREFULLY AS YOU CAN, AND TO CONSIDER ALL THE FULL MIX OF

15     EVIDENCE, NO ONE PIECE ALONE.  WE WANT YOU TO LOOK AT THE FULL

16     RANGE OF EVIDENCE, THE HISTORY OF THE STANDARD, THE QUALCOMM

17     COMPUTER CODE, HOW IT ALL FITS TOGETHER, AND WE ARE CONFIDENT

18     THAT WHEN YOU LOOK AT THAT FULL RANGE OF EVIDENCE, YOU WILL SEE

19     THE CLAIM LANGUAGE IS VERY, VERY DIFFERENT IN THE APPLE

20     PRODUCTS AND THE STANDARDS THEY SUPPORT.

21         LAST THING I'LL SAY ABOUT THE '151 PATENT IS THAT YOU

22     HEARD IN THE PATENT VIDEO THAT SOMETIMES PATENT EXAMINERS DON'T

23     HAVE ALL THE INFORMATION BEFORE THEM OR THEY COULD MAKE CERTAIN

24     MISTAKES.

25         THERE'S ONE OTHER THING THAT THEY MAY NOT APPRECIATE, AND

1    THAT IS THE ARGUMENTS THAT ARE GOING TO BE MADE AT TRIAL BY A

2    LITIGANT.

3          FOR THIS PATENT, IF CORE WIRELESS WERE RIGHT THAT THEIR

4    PATENT SOMEHOW COULD COVER A SYSTEM THAT RECEIVES AND IS

5    CONFIGURED TO RECEIVE AS MANY TIMING ADVANCE VALUES AS NEEDED,

6    WELL, IT TURNS OUT THAT THERE WAS A, AN EARLIER VERSION OF THE

7    GPRS STANDARD THAT DID EXACTLY THAT.

8          SO THERE'S A FUNDAMENTAL INCONSISTENCY BETWEEN THEIR

9    POSITION WITH RESPECT TO INFRINGEMENT AND THEIR WITH RESPECT TO

10   WHAT WAS KNOWN IN WHAT WE CALL THE PRIOR ART, OR WHAT CAME

11   BEFORE THE PATENT.

12         AND THERE'S OTHER PROBLEMS AS WELL THAT WE THINK CREATE

13   INVALIDITY ISSUES FOR THIS PATENT.

14         NOW, WE WILL HAVE A PROFESSOR FROM RICE UNIVERSITY WHO

15   WILL COME TESTIFY TO YOU ABOUT THIS PATENT.  IF I COULD ASK HIM

16   TO STAND UP.  HIS NAME IS DR. EDWARD KNIGHTLY, AND HE IS THE

17   CHAIRMAN OF HIS DEPARTMENT AT RICE UNIVERSITY, AND HE WILL

18   TESTIFY TO YOU IN GREATER DEPTH AND WILL DO A BETTER JOB WITH

19   EVERYTHING I JUST TOLD YOU ABOUT THIS PATENT.

20         AGAIN, WE THINK IT'S VERY IMPORTANT THAT YOU UNDERSTAND

21   THE TECHNOLOGY AND YOU UNDERSTAND THE DETAILS, AND DR. KNIGHTLY

22   IS GOING TO DO HIS BEST TO DO THAT FOR YOU.

23         LET'S TURN TO THE SECOND PATENT IN THE CASE, AND THAT'S

24   THE '536.

25         AND, AGAIN, LET'S GO IN THE SAME PROCESS.  LET'S GO

1    THROUGH THE BACKGROUND TECHNOLOGY, TO THE PATENT, TO THE

2    ACCUSED PRODUCTS.

3         SO FOR THE '536 PATENT, THE STARTING POINT AND THE

4    BACKGROUND, THAT IS TO SAY, WHAT CAME BEFORE IT, IS THIS IDEA

5    OF ENCODING SPEECH.

6         WHAT DOES THAT MEAN?

7         WELL, WHEN YOU SPEAK INTO A CELL PHONE, YOU'RE SPEAKING

8    INTO A MICROPHONE.  THE MICROPHONE TAKES THOSE SOUND WAVES AND

9    THEY'RE EVENTUALLY CONVERTED INTO COMPUTER 1'S AND 0'S, AND

10   THOSE COMPUTER 1'S AND 0'S ARE TRANSMITTED THROUGH RADIO

11   FREQUENCY COMMUNICATIONS IN WHAT ARE KNOWN AS FRAMES.

12        NOW, WE JUST TALKED ABOUT FRAMES A MOMENT AGO, AND WHEN WE

13   TALKED ABOUT FRAMES FOR THE '151 PATENT, WE WERE TALKING ABOUT

14   SCHEDULING MULTIPLE DEVICES TO HAVE ACCESS TO CERTAIN

15   FREQUENCIES.

16        NOW WHAT WE'RE TALKING ABOUT IS HOW ONE DEVICE WOULD USE

17   ITS PORTION OF THE COMMUNICATION SPECTRUM TO SEND INFORMATION,

18   IN THIS CASE TO SEND A SPEECH CALL.

19        SO HOW DOES IT DO IT?

20        IT BREAKS YOUR VOICE INTO FRAMES.  EACH ONE OF THESE

21   FRAMES REPRESENTS SOUND, A LITTLE TINY FRAGMENT OF SOUND

22   (INDICATING).

