UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONVERSANT WIRELESS LICENSING S.A.R.L.,, | Case No.15-cv-05008-NC |
| Plaintiff, | **ORDER GRANTING DEFENDANT'S MOTION FOR A FINDING OF UNENFORCEABILITY OF U.S. PATENT NO. 6,477,151** |
| v. | |
| APPLE, INC., | Re: Dkt. No. 547 |
| Defendant. | |

On remand from the Federal Circuit, defendant Apple, Inc. moves for a finding of unenforceability of U.S. Patent No. 6,477,151 ("'151 patent") held by plaintiff Conversant Wireless Licensing S.A.R.L. *See* Dkt. No. 547. The Court must address a single, narrow issue: whether some inequitable consequence flowed from Nokia's failure to disclose its intellectual property rights before a standard setting organization. If so, the Court must apply the doctrine of implied waiver and find the '151 patent unenforceable. For the reasons stated below, the Court GRANTS Apple's motion.

## I.    Background

### A.    Procedural History

In December 2016, the Court held an eight-day jury trial. *See* Dkt. Nos. 406, 465. The jury returned a verdict for Conversant, finding that Apple infringed on both the '151 patent and the '536 patent. *See* Dkt. No. 466. The Court denied Apple's post-trial motions

challenging the jury's verdict, its award of damages, and motion for unenforceability.  *See*
Dkt. No. 501.

Apple appealed.  *See* Dkt. No. 506.  On appeal, the Federal Circuit affirmed in part,
reversed in part, and vacated in part.  *See* Dkt. No. 528; *see also Core Wireless Licensing
S.A.R.L. v. Apple, Inc.*, 899 F.3d 1356 (Fed. Cir. 2018).[1]  Relevant here, the Federal Circuit
affirmed the jury's verdict as to Apple's infringement of the '151 patent, but remanded to
this Court on the single issue of "whether Nokia or [Conversant] inequitably benefited
from Nokia's failure to disclose, or whether Nokia's conduct was sufficiently egregious to
justify finding implied waiver without regard to any benefit that Nokia or [Conversant]
may have obtained as a result of that misconduct."  *Core Wireless*, 899 F.3d at 1368–69.

### B.    Factual Background[2]

U.S. Patent No. 6,477,151 ('151 patent) describes a method in which mobile
devices communicate with base stations.  *See id.* at 1358.  Specifically, the '151 patent
describes a method of synchronizing base stations with mobile devices using "continuous"
transmissions from a base station to a mobile device.  *See id.* at 1362.  Jarkko Oksala, a
Nokia employee, is the named inventor of the '151 patent.  *Id.* at 1365.  In 2011, Nokia
assigned the '151 patent to Conversant.  *See* Trial Tr. at 591:11–592:4.

In 1997 and 1998, the European Telecommunications Standards Institute ("ETSI"),
a standards-setting organization ("SSO"), was considering proposals to modify the General
Packet Radio Service ("GPRS") standard used in telecommunications.  *See id.*  ETSI
required its members, which included Nokia, to "use its reasonable endeavours to timely
inform ETSI of essential IPRs [intellectual property rights] it becomes aware of."  *Id.*  The
purpose of this disclosure requirement "was to permit the standards-setting decisionmakers
to make an informed choice about whether to adopt a particular proposal."  *Id.* at 1367.
ETSI members were required to disclose their patents and patent applications on particular

---

[1] While this appeal was pending, Core Wireless Licensing S.A.R.L. was renamed to
Conversant Wireless Licensing S.A.R.L.  *See* Dkt. No. 592 at 1.
[2] This factual background is largely drawn from the Federal Circuit's panel opinion.

United States District Court
Northern District of California

1    technology at the time they make a proposal, regardless whether that proposal is ultimately

2    adopted.  *Id.*

3         On November 4, 1997, Oksala prepared an invention report for Nokia describing

4    the synchronization method that would ultimately become the '151 patent.  *Id.* at 1365; *see*

5    *also* DX0115.  Nokia submitted Oksala's invention to ETSI for consideration in

6    connection with the GPRS standard.  *Id.*  At the same time, Nokia filed a Finnish patent

7    application based on that same invention.  *Id.*

8         ETSI rejected Nokia's proposal in January 1998.  *Id.*  Instead, ETSI adopted a

9    similar proposal by Ericsson, which described the same synchronization method except

10   that it made the method "optional."  *Id.*  In July 2002, Nokia finally disclosed to ETSI the

11   Finnish patent application and its related U.S. patent application.  *Id.*

## II.   Legal Standard

13        Even when a patent is otherwise valid, "[a] member of an open standard setting

14   organization may . . . have impliedly waived its right to assert infringement claims against

15   standard-compliant products."  *Hynix Semiconductor Inc. v. Rambus Inc.*, 645 F.3d 1336,

16   1347–48 (Fed. Cir. 2011) (quoting *Qualcomm Inc. v. Broadcom Corp.* ("*Qualcomm II*"),

17   548 F.3d 1004, 1019 (Fed. Cir. 2008)); *see also Core Wireless*, 899 F.3d at 1365.