23        AND ON THE OTHER END, ON THE OTHER PHONE, THOSE SOUND

24   FRAMES CAN BE REASSEMBLED AND PLAYED OUT THROUGH A SPEAKER TO

25   BE A HUMAN VOICE.  THAT'S HOW IT WORKS.  IT'S CALLED SPEECH

1  CODING.  THE SPEECH -- THE ACTUAL SOUND OF THE HUMAN VOICE

2  BECOMES SPEECH FRAMES, THOSE ARE TRANSMITTED AND THEN

3  REASSEMBLED ON THE OTHER SIDE AND PLAYED BACK AS A HUMAN VOICE.

4       NOW, EVERY SO OFTEN THERE CAN BE INTERFERENCE THAT

5  INTERFERES WITH THE COMMUNICATION.  AGAIN, THERE COULD BE BAD

6  WEATHER CONDITIONS OR THE SIGNAL HITS A BUILDING.  THERE'S ALL

7  SORTS OF REASONS.

8       AND THAT CAN CORRUPT A FRAME, CORRUPT THE RADIO

9  TRANSMISSION, AND WE CALL THAT A BAD FRAME.

10       WHAT CELLULAR ENGINEERS REALIZED A LONG TIME AGO IS THAT

11  IF YOU HAD A PROBLEM LIKE THIS, ONE SOLUTION YOU COULD USE IS

12  TO JUST REPEAT AN EARLIER FRAME, A FRAME RIGHT BEFORE IT,

13  REPEAT THE SOUND THAT'S ENCODED IN THAT FRAME.

14       AND THE PERSON ON THE OTHER END WON'T KNOW THE DIFFERENCE.

15  THE HUMAN EAR IS NOT SENSITIVE ENOUGH TO KNOW THE DIFFERENCE IF

16  JUST ONE FRAME HAS BEEN REPEATED.

17       SO THAT WAS REALIZED MANY YEARS AGO.

18       NOW, IN ADDITION TO SPEECH ENCODING -- AND MR. FENSTER

19  TOUCHED ON THIS -- THERE'S SOMETHING CALLED CONTROL MESSAGES.

20       CONTROL MESSAGES COULD BE ALL SORTS OF THINGS.  IT COULD

21  BE THIS PHONE NEEDS TO TELL THIS PHONE, LET'S SHIFT PROTOCOLS

22  FROM ONE PROTOCOL TO ANOTHER, AND THERE'S MANY OTHER VERSIONS

23  OF CONTROL MESSAGES THAT NEED TO BE SENT.

24       THOSE ARE DIFFERENT THAN SPEECH FRAMES.  THESE ARE SORT OF

25  THE EQUIPMENT COMMUNICATING WITH EACH OTHER.

1          AND YOU COULD SEND THOSE CONTROL MESSAGES OVER A SEPARATE

2     CHANNEL OR A SEPARATE LINE FROM ONE DEVICE TO ANOTHER.

3          BUT CELLULAR ENGINEERS REALIZED A LONG TIME AGO THAT ONE

4     THING YOU COULD DO IS YOU COULD TAKE ADVANTAGE OF THIS SAME

5     SORT OF TECHNIQUE THAT THEY WERE USING TO SOLVE THE BAD FRAME

6     PROBLEM AND THEY COULD ESSENTIALLY SNEAK A CONTROL MESSAGE INTO

7     A SPEECH COMMUNICATION.  THIS IS CALLED FRAME STEALING, BECAUSE

8     YOU'RE STEALING A FRAME THAT WOULD OTHERWISE BE SPEECH AND

9     YOU'RE SUBSTITUTING IN A CONTROL MESSAGE IN PLACE OF THAT

10    SPEECH FRAME.

11          AND THEN WHAT YOU DO IS THE PHONE HERE WILL JUST REPEAT

12    THE SPEECH FRAME BEFORE IT SO THE LISTENER WON'T NOTICE THE

13    DIFFERENCE.

14          THIS IS A WELL-KNOWN TECHNIQUE LONG BEFORE THE '536