18        To succeed on an implied waiver claim in the SSO context, the accused infringer

19   must first show by clear and convincing evidence that: "(1) the patentee had a duty of

20   disclosure to the standard setting organization, and (2) the patentee breached that duty."

21   *Hynix*, 645 F.3d at 1348.  Because implied waiver is an equitable defense, however, the

22   doctrine "may only be applied in instances where the patentee's misconduct resulted in

23   [an] unfair benefit."  *Core Wireless*, 899 F.3d at 1368 (quoting *Therasense, Inc. v. Becton,*

24   *Dickinson & Co.*, 649 F.3d 1276, 1292 (Fed. Cir. 2011) (en banc)).  Alternatively, implied

25   waiver may also be found in cases of "egregious misconduct sufficient to justify the

26   sanction of unenforceability of the patent at issue."  *Id.*

## III.  Findings of Fact and Conclusions of Law

28        On appeal, the Federal Circuit held that Nokia "had a duty to disclose its IPR no

United States District Court
Northern District of California

3

1    later than June 1998 [and] its later disclosure was clearly untimely and not sufficient to

2    cure the earlier breach of its duty." *Id.* Thus, the only question remaining is whether

3    "inequitable consequence flowed from Nokia's failure to disclose its patent application"

4    such that the doctrine of implied waiver should prevent enforcement of the '151 patent. *Id.*

5    Specifically, this Court must decide "whether Nokia or [Conversant] inequitably benefted

6    from Nokia's failure to disclose, or whether Nokia's conduct was sufficiently egregious to

7    justify finding implied waiver without regard to any benefit that Nokia or [Conversant]

8    may have obtained as a result of that misconduct." *Id.* at 1368–69.

9    **A.    Egregious Misconduct**

10        Apple argues that Nokia's failure to disclose its IPR to ETSI was sufficiently

11   egregious to justify implied waiver.  Apple identifies three categories of evidence

12   supporting their conclusion: (1) Nokia's motivation for patenting Oksala's invention; (2)

13   the timing of Nokia's patent filing and ETSI proposal; and (3) Nokia's delay in finally

14   disclosing its IPR.  *See* Dkt. No. 547-3.

15        Because "[i]mplied waiver is an equitable doctrine, [it] 'hinges on basic fairness.'"

16   *Core Wireless*, 899 F.3d at 1368.  As a result, "the remedy imposed by a court of equity

17   should be commensurate with the violation." *Id.* (quoting *Columbus Bd. of Educ. v.*

18   *Penick*, 443 U.S. 449, 465 (1979)).  Thus, it is not enough that Nokia committed

19   misconduct; that misconduct must be "sufficiently egregious." *Id.* at 1369.

20        There is no bright-line rule for what constitutes "sufficiently egregious"

21   misconduct.  *Cf. Therasense*, 649 F.3d at 1293 ("equitable doctrines require some measure

22   of flexibility").  *Therasense* provides a useful starting point.  *Cf. Core Wireless*, 899 F.3d

23   at 1368 (citing *Therasense*).  There, the Federal Circuit "recognize[d] an exception" to the

24   general rule that the defense of inequitable conduct required but-for proof of materiality

25   "in cases of affirmative egregious misconduct." *Therasense*, 649 F.3d at 1292.  The court

26   derived that exception from early Supreme Court cases dealing with the doctrine of

27   unclean hands involving perjury, bribery, and manufacture and suppression of evidence.

28   *Id.* at 1292–93 (citing *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S.

United States District Court
Northern District of California

4

806, 816 – 20 (1945); *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 240 (1944); *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 243 (1933)); *see also Apotex Inc. v. UCB, Inc.*, 763 F.3d 1354, 1362 (Fed. Circ. 2014) (finding "particularly significant and inexcusable the fact that [the inventor] arranged for the preparation and submission of an expert declaration containing false statements instrumental to issuance of the patent."). This exception was necessary to give courts sitting in equity "sufficient flexibility to capture extraordinary circumstances." *Id.* at 1293.