15    PATENT.

16          IF YOU'RE GOING TO DO THIS, THOUGH, IT RAISES THE QUESTION

17    OF HOW IS THIS PHONE GOING TO KNOW WHEN A FRAME HAS BEEN

18    STOLEN?  HOW IS IT GOING TO KNOW THAT THERE'S A CONTROL MESSAGE

19    THAT'S SORT OF SNUCK INTO THE SPEECH FRAME?

20          AND THERE WERE TWO TECHNIQUES FOR DOING THAT, IMPLICIT

21    MARKING AND EXPLICIT MARKING.

22          IMPLICIT MARKING IS GIVING SORT OF A HINT TO THIS DEVICE

23    THAT THERE MIGHT BE A CONTROL MESSAGE EMBEDDED IN IT.  WITH AN

24    IMPLICIT MARKING SYSTEM, YOU DON'T KNOW FOR SURE WHEN YOU'VE

25    RECEIVED THIS HINT.  YOU HAVE TO DO MORE INVESTIGATION.  BUT IT

1      GIVES YOU A HINT.

2          EXPLICIT MARKING TELLS YOU FLAT OUT, THERE IS A CONTROL

3      MESSAGE IN THIS FRAME.  IT TELLS YOU SPECIFICALLY.  IT'S

4      EXPLICIT ABOUT IT.

5          SO THAT'S THE BACKGROUND.  THIS IS ALL WELL-KNOWN BEFORE

6      THE '536 PATENT.

7          WHAT DID THE '536 PATENT CLAIM TO INVENT?

8          AND WHAT THE '536 PATENT CLAIMED TO INVENT WAS SNEAKING

9      CONTROL MESSAGES INTO SPEECH FRAMES USING A VERY SPECIFIC TYPE

10     OF IMPLICIT MARKING, VERY SPECIFIC TYPE OF IMPLICIT MARKING,

11     AND IT WORKS LIKE THIS.

12         YOU TAKE EACH FRAME AND YOU DIVIDE IT INTO ONE OF TWO

13     STATES, GOOD STATE, BAD STATE.  THAT'S THE HINT OR THE CLUE

14     THAT THERE MIGHT BE A CONTROL MESSAGE INSIDE THE FRAME.  BUT

15     YOU DON'T KNOW FOR SURE, AND SO YOU HAVE TO DO A FURTHER

16     INVESTIGATION OF THE BAD FRAMES.

17         SOME OF THE BAD FRAMES ARE GOING TO BE BAD SPEECH; THAT IS

18     TO SAY, IT WAS MEANT TO BE A SPEECH FRAME, BUT THERE WAS

19     INTERFERENCE ALONG THE WAY.  AND SO IT'S NOT A CONTROL MESSAGE,

20     IT'S JUST A BAD SPEECH FRAME.

21         OTHER BAD STATES WILL BE CONTROL MESSAGES.

22         THERE'S A COUPLE CRITICAL PARTS OF THIS.  THE FIRST IS IN

23     THIS FIRST STEP, THERE'S ONLY TWO STATES, GOOD OR BAD.  TWO.

24         SECOND THING, AND YOU'RE GOING TO LEARN MORE ABOUT WHAT

25     THIS NEXT PIECE MEANS OVER THE COURSE OF THE CASE, THIS SYSTEM

OPENING STATEMENT BY MR. MUELLER

1    DOESN'T USE WHAT ARE CALLED CODE WORDS.  NO CODE WORDS.

2         TWO STATES, NO CODE WORDS.

3         AND THAT WAS THE ALLEGED INVENTION.  IT WAS A SPECIFIC

4    FORM OF IMPLICIT MARKING.

5         NOW, THIS TYPE OF IMPLICIT MARKING WAS NEVER EVEN PROPOSED

6    BY NOKIA TO THE STANDARD SETTING COMMITTEE.