As explained above, the Federal Circuit found that Nokia "had a duty to disclose its IPR no later than June 1998 [and] its later disclosure was clearly untimely and not sufficient to cure the earlier breach of its duty." *Core Wireless*, 899 F.3d at 1368. Thus, Nokia's failure to disclose its IPR was misconduct. The Court FINDS, however, that Nokia's misconduct was not egregious or extraordinary.

As *Therasense* and its progeny make clear, egregious misconduct is a high bar. Misconduct is "egregious" in cases where the patent holder or applicant makes affirmative false statements or otherwise attempts to actively mislead relevant decision-makers. *See, e.g.*, *Apotex*, 763 F.3d at 1362; *Intellect Wireless, Inc. v. HTC Corp.*, 732 F.3d 1339, 1343–44 (Fed. Cir. 2013) ("[F]iling a false affidavit is exactly the sort of 'affirmative act[] of egregious misconduct' that renders the misconduct 'material.'"). Here, by contrast, Nokia made no similarly false statements, but simply failed to disclose its IPR. *Cf. Skedco, Inc. v. Strategic Operations, Inc.*, 287 F. Supp. 3d 1100, 1144 n.15 (D. Or. 2018) (questioning application of "egregious misconduct" exception to cases of omission).

Apple points to Oksala's invention report as evidence of egregiousness. That report shows that Oksala's manager did not initially view Oksala's invention as high-value and did not recommend Nokia pursue a patent. *See* DX0115 at 4. However, Nokia nonetheless applied to patent Oksala's invention and that method was ultimately adopted by ETSI, not through Nokia's efforts, but through *Ericsson's* proposal. It may well be that Nokia simply disagreed with Oksala's manager's initial assessment. After all, Ericsson seemingly arrived at a similar method and deemed it sufficiently worthy of consideration

to include in their own ETSI proposal.  Put simply, Apple has not shown by clear and convincing evidence that Nokia had an improper motive when it applied to patent and propose to ETSI Oksala's invention despite the initially lukewarm assessment of the invention.

Likewise, Apple has not shown by clear and convincing evidence that Nokia's simultaneous patent application and ETSI proposal was nefarious and not merely convenient.  Oksala's invention report was created on November 4, 1997.  *See* Trial Tr. at 232:14–19.  Nokia applied to patent that invention a week later on November 11, 1997 (*see* DX0076 at 2), and submitted its ETSI proposal that same week (*see* Trial Tr. at 1426:23–1427:3).  It is unclear, however, why this timing is suspicious and Apple offers no evidence to explain.

Closer to the mark is Nokia's four-year delay in disclosing its IPR.  But Apple has not shown by clear and convincing evidence that this delay was egregious.  *Qualcomm* provides a useful comparison.  *See Qualcomm, Inc. v. Broadcom Corp.* ("*Qualcomm I*"), 539 F. Supp. 2d 1214 (S.D. Cal. 2007) *aff'd in part & rev'd in part by Qualcomm II*, 548 F.3d at 1022, 1026 (affirming district court's finding of implied waiver, but vacating the scope of the district court's unenforceability remedy).

There, the district court applied the implied waiver doctrine to render Qualcomm's video compression patents unenforceable.  *Qualcomm II*, 548 F. 3d at 1008.  The court found "that Qualcomm and its employees orchestrated a plan to ignore Qualcomm's duty to disclose [its] patents to the JVT[,]" the SSO responsible for the standard in question.  *Qualcomm I*, 539 F. Supp. 2d at 1228.  In particular, the court documented extensive communications between various Qualcomm employees conspiring to "extend" Qualcomm's patents to cover the standard at issue when the patents "almost exclusively" referred to different material.  The court also noted communication by Qualcomm employees recommending that Qualcomm "lobby[] [its] technology in the appropriate forums."  *Id.* at 1228–29.  Moreover, Qualcomm failed to disclose its patents to the SSO until after it initiated its lawsuit against Broadcom.  *Id.* at 1228.

6

By contrast, there was no similar evidence here.  While Qualcomm conspired to "extend" its pre-existing patents, which, in the words of its own employees, covered "almost exclusively" different material, Nokia sought to patent a wholly new invention. Qualcomm's manipulation of its intellectual property made its nondisclosure particularly exceptional and therefore egregious.  But here, Apple's characterization of Nokia's motivation to patent Oksala's invention as nefarious is not persuasive.  There simply is not clear and convincing evidence of egregiousness.