7         BUT IN ANY EVENT, THEY WENT IN A DIFFERENT DIRECTION, AND

8    THE DIRECTION THAT THEY WENT IN WAS TO USE EIGHT STATES.  SO

9    FOR ANY GIVEN FRAME -- LET'S TAKE FRAME 2 AS AN EXAMPLE --

10   THERE WOULD BE ONE, TWO, THREE, FOUR, FIVE, SIX, SEVEN, EIGHT,

11   EIGHT STATES.

12        AND THERE WOULD BE CODE WORDS USED IN THE SYSTEM.

13        VERY DIFFERENT APPROACH.

14        THE QUALCOMM CHIPS USE WHAT THE GSM STANDARD SAYS TO DO.

15        SO WE HAVE TWO STATES VERSUS EIGHT.  WE HAVE NO CODE WORDS

16   VERSUS CODE WORDS.

17        AND NOW LET ME SHOW YOU EXACTLY IN THE CLAIM LANGUAGE

18   WHERE YOU CAN FIND THESE THINGS AND WE'LL COMPARE IT TO THE

19   STANDARD.

20        SO IN THE CLAIM LANGUAGE, NOW WE'RE LOOKING AT CLAIM 19,

21   THE ONE CLAIM ASSERTED FOR THE '536 PATENT.  THIS IS WHAT IT

22   SAYS:  "WHEREIN EACH FRAME HAS ONE OF TWO STATES, THE STATES

23   BEING A GOOD STATE AND A BAD STATE."

24        LET ME READ THAT AGAIN.  "EACH FRAME HAS ONE OF TWO

25   STATES, THE STATES BEING A GOOD STATE AND A BAD STATE."

1    SO THAT'S RIGHT HERE (INDICATING).  EACH FRAME HAS ONE OF

2    TWO STATES, GOOD STATE AND A BAD STATE.

3    AND HIS HONOR HAS TOLD US EXACTLY WHAT THAT MEANS.  GOOD

4    STATE MEANS STATE FLAGGING THAT THE FRAME CONTAINS ERROR-FREE

5    USER INFORMATION.

6    BAD STATE MEANS STATE FLAGGING THAT THE FRAME DOES NOT

7    CONTAIN ERROR-FREE USER INFORMATION.

8    I ALSO MENTIONED CODE WORDS.  WELL, THERE'S THIS WORD

9    CALLED BIT PATTERN WHICH APPEARS THROUGHOUT THE CLAIMS, AND

10   YOU'LL SEE IT WHEN YOU LOOK AT THE CLAIM IN YOUR BINDERS.

11   HIS HONOR HAS CONSTRUED THAT TO MEAN A SEQUENCE OF BITS

12   CONVEYING A SIGNALLING MESSAGE NOT DELINEATED BY A CODE WORD.

13   NOT DELINEATED BY A CODE WORD.

14   SO TO MEET THAT BIT PATTERN REQUIREMENT, YOU CANNOT BE

15   DELINEATED BY A CODE WORD.

16   THE ACTUAL GSM STANDARD THAT'S ACCUSED -- AND NOW AGAIN

17   WE'RE TALKING ABOUT 2G, THE OLDEST STANDARD THAT'S CURRENTLY

18   SUPPORTED BY MANY PHONES -- THE ACTUAL GSM STANDARD USES EIGHT

19   STATES AND IT USES CODE WORDS.

20   LET ME SHOW YOU THE EIGHT STATES.  THEY'RE RIGHT HERE.

21   WE'LL TAKE YOU THROUGH THESE ONE BY ONE OVER THE COURSE OF THE

22   TRIAL.

23   I THINK MR. FENSTER SAID SPEECH IS EITHER GOOD OR BAD, OR

24   ALL FRAMES ARE EITHER GOOD OR BAD.

25   THERE'S ONE GREAT EXAMPLE OF HOW THAT'S WRONG.  LOOK AT

1    THE SECOND BOX, SPEECH DEGRADED.  SPEECH FRAME WITH CRC OK, BUT

2    18 BITS AND CLASS2 BITS MAY BE CORRUPTED.