Apple also cites *Momenta Pharmaceuticals, Inc. v. Amphastar Pharmaceuticals, Inc.*, 298 F. Supp. 3d 258 (D. Mass. 2018) in support of its position.  *Momenta* is likewise distinguishable.  First, the Court notes that *Momenta* did not specifically address the implied waiver doctrine's equitable considerations.  *See id.* at 264 (describing two-pronged test for implied waiver requiring duty and breach).  It is not clear whether the district court applied implied waiver because Momenta engaged in egregious misconduct or because it obtained an unjust benefit.  In any case, *Momenta* engaged with more egregious facts.

Momenta held a patent in "a set of manufacturing quality control processes that ensure that each batch of generic enoxaparin[,]" drug used to prevent blood clots, includes specific sugar chains.  *Id.* at 262.  When the United States Pharmacopeia ("USP") sought to incorporate Momenta's patented method into the standard for formulating enoxaparin, Momenta not only failed to disclose its ownership of the patent, but also "asked the USP to request that [a different pharmaceutical company] affirmatively abandon its patent that might cover [the standard] instead of simply allowing it to lapse."  *Id.* at 267.  Similar evidence is not present here.

In short, Nokia's failure to disclose its IPR to ETSI was undoubtedly misconduct. But that misconduct does not clearly and convincingly rise to the level of "affirmative egregious misconduct" required.  *Therasense*, 649 F.3d at 1292.

### B.   Inequitable Benefit

Apple next argues that Conversant obtained unjust benefits from Nokia's misconduct, justifying unenforceability under the implied waiver doctrine.  In particular,

1    Apple contends that Conversant obtained benefits in the form of licensing fees and by

2    increasing its leverage over industry participants who must produce standards-compliant

3    products.  *See* Dkt. No. 547-3.

4         "[I]n some circumstances courts have held that an equitable defense will not be

5    recognized if the offending party did not gain a benefit from its wrongdoing."  *Core*

6    *Wireless*, 899 F.3d at 1368 (citing *Therasense*, 649 F.3d at 1292).  Because the implied

7    waiver doctrine can render a patent unenforceable, the doctrine "should only be applied in

8    instances where the patentee's misconduct resulted in [an] unfair benefit."  *Id.* (quoting

9    *Therasense*, 649 F.3d at 1292) (alterations in original).  If the patentee obtained "an unjust

10   advantage" or "an undeserved competitive advantage," the implied waiver doctrine may

11   justify a sanction of unenforceability of the patent at issue.  *Id.*

12        Here, Nokia and Conversant have obtained such an unfair competitive advantage.

13   The '151 patent became standards-essential when ETSI incorporated the method into the

14   GPRS standard, allowing Conversant to extract licenses from industry participants.  At

15   trial, John Lindgren, Conversant's CEO, testified that Conversant licensed the '151 patent

16   as part of its patent portfolio to numerous third parties, including Microsoft, Sony, and

17   Ericsson.  *See* Trial Tr. at 606:18–23.  And Nokia's patent licensing offer to Apple states

18   that its essential patent families, which includes the '151 patent, commands substantial

19   royalties.  *See* PX0560 at 1–3.  This undeserved competitive advantage is further bolstered

20   by the fact that the '151 patent is essential.  *Cf. Core Wireless*, 899 F.3d at 1367 ("[T]here

21   is no ground for dispute that Nokia's proposal, if adopted, would have made [the '151]

22   patent standards-essential.").  As Lindgren recognized, "[s]tandards-essential patents

23   cannot be 'designed around' and must be licensed by anyone using the standard."  *See*

24   PX0561 at 21.

25        Conversant raises several arguments against a finding of an inequitable benefit.

26   First, Conversant argues that its '151 patent is not essential because ETSI did not accept

27   Nokia's proposal and incorporated Ericsson's proposal instead.  The Federal Circuit,

28   however, all but held that the '151 patent was essential to the GPRS standard.  "Oksala . . .