3        SO SOMETIMES IT'S ACTUALLY IN BETWEEN.  IT'S NEITHER GOOD

4    NOR BAD.  GOOD IS ABOVE IT.  BAD IS BELOW IT.  IN THE MIDDLE IS

5    SPEECH DEGRADED.

6        THE BOTTOM LINE IS THIS IS AN EIGHT STATE SYSTEM THAT

7    ALLOWS FOR GREATER SPECIFICITY IN THE TWO STATES ASSIGNED.

8    THEY'RE PUTTING THINGS IN EIGHT PARTICULAR CATEGORIES, AND

9    THAT'S ADVANTAGEOUS FOR VARIOUS REASONS THAT YOU'LL LEARN

10   ABOUT.

11       IT'S VERY DIFFERENT FROM A SIMPLE TWO STATE SYSTEM.  IT'S

12   GOT EIGHT STATES, AND THAT'S THE WAY IT HAPPENS IN THE GSM

13   STANDARD.  THAT'S THE WAY IT HAPPENS IN THE QUALCOMM CHIPS.

14       NOW, FOR ALL THESE REASONS, THE '536 SYSTEM DOES NOT EQUAL

15   THE GSM STANDARD OR THE QUALCOMM CHIPS.

16       AND JUST AS WITH THE '151 PATENT, THERE'S ALSO INVALIDITY

17   ISSUES.  THE GSM STANDARD DOESN'T USE THE '536 APPROACH, BUT

18   THERE'S A VERY OLD STANDARD CALLED IS-54 THAT DID, AND IT DID

19   SO BEFORE THE '536 PATENT WAS FILED.

20       AND YOU WILL HEAR ALL ABOUT THAT, AND YOU'LL HEAR EXACTLY

21   HOW IS-54 WORKED, AND YOU WILL LEARN THAT IT USED THIS

22   APPROACH, THIS IMPLICIT MARKING APPROACH IN THE '536 PATENT

23   BEFORE THE '536 PATENT WAS FILED, AND THAT'S AN ADDITIONAL

24   PROBLEM WITH THE '536 PATENT.

25       DR. MICHAEL BUEHRER FROM VIRGINIA TECH -- AND DR. BUEHRER,

1    IF YOU COULD STAND UP, PLEASE -- WILL TESTIFY TO YOU ON THE

2    '536 PATENT ISSUES, AND HE'S GOING TO EXPLAIN THE BACKGROUND

3    TECHNOLOGY, THE PRIOR ART, THE PATENT, AND HE WILL APPLY IT TO

4    THE STANDARD, THE GSM STANDARD.  HE WILL APPLY IT THE QUALCOMM

5    CHIPS.

6         AND AS WITH BOTH THE PATENTS IN THIS CASE, WITH

7    DR. BUEHRER'S HELP, WE ARE GOING TO TRY TO COMPREHENSIVELY AND

8    METHODICALLY GO THROUGH ALL THE EVIDENCE, NOT JUST PART OF THE

9    EVIDENCE, ALL OF THE EVIDENCE THAT MATTERS AND THAT'S RELEVANT

10   TO THE ISSUES BEFORE YOU, THE LADIES AND GENTLEMEN OF THE JURY.

11        THANK YOU, DR. BUEHRER.

12        NOW, I THINK YOU CAN SEE SOME OF THE PROBLEMS WITH

13   CORE WIRELESS'S ALLEGATIONS IN THIS CASE.

14        THE '536 PATENT SIMPLY DOESN'T EQUAL THE GSM STANDARD OR

15   THE QUALCOMM CHIPS.

16        THE '151 PATENT DOESN'T EQUAL THE GPRS STANDARD OR THE

17   QUALCOMM CHIPS.

18        AND YOU SIMPLY DON'T NEED TO PAY A PENNY FOR PATENTS THAT

19   YOU'RE NOT USING, AND APPLE ISN'T USING EITHER ONE OF THESE

20   PATENTS.

21        I JUST WANT TO VERY BRIEFLY SAY TWO THINGS ABOUT THE 24 --

22   MORE THAN $24 MILLION DAMAGES CLAIM THEY'VE MADE IN THIS CASE.

23        THE FIRST IS YOU WILL LEARN OVER THE COURSE OF THE CASE

24   SOME OF THE PROBLEMS WITH THAT CLAIM, EVEN IF YOU SORT OF TAKE

25   IT ON ITS FACE AND START TO LOOK AT THE DEMAND ITSELF.

1          BUT THE DEEPER PROBLEM IS APPLE'S -- THE REAL NUMBER IN

2     THIS CASE, THE AMOUNT THAT APPLE REALLY OWES CORE WIRELESS IS

3     ZERO.  YOU DON'T PAY FOR PATENTS YOU'RE NOT USING.  YOU DON'T

4     PAY FOR PATENTS YOU'RE NOT INFRINGING.  YOU DON'T PAY FOR

5     PATENTS THAT DON'T COVER THE STANDARD AND THE CHIPS USED IN