United States District Court
Northern District of California

United States District Court
Northern District of California

explained the difference between [Nokia's] proposal and Ericsson's by pointing out that Ericsson's proposal is different only because it made his idea 'optional.'" *Core Wireless*, 899 F.3d at 1367.  The patented method, however, was only optional for base stations; mobile devices were required to have the capability to operate in accordance with the patented method.  Indeed, the jury found, and the Federal Circuit affirmed, that Apple's devices infringed the '151 patent because they were configured to operate in accordance with the patented method.  As the Federal Circuit explained:

> "[I]nfringement is not avoided merely because a non-infringing mode of operation is possible." *z4 Techs., Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1350 (Fed. Cir. 2007); *see also VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1322 (Fed. Cir. 2014).  To take a simple example, a patent that claims an automobile configured to operate in third gear would be infringed by an automobile that is configured to operate in first, second, and third gears. The automobile is at all times configured to operate in any one of its possible gears, including the infringing one, even if the automobile is never driven in the infringing gear. Similarly, claim 14 [of the '151 patent] is satisfied as long as Apple's devices are configured to operate in a mode that receives a TAV only once per multi-frame structure and uses it for all channels.

*Id.* at 1363.  In short, the '151 patent was essential because industry participants must design their devices to be compatible with the patented method.  *Cf. Momenta*, 298 F. Supp. 3d at 268 ("[T]he fact that the jury found that the [defendant] . . . infringe[d] the . . . patent supports an inference that use of the invention disclosed by the . . . patent 'reasonably might be necessary to comply with [the standard].'").

Next, Conversant argues that its commitment to fair, reasonable, and non-discriminatory ("FRAND") licensing of its patents means that it could not have obtained an inequitable benefit.  The Court disagrees; whether Conversant offered FRAND terms is beside the point.  The issue is whether Conversant should have been able to request a license at all.  A FRAND license may be inequitable if the licensing party was forced to

obtain the license.  *Cf. Qualcomm II*, 548 F.3d at 1021 ("Forcing a party to accept a license and pay whatever fee the licensor demands . . . are significant burdens.").  If the '151 patent was not essential, third parties may not have been required to obtain a license, regardless whether the license was on FRAND terms.

Third, Conversant argues that Apple failed to specifically trace any licensing revenue to the '151 patent.  This argument is unpersuasive.  Lindgren testified at trial that "it is rare for companies to take licenses to individual enumerated patents."  Trial Tr. at 607:1–2.  Requiring proof that a particular patent conferred specific monetary benefits would ignore that common practice.  Rather, the Court infers from the fact that Conversant specifically identified the '151 patent for enforcement that the '151 patent has significant worth.  Furthermore, the benefit conferred by the '151 patent was not limited to licensing revenue.  As Nokia recognized, the value of each standards-essential patent lay not only in revenue attributable to it, but also in increasing Nokia's leverage by bolstering its patent portfolio.  *See* PX0603 at 7.

Finally, Conversant asserts that Apple has not met their burden because they failed to connect their nondisclosure with the inequitable benefit.  Such but-for proof, however, is not required.  Nokia's failure to disclose its IPR deprived ETSI members the opportunity to make a fully informed decision as to the technical solution for the GPRS standard.  *See Core Wireless*, 899 F.3d at 1366.  Nokia and Conversant cannot now "rely on the effects of its misconduct to shield it from the application of the equitable defense of implied waiver."  *Qualcomm II*, 548 F.3d at 1021.  In any case, Dr. Michael Walker, former Chairman of the Board of ETSI, testified that ETSI members are incentivized to choose technical solutions that are free of licensing costs.  *See* Trial Tr. at 1420:2–14.  Dr. Walker's testimony suggests that, had Nokia disclosed its IPR, there was a reasonable possibility that the '151 patent would not have been incorporated into the GPRS standard.

In sum, although Nokia's conduct before ETSI was not egregious, Nokia's failure to disclose its IPR allowed Nokia and Conversant to inequitably benefit from that misconduct.

## C.    Scope of Remedy

Unenforceability remedies must be "properly limited in relation to the underlying breach." *Qualcomm II*, 548 F.3d at 1026.  In the SSO context, unenforceability remedies must be limited to the relevant standards.  *See id.* at 1026.

The '151 patent was incorporated into the GPRS standard as a result of Nokia's nondisclosure.  Accordingly, the Court FINDS that Conversant has implicitly waived its rights to enforce the '151 patent against products practicing the GPRS standard.

## IV.  Conclusion

The Court GRANTS Apple's motion for unenforceability.  The Court FINDS that Conversant has implicitly waived its rights to enforce the '151 patent and its continuations, continuations-in-part, divisions, reissues, or any other derivatives of the '151 patent against products practicing the GPRS standard, including the accused Apple products.

**IT IS SO ORDERED.**

Dated:  May 10, 2019                            _____

NATHANAEL M. COUSINS
United States Magistrate Judge