6     YOUR PRODUCTS.  THAT'S JUST NOT RIGHT.

7          AND I THINK AFTER YOU LOOK AT ALL THE EVIDENCE IN THIS

8     CASE, YOU WILL UNDERSTAND WHY MICROSOFT EXITED THIS

9     ARRANGEMENT.

10          YOU WILL UNDERSTAND THAT THE CLAIMS BEING MADE IN THIS

11     CASE ARE UNFOUNDED.

12          THANK YOU FOR YOUR TIME.  IT'S BEEN A LOT TO ABSORB TODAY.

13     WE'RE GOING TO DO OUR BEST TO TAKE IT SLOWLY AND CAREFULLY THE

14     WHOLE WAY THROUGH.  WE APPRECIATE YOUR SERVICE AS JURORS.

15          AT THE CONCLUSION OF THE CASE, I WILL COME BACK TO YOU AND

16     REQUEST THAT YOU RETURN A VERDICT IN FAVOR OF APPLE.

17               THE COURT:  THANK YOU VERY MUCH.

18          LADIES AND GENTLEMEN, THAT ENDS A VERY LONG DAY OF YOUR

19     FIRST DAY OF JURY SERVICE.  I THANK YOU FOR YOUR ATTENTION

20     THROUGHOUT THE PROCEEDINGS.  IT'S VERY APPRECIATED.

21          WE'RE GOING TO EXCUSE YOU FOR TODAY AND ASK YOU TO RETURN

22     AT 9:00 A.M. TOMORROW TO THE JURY ROOM.  WE WILL HAVE SOME

23     TREATS AND COFFEE THERE TO START YOUR DAY.

24          WE WILL BE STARTING WITH THE ATTORNEYS A LITTLE BIT BEFORE

25     THAT, SO YOU MIGHT HEAR OUR VOICES OUT HERE, BUT WE'LL START

1     WITH THE FIRST WITNESS AT 9:00 A.M. TOMORROW.

2          TRAVEL SAFELY AND WE'LL SEE YOU TOMORROW.

3          THANK YOU.

4          (JURY OUT AT 4:46 P.M.)

5               THE COURT:  ALL RIGHT.  WE RETURN TO THE RECORD.  THE

6     JURORS ARE NOT PRESENT.

7          AND THANK YOU FOR YOUR PRESENTATIONS TODAY.

8          WE'LL NOW KICK INTO OUR EVENING PROTOCOL OF WORK TO COME

9     FOR YOUR ASSEMBLED ARMIES.  ANY EMERGENCY OR URGENT MATTERS WE

10    NEED TO TAKE UP NOW BEFORE THE EVENING SESSION?

11               MR. MUELLER:  NOT FOR APPLE, YOUR HONOR.

12               MR. WANG:  YOUR HONOR, NOT AN EMERGENCY, BUT WE ARE

13    WORKING TO PREPARE JURY BINDERS, SOME PICTURES OF THE WITNESSES

14    AND THE PATENTS AND THE COURT'S CLAIM CONSTRUCTION.

15          SO CAN WE JUST HAVE THAT FOR THEM TOMORROW MORNING?  OR --

16               THE COURT:  AS LONG AS THERE'S NOT -- I WILL WANT TO

17    SEE WHAT YOU'RE DOING, TOO, SO YOU HAVE IT FOR ME AND THEN WE

18    CAN GIVE IT TO THE JURY AFTER THAT.

19          LET'S RECONVENE AT 8:50, TEN MINUTES TO 9:00 TOMORROW.

20    I'LL LOOK AT WHAT YOU FILE OVERNIGHT.

21          AND I'LL SEE YOU IN THE MORNING.

22          GOOD NIGHT.

23          (THE EVENING RECESS WAS TAKEN AT 4:47 P.M.)

24

25

1

2

3                          CERTIFICATE OF REPORTERS

4

5

6

7          WE, THE UNDERSIGNED OFFICIAL COURT REPORTERS OF THE

8     UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF

9     CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO

10    HEREBY CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12    A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13    ABOVE-ENTITLED MATTER.

14

15

16         IRENE RODRIGUEZ, CSR, CRR
           CERTIFICATE NUMBER 8076

17

18

19         LEE-ANNE SHORTRIDGE, CSR, CRR
           CERTIFICATE NUMBER 9595

20

21         DATED:  DECEMBER 5, 2016

22

23

24

25